IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA : 
 : 
v. : 
 : 
REMY RA ST FELIX : 1:23CR260-2

UNITED STATES' TRIAL BRIEF

NOW COMES the United States of America by and through Sandra J. Hairston, United States Attorney for the Middle District of North Carolina, and hereby files this trial brief, and states as follows:

I. STATEMENT OF FACT

It is anticipated that the United States' evidence at trial will establish the following:

Beginning in 2021, Jarod Gabriel Seemungal, a resident of South Florida, perpetrated a series of thefts from custodial cryptocurrency exchange accounts, including accounts at Coinbase and Block Fi. Seemungal conducted those heists with foreign co-conspirators known to Seemungal as "Neb" and "Aabis." They gained access to the account by SIM Swapping the exchange

1

customers.[1] In the summer of 2022, Seemungal, Neb, and Aabis agreed to a change in tactics. They devised a scheme to commit home invasions, detain individuals, extort access to cryptocurrency accounts (both custodial exchange accounts and self-hosted wallets), and steal the funds.[2]

Between 2022 and July 2023, Seemungal organized and co-funded home invasions to extort access to victim's cryptocurrency funds, which the conspirators would then steal. The Defendant, Remy St Felix, was recruited before the first home invasion and quickly emerged as the leader of the Florida-based home invasion crew, recruiting several of his associates for the conspiracy. Other conspirators included, among others, Ruben Matias Nicolopulos Silva, Nathan Noel Quintana, and Jesus Manuel Santiago.

---

[1] SIM-swapping is a type of account takeover fraud. Through different means, fraudsters port a victim's mobile phone number to a mobile device that they control. They then reset the password to the victim's target account (e.g., email, social media, custodial cryptocurrency exchange) using a two-factor authentication code sent to the compromised phone number. As a result, they gain control of the target account and, in the case of a custodial cryptocurrency exchange account, can often transfer funds.

[2]Accordingly, the wire fraud conspiracy charged in Count One began in February 2021 and continued to July 2023. The method by which the custodial exchange accounts were accessed changed, but the object of accessing the account as the rightful customer in order to request that funds be transferred from the account remained the same.

2

Between September 2022 and July 2023, St Felix, with others, invaded homes to rob individuals of cryptocurrency in Delray Beach, Florida; Homestead, Florida; and Durham, North Carolina. He made attempts, with others, in Little Elm, Texas; Ft. Lauderdale, Florida; and East Meadow, New York. St Felix was personally involved in each incident in some way.

Throughout the conspiracy, the conspirators communicated via the Telegram text messaging application to plan their crimes. For example, they identified targets and discussed how to gain entry to homes, the items required to carry out the crimes (e.g., rental cars, guns), the technical aspects of stealing cryptocurrency, and the life patterns of the targets. They also circulated pictures of their targets and their homes.

The conspirators primarily targeted victims who they believed had obtained a significant amount of cryptocurrency through criminal enterprises or who were cryptocurrency "investors," believed to have invested large sums in cryptocurrency.

One of the "investor" targets, provided by a co-conspirator known as "Galaxy," was Victim-8, a Durham, North Carolina, resident who held cryptocurrency in an account at the cryptocurrency exchange, Coinbase.

3

Case 1:23-cr-00260-WO   Document 89   Filed 06/13/24   Page 3 of 41

On April 8, 2023, St Felix and Elmer Ruben Castro traveled from South Florida to Durham in a rental car obtained by Nicolopulos. Over the next several days, they surveilled Victim-8's residence, spending nights at a hotel in Durham. On April 11, 2023, they went to Walmart and Castro purchased several items, including a clip board and a reflective vest.

On April 12, 2023, at approximately 7:30 am, St Felix and Castro, dressed as workers wearing reflective clothing, knocked on Victim-8's door. Victim-8's wife answered. The men, both armed with handguns and wearing masks, entered the home. Hearing his wife scream, Victim-8 came to the kitchen and saw one of the men fighting with her. The other man punched Victim-8 in the face. The men zip-tied the victims' hands and feet and separated them. During the home invasion, the men threatened Victim-8 and his wife.

St Felix forced Victim-8 upstairs to a loft office. He asked Victim-8 about his Coinbase cryptocurrency exchange account and continued to threaten him. At gunpoint, Victim-8 accessed his desktop computer. St Felix contacted Seemungal and others by Telegram audio call. St Felix downloaded AnyDesk remote desktop software to Victim-8's computer.

4

Seemungal, who was in Florida, remotely accessed Victim-8's computer and made three cryptocurrency transfers out of Victim-8's Coinbase account to an account controlled by Seemungal, Aabis, Neb, and Galaxy. To do so, St Felix provided Seemungal multi-factor authentication pins sent to Victim-8's phone. A fourth transfer was attempted but blocked by Coinbase. Before each of the transfers, Seemungal used Coinbase to exchange various cryptocurrency coins into bitcoin and ether, common types of virtual currency.

St Felix and Castro placed Victim-8 and his wife, zip-tied, in a bathroom. They destroyed their phones and Victim-8's computer, and then left.

Galaxy was entitled to half of the stolen funds by prior agreement. Seemungal attempted to launder the other half through a foreign cryptocurrency instant exchange (VCE) by converting them into Monero (XMR), an anonymity-enhanced cryptocurrency.[3] Using VCE again, Seemungal converted a portion of the funds out of XMR to Ether. He then swapped the Ether funds for USDC, a stablecoin pegged to the U.S. dollar.

