UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA


UNITED STATES DISTRICT COURT          ) 1:23CR260-2

v.                                    ) Greensboro

REMY RA ST. FELIX                     ) June 20, 2024



 TRANSCRIPT OF THE EXCERPTED TRIAL TESTIMONY OF JESUS SANTIAGO
              BEFORE THE HONORABLE WILLIAM OSTEEN
                UNITED STATES DISTRICT JUDGE

                        APPEARANCES:

FOR THE GOVERNMENT:

          ERIC L. IVERSON
          U.S. Attorney's Office
          Middle District of North Carolina
          101 South Edgeworth Street - Fourth Floor
          Greensboro, North Carolina  27401
          (336) 332-6302

          BRIAN MUND
          DOJ-CRM
          10th & Constitution Avenue, NW
          John C. Keeney Building - Suite 600
          Washington, DC  20530
          (202) 598-6205

FOR THE DEFENDANT:

          ALAN DOORASAMY, SR.
          Law Office of Alan Doorasamy, Sr.
          107 Westdale Avenue
          Winston-Salem, North Carolina  27101
          (336) 749-6412

COURT REPORTER:

          STACY HARLOW, RVR-M, CVR-M, CM, RBC, RCP
          Post Office Box 21471
          Winston-Salem, North Carolina  27120
Proceedings recorded by voice stenography realtime translation.
     Transcript produced by computer-aided transcription.

                              INDEX

                        EXAMINATION INDEX

                                                    Page


WITNESSES CALLED ON BEHALF OF THE GOVERNMENT:

JESUS SANTIAGO

          Direct Examination by Mr. Iverson        4

          Cross-Examination by Mr. Doorasamy        49

Case 1:23-cr-00260-WO    Document 114    Filed 08/11/24    Page 2 of 58

EXHIBIT INDEX

EXHIBIT      DESCRIPTION                OFFERED   ADMITTED

EXHIBITS OFFERED ON BEHALF OF THE GOVERNMENT:

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---------|-------------|---------|----------|
| 11 | Chain and pendant | 10 | 11 |
| 20A | Telegram Chats | 45 | 46 |
| 20B | Telegram Chats | 45 | 46 |
| 20C | Telegram Chats | 45 | 46 |
| 20D | Telegram Chats | 45 | 46 |
| 20E | Telegram Chats | 45 | 46 |
| 20F | Telegram Chats | 45 | 46 |
| 39 | Videos of Justin Abduction | 19 | 19 |
| 40 | Santiago Plea Agreement | 11 | 12 |
| 41 | Santiago Agreement w/Government | 14 | 14 |
| 42A | Photograph | 41 | 41 |
| 42B | Photograph | 41 | 41 |

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

P R O C E E D I N G S

(June 20, 2024.)

(Beginning of Excerpt.)

(JESUS SANTIAGO WAS SWORN.)

MR. IVERSON:  So if you'll adjust the microphone so that you're speaking into it.

THE WITNESS:  (Complies.)

Whereupon,

JESUS SANTIAGO

having been first duly cautioned and sworn, testified as follows:

DIRECT EXAMINATION

BY MR. IVERSON:

Q.   State your name.

A.   Jesus Santiago.

Q.   How old are you, Mr. Santiago?

A.   Twenty-three.

Q.   Where are you from?

A.   West Palm Beach, Florida.

MR. IVERSON:  Ms. Collins, will you depict -- or publish 24I?

BY MR. IVERSON:

Q.   Do you have a nickname?

A.   No.

Q.   Do you recognize that information?

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A. Yes.

Q. Is that from your Coinbase account?

A. Yes.

MR. IVERSON: Ms. Collins, 30A, please.

BY MR. IVERSON:

Q. Do you know who that is?

A. Yes.

Q. Who is it?

A. Me.

Q. Do you know Remy St. Felix?

A. Yes.

Q. How long have you known him?

A. Fourteen years.

Q. How do you know him?

A. Childhood friend.

Q. From, say, beginning of 2022 till the time you were incarcerated, how often did you see him?

A. Often.

Q. How many -- approximately how many times a week or a month?

A. Like probably twice a week.

Q. Do you know if he makes music?

A. Yeah.

Q. Does he have a name that he makes music under?

A. Yes.

Q.   What is it?

A.   Remgod.

Q.   Remgod?

A.   Yes.

Q.   Do you see him here today?

A.   Yes.

Q.   Can you identify him by an article of clothing he's wearing?

A.   A button-down shirt, blue.

Q.   Mr. Santiago, are you currently in jail?

A.   Yes.

Q.   What are you in jail for?

A.   Conspiracy to commit kidnapping.

Q.   What did that entail?  What'd you do?  What were the -- what was the -- what were the crimes?

A.   Kidnapping.

Q.   Was there any robbery involved with the kidnapping?

A.   Yes.

Q.   What were you guys trying to do?

A.   Home invade and steal Bitcoin.

Q.   Was Mr. St. Felix, the defendant, involved?

A.   Yes.

Q.   How so?  How?

A.   How?

Q.   Yeah.

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A.   He got groups together.

Q.   How'd you get involved in this?

A.   He asked me to be --

Q.   Who --

A.   -- part of it.

Q.   -- asked you?

A.   Remy.

Q.   Do you know if the defendant, Mr. St. Felix, participated in any home invasions?

A.   Yes.

Q.   What are some of those home invasions?

A.   Miami, Homestead, and North Carolina.

Q.   Do you remember the -- the targeted individuals?

A.   Homestead, it was Justin.

Q.   Okay.

A.   And I -- I don't know about North Carolina.

Q.   Do you know if any of the home invasions were successful in -- in stealing cryptocurrency?

A.   Yes.

Q.   Which ones or one?

A.   North Carolina.

Q.   Do you know if Remy received proceeds from that?

A.   Yes.

Q.   Did you talk to him about that?

A.   Yes.

Q. Do you know what he did with the proceeds?

A. Buy jewelry and travel.

Q. What type of jewelry?

A. Gold.

Q. Gold what?

A. A chain and a bracelet.

Q. Do you remember what the chain looked like?

A. It had a circle pendant and, like, a Cuban link style chain.

MR. IVERSON: Ms. Collins, will you display 35 -- actually, just wait a second.