---

[3] Monero is an anonymity-enhanced cryptocurrency, sometimes called "privacy coins," are cryptocurrencies that preserve anonymity by obscuring the flow of money across their networks. They make it difficult to work out who sent what to whom.

5

Finally, Seemungal sent both St Felix and Castro exactly $22,267.65 worth of cryptocurrency at their Coinbase accounts, approximately 15% of the proceeds each.

FBI personnel were able to trace Victim-8's stolen funds from his Coinbase account to VCE. They provided VCE with the cryptocurrency transaction information associated with the movement of Victim-8's funds to VCE. In turn, VCE provided records grouped by session revealing the above-described transactions into XMR and then from XMR to Ether. FBI was then able to trace the funds from the identified Ether account to the Coinbase accounts of St Felix and Castro.

On the morning of July 27, 2023, officers arrested St Felix in the parking lot of a McDonald's in West Hempstead, New York. Prior to the arrest, they saw St Felix seated in a vehicle by himself, holding his cell phone. Officers recovered a handgun at St Felix's feet and an AR-style rifle and zip-ties from the back cargo area of the vehicle.

A review of St Felix's phone revealed multiple Telegram text messages plotting to steal cryptocurrency by home invasion. For example, a Telegram thread between St Felix and Neb included detailed discussion of the home

6

invasion of Victim-8 and revealed that St Felix had traveled from Florida to New York to attempt a home invasion of a New York resident, Victim-10. In the chat, St Felix and Neb discussed a plan to home invade Victim-10 and access his Coinbase account, including by using Victim-10's child as "leverage."

FBI also located multiple images of evidentiary value on St Felix's phone, including a picture of him the night before the robbery of Victim-8 wearing his robbery outfit and images related to other home invasions. FBI obtained similar evidence from St Felix's Google account, such as an image of Victim-8's license and images related to his cryptocurrency holdings.

## II.    LEGAL ISSUES

### A. <u>Expert Witness Testimony</u>

The United States intends to call expert witnesses to testify in the areas of digital forensic examination, cryptocurrency and cryptocurrency tracing, and historical cellular location data and mapping.

The admissibility of expert testimony is governed by Fed. R. Evid. 702. Federal Rule of Evidence 702(1) requires that an expert have "specialized knowledge [that] will assist the trier of fact"; (2) that the expert be qualified to testify because of "knowledge, skill, experience, training or education"; (3) that

the witness base his testimony upon "sufficient facts or data"; and (4) that the witness has used "reliable principles and methods" and "applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702.

In applying this rule, a court determines whether the proffered expert testimony involves specialized knowledge and whether the testimony will aid the jury to understand evidence or determine a fact at issue. *See Daubert v. Merrill Dow Pharms. Inc.*, 509 U.S. 579, 592 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (the trial court's gate-keeping function extends to all expert testimony). "The analysis must be a 'flexible one.'" *United States v. Prince-Oyibo*, 320 F.3d 494, 498 (4th Cir. 2003) (quoting *Daubert*, 509 U.S. at 594). "The touchstone of the rule is whether the testimony will assist the jury." *United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011). The experts identified by the United States have the specialized knowledge and skill required by Rule 702 and the subject matter of their testimony will aid and assist the jury in understanding the evidence. Further, the methods used by these experts have been recognized as reliable and their analyses were performed in a reliable manner.

8

B. <u>The Evidence on St Felix's Cell Phone</u>

The United States intends to admit evidence recovered from St Felix's cell phone, including photos, text messages and Telegram messages.

The United States intends to call witnesses responsible for seizing the phone from St Felix as well as the witness responsible for extracting the cell phone data from St Felix's phone. Federal Bureau of Investigation (FBI) Digital Forensic Examiner (DFE) Christian Isolda, who has been noticed as an expert,[4] will testify that he extracted information from St Felix's cell phone and reviewed the Cellebrite report parsing this information. He will identify certain images and messages as having been on St Felix's cell phone and will explain the meaning of different categories of information displayed by Cellebrite.

a. <u>The Six Telegram Threads From St Felix's Phone</u>

The United States plans to introduce one entire Telegram chat thread and portions of five additional threads from St Felix's phone. St Felix is a

---

[4] DFE Isolda has been noticed as an expert relating to digital forensic examination. The Fourth Circuit has previously opined that the extraction of information from a cell phone does not necessarily constitute expert testimony. *See United States v. Chavez-Lopez*, 767 F. App'x 431, 434 (4th Cir. 2019) (unpublished).

9

participant in each of the chat threads. Each thread relates to one or more aspects of the robbery and kidnapping conspiracies charged. In summary, the Telegram group chats include:

- A chat between St Felix and Neb discussing the home invasion of Victim-8 and planning other home invasions, particularly the home invasion of Victim-10;

- St Felix and his co-conspirators, including Seemungal and Neb, discussing the planned home invasion of Victim-10;

- St Felix and numerous co-conspirators discussing the planned home invasion of A.D. While doing so, they reference the home invasions of Victim-1 (Delray Beach) and Victim-6 (Little Elm);

- Nicolopulos sending St Felix pictures of two of the Little Elm victims during the home invasion;

- St Felix and numerous co-conspirators discussing the home invasion of Victim-6 (Little Elm). St Felix provides the group advice on how best to carry out the crime based on his surveillance.