BY MR. IVERSON:

Q. Do you know if he did the home invasion in Durham alone or with anyone else?

A. There was somebody with him.

Q. Who -- do you know who that is?

A. Yes.

Q. Who?

A. Elmer.

Q. Do you know Elmer?

A. Yes.

Q. How do you know Elmer?

A. We went to school together.

MR. IVERSON: Ms. Collins, will you display 35A? Start with A.

BY MR. IVERSON:

Q. Do you know who those individuals are?

A. Yes.

Q. Who?

A. Remy and Elmer.

Q. Who's bigger, Remy or Elmer?

A. Remy.

Q. How would you describe Elmer?

A. Short and slim.

MR. IVERSON: 35B, Ms. Collins.

BY MR. IVERSON:

Q. Who's that?

A. Remy.

Q. You recognize what he's holding up?

A. Yes.

Q. What is it?

A. A chain and a pendant.

Q. It's the one you described that he bought with the proceeds from the Durham home invasion?

A. Yes.

Q. I got in my hand what I've marked as Government's Exhibit 11 for identification.

Will you look at that?

A. (Complies.)

Q. Do you recognize that?

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A.   Yes.

Q.   What is it?

A.   The chain and the pendant.

Q.   The same one?

A.   Yes.

MR. IVERSON:  Your Honor, I'd offer Exhibit 10 into evidence.

(Government's Exhibit Number 11 was offered.)

THE COURT:  Same objection as before?

MR. DOORASAMY:  Yes, Your Honor.

THE COURT:  I'll overrule.  Government's Exhibit 10 is admitted.

BY MR. IVERSON:

Q.   Mr. Santiago, will you hold that up so -- just so the jury can see it?

MR. IVERSON:  Oh, I'm sorry.  I think that's 11.  Let me double check.

Ms. Collins says it's 11.  It's 11.  Let me go back and look and see what 10 is.

I'm sorry.  Ten was the zip ties and they're already in.

THE COURT:  Sorry, eleven.

MR. IVERSON:  Eleven; I misspoke.

THE COURT:  Government's Exhibit 11 is admitted.

(Government's Exhibit Number 11 was admitted and made

a part of the record of this proceeding.)

BY MR. IVERSON:

Q. Will you hold it up, Mr. Santiago?

A. (Complies.)

Q. Thank you.

Did you sign a plea agreement?

A. Yes.

Q. I'm going to hand you what's marked Exhibit 40 for identification. Take a look at that, including the last page.

A. (Complies.)

Q. Is that your plea agreement?

A. Yes.

Q. And I believe your testimony before is, you -- you pled guilty to conspiracy to commit kidnapping?

A. Yes.

MR. IVERSON: Offer Exhibit 40 into evidence.

(Government's Exhibit Number 40 was offered.)

MR. DOORASAMY: Same objections, Your Honor.

THE COURT: It's 40?

MR. IVERSON: Yes. Let me double check and make sure I've got this right, but I believe -- yeah, Mr. Santiago's plea agreement, which he's just identified as Exhibit --

MR. DOORASAMY: No objection to that.

THE COURT: All right.

Government's Exhibit 40 is admitted.

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

(Government's Exhibit Number 40 was admitted and made a part of the record of this proceeding.)

BY MR. IVERSON:

Q. Mr. Santiago, have you been sentenced?

A. No.

Q. How much prison time are you facing?

A. I don't know yet.

Q. Do you know what the statutory min and max are?

A. Yes.

Q. Is it zero to life?

A. Yes.

Q. Who will decide what sentence you receive?

A. The judge.

Q. Do you expect to serve prison time?

A. Yes.

Q. Are you aware that the Government can make a motion to the judge recommending a reduced sentence?

A. Yes.

Q. Are you hoping that occurs?

A. Yes.

Q. Has the Government made any promises to you, though, about asking the judge to reduce that sentence?

A. No.

Q. Did you sign an agreement with the Government?

A. Yes.

Q. Got in my hand 41. Do you recognize that?

A. Yes.

Q. Is that the agreement between you and the Government?

A. Yes.

Q. In that agreement, does the Government agree not to use any of your own statements against you?

A. Yes.

Q. What is that conditioned on?

A. If I tell the truth.

Q. So you have to tell the truth?

A. Yes.

Q. You mentioned the -- the defendant, Mr. St. Felix, is the one that got you involved in the home invasion scheme; is that accurate?

A. Yes.

Q. Can you explain how that happened, how the plan was presented to you?

A. It was a -- a Bitcoin heist, basically.

Q. Where was it going to take place, generally speaking.

A. Different locations. Wherever we got targets from.

Q. Do you know if there was a home invasion before you began participating?

A. Yes.

Q. Did you hear about it?

A. Yes.

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

Q.   What did Mr. St. Felix tell you about it?

A.   It didn't go as planned.

Q.   Do you know who the target was?

A.   No.

Q.   Did you know anything about the target?

A.   All I know is that they were old -- old folks.

Q.   Once you agreed to participate, who did you -- who did you target?

A.   Justin.

Q.   Justin?

A.   Yes.

MR. IVERSON:  Your Honor, I'd offer 41 into evidence. I neglected to do that.  It's the agreement between the Government and Mr. Santiago.

(Government's Exhibit Number 41 was offered.)

MR. DOORASAMY:  No objections.

THE COURT:  Forty-one's admitted.

(Government's Exhibit Number 41 was admitted and made a part of the record of this proceeding.)