- St Felix and his co-conspirators Santiago, Daily, and Nicolopulos, discussing a chain and pendant stolen from Victim-6 (Little Elm).

10

It is well established that evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Fed. R. Evid. 401. Each of the Telegram chats is relevant to St Felix's involvement in the charged criminal conspiracy. Further, the content of the chats themselves establishes the existence of a conspiracy to commit the crimes charged.

C. The United States Intends To Admit Self-Authenticating Records Pursuant to Fed. R. Evid. 902.

Under Fed. R. Evid. 902, certain categories of records are self-authenticating and "require no extrinsic evidence of authenticity in order to be admitted." The United States intends to admit self-authenticating records pursuant to Fed. R. Evid. 902(11), and 902(13), as well as 18 U.S.C. § 3505, described further below.

Fed. R. Evid. 902(11) provides for the authentication of "Certified Domestic Records of a Regularly Conducted Activity." The records must satisfy the business records requirements set forth in Fed. R. Evid. 803(6)(A)-(C). Rule 803(6) provides that business records are admissible if they are accompanied by a certification of their custodian or other qualified person that satisfies three

11

requirements: (A) that the records were "made at or near the time by—or from information transmitted by—someone with knowledge"; (B) that they were "kept in the course of a regularly conducted activity of a business"; and (C) that "making the record was a regular practice of that activity." *Id.* 18 U.S.C. § 3505 provides a parallel mechanism for authenticating foreign records of regularly conducted activity where an appropriate certification has been obtained.

The Federal Rules of Evidence were amended in 2017 to add Rule 902(13) and 902(14), which allow the use of a certification to authenticate certain electronic evidence. Fed. R. Evid. 902(13) addresses the authentication of "a record generated by an electronic process or system that produces an accurate result, as shown by a certification of a qualified person that complies with the certification requirements of Rule 902(11) or (12)." Just as business records are certified by Fed. R. Evid. 902(11), an electronic record is also deemed to be self-authenticating and requires no extrinsic evidence of authenticity for it to be admitted into evidence, as long as there is a "certification of a qualified person" that is consistent with the requirements of Rule 902. See Fed. R. Evid. 902(13) (2017 amendment).

12

Rule 902(11) directs the party intending to offer a record into evidence pursuant to the rule to provide notice and to make the records and certifications available to the opposing party. Rule 902(13) incorporates the notice provisions of Rule 902(11). The United States has satisfied the requirement of "reasonable written notice" of the United States' intent to admit the below-described records. Specifically, on May 29, 2024, the United States advised defense counsel in writing that the United States intended to admit certified business records at trial, including affidavits/certifications from Google, Verizon, AT&T, T-Mobile, and Wells Fargo. The United States then formally provided written notice to defense counsel for St Felix on June 6, 2024, of its intent to introduce records by certification under Federal Rules of Evidence 902(11) and/or 902(13) for business records provided by AT&T, T-Mobile, Verizon, Google, and Wells Fargo, and that the relevant certifications had been provided. To date, there has been no objection from St Felix. Accordingly, the United States submits that it has made a prima facie showing that the records are authentic pursuant to Federal Rule of Evidence 902, such that the United States need not call witnesses at trial merely to establish the authenticity of the records.

13

To the extent that St Felix argues that these certifications violate his Sixth Amendment right to confront witnesses against him, he is wrong. The Fourth Circuit specifically ruled in *United States v. Hassan*, 742 F.3d 104, 133 n.25 (4th Cir. 2014) that such certifications may have been prepared for trial but were not testimonial so as to violate the Supreme Court's ruling in *Crawford v. Washington*, 541 U.S. 36 (2004). Specifically, the court stated, "It would make no sense to require a records custodian to contemporaneously execute an affidavit attesting to the accuracy of a business record each time one is created or maintained, when there is no pending litigation or need for such a certification." *See Hassan*, 742 F.3d at 133 n.25.

Likewise, sister circuit courts have held that authenticating 902(11) statements are not testimonial. *See United States v. Yeley-Davis*, 632 F.3d 673 (10th Cir. 2011) (stating that "[b]ecause the purpose of the certifications here was merely to authenticate the cell phone records—and not to establish or prove some fact at trial . . . they are not testimonial"); *United States v. Ellis*, 460 F.3d 920, 927 (7th Cir. 2006) ("the written certification . . . is nontestimonial [because it is] too far removed from the 'principal evil at which the Confrontation Clause was directed' to be considered testimonial." (quoting

14

*Crawford*, 541 U.S. at 50)); *United States v. Weiland*, 420 F.3d 1062, 1077 (9th Cir. 2005) (holding that "a routine certification by the custodian of a domestic public record . . . and a routine attestation to authority and signature . . . are not testimonial in nature") (citation omitted). *See also United States v. Anekwu*, 695 F.3d 967, (9th Cir. 2012) (rejecting *Crawford* objection to self-authenticated foreign business records).

Therefore, the 902(11) and/or 902(13) certificates do not violate Davenport's right to confrontation and serve to authenticate certain records.

### a. Records from Overseas Cryptocurrency Exchange

The aforementioned cryptocurrency tracing will be the subject of testimony by noticed expert, FBI Computer Scientist (CS) Lindsey Chiesa and will be corroborated through witness testimony by Jarod Seemungal, who will explain that he conducted the VCE cryptocurrency transactions using the proceeds of the cryptocurrency stolen from Victim-8, part of which Seemungal then transferred to Castro and St Felix.