BY MR. IVERSON:

Q.   Did you communicate with others involved about the -- the home invasion of Justin?

A.   Yes.

Q.   How'd you communicate with them?

A.   Telegram.

Q. In a group or -- or just one on one?

A. In a group.

Q. So you got added to that group at some point?

A. Yes.

Q. What were you told about Justin?

A. That he has a lot of Bitcoin.

Q. How much did you expect to steal?

A. 200,000 -- thousands.

Q. I'm going to direct your attention to the afternoon of September 15, 2022. Did you participate in a home invasion?

A. Yes.

Q. Describe what happened.

A. Waited till he got home, forced him inside and held some of his family in there too. And they ransacked the house. Found out there was nothing there, and then we -- they decided to bring him with us.

Q. Who decided that?

A. Remy.

Q. Who went into the house?

A. Me, Remy, and Nathan.

Q. Does Nathan have a nickname?

A. Yeah.

Q. Do you know?

A. Yeah.

Q. What is it?

A.   Kilo.

Q.   Were any of you armed?

A.   Yes.

Q.   Who?

A.   All of us.

Q.   What kind of weapon did you have?

A.   I had an AR.

Q.   An AR-style rifle?

A.   Yes.

Q.   What about Kilo and the defendant?

A.   They had pistols.

Q.   When you -- how'd you first encounter Justin?  I'm just asking how did you first come in -- into contact with Justin?  You -- I just want you to explain it a little bit more.  You referred to it before.

A.   Like, how did I first see him or where did I first see him?

Q.   Where'd -- where did you first see him on this day we're talking about?

A.   When he got out of his car.

Q.   Okay.

And then what happened?

A.   We forced him inside his house.

Q.   And once you're inside, do you see anyone else?

A.   Yes.

Q. Who do you see?

A. His dad and his sister.

Q. And what happens from there inside the house?

A. They took Justin to his room.

Q. Who took him to his room?

A. Remy and Kilo.

Q. What'd you do?

A. I held his sister and his dad in the living room.

Q. Why?

A. So they wouldn't call the police.

Q. Then what happened?

A. And they search in his room trying to make him give up the Bitcoin, but he said he didn't have any. So they decided to bring him with us.

Q. Were you back there with Kilo and the defendant in his room?

A. No.

Q. What did you hear?

A. Going through the room, I heard Justin scream a little bit and that's about it.

Q. Okay.

When they brought him out, was he detained in any way?

A. Yes.

Q. How?

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A.   His -- his hands were tied up with shoestrings.

Q.   In the front or in the back?

A.   In the back.

Q.   Then what happened?

A.   They took him to the car.

Q.   Who took him to the car?

A.   Remy and Kilo.

Q.   They take anything else from the house, that you're aware of?

A.   His computer and the camera system.

Q.   Why was the camera system taken?

A.   So it wouldn't be no trace.

Q.   What about the computer?

A.   To see if we can get inside his Bitcoin through the computer.

Q.   Do you know whether Justin had a phone?

A.   Yes.

Q.   Do you know what happened to that?

A.   Yes.

Q.   What happened to that?

A.   We got -- made him open his phone to go through his bank account and his Coinbase accounts to see if he had anything.  He didn't have anything.

Q.   When was that?

A.   In the car going north.

Q.   Okay.  We'll talk about that in a minute.

I want to show you Government's Exhibit 39.  I'm going to bring the laptop up to you and -- and show you two videos that are on that exhibit.

Do you recognize those?

A.   Yes.

Q.   You watched them before?

A.   Yes.

Q.   What do they show?

A.   Justin pulling up to his house and we pulling up behind him and forcing him inside.

Q.   Okay.

Is there also a video of you tak- -- you guys taking him out of the house?

A.   Yes.

MR. IVERSON:  I'd offer 39 into evidence.

(Government's Exhibit Number 39 was offered.)

MR. DOORASAMY:  No objections.

THE COURT:  Thirty-nine is admitted.

(Government's Exhibit Number 39 was admitted and made a part of the record of this proceeding.)

MR. IVERSON:  Ms. Collins, I know you're getting situated.  Bring up, when you get a chance, Video 1.  You can play to -- play to 35 seconds.

(Video starts playing.)

BY MR. IVERSON:

Q. You mentioned Justin had a yellow car, I believe; is that correct?

A. Yes.

Q. Is that the yellow car right there pulling into the driveway in the left side of the screen?

A. Yes.

MR. IVERSON: Okay. We can keep going. Stop at about 45 seconds if you would, Ms. Collins.

Right there.

(Video stops playing.)

BY MR. IVERSON:

Q. Can you read the date and the time at the top right of the screen?

A. September 15, 2022, 3:04.

Q. Sound about right?

A. Yeah.

MR. IVERSON: Keep playing, Ms. Collins. Just stop at 55 seconds in.

(Video is playing.)

BY MR. IVERSON:

Q. Do you recognize that black car pulling up?

A. Yes.

Q. Who's that getting out?

A. Nathan.

Q.   Kilo?

A.   Yes.

MR. IVERSON:  Keep playing, Ms. Collins.

(Video starts playing.)

MR. IVERSON:  Stop, Ms. Collins.

(Video stops playing.)

BY MR. IVERSON:

Q.   Who are those two individuals?

A.   Me and Remy.

Q.   Which one's you?

A.   In the green.

Q.   Were you guys wearing gloves?

A.   Yes.

Q.   Were you wearing masks?

A.   Yes.

Q.   Everyone?

A.   Yes.

Q.   What kind of sweatshirt is that green sweatshirt you're wearing?

A.   A Dolphins.

Q.   Dolphins?

A.   Yeah.

Q.   What's on the defendant's head there?

A.   A mask.

Q.   What color is it?

A. White.

Q. Do you remember what the fabric was like?

A. Not really. I want to say it was just thin.

Q. Thin?

A. Yeah.

Q. Okay.

MR. IVERSON: If you'll play the rest of this video.

(Video is playing.)