In January 2024, the United States transmitted a formal request through the government of the Seychelles for a records certification from VCE attesting to the authenticity of the records provided. The Seychelles authorities

15

are aware of the trial date and the United States hopes to receive the records certification prior to trial. If such certification is timely received, the United States intends to authenticate such records pursuant to 18 U.S.C. § 3505, which provides a parallel mechanism to Rule 902(11) for authenticating foreign records of regularly conducted activity where an appropriate certification has been obtained. *See* 18 U.S.C. § 3505.

In the event that the United States does not receive the expected VCE record certifications, the United States will use Fed R. Evid. 901(b)(4) as an alternate basis of authentication. Fed R. Evid. 901(b)(4) provides for authentication based on "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(4). Rule 901(b)(4) "is one of the most frequently used to authenticate e-mail and other electronic records." *Boshea v. Compass Mktg., Inc.*, No. CV ELH-21-309, 2023 WL 2743333, at *5 (D. Md. Mar. 31, 2023) (internal citations omitted). As courts have explained, "[a] party seeking to admit an exhibit need only make a prima facie showing that it is what he or she claims it to be. . . . "[t]his is not a particularly high barrier to overcome." *Id*. at *6. Indeed, the

16

> [t]he question for the court under Rule 901 is whether the proponent of the evidence has 'offered a foundation from which the jury could reasonably find that the evidence is what the proponent says it is ....' The Court need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the *jury* ultimately might do so.

*Id*. (internal quotation omitted) (emphasis in original).

In this case, the VCE records at issue are electronically generated reports of cryptocurrency exchange transactions conducted by Jarod Seemungal in an attempt to launder the origin of the cryptocurrency stolen from Victim-8. The information in the records, grouped by session, includes information about each cryptocurrency exchange transaction, including the VCE Order ID, the receiving cryptocurrency address, the original currency and the currency to which it was converted, the time that the exchange was initiated, and the respective values in the original and exchanged currency.

The authenticity of the VCE records will be established by the testimony of both CS Chiesa and Seemungal. CS Chiesa's testimony will explain how her tracing of the funds from Victim-8's Coinbase account led to cryptocurrency addresses from which the funds were sent to VCE.

For the transfers into VCE, the time, cryptocurrency type and amount, the receiving cryptocurrency address detailed in the VCE transaction records

17

are independently corroborated by CS Chiesa through use of blockchain explorer tools.

The United States expects Seemungal to credibly testify that he exchanged the approximate amount of the identified form of cryptocurrency to the identified form of cryptocurrency at the approximate times set forth in the VCE records. Specifically, Seemungal will explain how he converted the Ether and Bitcoin funds to XMR, and then transferred a portion of the funds back to Ether to convert to USDC and send to Castro and St Felix.

The authenticity of the VCE records is further corroborated by the Ether address to which the exchanged funds were sent. The VCE records reflect this address. CS Chiesa was able to independently trace the path of the $22,267.65 in USDC received both by Castro and St Felix's Coinbase accounts, respectively, back to the same transaction involving the same receiving cryptocurrency address.

18

Accordingly, the United States will provide a sufficient foundation from which the jury could reasonably find that the evidence is what it is claimed to be.[5]

D. Expert Testimony May Rely on VCE Records Not In Evidence.

The expert witnesses noticed by the United States include FBI CS Lindsey Chiesa. DE # 79. The United States expects that CS Chiesa's expert testimony tracing the movement of Victim-8's funds to VCE and to the accounts of St Felix and Castro will rely in part on records provided by VCE. For the reasons set forth above, the United States believes that all the records relied upon can be entered as admissible evidence.

However, regardless of whether the underlying records are entered into evidence, CS Chiesa may rely in part upon VCE records to form her expert opinion. Pursuant to Federal Rule of Evidence 703, "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on

---

[5] Because the VCE records are machine-generated data, the sole issue is the authenticity of the records, and there is no potential hearsay problem. The raw data provided in the VCE reports do not constitute "statements" and the machines are not "declarants." *See United States v. Washington*, 498 F.3d 225, 231 (4th Cir. 2007).

19

those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703; *see also United States v. Johnson*, 587 F.3d 625, 635 (4th Cir. 2009) ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.").

In this case, the United States expects that CS Chiesa will establish that those involved in cryptocurrency tracing would reasonably rely in part upon records provided to law enforcement by a cryptocurrency exchange such as VCE, especially, that experts such as CS Chiesa know such information to accurately reflect the transaction records held by those companies even absent a sworn certification, that such information is regularly relied upon by cryptocurrency experts in law enforcement, and that such information is even more reliable where, as here, parts can be separately corroborated by outside evidence such as witness reports and public blockchain explorers.

Indeed, an expert witness's reliance on otherwise inadmissible evidence "only becomes a problem where the witness is used as little more than a conduit or transmitter for testimonial hearsay, rather than as a true expert whose

20

considered opinion sheds light on some specialized factual situation." *Johnson*, 587 F.3d at 635. CS Chiesa's expert opinion, which fashions an informed opinion as to the flow of proceeds based on multiple sources, does more than simply transmit VCE information. Indeed, in significant part, the VCE records merely corroborate CS Chiesa's analysis, Victim-8's stolen funds were sent to VCE and the funds deposited into St Felix and Castro's Coinbase accounts were sent from VCE.