BY MR. IVERSON:

Q. Who was driving the car?

A. José.

Q. Does he got a nickname?

A. Yeah.

Q. What it is?

A. A gun.

Q. Huh?

A. A gun.

Q. I'm sorry. Does he -- does José have a nickname?

A. A nickname?

Q. Yeah.

A. Yeah.

Q. Do you remember what it is?

A. Scrappy.

MR. IVERSON: Ms. Collins, will you bring up 21E? It's already in evidence.

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

BY MR. IVERSON:

Q.   What did you say the defendant was wearing on his head?

A.   A mask.

Q.   What color?

A.   White.

MR. IVERSON:  21E.

BY MR. IVERSON:

Q.   Recognize that person?

A.   Yes.

Q.   Who is it?

A.   Remy.

MR. IVERSON:  Play the second video in Exhibit 39, Ms. Collins.

MR. DOORASAMY:  Your Honor, we object to the second video.

THE COURT:  All right.

Ladies and gentlemen, I'm going to ask you to step back to the jury room for just a minute, please.

(Jurors exiting the courtroom at 4:09 P.M.)

THE COURT:  How long is the second video?

MR. IVERSON:  About the same length as the first.

THE COURT:  Let me see the second video.

MR. IVERSON:  It's a minute and 28 seconds, Your Honor.

(Video is played.)

THE COURT: And the objection?

MR. DOORASAMY: Yes, Your Honor. They need to lay a foundation for that video.

THE COURT: In terms of what? I mean, I think he just testified as to what they did, which matches up exactly with the video. I mean, I'm -- the foundation being?

MR. DOORASAMY: Well, whose video is it?

THE COURT: Well, that's a great question. It looks like a security video off somebody's house.

MR. IVERSON: I don't -- I don't know. I think the record reflects that Mr. Santiago watched it and it depicts them coming and going from the home invasion, so it would be authenticated by him recognizing himself and what they did.

MR. DOORASAMY: I think to introduce it, Your Honor, the Government needs to call the owner of that video to testify.

THE COURT: Okay.

Okay. Authentication or identifying information evidence is -- requires that the proponent produce evidence sufficient to support a finding that the item is what the proponent claims it is.

And the claim here, although not specifically made, is that the video accurately reflects what occurred on -- what? -- September 15, 2022?

MR. IVERSON: Correct, Your Honor.

THE COURT: And Rule 901 is examples only and not a complete list. And there are videos -- I -- I hes- -- I -- they're not self-authenticating, but I don't have the case in front of me, but 901(a)(1), testimony of a witness with knowledge that an item is what it is claimed to be. The question of what's this claimed to be? It's claimed to be an accurate depiction of what occurred on September 15, 2022, with respect to this particular home invasion.

Mr. Santiago participated in the home invasion, described what happened during the home invasion, described coming out with the victim, as well as the computer and everything else in this video. It seems to me that's sufficient to establish that the video is what it is claimed to be, which is an accurate represen- -- a representation or a video of what occurred.

And then 901(b)(4), distinctive characteristics and the like, I'm not sure that relying on the -- on the date and timestamped -- well, I don't think he could introduce the video without some testimony about the date and timestamp on there, unless this witness is able to say, as he did, that that's roughly the date and time that all this occurred.

So I think in terms of authentication, I understand the objection, the operator of the video or the owner of the video camera has not testified in court that the camera was

working, functioning as designed on the day that this video was taken and this a -- you know, a preserved version of the video, but I don't think that's the only way that certain evidence can be authenticated. And here I think the video -- a person with knowledge, that is Mr. Santiago, has described what happened, and that description appears to me to be sufficiently consistent with the video that Mr. -- the next quest- -- I can't remember if you asked it or not.

Okay. So we got a lot of order because both videos are contained in Government's Exhibit 39. There was no objection to 39, so that one's been -- so 39 has been admitted.

I think in -- in light of the ob- -- objection, I think you need to go back and -- let me see -- maybe you asked it. He said he watched the video. And what do they show? And he says, Justin following up to his house and pulling us up behind him. You guys take him out of the house. Yes.

I think had there been an objection there, the only question was missing is: Does the video accurately reflect what happened?

So bring the jury back in and we'll see what Mr. Santiago says in response to that and I'll rule on the objection.

Bring the jury back in.

(Jurors enter the courtroom at 4:18 P.M.)

THE COURT: Do you have a question for the witness,

Mr. Iverson?

MR. IVERSON: Yes, Your Honor.

BY MR. IVERSON:

Q. Thirty-nine, Exhibit 39, I showed you -- when I walked up there with the computer, I showed you two videos; correct?

A. Yes.

Q. What'd the first one show? Well, we've already watched that, but what did -- what is the second one of?

A. Us coming out of the house.

Q. Okay.

Have you watched that full video?

A. Yes.

Q. Does it fairly and accurately depict you coming out of the house during the Justin Baretto kidnapping?

A. Yes.

THE COURT: All right. I'll overrule the objection. You may play the video.

(Video is playing.)

BY MR. IVERSON:

Q. Do you know who that is?

A. Yes.

Q. Who?

A. Nathan.

Q. Okay.

Who's that?

A.  Justin and Remy.

Q.  Who's that coming out of the house now?

A.  Me.

Q.  Did you say anything to Justin's sister and father before you left?

A.  Yes.

Q.  What'd you say?

A.  Don't call the police and he'll be okay.

Q.  Once Justin was in the car, what happened?

A.  We got him to open his phone to see if he had any Bitcoin in his accounts and money in his bank accounts, and we messaged his friends to see if they'll send money.

Q.  Were you able to find any cryptocurrency or money in his bank account that you were able to access when looking at his phone while in the Cadillac?

A.  No.

Q.  How were -- so you -- and you said you messaged his friends?

A.  Yeah.

Q.  Who was doing the messaging, if you remember?

A.  Nathan.

Q.  And is there -- how did you use -- is there -- what -- let me take a minute.

Did you send anything out to advertise what you guys

were doing?

A.   Yes.

Q.   What?

A.   A video of him.

Q.   One or multiple?

A.   Multiple.

MR. IVERSON:  Ms. Collins, if you'll bring up --
actually, before we do that.