Finally, any concern about CS Chiesa's reliance on uncertified VCE records can be substantially addressed by St Felix's opportunity to test CS Chiesa's "honesty, proficiency, and methodology" through cross-examination. *Id.* at 636.

E. <u>The United States' Coinbase Summary Exhibits Are Admissible.</u>

Federal Rule of Evidence 1006 provides that, "[t]he proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006. Summary charts under Fed. R. Evid. 1006 are permissible where: (1) the documents are so voluminous as to make comprehension difficult and inconvenient (though not necessarily impossible); (2) the documents

themselves are admissible; (3) the chart is reasonably available for inspection and copying; (4) the chart is accurate and non-prejudicial; and (5) the witness who prepared the chart is available to lay an appropriate foundation. *See United States v. Hemphill*, 514 F.3d 1350, 1358-59 (D.C. Cir. 2008).

The United States anticipates introducing summary charts to aid the jury. Certain evidence in this case, such as the tens of thousands of lines of Coinbase records in multiple Excel spreadsheets detailing complex transactional information, would be cumbersome to navigate and difficult for the jury to read in their native format. Such evidence falls within the category of records too voluminous to be conveniently examined in court.

Charts of these records will summarize relevant information from the Coinbase records. The United States' charts will fairly and accurately summarize otherwise admissible documents, without using inflammatory and prejudicial wording, that are too voluminous to be easily or conveniently examined by the jury. The United States will ask the Court to instruct the jury that the charts are being admitted solely for the jury's convenience and are valid only to the extent they accurately reflect the underlying evidence and

22

that if the summary evidence does not correctly reflect the facts proved at trial, the jury should give the summary evidence only such weight as it deserves.

For example, Coinbase records for Victim-8 alone are comprised of several images and a spreadsheet with over 30,000 rows. The summary document does not summarize all that information, but instead highlights relevant account subscriber information and certain transactions related to the Durham home invasion that would otherwise be cumbersome to present. In addition to Victim-8's records, the United States intends to introduce Coinbase records relating to a victim of the Homestead, Florida, home invasion, as well as Coinbase records relating to two of St Felix's Coinbase accounts as well as Coinbase accounts associated with St Felix's co-conspirators Elmer Castro, Jarod Seemungal, Ruben Nicolopulos, Nathan Quintana, Jesus Santiago, Haisel Daily, and Jose Avila. Accordingly, the United States intends to use summary exhibits to display relevant information like account subscriber information or relevant cryptocurrency transactions, such as the transaction in St Felix's Coinbase account receiving the proceeds of the Durham cryptocurrency robbery.

23

The United States has provided a copy of the summary charts to defense counsel in accordance with Fed R. Evid. 1006. *See* Fed R. Evid. 1006 ("The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.").

F. <u>All Statements By St Felix's Co-Conspirators in Furtherance of their Home Invasion Scheme Do Not Constitute Hearsay.</u>

Federal Rule of Evidence 801(d)(2)(E) provides that an out-of-court statement "made by the party's coconspirator during and in furtherance of the conspiracy" does not constitute hearsay and is thus admissible. To admit a co-conspirator's statements under Federal Rule of Evidence 801(d)(2)(E), the United States must show by a preponderance of the evidence that "(1) a conspiracy existed, (2) the conspiracy included both the declarants and the defendants against whom the statements were offered, and (3) the statements were made during the course of and in furtherance of the conspiracy." *United States v. Mathis*, 932 F.3d 242, 254 (4th Cir. 2019) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)); *see also United States v. Smith*, 441 F.3d 254, 261 (4th Cir. 2006). Statements in furtherance of a conspiracy include not only planning and coordination of events in furtherance of the conspiracy, but also

24

statements informing each other as to the progress or status of the conspiracy. *Mathis*, 932 F.3d at 254. "A particular statement may be found to be 'in furtherance' of the conspiracy even though it is 'susceptible of alternative interpretations' and was not 'exclusively, or even primarily, made to further the conspiracy,' so long as there is 'some reasonable basis' for concluding that it was designed to further the conspiracy." *United States v. Shores*, 33 F.3d 438, 444 (4th Cir. 1994).

Indeed, "[m]ost courts, including the Fourth Circuit, construe the 'in furtherance' requirement so broadly that even casual relationships to the conspiracy suffice to satisfy the exception [to the hearsay rule]." *Smith*, 441 F.3d at 262 (internal quotation and citation omitted). While the statements of co-conspirators in furtherance of a conspiracy were distinguished from inadmissible "idle conversation" in *United States v. Urbanik*, 801 F.2d 692, 695-98 (4th Cir. 1986), this exception to the exception has been narrowly construed. *See United States v. Graham*, 711 F.3d 445, 452-53 (4th Cir 2013) (rejecting defendant's contention that telephone conversation about his past debt for marihuana was inadmissible "idle chatter"); *United States v. Howard*,

25

115 F.3d 1151, 1156 (4th Cir. 1997) (rejecting defendant's contention that conversations in jail with his nephew were inadmissible "idle chatter").

Here, the United States intends to present at trial numerous statements made in Telegram chats by St Felix's co-conspirators in furtherance of the conspiracy, from discussions about planning the home invasions, including targets, rental cars, firearms and surveillance efforts, to reporting on the status of recent home invasions and the distribution of stolen proceeds.