BY MR. IVERSON:

Q.   Did anyone strike Justin when he was in the car?

A.   Yes.

Q.   Who?

A.   Me and Remy.

Q.   Did you strike him with your fist or something else?

A.   Fist and gun.

Q.   Do you know what Remy struck him with?

A.   Fist and gun.

Q.   At this point, what gun did you have?

A.   A pistol.

Q.   What happened to Justin?

A.   He got hit in the face and he just started bleeding,
and that was it.

Q.   How long did you guys have him in the car,
approximately?

A.   An hour, maybe two.

Q. What ultimately happened to Justin? Did he ever get out of the car?

A. Yeah.

Q. So tell us about that.

A. We just decided to let him go after nobody sent money.

Q. Had you driven somewhere?

A. Yes.

Q. Do you know whereabouts?

A. I want to say Fort Pierce.

Q. How -- do you remember what road you took to get there?

A. I-95.

Q. Would that have been north or south from Justin's house?

A. North.

MR. IVERSON: Okay. Ms. Collins. Exhibit 32, Video 2.

(Video is playing.)

BY MR. IVERSON:

Q. Do you recognize this video, Mr. Santiago?

A. Yes.

Q. So for -- do you -- which side are you on?

A. The right side.

Q. Looking at the video?

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A.   Yes.

Q.   So that would be to Justin's left side?

A.   Yes.

Q.   Who's on the other side of Justin?

A.   Remy.

MR. IVERSON:  Play the video, Ms. Collins.

(Video is playing.)

MR. IVERSON:  Play Video 3, Ms. Collins.

(Video is playing.)

BY MR. IVERSON:

Q.   So that's still -- that's -- that's you on Justin's left; correct?

A.   Yes.

MR. IVERSON:  Ms. Collins, if you'll play to -- to nine minutes in, or nine seconds.

(Video is playing.)

BY MR. IVERSON:

Q.   Who just hit Justin?

A.   Remy.

Q.   Did someone else hit him in this video?

A.   Yes.

Q.   Who is it?

A.   Me.

MR. IVERSON:  Play the video.

(Video is playing.)

MR. IVERSON: Thank you, Ms. Collins.

BY MR. IVERSON:

Q. After -- and I don't think I directly asked, but that was Justin; right? We've been talking about Justin?

A. Yes.

Q. Okay.

Was there a next target to home invade and steal cryptocurrency from after Justin?

A. Yes.

Q. Who?

A. His name was Tye.

Q. Remember where he lived?

A. In Texas.

Q. Do you know why he was targeted?

A. Yes.

Q. Why?

A. Because he had a lot of money and jewelry and Bitcoin.

Q. Do you know about how much money, either in cash or cryptocurrency, you all expected him to have?

A. Millions.

Q. Do you know if the defendant, Mr. St. Felix, ever went to Texas?

A. Yes.

Q. Do you know approximately how many times?

A. Multiple.

Q. Did you ever go with him?

A. Yes.

Q. How many times?

A. Twice.

Q. The first time, who went with you guys?

A. Me, Nathan, and José.

Q. Why'd you guys go?

A. To try to get into his house and force him to send Bitcoin.

Q. Did you take any items for the job with you?

A. Yes.

Q. What'd you take?

A. Guns.

Q. Take any clothing for the job?

A. Yes.

Q. Like what?

A. All black clothing.

Q. Okay.

Do you recall if you took masks and gloves?

A. Yes.

Q. And did you?

A. Yes.

Q. When you got to Texas, did you buy anything for the job?

A. Yes.

Q. What?

A. Zip ties.

Q. Now in addition to the two trips you went with the defendant on to Texas, was there a third trip you tried to go?

A. Yes.

Q. Did you guys make it?

A. No.

Q. What happened?

A. We got into a car accident.

Q. We'll get back into that in a minute.

MR. IVERSON: Ms. Collins, will you please display 21D?

BY MR. IVERSON:

Q. Mr. Santiago, do you recognize that person?

A. Yes.

Q. Who is it?

A. Remy.

MR. IVERSON: Ms. Collins, will you blow up the make and model of the car on the wheel?

BY MR. IVERSON:

Q. You recognize that car model?

A. Yes.

Q. Or make.

What is it?

A.   An Audi.

Q.   Did you ever travel to Texas with the defendant in an Audi?

A.   Yes.

MR. IVERSON:  Thank you, Ms. Collins.

I got one more on that one.  Sorry.

Will you blow up on the gas pump?

BY MR. IVERSON:

Q.   Do you recognize what's in the white there?

A.   Yes.

Q.   What is it?

A.   The state of Texas.

MR. IVERSON:  21F, Ms. Collins.

BY MR. IVERSON:

Q.   Do you recognize who's in the foreground of this picture?

A.   Yes.

Q.   Who?

A.   Me.

Q.   You -- which one's you?

A.   In the back.

Q.   How can you tell that's you in the back?

A.   My tattoos.

Q.   Who's the other person in the picture?

A.   Remy.

Q.   So is Remy the one with his -- half his face cut off there on the right side?

A.   Yes.

Q.   Do you remember where this -- when this is from?

A.   On the way to Texas.

Q.   On the -- what was your answer?  I couldn't hear you.

A.   On the way to Texas.

MR. IVERSON:  Ms. Collins, if you could pull up 26E.

BY MR. IVERSON:

Q.   Do you recognize this?

A.   Yes.

Q.   What is it?

A.   The Telegram group chat.

Q.   Do you remember what this one was about?

A.   Yes.

Q.   What?

A.   We get 10,000 if we come back without doing anything.

Q.   Which target was this?

A.   You said which part?

Q.   Target.  Who were you targeting at this time?

A.   Tye.

MR. IVERSON:  Ms. Collins, will you blow up this right here (indicating)?

BY MR. IVERSON:

Q.   Do you know who Fawk u Mean is?

A.   Yes.

Q.   Who?

A.   Remy.

Q.   Thank you.

Next to the thumbs up, do you recognize that profile picture?