The United States further intends to elicit at trial additional statements from St Felix's co-conspirators relating to statements made to them by other co-conspirators in furtherance of the cryptocurrency home invasion scheme.[6]

To the extent St Felix would argue that admission of these statements violates his right to confrontation under the Sixth Amendment, the Fourth Circuit has squarely rejected that argument. Specifically, in *Mathis*, the Court noted that the

> defendants made the challenged statements to co-conspirators . . . about criminal activities related to the DNGS criminal enterprise.

---

[6] While the Superseding Indictment charges three counts of conspiracy with different objects (wire fraud, kidnapping, and Hobbs Act Robbery), the charges all arise from the same home invasion scheme. Accordingly, all statements in furtherance of the co-conspirators home invasion activity properly furthered each of the alleged conspiracies.

26

Moreover, all the statements were made in furtherance of that criminal conspiracy and were not intended to be used as a substitute for trial testimony. Accordingly, the admission of the challenged statements did not violate the defendants' rights under the Confrontation Clause.

932 F.3d at 255–56 (citing *United States v. Jordan*, 509 F.3d 191, 194, 201 (4th Cir. 2007)).

Accordingly, these co-conspirator statements are admissible as statements in furtherance of the conspiracy.

G. <u>The Court Should Permit The Use of Transcripts to Aid in the Presentation of Video Evidence.</u>

The United States anticipates that during its case in chief it will introduce a recorded video conversation between St Felix and Seemungal. For that video, the United States seeks to submit a transcript of the video to aid the jury in listening to the content of the video. The United States will not seek to send the transcripts back to the jury room during jury deliberations and will seek jury instructions clarifying that the jury's recollection of the video recording controls as the critical piece of evidence. *See United States v. Bell*, 711 F. App'x 702, 705 (4th Cir. 2017) (unpublished) (citing cases).

27

H. The Extortion Videos St Felix Made of One of His Victims Are Admissible and Statements the Victim Makes Are Not Hearsay.

Rule 803(1) creates an exception for hearsay statements "describing or explaining an event or condition, made while or immediately after the declarant perceived it," also known as "present sense impressions." Fed. R. Evid. 803(1).

Likewise, Rule 803(2) creates an "excited utterance" exception for hearsay statements "relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Fed. R. Evid. 803(2). To qualify under the excited utterance exception, (1) the declarant must have "experienced a startling event or condition"; (2) she must have related the statement "while under the stress or excitement of that event or condition, not from reflection"; and (3) the statement or utterance must have "related[ed] to the startling event or condition." *United States v. Jennings*, 496 F.3d 344, 349 (4th Cir. 2007) (quoting *Morgan v. Foretich*, 846 F.2d 941, 947 (4th Cir. 1988)).

The United States intends to admit five videos that St Felix and his co-conspirators forcibly taped of Victim-3, the target of the Homestead, Florida, cryptocurrency home invasion. Specifically, the co-conspirators planned and executed a home invasion of Victim-3 with the intent to extort access to his

28

cryptocurrency accounts, detain the individuals inside the home at gunpoint, and rob Victim-3 of funds in his cryptocurrency. Once the co-conspirators learned that Victim-3 did not have the expected funds in his cryptocurrency accounts, they took him hostage at gunpoint, tying his hands and forcing him into a vehicle where he was recorded in at least five videos pleading for individuals to send cryptocurrency to the perpetrators in exchange for his release.

The videos at issue were made at threat of gunpoint and physical beating; several of the videos depict one or two firearms pressed against the speaker's neck. In one of the videos, the speaker is being beaten. The speaker has visible wounds on his face and is bleeding from his mouth.

Most of the statements on the video will not be introduced for the truth of the matter asserted, but instead for the state of mind of the speaker and the effect of the statements on the listeners. But each of the statements recorded on the short hostage videos may also be introduced for its truth. Specifically, the speaker in the videos was subject to a startling condition—his abduction at gunpoint. He also made the statements while under the stress of that

29

present condition, and his comments related to his abduction.[7]  *See United States v. Jackson*, 124 F.3d 607, 618 (4th Cir. 1997) (affirming admission of statements that the defendant was threatening to shoot family under the present sense impression and excited utterance exceptions because the event was both startling and ongoing); *see also United States v. Lundy*, 83 F.4th 615, 619 (6th Cir. 2023) ("not a close call" that statement made after having gun pointed at face fell within excited utterance exception).

I.  <u>The United States May Introduce Evidence of Other Acts.</u>

Under Federal Rule of Evidence 404(b), evidence of other acts "is not admissible to prove the character of a person in order to show action in conformity therewith." However, evidence of other acts is "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident . . . ." *Id.* Rule 404(b) is a rule of inclusion. *United States v. Briley*, 770 F.3d 267, 275 (4th Cir. 2014). "[T]he Rule's inclusive nature militates toward admitting all evidence of other

---

[7] The records in the video should also fall under the residual hearsay exception because of all the other indicia of reliability. Fed. R. Evid. 807(a).

30

crimes or acts except that which tends to prove only criminal disposition." *Id.* (internal quotations omitted).