A.   Yes.

Q.   Whose profile picture is that?

A.   Remy's.

Q.   Is it a picture of Remy?

A.   No.

MR. IVERSON:  26F, Ms. Collins.

BY MR. IVERSON:

Q.   The pinned item at the top.

Do you know whose address that is, Mr. Santiago?

A.   Yes.

Q.   Whose?

A.   Tye.

MR. IVERSON:  Ms. Collins, will you bring up 34A?

BY MR. IVERSON:

Q.   Mr. Santiago, your prior testimony is you've known Mr. St. Felix, the defendant, for about 14 years?

A.   Yes.

Q.   You're childhood friends?

A.   Yes.

Q. Can you recognize his voice?

A. Yes.

(Video is playing.)

BY MR. IVERSON:

Q. Have you watched this whole video before?

A. Yes.

Q. Who's talking on this video?

A. Remy.

MR. IVERSON: Pause it.

BY MR. IVERSON:

Q. And is this the same -- the same Telegram profile picture we just discussed in one of the previous two exhibits?

A. Yes.

Q. Whose Telegram profile picture is that?

A. Remy's.

Q. So can we talk about the time that you and the defendant tried to go to Texas but didn't make it? What happened?

A. We got into a car accident.

Q. How'd that happen?

A. Got into a high-speed chase with the police.

Q. Who were you with?

A. Remy and some other guys I don't really know.

Q. Where was everyone sitting when the chase started?

A. I was in the passenger, Remy was in the back, the

other guy was in the back, and the driver.

Q.   And what kind of car were you in?

A.   An orange Scat Pack.

Q.   Did you guys have any firearms with you?

A.   Yes.

Q.   Why'd you have those with you?

A.   We were going to rob Tye.

Q.   So did there come a time when a law enforcement officer turned on his lights and sirens?

A.   Yes.

Q.   What happened then?

A.   The driver woke us up and asked what we should do.

Q.   Did anyone respond?

A.   Yes.

Q.   Who?

A.   Remy.

Q.   What'd he say?

A.   Don't stop.  We got too much in the car.

Q.   Then what happened?

A.   He took off.

Q.   Who took off?

A.   The driver.

Q.   Do you remember about what speed?

A.   A hundred, a hundred miles.

Q.   How'd the crash happen?

A. He was going to get off an exit ramp and he was going too fast and there was a sharp right turn and we went straight off the ramp and hit a ditch and flipped a couple times.

Q. Flipped how many times?

A. Couple times, maybe, like, four or five.

Q. Was anyone hurt?

A. Yes.

Q. Who?

A. Everyone besides me.

Q. How was the defendant hurt, if you know?

A. He broke his leg.

Q. What about the other two guys?

A. They were knocked out, unconscious.

MR. IVERSON: I'm going to hand you what is marked 42A and 42B for identification.

BY MR. IVERSON:

Q. Recognize those?

A. Yes.

Q. What do they depict?

A. The car we was driving.

Q. At what point?

A. This is after the accident happened.

Q. Those both -- that being 42A and B fairly and accurately depict the car after the accident?

A. Yes.

MR. IVERSON:  Offer those into evidence, Your Honor.

(Government's Exhibit Numbers 42A and 42B were offered.)

MR. DOORASAMY:  No objection.

THE COURT:  42A and 42B are admitted.

(Government's Exhibit Numbers 42A and 42B were admitted and made a part of the record of this proceeding.)

MR. IVERSON:  Publish those, Ms. Collins, briefly. 42A and 42B, please.

Ms. Collins, will you publish 21I?

BY MR. IVERSON:

Q.   Do you recognize that?

A.   Yes.

Q.   What is it?

A.   Me with the chain on.

Q.   Whose chain?

A.   Tye's.

Q.   How'd you get the chain?

A.   I picked it up at an airport.

Q.   Airport where?

A.   In Texas.

Q.   Why'd you -- why'd you go out there and get it?

A.   Because that's where we -- they offered to meet to give it to us.

Q.   Who's us?  You said give it to "us"?

A.   Yeah, the -- the guys in Florida.

Q.   Why'd you guys get the chain?

A.   Basically to pay us for the accident and the trips we took.

Q.   Was -- was the defendant part of the guys in Florida that got the chain?

A.   Yes.

MR. IVERSON:  17A, Ms. Collins.  Blow up the first four.

BY MR. IVERSON:

Q.   Do you recognize any of these usernames?

A.   Yes.

Q.   Can you tell us who goes with each for the ones you recognize?

A.   The first one is Kilo; the second one is Remy; the third one is me; and T, I can't remember who exactly that is.

Q.   Okay.

MR. IVERSON:  Next couple.

BY MR. IVERSON:

Q.   Do you know who Stakk or Starve is at the bottom?

A.   Yes.

Q.   Who's that?

A.   Matt.  Matthew.

Q.   Okay.

Who is Meow?

A.    Jarod.

Q.    Prince Baby Blue?

A.    Haisel.

Q.    Scrappy 561?

A.    Jose.

Q.    Thank you.

MR. IVERSON:  Ms. Collins, 17E, first message, please.

BY MR. IVERSON:

Q.    Will you read that?

A.    (Reading):  Waiting towards Terminal B with y'all chain.  I got to piss.

Q.    Do you remember what that's from or referring to?

A.    Yes.

Q.    What is it?

A.    Me going to pick the chain up.

MR. IVERSON:  21K, Ms. Collins.