"[A]cts that are a part of, or intrinsic to, the alleged crime do not fall under Rule 404(b)'s limitations on admissible evidence." *United States v. Brizuela*, 962 F.3d 784, 793 (4th Cir. 2020) (internal quotation marks omitted). "Evidence of other bad acts is intrinsic if, among other things, it involves the same series of transactions as the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Foster*, No. 21-4437, 2022 WL 4354340, at *2 (4th Cir. Sept. 20, 2022) (internal quotation omitted).

### a. Evidence that Defendant Was Incarcerated

The United States expects to elicit testimony from one of its witnesses, Nathan Quintana, that while he met St Felix in high school, they became close when they were cellmates in prison just prior to the start of the conspiracy. It is this relationship that resulted in St Felix becoming involved in the conspiracy. Accordingly, the fact that St Felix was incarcerated with Quintana is intrinsic to this case in that it is necessary to show knowledge and identity and "complete the story of the crime on trial." Accordingly, testimony relating to St Felix's past history in prison is admissible under Rule 404(b)(2). The

31

United States does not intend to elicit testimony related to the reason why St Felix was in prison at that time and has proposed a limiting instruction about how that information may be considered by the jury.

      b. <u>Evidence that St Felix and his Co-Conspirators Were Involved in Other Crimes</u>

The Telegram chats between St Felix and his co-conspirators contain intertwined references to other crimes, such as a check fraud scheme. The United States does not intend to focus on any such references or elicit testimony related to any check fraud activity and will redact references thereto to the extent reasonable. The United States intends to submit a jury instruction on other acts to clarify that the jury may not consider any such evidence relating to time in jail for the purpose of showing St Felix's character or any propensity to violate the law.

J. <u>The United States May Introduce Testimony With the Aid of An Interpreter.</u>

Pursuant to Federal Rule of Evidence 604, witnesses may testify through the use of an interpreter, provided that the "interpreter must be qualified and must give an oath or affirmation to make a true translation." Fed. R. Evid. 604. "In addressing an interpreter's fitness, 'the fundamental question is normally

32

one of qualification, not of veracity or fidelity. In the absence of special circumstances, the latter qualities are assumed.'" *United States v. Ballesteros*, 603 F. App'x 216, 217 (4th Cir. 2015) (unpublished).

The United States expects that one of its witnesses, A.B., will require a qualified Spanish-language interpreter. Pursuant to the Federal Rules of Evidence, the witness should be permitted to use the requested interpreter.

K. <u>The United States Intends to Seek Forfeiture of St Felix's Criminal Proceeds from the Durham Robbery.</u>

In the event St Felix is found guilty of one or more of the offenses set forth in Counts One through Eight of the Superseding Indictment, the United States seeks forfeiture pursuant to Title 18, United States Code, Section 981, which provides, in relevant part:

> (a) (1)    The following property is subject to forfeiture to the United States:
>
>         . . .
>
> (C)    Any property, real or personal, which constitutes or is derived from proceeds traceable to the violation…, or any offense constituting "specific unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

33

All of the offenses charged in Counts One through Eight of the Superseding Indictment constitute "specified unlawful activity" pursuant to Title 18, United States Code, Sections 1956(c)(7)(A)(incorporating violations listed in 1961(1) of the title) or 1956(c)(7)(D).

The property subject to forfeiture, as alleged in the Superseding Indictment and the Bill of Particulars, includes the following:

1. A money judgment in an amount representing the proceeds derived from the commission of such offense; and

2. A yellow chain and medallion seized on or about July 27, 2023, from the defendant, REMY RA ST FELIX.

The forfeiture issues will not be considered until and unless the jury returns a guilty verdict on one or more counts giving rise to the forfeiture. *See* Rule 32.2(b)(1). In that event, the court must determine what property is subject to forfeiture. Rule 32.2(b)(1)(A). The court's determination may be based on evidence already in the record and on any additional evidence or information submitted by the parties. Rule 32.2(b)(1)(B). The Rules of Evidence do not apply in the forfeiture phase of the trial, and the court may rely on evidence or information that is "relevant and reliable." Rule 32.2

34

(b)(1)(B); and s*ee United States v. Ali*, 619 F.3d 713, 720 (7th Cir. 2010) (because forfeiture is part of sentencing, less stringent evidentiary standards apply in the forfeiture phase of the trial; the evidence need only be reliable); *United States v. Capoccia*, 503 F.3d 103, 109 (2d Cir. 2007) (Rule 32.2(b)(1) allows the court to consider evidence or information, making it clear that the court may consider hearsay; this is consistent with forfeiture being part of the sentencing process where hearsay is admissible).

The United States' burden is to establish the forfeitability of property by a preponderance of the evidence. *See United States v. Martin*, 662 F.3d 301, 307 (4th Cir. 2011) ("the government must establish a nexus between the property for which it is seeking forfeiture and the crime by a preponderance of the evidence"); *United States v. Prather*, 456 F. App'x 622, 625 (8th Cir. 2012) (unpublished) ("The burden is on the Government to prove by a preponderance of the evidence the amount of the proceeds that should be subject to a personal money judgment").