BY MR. IVERSON:

Q.    Who's that?

A.    Remy.

Q.    Do you recognize what he's wearing around his neck?

A.    Yes.

Q.    What is it?

A.    The chain.

Q.    Whose chain?

A.  Tye's.

Q.  What happened to the pendant, the Tye pendant?

A.  It got sold.

Q.  Do you know who got a cut of that?

A.  Yes.

Q.  Who?

A.  Four of us.

Q.  How much did you get?

A.  Like, a thousand.

Q.  Each?

A.  Yes.

Q.  Know what happened to the chain?

A.  Yes.

Q.  What?

A.  It got sold.

Q.  Who bought it?

A.  Somebody inside the group.

Q.  Who?

A.  Haisel.

Q.  Did you get a cut?

A.  Yes.

Q.  About how much?

A.  Like, 6,000.

Q.  Do you know if the defendant got a cut?

A.  Yes.

Q.   Do you know about how much?

A.   The same amount.

MR. IVERSON:  Give me one moment.

Your Honor, at this point, I'd like to offer 20A through 20F into evidence.  It's Telegram chats that have not been moved in.

(Government's Exhibit Numbers 20A through 20F were offered.)

THE COURT:  You said 20 or 28?

MR. IVERSON:  I'm sorry; it's 20A --

THE COURT:  20A.

MR. IVERSON:  -- through 20F.

THE COURT:  Let's see.  You want to be heard?

MR. DOORASAMY:  No, Your Honor.

THE COURT:  I'm sorry?

MR. DOORASAMY:  No.

THE COURT:  No objection?

MR. DOORASAMY:  Except -- no.  With the same cautions that we raised before about this, Your Honor.

THE COURT:  Which ones are that?  I can't remember.

MR. DOORASAMY:  Your Honor, there's a list of objections that were made to these conversations.

THE COURT:  Ladies and gentlemen, I will remind you, it's up to you to determine whether or not a conspiracy existed and whether or not any statements are statements of

co-conspirators made in furtherance of the conspiracy.

THE COURT:  Government's Exhibits 20A through F?

MR. IVERSON:  20A, as in "alphabet," through 20F --

THE COURT:  Are admitted.

MR. IVERSON:  -- as in "fox."

(Government's Exhibit Numbers 20A through 20F were admitted and made a part of the record of this proceeding.)

MR. IVERSON:  Ms. Collins, if you'll bring up 20A.

BY MR. IVERSON:

Q.  Do you recognize the participants of that chat, Mr. Santiago?

A.  Yes.

Q.  Okay.

And Fawk u Mean is?

A.  Remy.

Q.  Stakk or Starve is?

A.  Matt.

Q.  Dre is?

A.  Me.

Q.  Prince Baby Blue is?

A.  Haisel.

MR. IVERSON:  If you'll go to 20D, Ms. Collins.  D, as in "dog."  First four chats, if you'll highlight.

BY MR. IVERSON:

Q.  Can you see those, Mr. Santiago?

A. Yes.

Q. Will you read them?

A. (Reading): I'll do the math on the money. I paid you already and et cetera, so it's a four-way even. So lit.

Q. Who -- who sent that?

A. Haisel.

Q. Then what are the next two, and who sent them?

A. (Reading): If we confirm deal, you can reimburse yourself then start cuts. This why I love you.

Q. Who sent that?

A. Remy.

Q. Last chat that's blown up.

A. (Reading): Yeah. Trust gang already on it, bro. I'm just not in town to talk about it, but when I'm back, I'm going to slide on you.

Q. Okay.

MR. IVERSON: Next group, Ms. Collins.

Actually, let's go to the next page. If you'll highlight this section right here (indicating). Just that one's fine.

BY MR. IVERSON:

Q. Do you recognize that chat?

A. Yes.

Q. What's it about?

A. Splitting the money up evenly.

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

Q.   The money from what?

A.   The chain.

Q.   Who's buying?

A.   Haisel.

MR. IVERSON:  21O, Ms. Collins.

BY MR. IVERSON:

Q.   Do you recognize the people in that picture?

A.   Yes.

Q.   Who are they?

A.   Me, Remy, Matt, and Haisel.

Q.   Which one's Matt?

A.   On the left in black.

Q.   Which one's Haisel?

A.   In the black and white.

Q.   Thank you.

MR. IVERSON:  23C, Ms. Collins.

BY MR. IVERSON:

Q.   Do you recognize those people?

A.   Yes.

Q.   Who are they?

A.   Remy and Elmer.

Q.   Okay.

I've got in my hand what is Exhibit 9A.  Do you recognize that?

A.   Yes.

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

Q.   What do you recognize it to be?

A.   My rifle.

Q.   When's the last time you saw this rifle?

A.   When I asked Remy to hold onto it.

Q.   Remember about when that was?

A.   I can't remember the exact date.

Q.   I'm not asking for the exact date.  Do you remember what year, what time of year?

A.   Last year.

Q.   Okay.

Why'd you ask him to hold onto it?

A.   Because I was moving out and I had nowhere to put it.

Q.   Okay.

MR. IVERSON:  No further questions.

THE COURT:  Cross-examination.

MR. DOORASAMY:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. DOORASAMY:

Q.   Good afternoon, Mr. Santiago.

A.   Afternoon.

Q.   During your entire testimony, you kept your head down.  Is there any reason for that?

A.   Yes, I'm nervous.

Q.   Okay.

Are you getting nervous because you're telling the

truth or because you're not telling the truth?

A. Because I'm telling the truth.

Q. Okay.

Now, the firearm that was just shown to you, Exhibit 9, you say you own that firearm?

A. Yes.

Q. And did you purchase it legally?

A. Yes.

Q. In your name?

A. No, I got it. They sold it to me as an anonymous buyer at a gun show.

Q. And are you able to purchase a firearm in your name?

A. Yes.

Q. Were you ever convicted of an offense for which you got more than 60 days in jail time?

A. No.

Q. Were you ever charged with any criminal offenses prior to this one?

A. One.

Q. What charge was that?

A. Misdemeanor weed.

Q. And were you convicted of that?

A. Yes.

Q. Were you ever charged with assault --

MR. IVERSON: Objection.

Case 1:23-cr-00260-WO    Document 114    Filed 08/11/24    Page 50 of 58

THE COURT: Yeah, sustained.

MR. DOORASAMY: Okay.