Generally, the forfeiture determination is made by the court, not the jury. *See* Rule 32.2(b)(1)(A). The rule, however, gives St Felix and the United States a limited right to have the jury retained to determine forfeiture to the

35

extent that the United States seeks to forfeit specific property. Rule 32.2(b)(5). The rule directs the court to "determine before the jury begins deliberating whether either party requests that the jury retained to determine the forfeitability of specific property if it returns a guilty verdict." Rule 32.2(b)(5)(A). The purpose of that provision, which was added to Rule 32.2 in 2009, is to avoid an inadvertent waiver of the right to jury determination and to allow the court and jurors to plan their calendars. *See* Advisory Committee Note to 2009 Amendment to Subdivision (b)(5)(A). The Notes also suggest that "it is desirable, when possible, to make the request earlier, at the time the jury is empaneled." *Id.* If St Felix fails to make a timely request to have the jury retained, his right to do so is waived. *See United States v. Nichols*, 429 F. App'x 355, 356 (4th Cir. 2011) (unpublished) (per curiam) ("[A]lthough a defendant has a right to have a jury decide a forfeiture issue, the defendant must affirmatively assert that right," citing Rule 32.2(B)(5)). Accordingly, the United States respectfully requests that the court inquire of St Felix, at the time the jury is empaneled, whether the Defendant will be invoking his limited right under Rule 32.2(b)(5) to have the jury retained.

36

Upon conviction of St Felix, the United States will be prepared to establish the forfeitability of the listed property by a preponderance of the evidence. After presenting any additional evidence it deems necessary, the United States will ask the court to enter a money judgment in an amount to be determined based on the evidence. In addition, the United States will ask that the Court, or the jury, if the Defendant has so elected, decide if the jewelry seized from the Defendant should be forfeited.

L. <u>Offenses Elements</u>

a. <u>Hobbs Act Robbery—Movement in Commerce</u>

The Superseding Indictment charges Hobbs Act Robbery Conspiracy (Count Three) and Hobbs Act Robbery (Count Eight). An element of Hobbs Act Robbery is showing that the robbery obstructed, delayed, or affected commerce or the movement of any article or commodity in commerce. *See* 18 U.S.C. § 1951(a).

In this case, the successful cryptocurrency robbery of Victim-8, the cryptocurrency funds were stolen from the custody of Coinbase, a cryptocurrency company that does business in interstate and foreign commerce. Further, the object of each home invasion was the robbery of cryptocurrency by using the Internet to move the victims' cryptocurrency in

commerce over the blockchain[1] from the accounts of the home invasion targets to the accounts controlled by Seemungal, Neb and Aabis. The robbery also included the conversion of various cryptocurrency coins into more common types of cryptocurrency. Notably, each currency conversion and account transaction incurred costs from Coinbase.

   b. Kidnapping—Appreciable Period

The Superseding Indictment charges Kidnapping Conspiracy (Count Two) and Kidnapping (Count Seven). One of the elements of kidnapping is that a defendant holds a person for ransom or reward or other reason. *See* 1201(a).

The proposed jury instructions for kidnapping include the instruction that "[t]he holding need only be for an 'appreciable period of time,' meaning that the holding or detention must be separate and distinct from the kidnapping or seizure. In other words, the United States must prove that the Defendant interfered with, and exercised control over, the victim's actions for some period of time."

The United States proposed this instruction based on the Supreme Court's guidance that "the act of holding a kidnapped person for a proscribed purpose necessarily implies an unlawful physical or mental restraint for an appreciable period against the person's will and with a willful intent so to

---

[1] The blockchain is essentially an internet-enabled financial system for virtual assets.

confine the victim." *Chatwin v. United States*, 326 U.S. 455, 460 (1946). The Fourth Circuit has further explained that the "'holding' or 'detention' element is separate and distinct from the 'kidnapping' or 'seizure' element[.]" *United States v. Lentz*, 383 F.3d 191, 204 (4th Cir. 2004). However, the appreciable amount of time that a kidnapped victim is held against their will may be a brief time period. *United States v. Lewis*, 662 F.2d 1087, 1088–89 (4th Cir. 1981).

In this case, each home invasion involved kidnappings for an "appreciable period," beyond a brief transitory seizure, holding the targets of the cryptocurrency home invasions against their will at gunpoint as well the as the other people present during the home invasions. In several kidnappings, including the Durham home invasion, the victims were not only held at gunpoint but also zip-tied by the kidnappers and left bound in their homes.

M. <u>Voir Dire Should Include A Question on Cryptocurrency.</u>

The United States respectfully requests that in addition to the Court's standard voir dire questionnaire, voir dire also includes a question relating to cryptocurrency. Specifically, the United States proposes that the potential jurors be asked "Do you, or do any of your family members, own cryptocurrency?" Such information will assist in selecting the jury in this case, which involves a scheme to steal cryptocurrency.

3

This, the 13th day of June, 2024.

SANDRA J. HAIRSTON
United States Attorney

/S/ ERIC L. IVERSON
Assistant United States Attorney
Middle District of North Carolina
NCSB No.: 46703
101 S. Edgeworth St., 4th Floor
Greensboro, NC  27401
Phone: 336/333-5351

/S/ BRIAN Z. MUND
Trial Attorney
CASB No.: 324699
United States Department of Justice
Computer Crime and Intellectual Property Section
Phone: 202/598-6205

## CERTIFICATE OF SERVICE

I hereby certify that on June 13, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Alan Doorasamy, Sr.

SANDRA J. HAIRSTON
United States Attorney

/S/ ERIC L. IVERSON
Assistant United States Attorney
Middle District of North Carolina
NCSB No.: 46703
101 S. Edgeworth St., 4th Floor
Greensboro, NC 27401
Phone: 336/333-5351