BY MR. DOORASAMY:

Q. So were you present the very first time Seemungal met with Mr. Felix?

A. The very first time?

Q. When he met with him.

A. No.

Q. Is it correct that you do not know what discussions Mr. Seemungal had with Mr. Felix about hiring him; is that correct?

A. Yes.

Q. The Jason -- Justin Baretto home invasion, did Mr. Seemungal tell you why they wanted -- you wanted to invade that house?

A. Yes.

Q. What was the reason?

A. Because he stole from him.

Q. And --

A. He stole from Seemungal and he knew he had a lot of Bitcoin.

Q. And did he tell y'all, I want -- I -- I want to get my revenge from this guy?

A. I can't remember.

Q. But he wanted to retaliate against him because --

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

MR. IVERSON: Objection.

THE COURT: I'll -- finish the question.

MR. DOORASAMY: Thank you.

BY MR. DOORASAMY:

Q. Isn't it correct he wanted to retaliate against Mr. Baretto for stealing his crypto?

A. Yes.

Q. Now, whose idea was it to purchase the zip ties?

A. Seemungal.

Q. And did you make a statement to the police that Mr. Seemungal was the brain behind all of this?

A. Yes.

Q. Did you use the term "crash dummies" at any time?

A. Yes.

Q. What is a crash dummy?

A. A person who will do anything for money.

Q. Okay.

And were you considered a crash dummy?

A. No, I consider myself a crash dummy at the moment because I felt like one.

Q. Okay.

Did you think Mr. Seemungal was using you as a crash dummy?

A. Yes.

Q. And is it correct that Mr. Seemungal's mandate was to

get to the computer and then he will hone in and steal the crypto?

A. Yes.

Q. Okay.

Now, did you fly to -- I beg your pardon. Let me back up.

Did you remove yourself from the group because they had gone to Texas so many times and nothing happened?

A. Yes.

Q. Were you upset that you were in a vehicle with Mr. Felix and total strangers?

A. Yes.

Q. Is it correct that you were afraid that something might go wrong and someone will snitch on you?

A. Yes.

Q. And is it correct that you then refused to go back to Texas for that home invasion?

A. Yes.

Q. But you did go back to Texas after the home invasion; isn't that correct?

A. After which home invasion?

Q. The Texas home invasion.

A. Yes.

Q. And why did you go back to Texas?

A. Just to pick the chain up.

Q. And who told you to come to Texas to pick the chain up?

A. Jarod.

Q. Now, "Jarod," you mean Mr. Seemungal?

A. Yes.

Q. So did you speak to him on the phone and he said, Santiago, come up and pick this chain and this pendant up?

A. We spoke in a group chat. Nobody else could go. I was the only one that was available to go.

Q. So acting on these instructions, you got on a plane and you went to Texas?

A. Yes.

Q. Now, who paid for your airline ticket to go to Texas?

A. Seemungal.

Q. So he was fully aware that you were coming to Texas for the chain, correct?

A. Yes.

Q. Did you take the chain back to Florida and put it on and take a picture with it?

A. Yes.

Q. Did you give the chain to Mr. Felix and ask him to take a picture with it?

A. I didn't ask him to take a picture with it. I just gave it to him.

Q. And you took a picture of it?

A.   Yes.

Q.   Do you know a person by the name of Quintana Kilo?

A.   Yes.

Q.   Did he take a picture with the chain?

A.   I believe so.

Q.   And Mr. Daily, Haisel Daily?

A.   Yes.

Q.   Did you know that he was a very close friend of Mr. Seemungal?

A.   Yes.

Q.   And is it correct that he wanted the chain and the pendant to sell to a drug dealer in California?

A.   Yes.

Q.   Did that transaction take place?

A.   No.

Q.   What happened to the chain and the pendant?

A.   The pendant was sold separately and Haisel bought the chain himself.

Q.   And then the money was distributed?

A.   Yes.

Q.   Did Mr. Seemungal authorize that distribution?

A.   Yes.

Q.   Now, you -- you resiled from the invasion in Texas. Why did you get paid?

A.   Because I was involved in a car accident and the

trips we took.

Q. Now, did you pay bond to get out in Louisiana?

A. I didn't pay bond myself.

Q. Your family paid the bond?

A. Jarod did.  Seemungal.

Q. So Mr. Seemungal paid your bond?

A. Yes.

Q. How much was your bond?

A. 3,500.

Q. Did you pay him back?

A. No.

Q. Mr. Seemungal also -- were you present when he said that any person that participated in the home invasion in Texas, win or lose, whether there was money there or not, would get $10,000?

A. Yes.

Q. Did you get that $10,000?

A. No.

Q. Did you know $150,000 was stolen from that house?

A. No.

Q. Did Mr. Seemungal tell you that?

A. No.

Q. Okay.

MR. DOORASAMY:  Give me a second, Your Honor.

BY MR. DOORASAMY:

Q. Now, you indicated a video was made of Mr. Justin Baretto; correct?

A. Yes.

Q. Did you make that video?

A. No.

Q. Do you know who instructed who to make that video?

A. Jarod told us to send -- make a video to send to his friends.

Q. So Jarod was directly involved in that?

A. Yes.

Q. And did Jarod tell you that by making the video and posting to the friends that he would extort money from his friends?

A. Basically.

MR. DOORASAMY: I have no further questions.

THE COURT: Redirect?

MR. IVERSON: None.

(End of Excerpt.)

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

CERTIFICATE

I, Stacy Harlow, Realtime Verbatim Reporter-Master, Certified Verbatim Reporter-Master, Certificate of Merit, Registered Broadcast Captioner, Registered CART Provider, and Official Reporter of the United States District Court for the Middle District of North Carolina, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the above-styled action on June 20, 2024, as reported by me by stenomask.

I certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Given under my hand this 11th day of August, 2024.

_____*Stacy Harlow*_
STACY HARLOW
Official Reporter, United States
Middle District of North Carolina

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina