UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA


UNITED STATES DISTRICT COURT ) 1:23CR260-2

v. ) Greensboro

REMY RA ST. FELIX ) June 20, 2024

TRANSCRIPT OF THE EXCERPTED TRIAL TESTIMONY OF
JAROD GABRIEL SEEMUNGAL
BEFORE THE HONORABLE WILLIAM OSTEEN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:

ERIC L. IVERSON
U.S. Attorney's Office
Middle District of North Carolina
101 South Edgeworth Street - Fourth Floor
Greensboro, North Carolina  27401
(336) 332-6302

BRIAN MUND
DOJ-CRM
10th & Constitution Avenue, NW
John C. Keeney Building - Suite 600
Washington, DC  20530
(202) 598-6205

FOR THE DEFENDANT:

ALAN DOORASAMY, SR.
Law Office of Alan Doorasamy, Sr.
107 Westdale Avenue
Winston-Salem, North Carolina  27101
(336) 749-6412

COURT REPORTER:

STACY HARLOW, RVR-M, CVR-M, CM, RBC, RCP
Post Office Box 21471
Winston-Salem, North Carolina  27120

Proceedings recorded by voice stenography realtime translation.
Transcript produced by computer-aided transcription.

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

INDEX


EXAMINATION INDEX

                                            Page


WITNESSES CALLED ON BEHALF OF THE GOVERNMENT:

JAROD GABRIEL SEEMUNGAL

          Direct Examination by Mr. Iverson        5

          Cross-Examination by Mr. Doorasamy     137

          Redirect Examination by Mr. Iverson    176

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

EXHIBIT INDEX

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---|---|---|---|
| EXHIBITS OFFERED ON BEHALF OF THE GOVERNMENT: | | | |
| 17A | Telegram Chats | 84 | 84 |
| 17B | Telegram Chats | 84 | 84 |
| 17C | Telegram Chats | 84 | 84 |
| 17D | Telegram Chats | 84 | 84 |
| 17E | Telegram Chats | 84 | 84 |
| 18A | Photograph | 94 | 94 |
| 18B | Photograph | 94 | 94 |
| 18C | Photograph | 94 | 94 |
| 18D | Photograph | 94 | 94 |
| 18E | Photograph | 94 | 94 |
| 19A | Telegram Chat | 104 | 106 |
| 19B | Telegram Chat | 104 | 106 |
| 19C | Telegram Chat | 104 | 106 |
| 19D | Telegram Chat | 104 | 106 |
| 19E | Telegram Chat | 104 | 106 |
| 26E | Screenshots of Telegram Chat | 66 | 67 |
| 26F | Screenshots of Telegram Chat | 66 | 67 |
| 26G | Telegram Chat | 99 | 99 |
| 28 | Seemungal Plea Agreement | 12 | 13 |
| 29 | Seemungal Immunity Agreement | 14 | 14 |

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

| | | | |
|---|---|---|---|
| 30B | Photograph of Haisel Daily | 31 | 31 |
| 30C | Photograph of Nathan Quintana | 32 | 32 |
| 30A | Photograph of Dre | 33 | 33 |
| 31 | Street View of Andy's House | 43 | 43 |
| 32 | Videos of Justin in the Car | 58 | 59 |
| 33 | Photograph of Tye's House | 62 | 62 |
| 34A | Recorded Phone Call Between Seemungal and St. Felix | 75 | 75 |
| 34B | Transcript of Recorded Phone Call Between Seemungal and St. Felix | 75 | 75 |
| 35A | Screenshots of Music Video | 131 | 133 |
| 35B | Screenshots of Music Video | 131 | 133 |

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

P R O C E E D I N G S

(June 20, 2024.)

(Beginning of excerpt.)

THE COURT: Mr. Seemungal, before you sit down, if you'll turn and face Ms. Daniel and be affirmed to your testimony.

(JAROD GABRIEL SEEMUNGAL WAS SWORN.)

Whereupon,

JAROD GABRIEL SEEMUNGAL,

having been first duly cautioned and sworn, testified as follows:

DIRECT EXAMINATION

BY MR. IVERSON:

Q. Mr. Seemungal, can you hear me?

A. Yes.

Q. If you'll scoot up and get the microphone where you need it.

Will you state your name?

A. Jarod Gabriel Seemungal.

Q. How old are you, Mr. Seemungal?

A. Twenty-three.

Q. Where are you from?

A. Palm Beach, Florida.

Q. West Palm Beach?

A. Yes.

Q. What state is West Palm Beach in?

A. Florida.

Q. Oh, you said that.

Where in Florida is it?

A. Southern Florida.

Q. Do you know an individual named Remy St. Felix?

A. Yes.

Q. How do you know him?

A. Through a mutual friend.

Q. Who introduced you?

A. Matt.

Q. For what purpose?

A. To commit home invasion robberies.

Q. Of what?

A. Cryptocurrency.

Q. Do you see Mr. St. Felix here today?

A. Yes.

Q. Will you please identify him by an article of clothing he's wearing?

A. In the blue shirt.

MR. IVERSON: For the record, Your Honor.

THE COURT: So noted.

BY MR. IVERSON:

Q. Did the defendant, Mr. St. Felix, participate in any home invasions?

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A. Yes.

Q. Will you identify some of them by location and victim?

A. Tullia Heissenberg in Delray Beach, Florida. Justin Baretto, in Miami, Florida. Michael Prim in North Carolina. And then a guy named Tyrek in Texas.

Q. Okay.

Did Mr. St. Felix, the defendant, enter the home in -- in Texas?

A. No.

Q. Okay.

What was his role in that one?

A. He was essentially the person who just got the crew together, I guess, to commit the robbery.

Q. How would you characterize the defendant's role in the home invasions?

A. He was the one that gathered all the physical aspects, I guess.

Q. When you say, "physical aspects," what do you mean?

A. The people that were in charge of getting the home invasions done.

Q. Okay.

What was your role?

A. The technical aspect.

Q. Were you and the defendant successful in stealing

cryptocurrency during any of the home invasions?

A. Yes.

Q. From what victim or victims?

A. Michael Prim in Durham, North Carolina.

Q. What did the defendant -- what role did the defendant play in that home invasion?

A. He physically went inside the house.

Q. Do you know if he went inside with anyone else?

A. Yes.

Q. Who?

A. Elmer Castro.

Q. Do you know if he has a nickname?

A. E.

Q. Who transferred Mr. Prim's cryptocurrency?

A. I did.

Q. What sort of account was it in?

A. A Coinbase account.

Q. Where were you when that happened?

A. Florida.

Q. How'd you get access to Mr. Prim's computer?

A. Through a remote connection.

Q. What kind?

A. In a remote connection through AnyDesk.

Q. AnyDesk?

A. Yeah, it's a -- you install the program and it lets

you remotely connect to the computer from anywhere.

Q. Okay.

It would have to be installed on Mr. Prim's computer?

A. Yes.

Q. Do you know who facilitated that?

A. Yes.

Q. Who?

A. Remy.

Q. And what -- what were you able to steal from Mr. Prim's account?

A. Cryptocurrency.

Q. Do you know about how much?

A. About 160,000.

Q. And I believe you said it, but from what kind of account was this?

A. Coinbase.

Q. When you moved the cryptocurrency from the account, did you do it in one or multiple transactions?

A. Multiple.

Q. Did you do anything before transferring the funds?

A. Yeah, all the funds were scattered in different types of cryptocurrency, so I moved them all into two common types, which are Bitcoin and Ethereum.

Q. Why'd you do that?

A. Bitcoin and Ethereum have the most liquidity, so it's

easiest to launder the money.

Q. So you stole about $160,000 worth of cryptocurrency?

A. Yes.

Q. Did the defendant get a portion of the proceeds?

A. Yes.

Q. How much?

A. Approximately 25,000.

Q. Okay.

Was that -- was the amount agreed to beforehand?

A. Yes, the percentage was.

Q. What percentage was agreed to beforehand?

A. Approximately 30 percent.

Q. Okay.

Just for the defendant?

A. No, for Remy and E.

Q. So they each got 15 percent?

A. Yes.

Q. Was that -- did that include transfer fees or -- or before or after transfer fees, if you recall?

A. After.

Q. And you mentioned laundering the crypto. How'd you launder the cryptocurrency?

A. Through a decentralized anonymous crypto exchange called FixedFloat. I transferred the crypto from Bitcoin Ethereum to a privacy coin called XMR, which you aren't able to

track.

Q. Once it was in XMR, what'd you do?

A. For Remy and E's cut, I converted it into Ethereum, and then from Ethereum into a stable coin called USDC because that's what they wanted. And then I just sent them approximately $25,000 in USDC to their Coinbase accounts.

Q. Each?

A. Yes.

Q. Do you remember what you used to exchange the Ethereum into USDC?

A. Uniswap.

Q. Are you currently in jail?

A. Yes.

Q. When were you arrested?

A. July 27, 2023.

Q. Where were you when you were arrested?

A. Palm Beach, Florida.

Q. What agency arrested you?

A. The FBI.

Q. I'm sorry. I couldn't hear.

A. The FBI.

Q. Thank you.

Are you in jail because you have pled guilty to multiple crimes?

A. Yes.

Q.   What crimes have you pled guilty to?

A.   Conspiracy to commit wire fraud, conspiracy to commit kidnapping, and kidnapping.

Q.   Generally, will you summarize the criminal conduct that led to those convictions?

A.   The conspiracy to commit wire fraud charge stems from something called SIM swapping, which is, essentially, hacking people for their cryptocurrency, and then the kidnapping charges stem from the physical robberies of people for their cryptocurrency.

Q.   Did you sign a plea agreement?

A.   Yes.

Q.   I'm going to hand you what I've marked Exhibit 28 for identification.  If you'll take a look at that.  Do you recognize it?

A.   Yes.

Q.   Will you look at the last page?

A.   (Complies.)

Q.   Is that your signature on it?

A.   Yes.

Q.   Is that your plea agreement?

A.   Yes.

MR. IVERSON:  Offer Exhibit 28 into evidence.

(Government's Exhibit Number 28 was offered.)

MR. DOORASAMY:  No objection.

THE COURT:  Government's Exhibit 28 is admitted.

(Government's Exhibit Number 28 was admitted and made a part of the record of this proceeding.)

BY MR. IVERSON:

Q.   Have you been sentenced?

A.   No.

Q.   How much time are you facing?

A.   Zero to life.

Q.   Who will decide your sentence?

A.   The judge.

Q.   Do you expect to serve time in prison?

A.   Yes.

Q.   Are you aware that the Government can make a motion to the judge recommending a reduced sentence?

A.   Yes.

Q.   Are you hoping that occurs?

A.   Yes.

Q.   Has the Government made any promises to you about asking the judge to reduce your sentence?

A.   No.

Q.   I'm going to hand you what I've marked Government's Exhibit 29 for identification.

Do you recognize that?

A.   Yes.

Q.   What is it?

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A.    My limited immunity agreement.

Q.    Did you enter into that agreement with the Government?

A.    Yes.

MR. IVERSON:    Enter Exhibit 29 into evidence.

(Government's Exhibit Number 29 was offered.)

MR. DOORASAMY:    No objection.

THE COURT:    Government's Exhibit 29 is admitted.

(Government's Exhibit Number 29 was admitted and made a part of the record of this proceeding.)

MR. IVERSON:    Ms. Collins, if you will display that. And if you'll highlight the bottom half.

BY MR. IVERSON:

Q.    Mr. Seemungal, in that agreement, does the Government agree not to use any of your own statements against you?

A.    Yes.

Q.    What is that promise conditioned on?

A.    Essentially that I'm completely candid and truthful in all my statements.

Q.    I'm sorry.  I couldn't hear you.

A.    That I'm completely candid and truthful with all my statements.

Q.    So if you're not truthful today, the Government can use your statements against you?

A.    Yes.

MR. IVERSON:  Thank you, Ms. Collins.

BY MR. IVERSON:

Q.  Approximately how long have you been stealing cryptocurrency?

A.  Right at the age of 19.

Q.  In the beginning, how did you steal cryptocurrency?

A.  Through something called SIM swapping.

Q.  What's SIM swapping?

A.  SIM swapping is essentially the hijacking of a phone number so that you're able to intercept all calls, text messages, any information that's sent to that phone number.

Q.  I'm going to ask you to try to speak you little bit slower so I can hear you all right.  Thank you.

So were you able to use SIM swapping to commit any thefts?

A.  Yes.

Q.  How so?

A.  Through SIM swapping, you're able to -- for reset into various massive accounts because you can intercept the two-factor authentication texts.

For example, when you're hacking into an e-mail, you can send a forgot password code to the phone number which, through SIM swapping, is in our control.  And through that, you can resend their e-mail.  And then from there, resend to any accounts attached to that e-mail and phone number.

Q. You said reset?

A. Yeah.

Q. Like reset the password?

A. Reset the password, just gain access.

Q. Yeah. And -- and SIM swapping, is it fair to say, it's taking over someone's phone so that you receive their messages?

A. Yes.

Q. Okay.

Will you explain to the jurors how -- well, let me -- let me take a step back. Did you use SIM swapping to access custodial cryptocurrency exchange accounts?

A. Yes.

Q. Did you steal funds from those accounts?

A. Yes.

Q. Would you walk the jurors through the steps you would do to execute that kind of theft?

A. First, you would need to identify a target. So you would run e-mails through what we used was called a Coinbase checker. It would essentially check if your e-mail was registered to a Coinbase account.

From there, if the e-mail was a hit and we had access to the phone carrier that the phone number attached to the e-mail was on, we would SIM swap the phone number. Through SIM swapping the phone number, reset the passwords to the e-mail,

and gain access to essentially everything attached to the e-mail.

After that, you would just send a forgot password request from the custodial exchange, and since you controlled the e-mail, you would be able to reset it like you owned it.

Q. And then once you owned it, what would you do?

A. You would reset the passwords into the crypto exchanges and then it's essentially all yours. All you need to do is just send out all the cryptocurrency that was held in the accounts.

Q. To addresses you control?

A. Yes.

Q. And you mentioned you targeted, in particular, Coinbase custodial exchanges?

A. Yes.

Q. Or, excuse me, custodial -- coin -- Coinbase custodial exchange accounts; correct?

A. Yes.

Q. Okay.

Did you have any partners?

A. Yes.

Q. Who are they?

A. Two guys from Europe named Aabis and Tidy.

Q. Okay.

Does Tidy have another name?

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A.  Yes.

Q.  What is it?

A.  Neb.

Q.  N-e-b?

A.  Yes.

Q.  How'd you meet Neb?

A.  Through Minecraft.

Q.  What's Minecraft?

A.  Minecraft is a multiplayer online game.

Q.  How long have you known Neb?

A.  Five or six years.

Q.  About how old were you when you met him?

A.  Sixteen or 17.

Q.  Do you know where Neb lives?

A.  Finland.  Finland.

Q.  Have you ever met him in person?

A.  No.

Q.  And you mentioned another individual named Aabis?

A.  Yes.

Q.  Is that A-a-b-i-s?

A.  Yes.

Q.  How long have you known Aabis?

A.  Seven or eight years.

Q.  Where does Aabis live?

A.  The United Kingdom.

Q. Have you ever met him in person?

A. No.

Q. So approximately how old would you have been when you first met Aabis?

A. Fourteen or 15.

Q. And how'd you meet him?

A. Through Minecraft.

Q. How many times, approximately, did you successfully steal cryptocurrency by some SIM swap heist, as you described?

A. At least a hundred.

Q. Have -- how many of those was Neb involved in?

A. All of them.

Q. How about Aabis?

A. All of them.

Q. Okay.

Typically how much were you able to steal, typically?

A. On average, about 10,000 U.S. dollars.

Q. What was the largest heist -- SIM swap heist that you perpetrated?

A. 3.5 million.

Q. 3.5 million?

A. Yeah.

Q. Who was the victim?

A. Tullia Heissenberg.

Q. How much were you able to steal? So you were able to

steal 3.5 million from Ms. Heissenberg?

A. Yes.

Q. Who else was involved?

A. Aabis and -- and Tidy.

Q. Tidy being Neb?

A. Yes.

Q. Okay.

How were the proceeds split?

A. Aabis received approximately $300,000 and then Tidy and I split the rest down the middle.

Q. Okay.

Why did Tidy or Neb and you get more than Aabis?

A. Because Aabis just held the SIM, which essentially means that he just received the phone codes and gave it to us.

Q. He held the cloned phone?

A. Yes.

Q. And you said you split the rest. Approximately how much was that?

A. 1.6 million.

Q. Do you still have the proceeds?

A. No.

Q. Why not?

A. Shortly after, I was home invaded and all my crypto was stolen.

Q. At gunpoint?

A. Yes.

Q. Before you were robbed, were you able to spend any of the cryptocurrency that you stole from Ms. Heissenberg and others?

A. Yes.

Q. Particularly with cryptocurrency stolen from Ms. Heissenberg, did you buy anything?

A. Yes.

Q. What'd you buy?

A. Car.

Q. What kind of car?

A. A BMW M8.

Q. Did you pay for the BMW M8 in cash or cryptocurrency?

A. Cryptocurrency.

Q. You know someone named D'Angel Contrares?

A. Yes.

Q. Does he have a nickname?

A. Dean.

Q. Dean?

A. Yes.

Q. How did you meet Dean?

A. Through Minecraft.

Q. How long have you known Dean, approximately?

A. Seven or eight years.

Q. Where does he live?

A. In Texas.

Q. Do you know what city?

A. Houston.

Q. Have you met him in person?

A. Yes.

Q. Did he ever assist you with theft of cryptocurrency by SIM swap?

A. Yes.

Q. How often?

A. Rarely. Less than ten times.

Q. Okay.

What was his role when he did?

A. Holding the cloned phone.

Q. He ever assist you with any home invasions?

A. Yes.

Q. Which home invasion or invasions?

A. In Little Elm, Texas.

Q. Okay.

And the target for that was who?

A. A guy named Tyreke.

Q. When did you decide to steal cryptocurrency by home invasion?

A. About the summer of 2022.

Q. How'd you come to that decision?

A. Tidy and I were both robbed and Tidy's friend was

already committing home invasions to steal cryptocurrency, so we just thought, if you can't beat them, join them.

Q. Tidy being Neb; right?

A. Yes.

Q. And what's his friend name -- friend's -- what was Neb's friend's name that was already committing crypto home invasions?

A. Galaxy.

Q. Galaxy?

So, I mean, it sounds like you were very successful in stealing by SIM swap and hacking. Why switch to home invasions?

A. SIM swapping became a lot harder, and generally the people with the most money had additional layers of security involving a physical authentication device, so it wasn't possible to steal their funds through SIM swapping.

Q. You had to get the physical -- well, explain the physical authentication device, what that is and how it works.

A. Essentially it's an authenticator app on your phone, but essentially, an account that has the authenticator app attached to it can't be taken over by SIM swapping. You need the authenticator code from the physical device.

Q. From the app on the device?

A. Yes.

Q. How long have you known Galaxy? Or you mentioned

Galaxy. Do you -- do you know Gal- -- did you know Galaxy before, you know, you knew he was a successful crypto home invader?

A. Yes.

Q. Okay.

How long have you known him?

A. Four or five years.

Q. How'd you meet him?

A. Minecraft.

Q. Minecraft?

So who -- who -- who came up -- who were -- who were going to be your partners in the home invasion scheme?

A. Neb and Aabis.

Q. Okay.

So same group?

A. Yes.

Q. What types of individuals did you plan to target?

A. Anyone who held cryptocurrency.

Q. You guys ever refer to investors?

A. Yes.

Q. Who would that be?

A. People that legitimately invested their money into crypto.

Q. You guys ever refer to something called Internet kids or --

A.    Yes.

Q.    -- I guess what would be the opposite of investors?

A.    Yes.

Q.    What would be the opposite of investor?

A.    Oh, people that were obtaining crypto like I was, through SIM swapping and hacking and social engineering, things like that.

Q.    In what countries did you plan to target people for home invasions, country or countries?

A.    The United States.

Q.    Why?

A.    That's just where a majority of the targets were at.

Q.    Did you plan to commit these home invasions yourself?

A.    No.

Q.    What was the plan?

A.    Get a crew of people willing to do the robberies.

Q.    And who initially was responsible for that?

A.    I was.

Q.    So before we get into that, the plan to steal cryptocurrency by home invasion, will you describe step by step what we need to happen in order to achieve that -- that goal?

A.    Well, the crew -- the physical crew would need to gain access to the house somehow.  After that, detain whoever was there, locate the owner of the cryptocurrency account that was being targeted, and gain access to their phone or computer.

And then from there, the plan was for us to remotely connect -- "us" being me and the Europeans -- into the computer and then send off all the cryptocurrency in the exchanges.

Q.   How would you get access to the computer or phone from the account holder?

A.   Remote connection.

Q.   How would you -- so you need the password first to --

A.   Oh, yes.  Yeah.

Q.   So how were you going to get the password for the --

A.   Physically.

Q.   Plan to use any weapons?  Not you, but the crew?

A.   Yes.

Q.   Okay.

Like what?

A.   Guns.

Q.   And where would the funds be transferred to?

A.   Cryptocurrency wallets that we had control of.

Q.   Did -- during the course of the -- the scheme, did -- did anyone set up a wallet?

A.   Yes.

Q.   Who?

A.   Anyone.  Anyone being me or the Europeans --

Q.   Okay.

A.   -- would set up the...

Q.   For -- let me use a specific example.  For Mr. Prim,

was his cryptocurrency transferred to a -- a cryp- -- a wallet?

A.   Yes.

Q.   Do you know who set that wallet up?

A.   Yes.

Q.   Who?

A.   Galaxy.

Q.   Okay.

Who had access to it?

A.   Me, Galaxy, and the other Europeans, Neb and Aabis.

Q.   Okay.

So at -- at some point, Galaxy begins to assist with the scheme?

A.   Yes.

Q.   All right.  We'll cover that later.

So in the beginning, if my understanding is correct, you were responsible for recruiting the individuals to commit the home invasions?

A.   Yes.

Q.   How did the defendant, Mr. St. Felix, become involved in the home invasion scheme?

A.   Through a mutual friend, Matt.  Matt introduced me to Remy.

Q.   Did you meet him in person?

A.   Yes.

Q.   Where?

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A.   At his house.

Q.   Was anyone else present?

A.   Matt.

Q.   What'd you tell him?  What'd you tell the defendant?

A.   Essentially that we had a plan to make money and it involved just robbing people of their cryptocurrency.

Q.   Did you explain how or what he would need to do to help?

A.   Yes.

Q.   And what was that?

A.   Gain access to the homes, detain whoever, and just gain access to the cryptocurrency accounts.

Q.   How'd he -- how did he react when you explained the -- this -- the plan to him?

A.   He was -- he was all for it.  He was ready to get started.

Q.   Do you know if he was ever shown videos as explanation of -- of how this should work?

A.   Yes.

Q.   How was he shown these videos?

A.   Through Telegram.

Q.   What did the video show?

A.   People -- it was during robberies and it was just videos of people having to send off their cryptocurrency.

Q.   Who sent the videos?

A. Neb.

Q. So they were vid- -- they were videos of cryptocurrency robberies?

A. Yes.

Q. And if you could be a little more detailed, if -- if you remember, on what they depicted.

A. One of the videos was some guy in Europe -- or I assume to be in Europe -- he had a gun to his head and --

MR. DOORASAMY: We object to this.

THE WITNESS: And essentially --

THE COURT: Hold on just a second.

MR. IVERSON: Hold on, sir.

THE WITNESS: Sorry.

THE COURT: I'm going to overrule.

BY MR. IVERSON:

Q. So you were explaining what the video depicted. And I think I heard there's a guy in Europe and he had a gun to his head. If you'll continue.

A. He had a gun to his head and he was just being told to unlock his -- his wallet and send off the cryptocurrency.

THE COURT: All right. Ladies and gentlemen, this is hearsay testimony. You cannot consider it for the truth of the matter asserted, that is to determine whether or not this robbery was actually committed in Europe.

You may, however, consider this testimony for the

purpose of establishing any knowledge any of the individuals who saw the video may have had.

You may continue.

BY MR. IVERSON:

Q. Did any of the videos that Mr. St. Felix was shown depict people tied up or restrained?

A. Yes.

Q. How so?

A. From what I remember, the guy had his hands behind his back and his ear was bleeding.

Q. So when, approximately, did you recruit the defendant for the purpose you've described?

A. Summer of 2022.

Q. Who, in addition to the defendant, agreed to participate in the scheme at about the same time?

A. Matt, Haisel, and then the Europeans, obviously.

Q. I'm going to hand you what I've marked 30B for identification. Would you take a look at that?

A. (Complies.)

Q. Do you recognize that individual?

A. Yes.

Q. Who is it?

A. Haisel Daily.

MR. IVERSON: Your Honor, may I enter 30B -- or I'd offer 30B.

(Government Exhibit's Number 30B was offered.)

THE COURT: Any objection?

MR. DOORASAMY: No objection.

THE COURT: 30B is admitted.

(Government's Exhibit Number 30B was admitted and made a part of the record of this proceeding.)

MR. IVERSON: Ms. Collins.

BY MR. IVERSON:

Q. This is Haisel Daily?

A. Yes.

Q. Did he have a -- any particular role in the -- in the home invasion conspiracy?

A. Yes.

Q. What was that?

A. He was responsible for getting all the guns.

MR. IVERSON: Ms. Collins, I'm going to ask you to bring up Exhibit 24G, page 2, without displaying page 1.

BY MR. IVERSON:

Q. Do you recognize that individual?

A. Yes.

Q. Who is that?

A. Matt.

Q. Matt?

I got in my hand what I've have marked 30C.

Do you recognize that individual?

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A.   Yes.

Q.   Who's that?

A.   Kilo or Nathan Quintana.

MR. IVERSON:  Your Honor, I'd offer 30C into evidence.

(Government's Exhibit Number 30C was offered.)

MR. DOORASAMY:  No objection.

THE COURT:  Government's Exhibit 30C is admitted.

(Government's Exhibit Number 30C was admitted and made a part of the record of this proceeding.)

BY MR. IVERSON:

Q.   Was Kilo, here depicted in 30C, involved in the home invasion scheme at any time?

A.   Yes.

Q.   I've got in my hand what's 30A.

Do you recognize who's depicted in 30A?

A.   Yes.

Q.   Who's that?

A.   Dre.

Q.   Dre?

A.   Yes.

Q.   D-r-e?

A.   Yes.

Q.   Was Dre involved in the home invasion scheme at any time?

A.   Yes.

MR. IVERSON:  I -- I'd offer 30A in.

(Government's Exhibit Number 30A was offered.)

MR. DOORASAMY:  No objection.

THE COURT:  30A is admitted.

(Government's Exhibit Number 30A was admitted and made a part of the record of this proceeding.)

MR. IVERSON:  Ms. Collins, I'm going to ask you to bring up 24K, page 2, without displaying page 1.

BY MR. IVERSON:

Q.   Mr. Seemungal, do you recognize this individual?

A.   Yes.

Q.   Who is that?

A.   Scrappy.

Q.   Scrappy?

A.   Yes.

Q.   Was he involved in the home invasion scheme?

A.   Yes.

Q.   Did he have a particular role?

A.   Yeah, he -- he was the driver.

Q.   Driver?

MR. IVERSON:  Ms. Collins, 24C, please, page 2.

BY MR. IVERSON:

Q.   Do you recognize that person?

A.   Yes.

Q.   Who's that?

A.   Remy.

MR. IVERSON:  Ms. Collins, 24E, page 2, without displaying page 1, please.

BY MR. IVERSON:

Q.   Do you recognize that person?

A.   Yes.

Q.   Who is that?

A.   Elmer Castro.

Q.   Otherwise known as E?

A.   Yes.

Q.   Do you know how he became involved in the home invasion scheme?

A.   Yes.

Q.   How?

A.   Remy brought him in.

MR. IVERSON:  Ms. Collins, can we go back to 30A, actually?  If you'll display that one?

BY MR. IVERSON:

Q.   I believe you identified this person as Dre?

A.   Yes.

Q.   Do you know how Dre became involved in the home invasion scheme?

A.   Yes.

Q.   How?

A. Remy brought him in.

MR. IVERSON: 24F, Ms. Collins, page 1.

BY MR. IVERSON:

Q. Do you recognize that driver's license and the information next to it?

A. Yes.

Q. What is it? Whose is it?

A. Mine.

Q. Is that your phone number down there at the bottom?

A. Yes.

MR. IVERSON: The next page of this exhibit, Ms. Collins.

BY MR. IVERSON:

Q. Who's that?

A. Me.

Q. How did members of the home invasion scheme generally communicate with one another?

A. Through Telegram.

Q. What's Telegram?

A. An encrypted messaging app.

Q. Did you guys pick it on purpose?

A. Yes.

Q. Why?

A. Telegram has end-to-end encryption so no one can see what you guys are talking about.

Q. Does Telegram require Internet or a mobile phone to use?

A. Yes.

Q. Do you keep your messages?

A. No.

Q. Why not?

A. Just getting rid of evidence.

Q. So how did you get rid of them?

A. You just delete the chat.

Q. Did you keep screenshots of your messages?

A. No.

Q. Why not?

A. Defeats the whole purpose of the app.

Q. What were some of the things that you, the defendant, and others discussed in the Telegram chats?

A. Targets, how to do the home invasions, how much money they had, things along those lines.

Q. So with respect to targets, what would you discuss about targets?

A. Identifying information, addresses, account balances, pictures, if there were any.

Q. What was the last thing you said?

A. Pictures, if there were any.

Q. What kind of pictures?

A. Just pictures of the -- the person.

Q. What about their homes? Anyone ever show pictures of homes?

A. Yes.

Q. Did you discuss tactics in the Telegram chats?

A. Yes.

Q. How so? What kind of tactics?

A. Just how to gain access to the house, you know, in the easiest way possible without detection.

Q. What are some of the ideas that were discussed?

A. Posing as Door Dash drivers, Amazon delivery, people in uniform.

Q. Did you use Telegram to coordinate and plan the actual invasions?

A. Yes.

Q. There's -- was there any surveillance of targets?

A. Yes.

Q. Was that discussed in Telegram?

A. Yes.

Q. How so?

A. Just how the neighborhood was, videos of the house. If there --

Q. Sorry. I couldn't hear that last one.

A. Pictures and videos of the house. If there was a lot of activity going on, things like that.

Q. Was anything purchased for the home invasion jobs?

A.   Yes.

Q.   What were some of the things that were purchased?

A.   Guns, rental cars, things along those lines.

Q.   So for things that were purchased for the home invasions, was that ever coordinated on Telegram?

A.   Yes.

Q.   Did you guys ever meet in person?

A.   Yes.

Q.   Was that coordinated on Telegram?

A.   Yes.

Q.   So for these home invasions, you -- it sounds like you had multiple targets; is that accurate?

A.   Yes.

Q.   Did you have one chat about one ongoing -- and -- and just to be clear, this -- when I -- when we've been discussing on Telegram, is this in a group chat or is this one-on-one with each of the people involved?

A.   Both.

Q.   Both?

A.   Yeah.

Q.   Okay.

So you'd have a group chat -- that's what I'm going to ask you about.  So for the group chats, did you have just one ongoing one or were there multiple?

A.   Multiple.

Q. Why?

A. Essentially after -- after anything that went -- or after anything happened, the group chat that was used to plan would be deleted and then a new one would be created for the next job.

Q. Okay.

So often by target. You said -- you said by job, but...

A. Yes, by target.

Q. Okay.

And finally, in these group chats, was there ever communication during home invasions?

A. Yes.

Q. So you mentioned some items that were purchased, and one of the items you mentioned was guns. Why were guns purchased?

A. For use during the robberies.

Q. And if I remember correctly, Mr. Daily had the responsibility of obtaining those?

A. Yes.

Q. Will you explain how some of the -- the guns were obtained, if you know?

A. Haisel knew people from the street, so if we needed a gun or guns, he would hit his contacts up and we would just give him the money to go buy them.

Q. You mentioned rentals, what kind of rentals?

A. Rental cars.

Q. Why did you need rental cars?

A. Anonymity, I guess. Using your own personal vehicle for a home invasion isn't --

Q. Sorry, I could hear that last part.

A. Sorry.

Q. Just keep -- keep your voice up.

A. Yeah, anonymity. Using your own personal vehicle for a home invasion isn't really the best idea.

Q. During the scheme -- well, was there -- were there ever hotels rented?

A. Yes.

Q. For what purpose?

A. For the crews to stay in.

Q. Stay in during what?

A. The robberies.

Q. If you remember, what were some of the places that hotels were secured?

A. Durham, North Carolina. Texas. I don't believe there was any for Miami.

Q. Who made those bookings generally?

A. Aabis or me.

Q. So these items, who paid for this stuff?

A. Me and the Europeans.

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

Q.   How?

A.   We would just split whatever the price was evenly. They would send me cryptocurrency and then I would sell it off and then either take it out cash through an ATM or send it to Matt for him to send whatever he needed to.

Q.   Okay.

How would you send it to Matt if you did it that way?

A.   Through Zelle.

Q.   Okay.

Otherwise, the other option would be cash and just hand whoever was buying cash?

A.   Yes.

Q.   You said you were arrested on July 27th of last year. Do you know if anyone else involved in this scheme was also arrested on that date?

A.   Yes.

Q.   Who?

A.   Remy.

Q.   Where?

A.   In New York.

Q.   Do you know why he was there?

A.   For another robbery.

Q.   How'd you find out about that particular home invasion?

A.   Through Remy.

Q. How so?

A. On the way there, he asked me for gas money, and then that's when I was clued in on the robbery in New York.

Q. Okay.

Did you give him some gas money?

A. Yes.

Q. Do you know if he -- "he" being the defendant, Mr. St. Felix, was communicating with anyone else about that home invasion?

A. At the time, no. But now, yes.

Q. Were any in-person meetings held?

A. Yes.

Q. What were some of the places in-person meetings were held among the conspirators?

A. My friend Andy's house. A park that was kind of central to everyone. That's all I can think of.

Q. Where was the park? What city?

A. In West Palm Beach.

Q. Do you know what city Andy's house is in?

A. Yes.

Q. What one? What city's Andy's house in, if you know?

A. West Palm Beach.

Q. West Palm.

I'm going to hand you what I've marked Exhibit 31. Do you recognize that?

A.    Yes.

Q.    What is it?

A.    Andy's house.

Q.    Did you guys --

MR. IVERSON:  Well, let's -- I'd like to offer 31 into evidence, please.

(Government's Exhibit Number 31 was offered.)

THE COURT:  Any --

MR. DOORASAMY:  No objection.

THE COURT:  Government's Exhibit 31 is admitted.

(Government's Exhibit Number 31 was admitted and made a part of the record of this proceeding.)

MR. IVERSON:  If we could publish that, Ms. Collins.

BY MR. IVERSON:

Q.    Did you guys ever meet at Andy's before or -- and/or after a home invasion?

A.    Yes.

Q.    More than once?

A.    Yes.

MR. IVERSON:  Okay.  Thank you, Ms. Collins.

BY MR. IVERSON:

Q.    Who was the first person you targeted?

A.    Tullia Heissenberg.

Q.    Is that the same person that you SIM swapped for millions of dollars?

A.   Yes.

Q.   Why did you think she had more cryptocurrency?

A.   At the time we hacked her, we were able to get access to two custodial exchanges.  One was a BlockFi account, which held the 3.5 million, and the other was a Gemini account, which had a million in crypto.

Q.   So you suspected she had -- still had what?

A.   About a million dollars in the Gemini.

Q.   Did you share that information with the defendant and others?

A.   Yes.

Q.   Who did you expect to be at Ms. Heissenberg's home?

A.   Her and her husband.

Q.   Do you know anything about her husband?

A.   Yes.

Q.   What?

A.   He has Parkinson's.

Q.   Did you know that before the home invasion?

A.   Yes.

Q.   How did you know that?

A.   Through a news article.

Q.   Did you share that with the defendant and others?

A.   Yes.

Q.   How would you have communicated that information?

A.   Through Telegram.

Q. Do you know if there was surveillance done on Ms. Heissenberg's home prior to the home invasion?

A. Yes.

Q. Do you know who conducted that surveillance?

A. Yes.

Q. Who?

A. Remy.

Q. How do you know that?

A. He sent pictures and videos of the house in a Telegram group chat.

Q. I'm going to direct your attention to the evening of December 12th of 2022. Did defendant and others commit a home invasion?

A. Yes.

Q. Of who?

A. Tullia Heissenberg.

Q. Before we get to the -- into that, what was the plan?

A. Gain access to the house, detain who was ever in there, and then get her to open her phone and then just send the cryptocurrency through the phone.

Q. Were you going to remotely connect?

A. No.

Q. So how was the plan -- how was -- how were you going to get the crypto for this one?

A. We sent a bunch of tutorials to the crew on how to

send and receive cryptocurrency, so we thought that they knew how to do it.

Q.  Okay.

Do you know which member of the crew specifically was going to send the cryptocurrency from Ms. Heissenberg's custodial exchange account?

A.  Yes.

Q.  Who was supposed to do that?

A.  Remy.

Q.  So was the home invasion of Ms. Heissenberg successful with respect to the theft of cryptocurrency?

A.  No.

Q.  How'd you find out?

A.  Matt, Haisel, and I were in the area where -- acting as lookouts.  We were all talking on Telegram, so us and the crew had communications going.  And then for a short period, they just stopped responding.  And then afterwards, they were talking in the group chat that -- that it went wrong.

Q.  So you said you were in the area.  Were you in a vehicle?  Were you on foot?

A.  I was in my car.

Q.  You were in your car.  Was anyone with you?

A.  Yes.

Q.  Who was with you?

A.  Matt.

Q. Do you know whether there were any firearms in the car?

A. Yes.

Q. Whose?

A. Mine.

Q. What kind?

A. A pistol.

Q. Okay.

And your and Matt's job was what for the Tullia Heissenberg home invasion?

A. Lookouts.

Q. My understanding from your testimony is that Haisel Daily's job was the same?

A. Yes.

Q. And where was he?

A. Further down the road somewhere opposite from where Matt and I were.

Q. Do you know if he was on foot or in a car?

A. In a car.

Q. Do you remember what kind of car?

A. I don't recall.

Q. Who went into the house?

A. Physically into the house, it was Remy, Kilo, and some guy named Dummy.

Q. Do you know how to spell Dummy?

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A.   D-u-m-m-y.

Q.   Do you know how they got to the house?

A.   They broke a window.

Q.   Was Scrappy involved in this particular home invasion?

A.   Yes.

Q.   How so?

A.   He was the driver.

Q.   For who?

A.   For the -- the crew that was going in the house.

Q.   Do you know where they parked?

A.   Yes.

Q.   Where?

A.   There was a parking lot, like, right behind Ms. Heissenberg's house.

Q.   So it went wrong.  Did you guys go anywhere afterwards?

A.   Yes.

Q.   Where?

A.   We met in front of Andy's house.

Q.   For what purpose?

A.   Just to discuss what -- where -- what went wrong.

Q.   Were you told what went wrong?

A.   Yes.

Q.   By who?

A.  I don't remember.

Q.  Okay.

What did you learn?

A.  That Ms. Heissenberg essentially showed them papers saying that she was hacked and that her crypto was stolen already and they believed her and then they just left after.

Q.  Did Dummy participate in any future home invasions?

A.  No.

Q.  Do you know why?

A.  Yes.

Q.  Why?

A.  They didn't want him on the crew anymore.

Q.  Who is "they"?

A.  Remy.

Q.  Did Remy tell you why he didn't want him on the crew anymore?

A.  Something about him getting in a fight with the old guy.

Q.  What old guy?

A.  Her husband.

Q.  Whose husband?

A.  Ms. Heissenberg's.

MR. IVERSON:  One minute.

BY MR. IVERSON:

Q.  Did you know if the individuals that went in Ms.

Heissenberg's house were armed?

A. Yes.

Q. Do you know if each of them was armed?

A. Yes.

Q. With what?

A. A pistol.

Q. Okay.

So firearms?

A. Yes.

Q. Was there a next target after Ms. Heissenberg?

A. Yes.

Q. Who was that?

A. Justin Baretto in Miami.

Q. Why was Mr. Baretto selected as a target?

A. Tidy, Aabis, and I got information that he was involved with our robberies.

Q. The robberies against you, where they stole cryptocurrency?

A. Yes, and Tidy.

Q. Tidy being who?

A. Neb.

Q. Aside from that, did you expect Mr. Baretto to have cryptocurrency?

A. Yes.

Q. Why?

A. He was a known SIM swapper. He worked with a lot of people that had a lot of money.

Q. A lot of people who had what?

A. Had a lot of money.

Q. Okay.

MR. IVERSON: Give me one moment.

BY MR. IVERSON:

Q. So when you say known SIM swapper, if you know, was his reputation as a SIM swapper for stealing things?

A. Yes.

Q. What?

A. Cryptocurrency.

Q. Did you expect Mr. Baretto to have Bitcoin and/or Ether?

A. Yes.

Q. Do you know if any surveillance was done on his house?

A. Yes.

Q. What was the -- or I guess how do you know that?

A. Pictures and videos were sent to a group chat we had on Telegram.

Q. If you know, do you know who conducted the surveillance?

A. Remy was involved.

Q. What was the plan for Mr. Baretto's home invasion?

A. Just go in, gain access to his cryptocurrency wallets, and then send his crypto currency to wallets that we controlled.

Q. Do you remember if you were going to remotely connect on this one?

A. Yes.

Q. You were -- you were going to remotely connect to his devices?

A. Yes.

Q. Direct your attention to the afternoon of September 15th of 2022. What happened?

A. Matt, Haisel, and I were in the area as lookouts. Remy and the crew were in a black Cadillac. We were talking beforehand, and then someone said that Justin was pulling into his driveway.

Then all communications were cut off until Remy sent a picture of Justin in the backseat of the car and said that the plan was changed.

Q. What'd you understand that to mean?

A. That he took him out of the house.

Q. Was that the plan?

A. No.

Q. So you were in the area of Justin Baretto's home; is that correct?

A. Yes.

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

Q. This is in or around Miami, Florida?

A. Yes.

Q. About how far from West Palm?

A. Forty miles.

Q. Okay.

North or south?

A. South.

Q. What kind of car were you in?

A. My car.

Q. Your BMW?

A. Yes.

Q. Was someone else in the car with you?

A. No.

Q. You mentioned you were talking to other people that were also in a car; is that correct?

A. Yes.

Q. Who were they?

A. Matt and Haisel.

Q. Were they together?

A. Yes.

Q. Do you know what car they were in?

A. In an orange Dodge Charger.

Q. And what was your, Matt, and Haisel's job?

A. Lookouts.

Q. Do you know who went into Justin Baretto's home?

A.    Yes.

Q.    Who?

A.    Remy, Dre, and Kilo.

Q.    And do you know what kind of car they were in before they did that?

A.    Yes.

Q.    What kind?

A.    A black Cadillac.

Q.    Know who was driving?

A.    Scrappy.

Q.    Do you know what kind of car Scrappy drove for the Ms. Heissenberg home invasion?

A.    The same car.

Q.    Black Cadillac?

A.    Yes.

Q.    So once you learned that they had taken Baretto from the home and he was in a car -- actually, let me ask you: Well, do you know what car he was in?

A.    Yeah, he -- he was in a yellow Mustang.

Q.    Okay.

      That's his car?

A.    Yeah, his car.

Q.    Okay.

      Once you get the picture from the defendant and you learned that he was -- that Justin Baretto was taken out of the

home, where was -- where was that picture from?  What did that picture show?

A.   Him in the backseat of the Cadillac.

Q.   In the back of the Cadillac?

What'd you guys decide to do at that point?

A.   At that point, Tidy had gained access to his Telegram and then we just had the idea of just extorting the people he worked for or, you know, trying to get money out of anyone that he had contact with.

Q.   Who's "we"?

A.   Me and the Europeans.

Q.   Did you communicate that plan to the guys in the Cadillac?

A.   Yes.

Q.   And how did they respond?

A.   They were all down for it.  I mean, I learned later that they were already trying to extort his father.  So...

Q.   So what happened once you guys decided to -- to do this, to roll with this?

A.   I mean, I freaked out.  I was just driving around aimlessly for a long time.  Tidy and Aabis logged into Justin's Telegram and they were having the people in the car send videos and pictures of Justin so then they can use those pictures and try and extort people from Justin's Telegram.

Q.   Okay.

Extort how?

A. Getting money out of them to spare Justin or saying that if they didn't send money that they were next.

Q. How was -- in -- in a little more detail, if you can, how was Justin's kidnapping or abduction advertised to these people?

A. Through Telegram.

Q. And where were those -- and I believe they're images and videos, you said?

A. Yes.

Q. Of Justin in the car?

A. Yes.

Q. Who -- where were those videos and images sent on Telegram?

A. Into a group chat.

Q. Into a group chat?

A. Yes.

Q. So how -- where -- where were the people that were being broadcast about this abduction, where were they supposed to send funds?

A. To a website that Tidy set up that had a list of cryptocurrency tickers and then addresses to receive that cryptocurrency and that we controlled.

Q. Do you know if anyone sent money?

A. Yes.

Q. Okay.

Do you know how much?

A. Someone sent $10 as a joke.

Q. Is that it?

A. Yes.

Q. Do you know what happened ultimately to Justin?

A. Yes, they dropped him off somewhere. And then I was told later on that someone -- that Kilo shot in the air to scare him, and they just drove off.

Q. Do you know how long Justin was in the Cadillac with those guys?

A. A few hours.

Q. With respect to the home invasion of the Heissenbergs, as well as Justin Baretto's, do you recall whether the people that went in the house were wearing any masks, if you know?

A. Yes.

Q. Were they?

A. Yes.

Q. What about gloves?

A. Yes.

Q. They were?

A. Yeah.

Q. I have in my hand what I have marked Exhibit 32.

MR. IVERSON: I'm actually going to hand this to Ms.

Collins.

If we could, Ms. Daniel, can we bring up the thumbnails of what's on that CD for just the witness and not the jurors?  Is that possible, so I can have him ID that?

I -- I can take him the computer.

THE COURT:  I'm sorry?

MR. IVERSON:  I can bring -- if I can bring the computer up and show him --

THE COURT:  You can.

MR. IVERSON:  -- what's on the CD.  Authenticate it that...

BY MR. IVERSON:

Q.    Mr. Seemungal, do you recognize those five videos?

A.    Yes.

Q.    What are they?

A.    Videos from Justin being in the back of the car.

Q.    Under what circumstances did you see them?

A.    Through Telegram.

MR. IVERSON:  Your Honor, if -- we'd like to enter Exhibit 32 into evidence.

(Government's Exhibit Number 32 was offered.)

MR. DOORASAMY:  No objections.

THE COURT:  Government's Exhibit 32 is admitted.

(Government's Exhibit Number 32 was admitted and made a part of the record of this proceeding.)

MR. IVERSON: Okay.

And, Ms. Collins, I would like you to play Video 1 until -- well, let's play it all the way through and then I'll have you stop it at the six-minute mark, six-second mark.

(Video is playing.)

BY MR. IVERSON:

Q. Mr. Seemungal, what's a plug at a store?

A. A cellphone store employee.

Q. For what purpose?

A. SIM swapping.

Q. An insider?

A. Yes.

MR. IVERSON: Ms. Collins, if you'll just take it to the second six for me, and I'm going to have you zoom in. That's perfect. That's fine.

Can you zoom in on the gun on the right? Thank you. And if you'll play Video 5 on this CD.

(Video is playing.)

BY MR. IVERSON:

Q. Did you and the others target anyone after Justin Baretto?

A. Yes.

Q. Who's that?

A. Tyrek in Texas, and then Michael Prim in North Carolina.

Q. Okay.

So let's talk about Tyrek in Texas. Do you know where in Texas Tyrek lived?

A. Little Elm.

Q. Does he go by Tyrek?

A. Online?

Q. Yeah.

A. No.

Q. Okay.

When you guys talked about him, how'd you refer to him?

A. Tye.

Q. Tye, T-y-e?

A. Yes.

Q. Was Tye an investor or a criminal?

A. Criminal.

Q. How was he selected as a target?

A. One of the -- one of the friends of Aabis was close friends with Tye and then he was just known to have a lot of money.

Q. How much money did you expect him to have?

A. Six or 7 million.

Q. Did you do any research to try to confirm that?

A. Yes.

Q. What was that?

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A.    Well, he posted all the screenshots and stuff of his wallets himself on Instagram and Telegram and stuff like, so it was kind of -- we just knew.

Q.    When you say, "wallets," what kind of wallets?

A.    Cryptocurrency wallets.

Q.    Did he post anything else of value online?

A.    Yes.

Q.    What?

A.    Cash and jewelry.

Q.    What kind of jewelry?

A.    Watches, chains, and pendants.

Q.    So he lived in Little Elm.  Do you know if there's any major cities near Little Elm?

A.    Yes.

Q.    What one?

A.    Dallas.

Q.    Have you ever been to Tye's house?

A.    Yes.

Q.    Do you recognize that?

A.    Yes.

Q.    Or I should say the exhibit for the record. Thirty-three for identification.  What is Exhibit 33, sir?

A.    A picture of the front of Tyrek's house.

MR. IVERSON:  Offer 33 into evidence.

(Government's Exhibit Number 33 was offered.)

MR. DOORASAMY: No objection.

THE COURT: Thirty-three is admitted.

(Government's Exhibit Number 33 was admitted and made a part of the record of this proceeding.)

MR. IVERSON: Ms. Collins.

BY MR. IVERSON:

Q. So that's Tye's house?

A. Yes.

Q. So with respect to the home invasion of Tye, initially what was the plan?

THE COURT: I'll tell you what, before he answers that, let's -- it's 10 after 11:00, let's take a midmorning recess.

Ladies and gentlemen, I'm going to excuse you for 15 minutes for our midmorning recess.

(Jurors exiting the courtroom at 11:10 A.M.)

THE COURT: We'll be in recess for 15 minutes.

(Off the record at 11:10 A.M.)

(On the record at 11:24 A.M.)

THE COURT: Everybody's here. Send the jury back in and we'll get started.

(Jurors entering the courtroom at 11:26 A.M.)

THE COURT: All right. Mr. Iverson, you may continue.

MR. IVERSON: Thank you.

Ms. Collins, bring up 33.

CONTINUED DIRECT EXAMINATION

BY MR. IVERSON:

Q. So just to reorient, Mr. Seemungal, this is Tye's house; correct?

A. Yes.

Q. And he was the target you guys were going for after Justin Baretto; is that accurate?

A. Yes.

Q. Okay.

MR. IVERSON: Thank you, Ms. Collins.

BY MR. IVERSON:

Q. So initially what was the plan with respect to the home invasion of Tye?

A. Same as before. Get a rental car. Have the crew drive over to Texas and then do the robbery.

Q. Where would the crew drive from?

A. Florida.

Q. And who would -- who would -- who was part of this?

A. Originally it was Remy, Dre, Kilo, and Scrappy.

Q. Okay.

Did the defendant, Remy St. Felix, go to Texas multiple times for the Tye home invasion?

A. Yes.

Q. On each of the trips, what was the -- what was the

purpose? What was the goal?

A. Commit a robbery for the cryptocurrency.

Q. Do you know approximately how many times Tye went to Texas? Or, I'm sorry, the defendant went to Texas?

A. Three.

Q. And the -- the first trip, you mentioned some other individuals just a minute ago. Is that the trip you were referencing?

A. Yes.

Q. Okay.

So who -- who went with the defendant on the first trip?

A. It was Scrappy, Remy, Kilo, and Dre.

Q. Okay.

Do you know what happened?

A. They started arguing and then they just -- they didn't want to do it, so they came back home.

Q. At any point was anyone from Texas involved in the plan to home invade Tye?

A. Yes.

Q. Who?

A. Originally at first it was Dean and Tristan.

Q. And remind the jurors who Dean is.

A. Dean is the guy in Texas.

Q. Okay.

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A friend of yours?

A.   Yes.

Q.   How'd you meet him?

A.   Through Minecraft.

Q.   Who's Tristan?

A.   Tristan is Dean's friend.

Q.   What was their role going to be initially?

A.   Lookouts.

Q.   And who was going to do the actual home invasion?

A.   The people from Florida.

Q.   That include the defendant?

A.   Yes.

Q.   The last time that the defendant tried to go to Texas, do you know what happened?

A.   Yes.

Q.   What happened?

A.   They got in a high-speed chase with police in Louisiana and ended up crashing the car.

Q.   Do you know who was there?

A.   Remy and Dre, I know.  Then someone that Remy brought in and then another guy that Matt brought in.

Q.   Do you know if anyone was hurt?

A.   Yes.

Q.   Who was hurt?

A.   Remy.

Q.   How?

A.   His leg was broken.

Q.   Was that in the car wreck fleeing from the law enforcement officer?

A.   Yes.

MR. IVERSON:   Ms. Daniels, may I have 26E and 26F, if you have those?

BY MR. IVERSON:

Q.   Mr. Seemungal, I'm going to hand you what's 26E and F.  Do you recognize those?

A.   Yes.

Q.   What are they?

A.   Screenshots of Telegram chats.

THE COURT:   Screenshots of who?

THE WITNESS:   Telegram chats.

THE COURT:   Oh.

BY MR. IVERSON:

Q.   And what are they about?

A.   The home invasion robbery.

Q.   Of anyone in particular?

A.   Tyrek.

MR. IVERSON:   I'd offer 26E and F into evidence.

(Government's Exhibit Numbers 26E and 26F were offered.)

MR. DOORASAMY:   No objections.

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

THE COURT: Government Exhibits 26E and F are admitted.

(Government's Exhibit Numbers 26E and 26F were admitted and made a part of the record of this proceeding.)

BY MR. IVERSON:

Q. All right.

So looking here at 26E, how many members are in this group?

A. Ten.

Q. How do you know that?

A. It says on the top.

Q. Okay.

MR. IVERSON: Ms. Collins, if you'll highlight the first blue message.

BY MR. IVERSON:

Q. Do you know who that's from?

A. Yes.

Q. Okay.

The first word's "Meow." Do you know who -- do you know who Meow is?

A. Yes.

Q. Who's Meow?

A. Me.

Q. Were you -- and you said you know this is from, who's it -- who's it from?

A.    Remy.

Q.    Can you read it please?

A.    (Reading):  Meow, I fuck with you man, I really hope this go through because --

Q.    Mr. Seemungal, I'm going to stop you.  We have a tendency to read faster than we speak.

A.    Sorry.

Q.    So if you could just try to remember to read slowly.

A.    (Reading):  I really hope this goes through because shit ain't looking too good, but I got faith in you and this plan.  So we're going to do what we have to do, but we need to get it done ASAP.  Morning is literally best time.

Q.    Morning's the best time for what?

A.    For robbery.

Q.    Of who?

A.    Tyrek.

Q.    Thank you.

MR. IVERSON:  Ms. Collins, if you will highlight the profile picture of the cat?

BY MR. IVERSON:

Q.    Do you recognize that?

A.    Yes.

Q.    What is it?

A.    My cat on a gun.

Q.    Whose gun is that?

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A.   Mine.

Q.   Is this a profile picture?

A.   Yes.

Q.   Whose profile picture?

A.   Mine.

Q.   Thank you.

And you read a chat from the defendant.  Who -- who responds next in this thread?

A.   I did.

MR. IVERSON:  If you will highlight this portion (indicating), Ms. Collins.

BY MR. IVERSON:

Q.   What is this?

A.   It's a website that lets you look at, like, Minecraft skins and capes.

Q.   So have you forwarded this image?

A.   Yes.

Q.   What does it depict?

A.   Tyrek's Minecraft capes.

Q.   What about below it?  Or do you recognize some of the capes?

A.   Yes.

Q.   What are they?

A.   Pictures of his chain and pendant and his dog.

Q.   Okay.

Is that the bottom three?

A.  Yes.

Q.  Do you know what the pendant is?

A.  Yes.

Q.  What's it say?

A.  Tye.

Q.  T-y-e?

A.  Yes.

Q.  Thank you.

MR. IVERSON:  Ms. Collins, if you'd zoom back out.

And if you'll start with "fully iced," and highlight down from there, Ms. Collins.  That's great.

BY MR. IVERSON:

Q.  Are these messages you sent?

A.  Yes.

Q.  Will you read them, please?

A.  (Reading):  Fully iced out chain with his government name on it should say enough.

And then I replied to Remy's previous message saying,

(Reading):  Yeah, I mean, I didn't know any of this info about his parents not being there, et cetera, till now. Worse comes to worse, y'all getting your 10 ball, but I'm not trippin about it because I know this nigga a lick.

Q.  What's a lick?

A.  A good target for a robbery.

Q.   What's a 10 ball?

A.   $10,000.

Q.   What was that about?

A.   That if Tyrek didn't have any money, we would pay them $10,000 each.

Q.   Who's "we"?

A.   Me and the Europeans.

Q.   Who did you guys expect to be at Tye's house during the home invasion?

A.   Tye, his brother, and his mom.

Q.   So after you write this, there's a thumbs up.  Can you explain that to the jurors?

A.   It's -- it's just a -- for a reaction emoji.  Just thumbs up usually means that whoever reacted agrees with the message.

Q.   And who -- who gave the thumbs up?

A.   Remy.

Q.   The picture next to the thumbs up, what is that?

A.   Remy's profile picture on Telegram.

Q.   Okay.

And you've seen that before?

A.   Yes.

Q.   Is that actually a picture of the defendant?

A.   No.

Q.   And if you'll read that last message in blue or what

is above it.

A.    The blue message or --

Q.    The blue message, yes.

A.    (Reading):  And when we go back, we're going to check doors and windows because I believe the Ring camera.

And then it's cut off.

MR. IVERSON:  Ms. Collins, will you display 26F?  Will you highlight the address pinned to the top?

BY MR. IVERSON:

Q.    So first I'll ask you:  Is this a screenshot image from the same text message thread as we just were reviewing in 26E?

A.    Yes.

Q.    Okay.

So in 26F here, there's an address pinned to the top of the message.  Do you recognize that address?

A.    Yes.

Q.    What is it?

A.    Tyrek's home address.

MR. IVERSON:  Thank you, Ms. Collins.

Ms. Collins, there's a profile picture that's colorful.  Will you blow that one up, please.

BY MR. IVERSON:

Q.    Mr. Seemungal, do you know whose profile picture that is?

A.    Yes.

Q.    Whose?

A.    Neb or Tidy.

Q.    Do you know what this depicts?

A.    Yes.

Q.    What?

A.    NFT?

Q.    What's "NFT" stand for?

A.    Non-fungible token.

MR. IVERSON:  Thank you, Ms. Collins.

BY MR. IVERSON:

Q.    And if you'll give this a read and summarize for the jurors what's being discussed here.

A.    Essentially we were just describing how we need to remote connect into his computer because he might have a bunch of money laying around in various cryptocurrency wallets.

Q.    And how were you going to remote connect?

A.    Through AnyDesk.

Q.    Okay.

Are there instructions here?

A.    Yes.

MR. IVERSON:  Ms. Collins, will you blow up these (indicating), please?

BY MR. IVERSON:

Q.    Will you read the message at the -- at the top that's

blown up?

A.    (Reading):  In case we need to remote in, just go to AnyDesk.com\download and install it and we'll have a nine-digit code at the top we need to connect.

MR. IVERSON:  Thank you, Ms. Collins.

BY MR. IVERSON:

Q.    Okay.

I -- I want to show you what I've got marked as 34A. It's a disc.  We're going to do it the same way I showed you the previous disc exhibit.  Just give me a minute.

Do you recognize what this is?

A.    Yes.

Q.    What is it?

A.    It's a recording that I made of a Telegram call.

Q.    Between who?

A.    Remy and I.

Q.    When or what was going on?

A.    Something was going on with the crew in Texas and Remy called me on Telegram to explain what was going on.

Q.    Why'd you record it?

A.    To send to the Europeans because they wanted to know what was going on.

Q.    Okay.

Got in my hand what I've marked 34B.  You recognize that?

A.   Yes.

Q.   What is it?

A.   A transcript of the recording.

Q.   Have you reviewed the transcript and listened to the call?

A.   Yes.

Q.   Fair and accurate reflection of what's said in the call?

A.   Yes.

MR. IVERSON:  Your Honor, I'd offer 34A and 34B into evidence.  If we're permitted, we have extra copies of the transcript for the jurors.

(Government's Exhibit Numbers 34A and 34B were offered.)

THE COURT:  All right.

Any --

MR. DOORASAMY:  No objection.

THE COURT:  All right.

Government's Exhibits 34A and 34B are admitted.

(Government's Exhibit Numbers 34A and 34B were admitted and made a part of the record of this proceeding.)

THE COURT:  Ladies and gentlemen, with respect to a transcript, a transcript is an aid to assist you in understanding what's said on the videotape, but whether a -- the actual evidence in the case -- I said, "videotape" -- the

actual evidence in the case is the audio, and whether a transcript correctly or incorrectly reflects the contents of the conversation or the identity of the -- any speakers is entirely for you to determine.

You will make this determination based on the evidence and testimony in the case, your own comparison of the transcript to what you hear on the tape, and any other relevant evidence or testimony. And if you believe the transcript is incorrect or inaccurate in any respect, you should disregard it to that extent. I'll give you additional instructions on that in the final instructions.

You may proceed

MR. IVERSON: Thank you, Your Honor.

Ms. Collins, if we could open up what is on 34A.

THE COURT: If you want to pass out those extras.

MR. IVERSON: I'll pass out.

THE COURT: You may do so. Just hand them to...

MR. IVERSON: Just take one and pass them out.

Will you click on that, but not start it yet? Thank you.

BY MR. IVERSON:

Q. So what are we looking at, Mr. Seemungal?

A. A recording of a Telegram call.

Q. Okay.

Whose desktop computer is this?

A. Mine.

Q. And the person displayed here at -- at the center, do you recognize that profile picture?

A. Yes.

Q. Whose profile picture is that?

A. Remy's.

Q. Is that a picture of Remy?

A. No.

Q. I can see that it says, "Remy" under it. Can you explain that?

A. Yeah, Remy's Telegram name was something else, so I renamed him on Telegram so that it was just easier to know it was him.

Q. Okay.

MR. IVERSON: Ms. Collins, would you play to about minute 40 -- or second 45, please.

(Video is playing.)

BY MR. IVERSON:

Q. Mr. Seemungal, what are you guys talking about?

A. This was the first trip to Tyrek's house.

Q. And does a reference you make -- I believe it's you -- if you would confirm -- to videos Dean's been sending?

A. Yes.

Q. Okay.

And that's you that references that?

A. Yes.

Q. So the other person on the call was who?

A. Remy.

Q. What are the videos Dean has been sending?

A. It was just surveillance of the house.

Q. And there's mention of flying back where -- or flying back. To where would someone be flying back?

A. To Florida.

Q. Okay.

MR. IVERSON: Ms. Collins, would you play to one minute and 55 seconds?

(Video is playing.)

MR. IVERSON: Will you stop it real quick?

Is there any way to turn it up anymore just slightly? Thank you.

BY MR. IVERSON:

Q. So I believe you say, "beaming people for seven figures"?

A. Yes.

Q. Who are you referring to doing that?

A. Tyrek.

Q. What's that mean?

A. Tyrek had just recently scammed someone for $2 million.

Q. And you guys discuss a replacement; is that correct?

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A. Yes.

Q. Or do you know what that was about?

A. One person in the crew that Remy brought didn't want to do it anymore, so we were discussing flying someone in to replace him.

Q. And the person you've identified as the defendant says, how about Monday, or something to that effect.

What is your understanding of that statement?

A. That Monday was when the robbery would take place.

MR. IVERSON: Ms. Collins, would you play to 2 minutes and 30 seconds.

(Video is playing.)

BY MR. IVERSON:

Q. You refer to "your boys" when talking to the defendant. Who are you referring to?

A. The Europeans.

Q. I think you --

MR. IVERSON: So if we could play that part again, Ms. Collins. And that's about two minutes to 2:30.

BY MR. IVERSON:

Q. So during this portion, I believe you say -- you reference "your boys" and then you reference "my boys," and I want to know who -- who those references are to. I'm going to let Ms. Collins play it again, though.

(Video is playing.)

THE WITNESS: Oh, "your boys" was referencing the crew that was there, and then whoever he was bringing in to replace whoever was having an issue.

BY MR. IVERSON:

Q. Okay.

And if you -- if you said, "my boys," who would you be -- who would you be referring to?

A. The Europeans.

Q. Europeans.

MR. IVERSON: If you'd play to two minutes and 50 seconds, Ms. Collins.

(Video is playing.)

BY MR. IVERSON:

Q. What was that conversation about or portion?

A. Just introducing the person to replace whoever was having an issue.

Q. On the way -- on the way back from where? I believe the person you identified as the defendant said on the way back from somewhere?

A. From Texas.

Q. Okay.

MR. IVERSON: Will you play to minute three, Ms. Collins.

(Video is playing.)

BY MR. IVERSON:

Q.   What'd the defendant say?

A.   That he's all in.

Q.   What'd you understand that to mean?

A.   That he was fully down to commit robberies for cryptocurrency.

MR. IVERSON:  Will you play to the end, Ms. Collins.

(Video is playing.)

BY MR. IVERSON:

Q.   You reference "generational wealth," what do you -- what do you mean?

A.   So much money that your next generation won't have to worry.

Q.   I'm sorry.  I couldn't hear the last part.

A.   So much money that your next generation wouldn't have to work.

Q.   Wouldn't have to work?

After the defendant was injured in the car wreck and broke his leg, what became of the plan to home invade and rob Tye?

A.   Dean said that his dad was very experienced in home invasions, so he wanted to pick it up.

Q.   Pick what up?

A.   The home invasion for Tye.

Q.   Did he get a crew together?

A.   Yes.

Q.    Where were they from?

A.    Texas.

Q.    So, at this point, did anyone -- once the defendant is injured in the car wreck, did anyone from Florida travel to Texas in -- in furtherance of the -- the Tye home invasion?

A.    In furtherance, no, but to pick things up from after it happened, yes.

Q.    Okay.

Did you ever go to -- to Little Elm --

A.    Yes.

Q.    -- Texas?

When did you go?

A.    December.

Q.    Okay.

For what purpose?

A.    I was dropping off the car that they were going to use.

Q.    They were going to use for what?

A.    For the home invasion.

Q.    Who was going to use it?

A.    The Texas crew.

Q.    What kind of car was it?  Like, is it a rental or is --

A.    It -- it was a rental car.

Q.    Okay.

So you were bringing the rental car from Florida to Texas for them to use it during the Tye home invasion?

A. Yes.

Q. Did you drive it out to Texas alone or with someone else?

A. With someone else.

Q. Who did you go with?

A. Haisel.

Q. Did you end up staying in Texas?

A. Yes.

Q. Why?

A. On the way there, the car got rear-ended, and then the Europeans wanted me to stay there until the new car came. And then after the new car came, they were just, like, I might as well stay there to kind of supervise the whole thing.

Q. The home invasion?

A. Yes.

Q. So ultimately you stayed to supervise the -- the Texas crew home invasion of Tye; is that correct?

A. Yes.

Q. I'm going to hand you what's marked as 17A through 17E.

All right. So this is 17A through 17E. If you'll flip through that, Mr. Seemungal.

A. (Complies.)

Q. You recognize it?

A. Yes.

Q. Is it a Telegram chat thread?

A. Yes.

Q. Group chat?

A. Yes.

Q. What's it about, generally?

A. Discussing the robbery.

Q. Of who?

A. Tyrek.

Q. Okay.

MR. IVERSON: I'd offer 17A through 17E into evidence.

(Government's Exhibit Numbers 17A, B, C, D, and E were offered.)

MR. DOORASAMY: No objection.

THE COURT: Government Exhibits 17A through 17E are admitted.

(Government's Exhibit Numbers 17A, B, C, D, and E were admitted and made a part of the record of this proceeding.)

MR. IVERSON: Ms. Collins, if you'll publish 17A.

Okay. Ms. Collins, will you highlight the first four people under the heading "participants"?

BY MR. IVERSON:

Q. Are these, Mr. Seemungal, Telegram usernames?

A. Yes.

Q. You recognize them?

A. Yes.

Q. Will you, if you know, tell the jurors who each of these usernames is?

A. Key Trust Bank is Kilo. Fawk u Mean is Remy. Dre is Dre. T is Tristan.

MR. IVERSON: Next four, Ms. Collins.

THE WITNESS: Aabis is Aabis. Dean is Dean. Neb is Neb. Stakk or Starve is Matt.

MR. IVERSON: Last four, Ms. Collins.

THE WITNESS: Meow is me. Frank Lo Bri is Jesus from Texas. Prince Baby Blue is Haisel. Scrappy561 is Scrappy.

BY MR. IVERSON:

Q. You said Jesus from Texas. Was -- how does he fit into this?

A. He is one of the drivers.

Q. For?

A. For the Texas robbery.

Q. Part of Dean's crew?

A. Yes.

MR. IVERSON: Ms. Collins, will you publish 17B, page 1, and blow up the last two messages.

BY MR. IVERSON:

Q. Will you read those, Mr. Seemungal?

A. Remy says,

(Reading): So do we all know the game plan or we need a quick synopsis?

And then I said,

(Reading): They want your expert opinion on the plan.

MR. IVERSON: Go to the next page, Ms. Collins. Highlight the first two messages on the next page.

BY MR. IVERSON:

Q. Will you read these slowly?

A. Tristan says.

(Reading): They've got a plan, but open to hear.

Remy says,

(Reading): From 9:00 P.M. to 3:00 A.M. best time for entry because that's when Door Dash will leave food on doorstep and roughly about ten minutes later, he grabs food. When I'm feet you're going to need to be by the front door without triggering the Ring camera, so stay by the windows and privacy bush. Also stay low to the floor because it's a specific blind that's low and cracked open. The window we'll be by is like a dining room area/den that takes you straight to the kitchen. As far as everything, you guys should know to play it safe.

Q. What's the date?

A. December 17, 2022.

Q. Do you know how Remy knows this information?

A. Because he was previously in Texas.

MR. IVERSON: Next three messages, Ms. Collins.

BY MR. IVERSON:

Q. And when you're -- just so you know, Mr. Seemungal, when you're -- when you turn, you get a little away from the microphone, so maybe you can adjust the microphone or just keep that in mind.

A. (Reading): Stealthiness and patience and the job is done. The dog is in the den by the front door also. No cage just like a safety gate.

Q. Who sent these?

A. Remy.

MR. IVERSON: Last two, Ms. Collins.

BY MR. IVERSON:

Q. If you'll read these.

A. I said,

(Reading): One of them went to the store real quick. Whenever nigga gets back we'll Facetime you.

Remy says,

(Reading): Try to avoid triggering Ring when parking. Also just call me when you guys ready.

Q. I'm going to direct your attention to the evening of December 12th of 2022. Oh, I said 12th.

I'm going to direct your attention to the evening of

December 22nd of 2022. What happened?

A. Dean and the techs were able to get inside the house after we assumed all of them left to go somewhere, so they all got inside the house.

His brother was there, so they detained him and just waited for everyone else to get back. And then when everyone else got back, it was his mother, Tyrek, and then I guess his dad. And then, at that point, they just started trying to get the cryptocurrency from Tyrek.

Q. Were you there?

A. Not -- not yet, no.

Q. Not -- you -- there's a time where you -- where you go, but you're not there at this point; is that correct?

A. Yes.

Q. Are you getting updates?

A. Yes.

Q. How so?

A. Through Telegram.

Q. And did you know how many people went into the house or do you know how many people were with Dean over at the house, maybe?

A. Four.

Q. Okay.

Who are they?

A. Dean, Christian, Jesse, and Jesus.

Q. Okay.

And the -- the members of Dean's crew, were they armed?

A. Yes.

And I forgot to mention a guy named Victor as well.

Q. Guy named Victor?

A. Yes.

Q. Okay.

And were they armed?

A. Yes.

Q. Do you know if they were wearing masks, gloves, or anything like that?

A. Yes.

Q. Were they?

A. Yes.

Q. Do you know if they had anything with them to detain anyone that might be in the house?

A. Yes.

Q. What did they have?

A. Jesse brought zip ties.

Q. You mentioned Tristian. Was he involved?

A. Yes.

Q. How so?

A. He was a lookout.

Q. So, in sum and substance, while you're not there --

well, actually, let me ask:  Where are you?

A.    I'm at an Airbnb a little --

Q.    Okay.

A.    -- further away.

Q.    Who was staying at that Airbnb?

A.    Me and all the Texas crew.

Q.    Okay.

What are some of the things you learned as you hear through Telegram about what's going on in the house?

A.    They're beating up Tyrek.  He gave all of these -- well, not all these, he gave a bunch of recovery phrases up for his cryptocurrency wallet, which is essentially about a 12- or 13-word phrase that will let you access a cryptocurrency wallet from anywhere.

Other than that, there really wasn't much going on. He said he didn't have anything.

Q.    Any what?

A.    Any cryptocurrency.

Q.    Did you or anyone else try to access those wallet with the recovery phrases?

A.    Yes.

Q.    What'd you find?

A.    From the screenshots the Europeans sent, there was large previous balances, but the wallets were empty.

Q.    Got it.

So the Europeans were doing that part?

A. Yes.

Q. There come a time when you went to the house?

A. Yes.

Q. Why?

A. The Europeans said I should because it was -- they were in there for, like, five hours and nothing was going on. So...

Q. For how long?

A. For five -- at least five hours. And nothing was going on, so the Europeans and I just came to an agreement that I'll just go and see what's going on.

Q. How'd you get there?

A. Tristian picked me up from the Airbnb and then dropped me off at some secluded spot and then Jesus, from Texas, went to that spot, and then from that spot I went to the house.

Q. When you entered the house, were you armed?

A. Yes.

Q. With what?

A. A gun that Jesus gave me.

Q. And when you -- when you got inside, do you remember who else was inside?

A. Yes.

Q. Who?

A. Dean, Jesse, Victor, and Christian.

Q. And they were armed?

A. Yes.

Q. Did you see Tye's mom?

A. Yes.

Q. What -- what condition was she in?

A. She was tied up sitting on a couch upstairs.

Q. Tied up how?

A. Zip-tied.

Q. Did you see Tye's father?

A. Passing glance. He was downstairs.

Q. Recall if he was tied up or not?

A. No.

Q. No, you don't recall --

A. I --

Q. -- or no he wasn't --

A. -- don't recall.

Q. -- tied up?

A. I don't recall.

Q. Okay.

And what about Tye's brother?

A. I don't know where he was.

Q. Okay.

What about Tye?

A. He was downstairs; him and Christian were waiting for

me to get there.

Q.   Okay.

What kind of condition was Tye?

A.   Beat up.  His face was swollen.

Q.   Do you recall if he was restrained or not?

A.   He wasn't.

Q.   What happened once you arrived?

A.   I get dropped off.  Tyrek and Christian are just waiting in, like, the -- the garage entrance area, I guess.

Then we go upstairs to his room.  Passing his mom, I hit her with the butt of a gun, and then we went into his room. I got on his computer and started looking through his computer, essentially, to find any hidden wallets or see if he had anything hidden around his room, you know, disguising a hardware wallet or something like that.

And then while on his computer, I heard him yell, and then I turn around, and Dean had an iron in his hand and, so, he irons Tyrek.

And then after that, Tye said that he had -- he had his -- his real wallet buried in the backyard, and then Jesse brought him down, and then after that he jumped the fence and escaped.

Q.   Jumped -- where -- where'd he jump the fence?

A.   In his backyard.

Q.   You said you hit Tye's mother with a gun?

A.    Yes.

Q.    Where did you hit her?

A.    In the face.

Q.    I have in my hand what's marked as 18A through 18E.

MR. IVERSON:  I actually offer 18A through 18E into evidence at this time.

(Government's Exhibit Numbers 18A, B, C, D, and E were offered.)

MR. DOORASAMY:  No objection.

THE COURT:  Government Exhibits 18A through 18E are admitted.

(Government's Exhibit Numbers 18A, B, C, D, and E were admitted and made a part of the record of this proceeding.)

MR. IVERSON:  Let me grab 18C and 18D out of this and bring those to you, Mr. Seemungal.

BY MR. IVERSON:

Q.    Will you take a look at those?

A.    (Complies.)

Q.    You recognize those?

A.    Yes.

Q.    What's 18C?

A.    A picture that Dean took of Tye's brother tied up.

Q.    Okay.

Did you receive that picture?

A.   It was sent in the group chat.

Q.   This when you were at the Airbnb rental?

A.   Yes.

MR. IVERSON:  Will you display 18C, please, Ms. Collins?

Will you highlight the individual on the floor with his hands behind his back, Ms. Collins?

BY MR. IVERSON:

Q.   Is that Tye's brother, Mr. Seemungal?

A.   Yes.

Q.   Thank you.

MR. IVERSON:  If we could do the next one, 18D, Ms. Collins.

BY MR. IVERSON:

Q.   Who's that, Mr. Seemungal?

A.   Tyrek's mom.

Q.   Is that Tyrek's dog above her?

A.   Yes.

Q.   Is this taken during the home invasion?

A.   Yes.

MR. IVERSON:  Thank you, Ms. Collins.

BY MR. IVERSON:

Q.   So once Tye hopped the fence and fled, what happened?

A.   We all left the house and escaped.

Q.   Did you or anyone else say anything to any of the

members of Tye's family or to Tye -- well, Tye was gone.  Any members of Tye's family before you left the house?

A.   People said stuff, but I don't recall.

Q.   Okay.

     Do you know if people were still tied up when you left?

A.   Yes.

Q.   Who?

A.   Everyone that was tied up.

Q.   Where'd you go?

A.   We went back to the Airbnb.

Q.   And then what?

A.   And then back to Dean's apartment after.

Q.   And what city is Dean's apartment in?

A.   Houston.

Q.   So you drove from the Dallas area to Houston?

A.   Yes.

Q.   Immediately?

A.   Yes.

Q.   Was anyone able to steal anything from Tye's house?

A.   Yes.

Q.   What?

A.   $150,000 in cash, two watches, and then a chain and pendant.

Q.   The two watches, generally, what kind of watches?

A. Rolexes.

Q. And the chain and pendant, what did that look like?

A. Diamond covered chain and pendant.

Q. Okay.

There was a picture earlier where you described a chain and pendant as belonging to Tye. Was it that same one?

A. Yes.

Q. Okay.

What's the pendant say?

A. Tye.

Q. Who got these items that y'all took from the house?

A. The Texas crew and I split the cash. Jesus from Texas got one of the watches and Dean got the other one.

Q. Who got the other one?

A. Dean.

Q. What happened to the chain and pendant?

A. Someone from Florida flew into Texas to come pick it up.

Q. Do you know who that was?

A. Dre.

Q. Dre flew out and got it?

A. Yes.

Q. Was that on behalf of the Texas -- or the Florida group?

A. Yes.

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

Q. Okay.

So that was their cut?

A. Yes.

MR. IVERSON: Ms. Collins, if you'll display Exhibit 21K.

BY MR. IVERSON:

Q. Do you recognize that individual, Mr. Seemungal?

A. Yes.

Q. Do you recognize what's around his neck?

A. Chain and pendant.

Q. Do you know whose chain and pendant that is?

A. Tyrek's.

MR. IVERSON: One moment.

BY MR. IVERSON:

Q. I'm going to hand you what I have in my hand that's marked as 26G. Take a look at that.

A. (Complies.)

Q. Do you recognize it?

A. Yes.

Q. What is it?

A. A Telegram chat between Remy and I.

Q. Generally, what is being discussed?

A. Targets to rob for cryptocurrency.

MR. IVERSON: Offer 26G into evidence.

(Government's Exhibit Number 26G was offered.)

MR. DOORASAMY: No objection.

THE COURT: 26G is admitted.

(Government's Exhibit Number 26G was admitted and made a part of the record of this proceeding.)

MR. IVERSON: If you'll display, Ms. Collins. Just highlight the first third.

BY MR. IVERSON:

Q. So you said this is between you and the defendant?

A. Yes.

Q. So your messages would be on the left and his would be in blue on the right; is that correct?

A. Yes.

Q. Will you read this?

A. Remy says,

(Reading): We can lay starting tomorrow.

I said,

(Reading): Bet. Let me know ASAP. Tomorrow, Sunday as well people should be home to fully confirm.

Then I later said,

(Reading): We've got another 800K in Texas and 4 million in Canada. I don't know how that would ever work. Dirty funds.

Q. What do you mean by "dirty funds"?

A. Crypto stolen through SIM swapping or robberies.

MR. IVERSON: Would you highlight the next portion,

Ms. Collins?  About a third.

BY MR. IVERSON:

Q.   If you'll read the top part?

A.   Remy says,

(Reading):  Man, I got the team ready.  I want to clean up Laudy before we take off, though.

Q.   What do you understand that to mean?

A.   He wanted to rob the people in Fort Lauderdale before they went anywhere else.

Q.   Will you read the last two messages displayed?

A.   Yeah.  I said,

(Reading):  The thing is with actual crypto investors and shit they have so, so much.  It's like retirement licks.

Q.   Who are actual crypto investors?

A.   People that bought cryptocurrency.

MR. IVERSON:  Okay, Ms. Collins.  Last two.

THE WITNESS:  Remy said,

(Reading):  So Laudy a clean investor.

I say,

(Reading):  No, Laudy is dirty money.

Q.   Thank you.

MR. IVERSON:  Ms. Collins, will you display 21M?

BY MR. IVERSON:

Q.   Is this top part of this same chat, just a different screenshot?

A.  Yes.

Q.  Thank you.

MR. IVERSON:  21N, Ms. Collins.

BY MR. IVERSON:

Q.  Who's this chat between?

A.  Remy and I.

MR. IVERSON:  Ms. Collins, if you'll highlight the middle section starting up here (indicating).

Thank you.

BY MR. IVERSON:

Q.  Will you read that, Mr. Seemungal?

A.  Remy says,

(Reading):  Bet.  We bout to start getting active. We need a few things to kick the process off though.

I ask,

(Reading):  What's good?

Remy says,

(Reading):  We need one of those license plate magnets to cover the tag and a uniform for whoever is knocking.

I ask,

(Reading):  What are we thinking Door Dash or let me know?

Remy says,

(Reading):  More than likely Door Dash or detect.

Q.  Okay.

MR. IVERSON: If you'll highlight the rest, Ms. Collins.

BY MR. IVERSON:

Q. I do not need you to read that. I just wanted to display it.

Do you remember what target you were referencing in this particular exhibit?

A. Yes.

Q. Who?

A. A SIM swapper named Andre who lived in Fort Lauderdale.

Q. SIM swapper named Andre?

A. Yes.

Q. Did you -- is that someone you targeted after Tye Little Elm?

A. I believe so.

Q. Okay.

Do you know that it was before or after Michael Prim in Durham?

A. Before.

Q. How much did you expect Andre to have?

A. He showed Aabis screenshots of his wallet with 15 million in it.

Q. Did you have any intelligence on whether he lived alone or with other people?

A.   Yes.

Q.   What was that intelligence?  What did you know?

A.   We knew that he lived with his mom.

Q.   Okay.

So you expected her to be there?

A.   Yes.

MR. IVERSON:  Got in my hand what is marked as 19A through 19E.

BY MR. IVERSON:

Q.   This is 19A through 19E.  If you'll flip through to get oriented about what it's about.

A.   (Complies.)

Q.   You recognize what 19A through 19E is?

A.   Yes.

Q.   Are they excerpts from a Telegram chat?

A.   Yes.

Q.   Are you a member of that chat?

A.   Yes.

Q.   Is the defendant?

A.   Yes.

Q.   Generally, what are you guys discussing?

A.   Cryptocurrency robberies.

Q.   Is there a particular target that you're discussing?

A.   Yes.

Q.   Who?

A.    Andre.

MR. IVERSON:  Offer 19A through 19E into evidence.

(Government's Exhibit Number 19A, B, C, D, and E were offered.)

MR. DOORASAMY:  We object to this.

THE COURT:  No obj- --

MR. DOORASAMY:  We object.

THE COURT:  Okay.  Let me see counsel up here.  Is that hard copies of the exhibits?

MR. IVERSON:  I'm sorry?

THE COURT:  Is that hard copies of the exhibits?

MR. IVERSON:  Yes, sir.

THE COURT:  Let me see those.  Bring those with you.

All right.

(Beginning sidebar.)

THE COURT:  All right.

MR. DOORASAMY:  Your Honor, the objection is, the Government is now introducing evidence for which Mr. Felix has not been charged.  He's never indicated that these were prior bad acts, never filed anything about that.

And this is highly prejudicial to the defendant.  He's not charged with this.  This is a communication.  There is no evidence that he actually participated in a crime or committed any overt acts about this, and this has been going on now.  But I think I -- I need to object because it does not

have any relevance to the charges he's facing in this case or the issues that were raised in this case.

THE COURT: Okay.

Well, a couple of different issues. And I understand your point; he hasn't been charged with these specific home invasions, but conspiracy is very broad. It's the agreement. And then I can't remember -- which ones require overt acts?

MR. IVERSON: Kidnapping.

THE COURT: Kidnapping. Conspiracy to commit kidnapping does require proof of overt acts.

But even if it didn't, I think the Government's entitled to some latitude to prove the full scope of the agreement between the co-conspirators.

And here, Mr. Seemungal, certainly there's other evidence with respect to North Carolina and New York that has been presented, but Mr. Seemungal says this was the agreement and these were the steps taken in furtherance of the conspiratorial agreement. So it's definitely broad, but I think it is part of the criminal activity, even if it's not separate. Even if each one has not been charged specifically. So I'll overrule the objection.

(End sidebar.)

THE COURT: All right.

I'll overrule the objection. You may proceed.

The objection is overruled. Government's Exhibits

19A and 19E are admitted.

(Government's Exhibit Numbers 19A, B, C, D, and E were admitted and made a part of the record of this proceeding.)

MR. IVERSON: Okay.

Let me -- let me hand this -- actually, I might keep this here and have Ms. Collins pull it up on the screen.

So 19A through 19E is now in evidence; is that correct, Your Honor?

THE COURT: That's correct.

MR. IVERSON: Okay.

Ms. Collins, will you pull up 19A, the participant section?

BY MR. IVERSON:

Q. Do you recognize those participants, Mr. Seemungal?

A. Yes.

Q. And I'm not going to go through them all again, but you're Meow; is that correct?

A. Yes.

Q. The defendant is Fawk u Mean?

A. Yes.

MR. IVERSON: 19B, Ms. Collins, page 5. Will you highlight the middle two green chats?

BY MR. IVERSON:

Q. Will you read those, Mr. Seemungal?

A.   Remy says,

(Reading):  Definitely was home.  Saw the whips.  Not too much movement and neighborhood basically operates like Tye's.  The people diagonally across the street from them have a Ring camera, but that's all I could really see.

Q.   What do you understand "basically operates like Tye's" to mean?

A.   That the neighborhood has the same amount of traffic as Tyrek's.

MR. IVERSON:  Page 7, Ms. Collins.  Top chat.

BY MR. IVERSON:

Q.   Who sends this chat?

A.   Remy.

Q.   Do you recognize that address?

A.   Yes.

Q.   Whose address is that or whose address did you believe it to be?

A.   Andre's.

MR. IVERSON:  Page 13, Ms. Collins.

BY MR. IVERSON:

Q.   Will you look at this page, Mr. Seemungal?

A.   (Complies.)

Q.   What's being discussed here?

A.   Guns.

MR. IVERSON:  Will you highlight the first four

chats, Ms. Collins?

BY MR. IVERSON:

Q. Will you please read the first four chats?

A. His says,

(Reading): Rem, I got Chico working on it.

Remy says,

(Reading): 38 would even do. No cap.

Q. Who do you understand "Rem" to be?

A. Remy.

MR. IVERSON: Next couple messages, Ms. Collins.

Actually, if you can do the rest of the page.

BY MR. IVERSON:

Q. You said?

A. I said,

(Reading): Anything that shoots.

Q. Remy responds?

A. Remy says,

(Reading): Facts, except high point. No.

Q. What's "high point"?

A. I guess some type of gun.

Q. Okay.

What were these guns for?

A. To use during the robbery.

MR. IVERSON: Page 14, Ms. Collins. First four, please.

BY MR. IVERSON:

Q. Will you read that, Mr. Seemungal?

A. Haisel says,

(Reading): 38 getting confirmed right now.

Matt says,

(Reading): Remy, I drop the renty off to you.

Remy says,

(Reading): You can or I can scoop tomorrow. Up to you.

BY MR. IVERSON:

Q. Okay.

And if you'll remind us, what was one of Haisel's roles in the scheme?

A. Getting the guns.

Q. Getting the guns?

A. Yes.

Q. And who's Stakk or Starve?

A. Matt.

Q. And what was one of his roles?

A. Getting the rental cars.

Q. And it says,

(Reading): Remy K. I drop off renty to you.

Do you know what "Remy K" is?

A. Matt had Remy renamed on Telegram.

Q. As?

A. Remy K.

Q. So is that essentially like a tag?

A. Yes.

Q. Thank you.

MR. IVERSON: Page 24, Ms. Collins.

BY MR. IVERSON:

Q. If you'd look at this, Mr. Seemungal.

A. (Complies.)

Q. What's this about?

A. I forwarded messages, and it was a tutorial on how to install AnyDesk.

Q. Okay.

Before we look at that --

MR. IVERSON: Could we look at the first text, Ms. Collins?

BY MR. IVERSON:

Q. Who sent that text?

A. Haisel.

Q. What's it say?

A. (Reading): Remy you got wheels and group ready or what do you need?

MR. IVERSON: And, Ms. Collins, if you'll highlight the remainder?

BY MR. IVERSON:

Q. So what are these about, Mr. Seemungal, generally.

A.   It's a tutorial on how to install AnyDesk and where to go.

Q.   Okay.

MR. IVERSON:  Page 25, Ms. Collins.  Okay.  If we could highlight the first four.

BY MR. IVERSON:

Q.   If you'll read what you sent in the second message.

A.   I said,

(Reading):  Have either a trazer or ledger and Remy knows what they look like.

Q.   What's a "trazer or ledger"?

A.   It's a hardware wallet for cryptocurrency.

Q.   What's Remy say in response?

A.   Remy says,

(Reading):  Betta head out.

MR. IVERSON:  Thank you, Ms. Collins.  Last four.

BY MR. IVERSON:

Q.   Will you read the messages sent by the defendant here?

A.   Remy says,

(Reading):  We're going to need gas.  I'm waiting for everybody to suit up right now.

Q.   Last one.

A.   (Reading):  Yes.  Do we got a picture of him?

Q.   Who do you understand "him" to be referring to?

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A.  Andre.

MR. IVERSON:  Your Honor, this might be a good place to stop.

THE COURT:  All right.

Ladies and gentlemen, I apologize.  I have a hearing and one other thing I have to do during lunch.  So today lunch will be just a little bit longer.  I'm going to excuse you from 12:30 to 2:00 for a lunch and recess.  The jury's excused until 2:00.

(Jurors exiting the courtroom at 12:33 P.M.)

(Off the record at 12:33 P.M.)

(On the record at 2:04 P.M.)

THE COURT:  Bring the jury in.

(Jurors entering the courtroom at 2:04 P.M.)

THE COURT:  Mr. Iverson, you may continue.

MR. IVERSON:  Thank you.

Ms. Collins, will you bring up 19C, page 1?  If you'll highlight the green message.

BY MR. IVERSON:

Q.  Mr. Seemungal, who's is that message from?

A.  Remy.

Q.  Will you read it?

A.  (Reading):  We ain't mash gas cause we didn't want to trigger shit.  Now you can send me his TLO one more time.

Q.  You're Meow; correct?

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A. Yes.

Q. What's a TLO?

A. Trans Union Lookup. It's just, essentially, a full background check.

Q. And how did you have access to that, generally?

A. Through some guy on Telegram.

Q. Guy on Telegram?

A. Yep.

Q. And would you use that to look up or do background checks on -- on targets for your home invasion robbery scheme?

A. Yes.

MR. IVERSON: Page 2, Ms. Collins.

BY MR. IVERSON:

Q. If you'll look at this, Mr. Seemungal.

A. (Complies.)

Q. What are -- what are you sending here?

A. TLO PDF files.

Q. Okay.

If you will read the third chat from the bottom.

A. I said,

(Reading): Mom's TLO.

MR. IVERSON: Page 3, Ms. Collins.

BY MR. IVERSON:

Q. The second chat, Mr. Seemungal.

A. Sent the file and said,

(Reading):  Father's TLO.

MR. IVERSON:  Bottom chat, Ms. Collins.

THE WITNESS:  Remy says,

(Reading):  Remind me of Granny.

BY MR. IVERSON:

Q.   Of who?

A.   Of Granny.

MR. IVERSON:  Next page, Ms. Collins.

BY MR. IVERSON:

Q.   Did you respond to the chat from the defendant that said, "Remind me of Granny"?

A.   Yes.

Q.   Will you read your response?

MR. IVERSON:  Ms. Collins, it's the third chat.

THE WITNESS:  I said,

(Reading):  No chance on getting beat up by an old man with Parkinson's this time at least.

BY MR. IVERSON:

Q.   What were you referring to?

A.   Ms. Heissenberg's husband.

Q.   And what -- who'd you understand "Granny" to be?

A.   Tullia Heissenberg.

MR. IVERSON:  Ms. Collins, will you go to 19D, page 1.  First three messages, please.

BY MR. IVERSON:

Q. Will you read these, Mr. Seemungal?

A. Remy says,

(Reading): Ten minutes away. Neighborhood looking smooth. We better check if the door unlocked.

Q. Do you know whose door they're about to check to see if it's unlocked?

A. Andre.

MR. IVERSON: Page 2, Ms. Collins. Second message, please.

BY MR. IVERSON:

Q. Who's this message from, Mr. Seemungal?

A. Remy.

Q. What's the date?

A. March 2, 2023.

Q. Will you please slowly read the message?

A. (Reading): All lights off again and no cars. We about to check the door. My bad. It's a wall that we have to jump and I'm not the one jumping that big because my leg lol. Will give y'all an update in a few.

Q. Do you have an understanding about what the defendant meant by "my leg"?

A. Yes.

Q. What was it?

A. When he broke his leg in Texas, I guess there was, like, some metal implanted.

MR. IVERSON: Page 8, Ms. Collins. Just the two green messages.

BY MR. IVERSON:

Q. Will you read those, Mr. Seemungal?

A. Remy says,

(Reading): Call now.

Q. Did you call the defendant?

A. Yes.

Q. What did you learn?

A. The address on the TLO was an old address and that it was an empty Airbnb.

Q. What was an empty Airbnb?

A. The address that we gave him.

Q. For who?

A. For Andre.

Q. The Fort Lauderdale address?

A. Yes.

MR. IVERSON: I'm going to 19E now, Ms. Collins. Page 2. Last chat.

BY MR. IVERSON:

Q. What's the date?

A. March 28, 2023.

Q. Will you read the chat?

A. (Reading): We better shoot to NC soon.

Q. Who's this from?

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A.   Remy.

Q.   Do you know what he's referencing here?

A.   Durham.

Q.   Durham what?

A.   Durham, North Carolina.  Michael Prim.

Q.   The planned home invasion of Michael Prim?

A.   Yes.

MR. IVERSON:  Next page, Ms. Collins.  First message.

BY MR. IVERSON:

Q.   Will you read that?

A.   Remy says,

(Reading):  Making sure all of the tech team ready and I got the goons on go.

Q.   Who do you understand to be the tech team?

A.   The Europeans and I.

Q.   Who do you understand to be the goons?

A.   Remy and whoever he brings with him.

Q.   To do what?

A.   Commit the robberies.

Q.   So --

MR. IVERSON:  Thank you, Ms. Collins.

BY MR. IVERSON:

Q.   Turning back to Durham, or Michael Prim, as you described it, who provided that target to the group?

A.   Tidy's friend, Galaxy.

Q. And Tidy's Neb; correct?

A. Yes.

Q. When did Galaxy become involved in -- in your particular scheme to commit home invasion robberies, approximately.

A. He was kind of involved from the beginning. He was giving me, like, tips and pointers and stuff. But in terms of supplying targets, it wasn't until North Carolina that he really got involved.

Q. Okay.

Do you know how Galaxy developed Michael Prim as a target?

A. Yes.

Q. How?

A. Through a leaks database called CoinTracker.

Q. What's CoinTracker?

A. CoinTracker is essentially a cryptocurrency portfolio tracker that will list all of your balances and where they're held.

Q. Do you know how he got hold of that database?

A. He bought the database.

Q. Off where?

A. From some guy named Velma.

Q. Was there a discussion about how much Galaxy would get for providing the -- the target?

A. Yes.

Q. And what was that?

A. 50 percent.

Q. Half?

A. Yes.

Q. How would the remainder be divided?

A. 30 percent would go to the robbery crew and then 20 percent was for me and the Europeans.

Q. Before the home invasion of Mr. Prim, do you know if anyone hacked any of his accounts?

A. Yes.

Q. Who?

A. Galaxy had access to his e-mail.

Q. Galaxy got access to his e-mail?

A. Yes.

Q. How'd you learn that?

A. Tidy told me.

Q. Tidy, being Neb, told you?

A. Yes.

MR. IVERSON: Give me one minute.

BY MR. IVERSON:

Q. Did you ever have access to Michael Prim's e-mails?

A. Not to his actual e-mail account, but Galaxy set up a forwarding service so that all new e-mails that he received we could all view.

Q.   How did he set up that forwarding service?  What platform did he use?

A.   Through something called YOPmail.

Q.   YOPmail?

A.   Yes.

Q.   Spell that.

A.   Y-O-P mail.

Q.   Okay.

Who had access to the -- the -- it would be an account -- right? -- a YOPmail account?

A.   Yes.

Q.   Who had access to the YOPmail account to which Michael Prim's e-mails were being forwarded?

A.   Me and the Europeans.

Q.   You and the Europeans?

What type of information did you see in there?

A.   Daily portfolio updates from CoinTracker.

MR. IVERSON:  Ms. Daniel, may I have 26J and K?  Apologize.

While you're getting that --

BY MR. IVERSON:

Q.   Who went to North Carolina for the Michael Prim home invasion?

A.   Remy and Elmer Castro.

Q.   Do you know how they got there?

A.    Yes.

Q.    How?

A.    A rental car.

Q.    Do you know who paid for that rental car?

A.    Yes.

Q.    Who?

A.    Me and the Europeans.

Q.    Do you know what make and model the rental car was?

A.    It was a BMW.

Q.    Do you know if it was a sedan or an SUV?

A.    SUV.

Q.    How did you pay for the rental car?

A.    Matt got it booked and then I just sent the cash to Matt.

Q.    Okay.

      So through Matt?

A.    Yes.

Q.    Do you know where they stayed in North Carolina?

A.    Yes.

Q.    Do you recall who arranged that?

A.    It was either Aabis or I.

Q.    Either you or Aabis?

A.    Yes.

Q.    Who paid for it?

A.    Me and the Europeans.

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

Q.  Okay.

Before we get into any more specifics --

MR. IVERSON:  Ms. Collins, will you bring up 26J?

BY MR. IVERSON:

Q.  Mr. Seemungal, will you take a look at this?

A.  (Complies.)

Q.  Do you recognize it?

A.  Yes.

Q.  What do you recognize it to be?

A.  A forwarded e-mail -- the YOPmail that we had access to.

Q.  How do you recognize it to be forwarded to the YOPmail?

A.  The header at the top.

Q.  The header at the top is what?

A.  It's specific to YOPmail.

Q.  Do you know whose CoinTracker portfolio update this is?

A.  Yes.

Q.  Whose?

A.  Michael Prim.

Q.  Will you read the date?

A.  April 10, 2023.

MR. IVERSON:  Ms. Collins, the next one, 26K.

BY MR. IVERSON:

Case 1:23-cr-00260-WO    Document 115    Filed 08/11/24    Page 122 of 179

Q.   You recognize this?

A.   Yes.

Q.   Is this also a CoinTracker portfolio update that was forwarded to YOPmail?

A.   Yes.

Q.   Is it also Mr. Prim's?

A.   Yeah.

Q.   Read the date, please.

A.   April 11, 2023.

Q.   Thank you, sir.

Do you know how long the defendant and Elmer Castro, or E, were in North Carolina?

A.   A few days.

Q.   Few days.  So more than a day?

A.   Yes.

Q.   Do you know if they conducted any surveillance on Mr. Prim's house?

A.   Yes.

Q.   How do you know that?

A.   Through pictures and videos that were sent on Telegram.

Q.   Do you know if there were any purchases for the job made in North Carolina?

A.   Yes.

Q.   How do you know that?

A.    They talked about needing supplies from Walmart.

Q.    Do you know what was purchased?

A.    A vest.  Things to make them look like construction workers.

Q.    Did you have any advanced knowledge exactly when the home invasion would occur?

A.    No.

Q.    How did you learn it had happened?

A.    Remy called the Telegram group chat.

Q.    And what did he tell you?

A.    That they were in and just asking how to proceed.

Q.    Could you hear whether anyone else was with the defendant?

A.    Yes.

Q.    Who else?

A.    Michael Prim.

Q.    Do you know at the time -- whether at the time they called you they -- if the defendant had been accessing Mr. Crim -- Prim's computer or not?

A.    No.

Q.    He had not?

A.    No.

Q.    Okay.

Did there come a time where he was able to?

A.    Yes.

Q. Will you describe what happened from there?

A. He gained access to his computer and installed the AnyDesk. Tidy originally tried to connect to Prim's computer, but his VPN kept dropping, so I ended up connecting.

After I contacted, I just went to his web browser, went to Coinbase, and then from Coinbase, I converted all of his alt coins that he had, all the alternate cryptocurrency, into Bitcoin and Ethereum and I just started sending them off to addresses that we controlled.

Q. Did you need anything in particular to actually send the cryptocurrency off the Coinbase platform?

A. Yes.

Q. What did you need?

A. The authenticator phrase -- or the authenticator received from the phone.

Q. Who provided you that?

A. Remy.

Q. With respect to Michael Prim, what accounts were you guys targeting? What was -- what was the plan as to what to target?

A. The Coinbase account and a Gemini account.

Q. Were you able to get any funds from the Gemini account?

A. No.

Q. Were you able to get all the funds from the Coinbase

account?

A. No.

Q. How did the home invasion come to an end?

A. Remy was just telling me that they needed to go. So I --

Q. Did he tell you why?

A. Not really, just that they had -- they had been there too long and that his entire room was made out of glass so people could see in and that they just needed to go.

Q. Then what happened?

A. They left and drove off, and then during the drive back, I had Elmer make a Coinbase account and then I sent him his portion to his Coinbase account.

Q. Same day?

A. Yes.

Q. Did you send the defendant his portion?

A. Yes.

Q. When, approximately?

A. A few days after.

Q. Okay.

Why -- do you know why -- why not at the same time as Mr. Castro?

A. There was something wrong with his Coinbase account and he couldn't receive any funds.

Q. And following the home invasion, were you

communicating with them by telephone, audio call, or by text message?

A. Both.

Q. Okay.

When you spoke with them, did you speak with the defendant?

A. Yes.

Q. How did he seem? What was his demeanor?

A. Happy that we had a successful heist.

Q. So the -- you moved the funds from the Coinbase account. Where was -- where did you first move them?

A. From Coinbase into a wallet that we controlled.

Q. Who controlled it?

A. Me, Galaxy, and Neb and Aabis.

Q. Okay.

And then if I remember your prior testimony, eventually half -- or some of the funds to FixedFloat?

A. Yes.

Q. How much?

A. Half.

Q. Half.

Who was the other half for?

A. Galaxy.

Q. And before you paid the defendant and Mr. Castro, what did you do with their cut of the funds?

A. So it went from the Coinbase to a wallet we controlled. Then from the wallet we controlled, I converted it into a privacy through FixedFloat called XMR into another wallet, and then from that wallet, converted the XMR into Ethereum.

Q. Using what?

A. FixedFloat.

Q. So you used FixedFloat again?

A. Yes.

Q. Okay.

Then?

A. Then I converted the Ethereum into a stable coin USDC, which is essentially -- is just a dollar on the blockchain, and then sent them their proceeds.

Q. Do you -- do you know someone named Phillip?

A. Yes.

Q. Okay.

Was he ever a home invasion target?

A. Yes.

Q. Okay.

And was he an investor or criminal?

A. Criminal.

Q. And where did he live?

A. Orlando.

Q. Do you know who within the crew targeted him

specifically?  I don't mean who picked him.  I mean, was there any surveillance done?

A.  Yes.

Q.  By who?

A.  By Remy and E.

Q.  Was this before or after Durham?

A.  Before.

Q.  Were there additional home invasion targets in the summer of 2023?

A.  Yes.

Q.  For example?

A.  More investors that Galaxy had.  Some more criminals.  I learned after the fact, after Remy asked me for gas money in New York, that there was people in New York and Georgia as well, and Tennessee.

Q.  If you'll take us back.  I know you've talked about it a little bit before, but how you came to learn about New York.

A.  Through Remy asking me for gas money.

Q.  To go to New York?

A.  Yes.

Q.  Let me hand you 16A and B.  It's already in evidence.

MR. IVERSON:  Ms. Collins, will you bring up 16A?  Highlight the participants, Ms. Collins.

BY MR. IVERSON:

Q. First, Mr. Seemungal, do you see the name of this chat?

A. Yes.

Q. What is it?

A. Plus Plus Plus Plus.

Q. Is this a Telegram chat?

A. Yes.

Q. Who are the members of this -- or participants in this chat? And I'll have you start from the top one, Fawk u Mean, and go to the bottom.

A. The first one is Remy. The second one is Aabis.

Q. That would be XX?

A. Yes.

Q. The third one is Galaxy, the fourth one is me. The fifth is Matt, and the sixth is Neb.

MR. IVERSON: If we could go to -- or, actually, if you could highlight that first green bubble there, Ms. Collins.

BY MR. IVERSON:

Q. Do you know what that is?

A. Yes.

Q. What is it?

A. A Dropbox link.

Q. Do you know what that Dropbox link is to?

A. Remy's music video.

Q. Did you say, "Remy's music video"?

A. Yes.

Q. I'm going to hand you what I've marked as 35A and 35B. If you'll look at those.

A. (Complies.)

Q. Do you recognize them?

A. Yes.

Q. What do you recognize them to be?

A. The screenshots from the music video.

Q. From the music video that's linked --

A. Yes.

Q. -- at that Dropbox?

A. Yes.

Q. And who's depicted in them?

A. Remy and E.

MR. IVERSON: I'd offer 35A and 35B into evidence.

(Government's Exhibit Numbers 35A and B were offered.)

MR. DOORASAMY: We object, Your Honor.

THE COURT: Do object?

MR. DOORASAMY: Yes.

THE COURT: All right.

Let me see that list of exhibits, Joy. Just your record, your list.

(Beginning sidebar.)

MR. IVERSON: So Mr. Seemungal just testified that

the Dropbox link in these chats are to this music video, and so it's just screenshots of the -- where the link in the Dropbox takes you.

THE COURT: And your objection is?

MR. DOORASAMY: Yes. What's the relevance?

MR. IVERSON: So there's a couple things. Ultimately, I expect Mr. Santiago to testify that that chain was bought with Prim's stolen funds.

THE COURT: Uh-huh.

MR. IVERSON: I think now, though, for relevance purposes, we've been talking about the bigger guy and the litter guy. I think that picture shows Mr. Castro as the littler guy. It also shows their association. And it's -- he's posting a video of himself, so it goes to the identity of Fawk u Mean as well.

THE COURT: And you say?

MR. DOORASAMY: He's already identified him as Fawk u Mean.

THE COURT: Yeah.

MR. DOORASAMY: He doesn't need this.

THE COURT: Well, in a jury trial -- I mean, there's a lot of stuff going on in this case, but I don't find this to be cumulative. It's -- I think the fact the video's in the Dropbox, these are photos from the Dropbox, and maybe that accurately reflects, but it doesn't. But I do think that adds

to Mr. Prim's testimony. So I'll overrule.

MR. IVERSON: Mr. Prim's or...

MR. DOORASAMY: Mr. Seemungal's testimony.

THE COURT: Wasn't it Prim who said, big guy, little guy?

MR. IVERSON: Oh, yes. Got it.

(End sidebar.)

THE COURT: I'll overrule. Government's Exhibit 35A and 35B are admitted.

(Government's Exhibit Numbers 35A and 35B were admitted and made a part of the record of this proceeding.)

MR. IVERSON: Ms. Collins, will you publish 35A?

BY MR. IVERSON:

Q. Do you recognize these individuals?

A. Yes.

Q. Who are they?

A. Remy and E.

Q. Okay.

Which one's which?

A. Remy's in the foreground. E's in the background.

MR. IVERSON: 35B, Ms. Collins.

BY MR. IVERSON:

Q. Do you recognize who that is?

A. Yes.

Q. Who's that?

A. Remy.

MR. IVERSON: Thank you, Ms. Collins.

Ms. Collins, will you bring up 26H, which is already in evidence?

BY MR. IVERSON:

Q. I'm going to hand this up to you, sir.

This is a screenshot of the Telegram chat?

A. Yes.

Q. Looking at the chat, do you know who this is between?

A. Remy and Neb.

Q. Will you read the second message?

Or, I'm sorry.

MR. IVERSON: Ms. Collins, will you highlight the second message, including the heart and the mobile profile picture there?

BY MR. IVERSON:

Q. Will you read that, Mr. Seemungal?

A. (Reading): Me and him been hacking into people's mails and seeing their crypto portfolios.

Q. Who sent that?

A. Neb.

Q. Who would he be referencing?

A. Him and Galaxy.

Q. Him and Galaxy?

A. Yes.

Q. And then someone loved this within the Telegram platform; is that correct?

A. Yes.

Q. Do you recognize whose profile picture is next to that heart?

A. Yes.

Q. Whose is that?

A. Remy.

MR. IVERSON: Will you blow up that profile picture, Ms. Collins?

BY MR. IVERSON:

Q. So this is a different profile picture than the -- the one you identified as his previously; is that correct?

A. Yes.

Q. Okay.

Can you have multiple Telegram profile pictures?

A. Yes.

Q. Thank you.

MR. IVERSON: 16B, Ms. Collins. Page 4, please.

BY MR. IVERSON:

Q. Do you see the third text from you?

A. Yes.

MR. IVERSON: Yeah. If you could blow it up, please.

BY MR. IVERSON:

Q. What's the date?

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A.   July 26, 2023.

Q.   Okay.

And if you will read the remainder of the text messages on this page.

You can read them to yourself and then just summarize what -- what's going on here.

A.   (Complies.)

It's just essentially what's going on in the neighborhood, like, the daily activity, traffic, and things like that.

Q.   Which target's neighborhood?

A.   New York.

MR. IVERSON:  Next page, Ms. Collins.  First two, please.

BY MR. IVERSON:

Q.   Second -- will you read the second text message that's highlighted?

A.   Says,

(Reading):  I thought we agreed on Amazon.  That's why we got the gear.

Q.   Do you know what that's in reference to?

A.   Wearing Amazon gear to try and trick them into opening the door.

Q.   And you said these were from July 26th of 2023; correct?

A. Yes.

Q. Is that the day before you and the defendant were arrested?

A. Yes.

MR. IVERSON: Give me one moment, Your Honor.

No further questions at this time.

THE COURT: Cross-examination.

MR. DOORASAMY: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. DOORASAMY:

Q. Good afternoon, Mr. Seemungal.

A. (No response.)

Q. Good afternoon.

A. Oh, good afternoon.

Q. Now, how old are you today?

A. Twenty-three.

Q. And at the time you got into the crypto crime game, you were 19?

A. Yes.

Q. Throughout your testimony today, you mentioned "me and the Eurpoeans"; that correct?

A. Yes.

Q. Can you tell me how many Europeans there were with you?

A. Three. Well, when I've referenced me and the

Eurpoeans, I'm speaking of the two of them.

Q. Okay.

And how long did you know the Europeans?

A. From six to seven years for one of them, and then seven to eight for the other one.

Q. And what do the Europeans do for a living?

A. Steal crypto.

Q. But did they have any legitimate job?

A. No, they were university students.

Q. How old are your European contacts?

A. I don't know.

Q. How old are they?

A. I don't know.

Q. You don't know?

A. No.

Q. You've never seen them?

A. No.

Q. But you trusted everything they told you to do; is that correct?

A. Yes.

Q. Do you recall that you were debriefed in this case four -- on four separate occasions?

A. Yes.

Q. First time you spoke to the police was on August 9, '23; correct?

Case 1:23-cr-00260-WO    Document 115    Filed 08/11/24    Page 138 of 179

A.    I believe so.

Q.    And then on October 23, 2023; isn't that correct?

A.    Yes.

Q.    Is that correct?

A.    Yes.

Q.    Then you spoke to them again on March 3, 2024; correct?

A.    Yes.

Q.    And then you spoke to them on April 11, 2024?

A.    I believe so.

Q.    And you decided to be debriefed so that you can be assisted as far as your sentence is concerned; isn't that correct?

A.    Yes.

Q.    Now, you testified earlier on that you might be looking at zero to life; is that correct?

A.    Yes.

Q.    And what sentence do you anticipate getting?

A.    I don't know.

Q.    But you do expect to get a much lower sentence because you have now told the story against others that are involved in this -- in this case?

A.    Yes.

Q.    You were charged with two other defendants; correct?

A.    In the original indictment, yes.

Q.   And you were charged with nine separate counts?

A.   Yes.

Q.   You pled guilty only to three of those nine counts; isn't that correct?

A.   Yes.

Q.   And when you pled guilty, there was a factual basis that was put together that supported your guilty plea; isn't that correct?

A.   Yes.

Q.   Did you review the factual basis?

A.   Yes.

Q.   And did you agree with the factual basis?

A.   Yes.

Q.   Now, do you or did you ever hold a legitimate job?

A.   Yes.

Q.   When?

A.   When I was younger, I worked for a Minecraft server.

Q.   Did you -- - do you know the game Minecraft?

A.   Yes.

Q.   What do you know about it?

A.   It's just a massive online game.

Q.   Okay.

And your friends in Europe, are they part of Minecraft?

A.   As they play the game, yes.

Q. Okay.

Now, were -- were you not a systems administrator of Minecraft?

A. Not of the game as a whole, but a separate server.

Q. Okay.

And you were paid $25 an hour at some point for being part of Minecraft; isn't that right?

A. Not of the actual game, but of a separate server, yes.

Q. Okay.

And your friends in -- in Europe were also systems administrators for Minecraft; isn't that correct?

A. Yes.

Q. And isn't it correct that you and your friends in Europe met years ago on Minecraft?

A. Yes.

Q. And that's how you developed your relationship?

A. Correct.

Q. And through Minecraft, y'all got access to many of the targets that you went after for their crypto; isn't that right?

A. No.

Q. Well, what was the value of the information y'all got from Minecraft?

A. The only information we got from Minecraft was the

pictures and stuff that Tyrek used as a Minecraft cape.  A lot of people that SIM swap started out by playing Minecraft.

Q.   Okay.

So let's talk about swapping.  What is SIM swapping?

A.   The hijacking of a phone number so that you can receive all the texts and phone calls and information that the number would have received if it wasn't hacked.

Q.   And once did a SIM swap, you would start to see what the user of that particular account was doing; is that correct?

A.   You would see everything that the phone number would receive, yes.

Q.   And through that, you learned whether they have crypto accounts or not?

A.   No, we knew that beforehand.

Q.   Okay.

So did you learn through SIM swap -- swapping that people had crypto accounts?

A.   Not through SIM swapping, no.

Q.   Okay.

How did you learn about people's crypto then?

A.   We would run e-mail lists and databases through Coinbase's API to see if they were registered or not.

Q.   Okay.

And during your testimony, you constantly referred to "we."  So when you say, "we ran," who are you referring to?

A.   Me, Aabis, and Tidy or Neb.

Q.   Okay.

Did you break into Metro PCS telephones?

A.   Yes.

Q.   How many of them did you break into?

A.   At least a hundred people.

Q.   And how much money did you make from that?

A.   Few million.

Q.   Okay.

And did you break into people's Instagram accounts?

A.   Yes.

Q.   Did you break into people's TracFone accounts?

A.   Yes.

Q.   Did you break into MailChimp and steal people's information?

A.   No.

Q.   Did you break into people's Google Drive and steal information?

A.   Yes.

Q.   How many of that did you do?

A.   Every person you SIM swap, you check all of their cloud storage and notes and things like that.

Q.   And did you break into people's Google Drive accounts and steal their information?

A.   Yes.

Q. Did you break into Dropbox and steal their information?

A. Yes.

Q. Did you break into Evernote and steal people's information?

A. Yes.

Q. Now, you also compromised the e-mails of many people; isn't that correct?

A. Correct.

Q. And that would be innocent people communicating on their e-mail, but you would intrude and you would monitor all their private activities; isn't that correct?

A. No.

Q. Well, what would you do -- what was the purpose of breaking into people's e-mails?

A. To reset their cryptocurrency custodial exchanges and search if they had any cryptocurrency keys stored in their e-mail.

Q. So all these social media platforms that I -- I mentioned, they would provide you with opportunities to get into people's crypto accounts; correct?

A. Yes.

Q. And most of the people that held those accounts innocently did not know that these things were happening to them; isn't that correct?

A. Yes.

Q. And throughout all of this, you are sitting in your home somewhere in Florida in the room committing all of these crimes, cybercrimes; is that correct?

A. Yes.

Q. And you were with yourself with your computer at your house; isn't that right?

A. Yes.

Q. Now, do you agree that in order to commit crimes like this, you have to be tech savvy?

A. Yes.

Q. In other words, you've got to have some serious knowledge about how computers and how softwares work; isn't that right?

A. Yes.

Q. So you have testified to the number of times you have SIM swapped or broke into people's accounts or stole cryptocurrency. Would you consider yourself a tech savvy person?

A. Yes.

Q. Would you consider your European counterparts to be tech savvy?

A. Yes.

Q. Do you agree that you have to have this highly specialized knowledge, otherwise you will not be able to commit

these crimes?

A. Yes.

Q. Now, at some point, you had broken in -- you had invaded the account of a woman by the name of Tullia Heissenberg?

A. Yes.

Q. What year was that?

A. 2021, I believe.

Q. March 2021?

A. Yes.

Q. And is it correct at that time, you did not know Mr. Felix?

A. Yes.

Q. And is it correct that when you invaded that account, you did it with your European counterparts?

A. Yes.

Q. Is it correct there was no home invasion in that case in March 2021?

A. Yes.

Q. Is it correct that the entire stealing of the $3.6 million was done online?

A. Yes.

Q. And is it true that Ms. Heissenberg had no clue that the accounts were compromised and her money was stolen?

A. Yes.

Q. And out of that came $3.6 million in crypto; is that correct?

A. Can you repeat your question?

Q. Out of that theft that you and your European friends had perpetrated against Ms. Heissenberg, y'all received a total of almost $3.6 million?

A. Yes.

Q. Out of that, you received over $1.4 million; is that correct?

A. Yes.

Q. Now, you purchased a vehicle that's over $140,000; is that right?

A. Yes.

Q. Could you afford that vehicle before that?

A. Yes.

Q. But you used the crypto from the Heissenberg heist to purchase that vehicle?

A. Correct.

Q. You had a hundred -- you had two and a half thousand miles on that vehicle and you -- you got into a collision; isn't that correct?

A. Shortly after I bought the car, yes.

Q. Okay.

And you testified that there were other heists -- attempted heists in Florida, for example, the second home

invasion of Ms. Tullia.  Do you recall that?

A.   Yes.

Q.   And you drove to the scene in your BMW?

A.   Yes.

Q.   When you and whoever you worked with committed the crimes against Justin Baretto, you also went there in your BMW?

A.   Yes.

Q.   When y'all went to the home of Tye in Texas, did you use your BMW?

A.   No.

Q.   Why not?

A.   I left it at home.

Q.   Okay.

Isn't it true that Justin Baretto, as you said, broke into your account and stole the money that you had stolen from Tullia Heissenberg?

A.   No.

Q.   Well, where did Justin Baretto get the money from?

A.   We received information that he was involved with Tidy and I being physically robbed.

Q.   But isn't it true that you told your friends that you were retaliating against him for stealing your crypto?

A.   Who are my friends?

Q.   Haisel Daily, Matthew Nicolopulos.

A.   No.

Q.   You never told them that you were retaliating against Justin Baretto?

A.   No.

Q.   Were you retaliating against anyone for stealing your crypto?

A.   Yes.

Q.   Who was it?

A.   Justin.

Q.   And that's Justin Baretto?

A.   Correct.

Q.   So that's the point I'm making.  You are retaliating against him for stealing your crypto?

A.   Yes, but Haisel and Matt never knew that.

Q.   Did you tell Matt that?

A.   No.

Q.   Did you tell Haisel Daily that?

A.   No.

Q.   Did you tell anyone that you were retaliating against Justin Baretto for stealing your crypto?

A.   No.

Q.   Do you recall after the invasion of Ms. Tullia Heissenberg in 2022 -- not the first one, the second one -- you had -- you told your friends you had no more targets?

A.   No.

Q.   You never said that?

A.    I don't recall saying that.

Q.    Okay.

Did you have any targets after the second invasion of Ms. Tullia Heissenberg's home?

A.    There was only one home invasion of Ms. Tullia.

Q.    Okay.

Well, let's talk about that home invasion.  Did you have any targets after that lined up?

A.    Yes.

Q.    Who was it?

A.    There was a list on Telegram.  I can't recall from memory.

Q.    Okay.

Did you talk to -- you mentioned the name Galaxy?

A.    Yes.

Q.    Did Galaxy talk to you about home invasions?

A.    Yes.

Q.    And isn't that when the idea of home invasions came up?

A.    No.

Q.    Isn't it true that you realized that these social media companies had discovered the loopholes in their -- in their system and were plugging them and you were finding it extremely difficult to get into those systems and then decided that home invasions was the way to do it; isn't that correct?

A. When you say, "social media companies," are you referring to the cellular companies?

Q. Yes, I'm looking at cellular companies and other companies you broke into.

A. Yeah, it was getting harder to hack into cellular companies, yes.

Q. So you decided that with your European friends, that home invasion is the way to go?

A. Yes.

Q. So did you and your friends then -- while you were on social media, whatever system y'all used to communicate, did y'all then start to devise a plan on how to commit home invasions?

A. Yes.

Q. And did y'all devise a plan among yourselves how to transfer the cryptocurrency from the accounts?

A. Yes.

Q. And did you all work a plan on how to get the personal information of your targets?

A. Yes.

Q. All of that was done by you and the European friends; is that right?

A. Correct.

Q. What you didn't have in all of this was somebody to break into the house; isn't that correct?

A.   Yes.

Q.   And so in order to fulfill your plan, you needed to hire somebody who would break into the house and give you access to the computer; isn't that right?

A.   Yes.

Q.   And your testimony today was, when they got to the computer, that's when you took over, you and your friends; isn't that right?

A.   Yes.

Q.   And you and your friends would devise this plan and conspired with each other, y'all made the decision how to remove the crypto from the accounts of those targets; isn't that correct?

A.   Yes.

Q.   And you would transfer them into accounts unrelated -- first transfer unrelated to those who were assisting you in the break-in?

A.   The money was moved to wallets that we all controlled.

Q.   And who created the wallets?

A.   Any of us could have created them.  We would then share the recovery phrases with each other so that everyone had access to the wallet.

Q.   Now, when you say, "we," again you're referring to you and the Europeans?

A. Yes.

Q. That created the wallets?

A. Yes.

Q. And isn't it true that you and the Europeans had exclusive control over those wallets?

A. Yes.

Q. And y'all could manipulate those funds whichever way y'all wanted to; isn't that right?

A. Yes.

Q. And you testified today that when you were taking the money out of Mr. Michael Prim's account, you had sent it through several different stages, different blockchains and exchanges, before it eventually ended up in the accounts of Elmer Castro, as you testified, and Mr. Felix, and even your account; isn't that right?

A. Yes.

Q. But throughout all of that, somebody had to control it and you were the one?

A. Yes.

Q. Did your European friends assist you in controlling all those funds?

A. In the movement of the funds for our half, no.

Q. Now, once again, you testified that you had to take these funds, you had to exchange them into Bitcoins, and then manipulate it from that point; isn't that right?

A.   Yes.

Q.   You have to have a lot of knowledge about how crypto works in order to do that; is that right?

A.   Yes.

Q.   Did you ever, by yourself, take your firearm and invade a home?

A.   No.

Q.   And get crypto?

A.   No.

Q.   Is it true you couldn't do it by yourself?

A.   Yes.

Q.   You needed help?

A.   Yes.

Q.   And in order to get that help, you first approached Haisel Daily?

A.   Yes.

Q.   And is it correct that Haisel Daily is a friend of yours with whom you went to school?

A.   Can you repeat that?

Q.   Did you go to school with Haisel Daily?

A.   We went to the same school.  We didn't know each other.

Q.   Okay.

But Haisel Daily, prior to any of these home invasions, was a friend of yours?

A. Yes.

Q. At the time you were arrested, the FBI found drugs in your house; isn't that correct?

A. Yes.

Q. Who owned those drugs?

A. Haisel.

Q. You kept the drugs for Haisel Daily because he was a drug dealer; isn't that correct?

A. No, I kept them because someone -- or he came to me, told me that someone shot him and tried to kill them and that they were scoping out his house, so he needed some place to put his suitcase.

Q. Do you remember Haisel Daily giving you $1,000?

A. No.

Q. Do you recall transferring $15,000 to Haisel Daily's mom?

A. Yes.

Q. And he gave you, in exchange for that favor for laundering that money, the drug money, he gave you $1,000?

A. Yes.

Q. And that's how you earned your income?

A. That was --

Q. Through -- through crime?

A. Yes.

Q. Now, did one of your friends say that if you cannot

hack them, rob them?

A.    It sounds familiar, yes.

Q.    Was that your European friends that told you that?

A.    I don't know.  I don't know.

Q.    Okay.

Do you recall first talking to Haisel Daily about a home invasion?

A.    Yes.

Q.    And Haisel Daily did not want to do it; isn't that correct?  He introduced you to Matt Nicolopulos?

A.    Yes.

Q.    So did you talk to Matt Nicolopulos and to Haisel Daily about assisting you in home invasions?

A.    Not physically doing it themselves, but finding people that were willing to do it.

Q.    Okay.

So you asked them to find someone to break into a home so that you could steal the crypto; is that correct?

A.    Yes.

Q.    And they eventually did -- now when you met Matt and you met Haisel, you did not know about Mr. Felix, who's sitting next to me?

A.    No.

Q.    You had no clue who Mr. Felix was at that time?

A.    Correct.

Q. It was Matt and Haisel Daily that introduced you to him?

A. It was Matt that introduced me to him.

Q. Now, prior to you meeting Mr. Felix, do you recall Haisel Daily organizing a crew to do home invasions for you, prior to meeting Mr. Felix?

A. Yes.

Q. Was then called the Benoist Farm Group?

A. Apparently that's where they were from. I didn't know.

Q. Is it correct that you purchased firearms for them?

A. Yes.

Q. That correct?

A. Yes.

Q. Is it correct that you gave them money to purchase a vehicle?

A. Yes.

Q. And is it correct that you gave them money in order to prepare themselves for a home invasion?

A. Yes.

Q. All of that was done prior to you knowing or meeting Mr. Felix; isn't that right?

A. Yes.

Q. And isn't it true that that group let you down and took off with your money, with the car, and with the guns?

A. Yes.

Q. And you never saw him again; is that correct?

A. Correct.

Q. And then you and your friends regrouped on how to get someone else to do a home invasion for you?

A. Yes.

Q. And is it correct that is how you eventually met Mr. Felix?

A. Yes.

Q. And Mr. Felix tasked, as you testified, you call it "the plan" -- is that correct? -- was to go into the house, get to the computer, and you'll take over from there?

A. Me or the Europeans, correct.

Q. Mr. Felix was ignorant as to how crypto worked or how computer stuff worked. He was not as tech savvy as you and your European group; isn't that correct?

MR. IVERSON: Objection. Compound question.

THE COURT: I'll sustain as to the form.

You can restate the question.

MR. DOORASAMY: Okay.

BY MR. DOORASAMY:

Q. Now, I'm going to jump a little bit. When you did the home invasion in Little Elm, Texas, on Tye's house -- you called him Tye -- is it correct that the actual home invasion was done by a new crew from Texas?

A. Yes.

Q. So what you really needed to fulfill your plans, you and the Europeans, was just a crew to break into the house?

A. Yes.

Q. All the intelligence about the plan was between you and the Europeans; is that correct?

A. Yes.

Q. I'm going to back up a little bit to the house -- Tullia Heissenberg's house. You testified about that earlier on. How many minutes did your crew spend in the house?

A. I don't know.

Q. Ten minutes?

A. Longer.

Q. How much longer?

A. I couldn't give you an exact time.

Q. Is it true that no crypto was stolen from the house?

A. Yes.

Q. Is it true that nobody got to a computer in that house?

A. Yes.

Q. And there was nothing to take from there; is that right?

A. Yes.

Q. And they left the house?

A. Correct.

Q. Now, Justin Baretto, earlier on you testified about him. You said you did not retaliate against Justin Baretto; is that correct?

A. I didn't tell any of the people that didn't previously know that Tidy and I were robbed that Justin was involved.

Q. Okay.

You didn't tell them that, I want y'all to invade this one because this guy stole my crypto?

A. I didn't -- yeah, I didn't tell them.

Q. Okay.

Do you know a person by the name of Derek Wesley Cox?

A. Yes.

Q. Did you pay him $75,000 to do some work for you?

A. Yes.

Q. And the job you tasked him with was to act as a federal agent and to check out Justin Baretto; isn't that right?

A. No.

Q. Well, did you ask him to check out Justin Baretto for you?

A. Yes.

Q. Why?

A. Wes was introduced to me as a federal agent, and he pretended to be one that entire time. We didn't know that he

wasn't actually who he said he was until he ran off with the money.

Q. But you paid him $75,000.

A. Yes.

Q. And you paid him that amount $7500 a month for ten months; isn't that correct?

A. I don't think the time span was that long.

Q. But it was $75,000?

A. Yes.

Q. Just to look -- just to check out Justin Baretto and to see if you can get your money back; isn't that right?

A. Yes, Wes said that he can get our money back.

Q. Did he get your money back?

A. No.

Q. And when that failed, you decided that you were going to do a home invasion in Justin Baretto's house; isn't that correct?

A. Yes.

Q. Now, is it correct that when you asked Felix, after your friends had spoken to him, to assist with home invasions, you did not know who worked with him or who he chose to work with him; is that correct?

A. Yes.

Q. They were not party to the decision-making between you and the Europeans; isn't that correct?

A. Yes.

Q. You testified that Justin Baretto was taken out of the house?

A. Yes.

Q. Is it correct that was not part of the plan?

A. Yes.

Q. Is it correct that's not what you instructed your crew to do in his house?

A. Yes, we never take them out of the house.

Q. And did you tell the police that it was not part of the plan to kidnap Justin?

A. Yes.

Q. Is it true that kidnapping was never a part of the plan?

A. Yes.

Q. Now, the invasion in Texas, isn't it correct that Mr. Felix had nothing to do with the invasion of the home in Texas in December 2022 -- 23?

A. He assisted the Texas crew in terms of telling them how to get in the easiest and -- and giving them pointers and things like that. But him physically being there, no.

Q. And isn't it true that after Mr. Felix had broken his leg, you completely cut him off and went ahead and got yourself a new crew to invade this house?

A. Didn't cut him off, but did get the new crew, yes.

Q.   Right.

And you got a whole lot of other people.  You got Jesus Salazar to go into the house?

A.   No.

Q.   You got Jessie Valdez?

A.   I didn't recruit any of those people.

Q.   Okay.

But -- and D'Angelo Contrares.  You recruited him; isn't that right?

A.   Yes.

Q.   And D'Angelo Contrares is somebody you had known for many years, as you said; isn't that correct?

A.   Yes.

Q.   And he told you that his father knew a little bit about home invasions; isn't that correct?

A.   Yes, he told me that his dad was very experienced in --

Q.   Okay.

So --

A.   -- robberies.

Q.   -- that crew worked for you to fulfill your decision about what you wanted out of this house; isn't that right?

A.   Yes.

Q.   Did Haisel Daily go to Texas with you just before the invasion?

A.    Yes.

Q.    And he was the only person -- was he the only person from Florida that went with you to this invasion; isn't that correct?

A.    Yes.

Q.    Is that because he's your trusted friend?

A.    No, we were driving the rental car from Florida to Texas and he offered to come with me.

Q.    But didn't you have an accident in Texas?

A.    Yes.

Q.    What happened?

A.    The car was rear-ended.

Q.    And what happened to Mr. Daily?

A.    We flew him back to Florida.

Q.    So he was not there on the day the house was invaded; is that correct?

A.    Yes.

Q.    So in the home invasion, you testified that you all had taken cash?

A.    Yes.

Q.    Two Rolex watches, a pendant and a chain; is that correct?

A.    Yes.

Q.    Did you get one of those watches?

A.    Not to keep, but to sell.

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

Q. Okay.

Did you sell it?

A. Yes.

Q. How much did you make?

A. Approximately, like, $15,000.

Q. Okay.

What happened to the $150,000?

A. It was divided between everyone in Texas.

Q. It was divided with the Texas crew that invaded the house; is that correct?

A. Yes.

Q. Now, did you inform the Europeans that you and the Texas crew discovered $150,000 in the house?

A. Not originally, no.

Q. Okay.

Why didn't you tell them that?

A. Because they would have wanted a percentage of that, and then the people in Texas and I just came to an agreement to just not say anything about it.

Q. In other words, there was not enough to pay the crew and to divide between you and your friends in Europe; is that right?

A. Yes.

Q. So you lied to your friends about what you found there by not telling them; isn't that right?

A. Yes.

Q. And isn't it true that out of the $150,000, the cash, you did not send a penny of that to anyone that was in Florida?

A. Yes.

Q. And isn't it correct that that pendant and chain was purchased by Haisel Daily?

A. Yeah, after the pendant and chain were given to the people in Florida, Haisel bought it off of them, yeah.

Q. Yeah.

But you brought Santiago up to Texas to pick up they -- pick up those two items; isn't that correct?

A. No.

Q. Who paid for his flight to Texas?

A. I don't know.

Q. How did he get to Texas?

A. A plane.

Q. Well, did you ask for him to come over to Texas?

A. No.

Q. Were you -- did he pick up the chain and the pendant at the airport?

A. Yes.

Q. You were at the airport?

A. Yes.

Q. You were sitting in a car when he came to pick it up; isn't that right?

A.  Yes.

Q.  So why did he come to Texas to pick up the chain and the pendant?

A.  Because the people in Florida felt that they were entitled to something from Texas because they messed up the crypto robbery.

Q.  But isn't it the truth that your friend Haisel Daily wanted to sell it and make some money out of it?

A.  No.

Q.  To his friends in California?

A.  Not that I recall.

Q.  You testified that Mr. Felix -- that's what you said -- you said Mr. Felix downloaded AnyDesk on Michael Prim's computer; isn't that right?

A.  Yes.

Q.  Mr. Prim testified here in this courtroom under oath and said he downloaded AnyDesk.

MR. IVERSON:  Objection.

THE COURT:  I'll sustain.  It's appropriate for argument, but not opining as to what was or wasn't said by another witness.

BY MR. DOORASAMY:

Q.  And once AnyDesk was open, your friends in Europe tried to remove the money from Mr. Prim's account; is that right?

Case 1:23-cr-00260-WO    Document 115    Filed 08/11/24    Page 167 of 179

A. No.

Q. Well, who initially tried to do that?

A. Tidy originally tried to connect -- to remote into the computer, but he wasn't able to.

Q. But if he had connected, he would have done it; isn't that right?

A. Yes.

Q. But because they failed to get in, you then went into the computer and removed it on their behalf?

A. Yes.

Q. And isn't it correct that they didn't let you in on the wallet they created for that money?

A. No.

Q. Well, did you tell the police that they let you in because you had to do the job for them?

A. Yes.

Q. So initially you were not part of the wallet they created to transfer the funds to themselves.

A. They were reluctant to give it to me, yes.

Q. Why were they reluctant to give it to you?

A. Galaxy didn't know me as well as Tidy did.

Q. In other words, they didn't trust you; is that correct?

A. Galaxy didn't.

MR. DOORASAMY: Your Honor, give me a second, please.

Thank you.

BY MR. DOORASAMY:

Q. Mr. Seemungal, are you aware that Mr. Felix has not been charged in Florida --

MR. IVERSON: Objection.

THE COURT: Well, let me hear the rest of the question.

MR. DOORASAMY: Are you aware that Mr. Felix has not been charged with the crimes you mentioned took place in Florida with you, to this date?

MR. IVERSON: Relevance.

THE COURT: I'm going to sustain.

MR. DOORASAMY: I want to be heard, Your Honor.

THE COURT: All right.

(Beginning sidebar.)

MR. DOORASAMY: Respectfully, Your Honor, I think that's a fair question.

THE COURT: He has not been charged in Florida.

MR. DOORASAMY: That's correct.

THE COURT: With the crimes that you allege he committed.

MR. DOORASAMY: That he testified to.

THE COURT: That he testified to. That he testified to.

MR. DOORASAMY: Yes.

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

MR. IVERSON:  He hasn't been charged in Florida. He's been charged with those crimes as a part of the conspiracy.

THE COURT:  Yeah.

Well, what does it prove that he hasn't been charged in Florida?  He's been charged here.

MR. DOORASAMY:  Well, he's not been charged with a Florida offense yet.

MR. MUND:  Yes, he has.

MR. DOORASAMY:  No, he hasn't.

THE COURT:  I don't know whether he has or hasn't.

MR. DOORASAMY:  No, he hasn't.  He's only referred to an overt act of the conspiracy.

MR. MUND:  That just a misstatement of law.

THE COURT:  Stop.

He -- assuming he hasn't been charged in Florida, what is the relevance of that fact?

MR. DOORASAMY:  I -- Your Honor, it goes to the defense.

THE COURT:  Well, I understand that, but what's the relevance of it?

MR. DOORASAMY:  I think it's important.  It's part of cross-examination.

THE COURT:  There are rules that apply, and I don't see the relevance of whether he has or he hasn't been charged

in Florida.

MR. IVERSON:  How does it go to the defense?

THE COURT:  Well, just --

MR. IVERSON:  I'm sorry.

THE COURT:  -- stop.

MR. DOORASAMY:  And, Your Honor, and I'm going to go through the different places.  He talked about New York.  He talked about Texas.  He talked about other issues, which the Court allowed the evidence to come in.

THE COURT:  As overt acts of the conspiracy.

MR. DOORASAMY:  So I can cross-examine about that.

THE COURT:  Yes, but what's whether he's charged or not got to do with that?  That's the point.  I -- I don't see the relevance of the -- the fact that he's charged in Florida, North Carolina, New York, or Texas, those -- those are law enforcement and prosecutor decisions.  I don't see what effect it has on this witness or even his knowledge of whether he -- or what the relevance is of his knowledge about whether he hadn't or hadn't -- has or has not been charged.

MR. DOORASAMY:  Your Honor, I'm -- I'm going to just let the Court decide it.

THE COURT:  Okay.

(End sidebar.)

THE COURT:  I'll sustain.

You may ask your next question, Mr. Doorasamy.

BY MR. DOORASAMY:

Q. You testified about a home invasion in New York; correct?

A. Yes.

Q. You were not part of the decision-making for the home invasion in New York; is that correct?

A. Yes.

Q. You learned about it subsequently; isn't that correct?

A. Yes.

Q. So you have no idea how that home invasion had come to be; isn't that right?

A. Yes.

MR. DOORASAMY: Your Honor, I'm going to need a second here.

BY MR. DOORASAMY:

Q. Now, do you recall --

MR. DOORASAMY: Thank you, Your Honor.

BY MR. DOORASAMY:

Q. Do you recall me asking you if you made statements to the police?

A. Yes.

Q. And one of the statements that you made was on October 23, 2023?

A. I believe so.

Q. Okay.

And I'm going to read straight out of the statement that you made to the police.

MR. IVERSON: Objection. Form.

THE COURT: Yeah, I'll sustain.

MR. DOORASAMY: Okay.

BY MR. DOORASAMY:

Q. Did you tell the police that after the failed Delray Beach armed home invasion and kidnapping of Justin, they realized that they were out of targets and brought in Galaxy to assist?

A. In October? I don't recall.

Q. You don't recall it or you don't recall telling the police that?

A. I -- I know there was some time between my first or second interview that I got two people confused from Europe.

MR. DOORASAMY: Ask the Court to bear with me, please.

BY MR. DOORASAMY:

Q. Do you recall telling the crew that went to Texas that whether Tye had any money or not, each would get $10,000 a piece?

A. Yes.

Q. And earlier on, when the prosecutor put it up, it was called "10 ball." Do you recall that?

A.   Yes.

Q.   And they were going to get that money irrespective of whether you found anything in the house or not; correct?

A.   Yes.

Q.   That was a form of payment to the crew; isn't that correct?

A.   Yes.

Q.   Do you recall the incident that took place where Mr. Felix had broken his leg in Louisiana in a collision?

A.   Yes.

Q.   And do you recall that Santiago and the rest of the people in the vehicle were arrested by the police in Louisiana?

A.   Yes.

Q.   Do you recall that you sent bond money to Matt Nicolopulos to pay to Santiago for his bond?

A.   Yes.

Q.   That was all payment to the crew for being -- for assisting you to invade these homes; isn't that correct?

A.   I wouldn't call it payment.  We were just looking out for them.  And I wasn't really given much leeway on bonding people out or not.

Q.   Okay.

But wasn't the plan that if there was money in someone's house, crypto, that you would get it out and a percentage -- a little percentage would go to the crew; isn't

that right?

A.   Yes.

Q.   Well, the $10,000 had nothing to do with crypto.  You agree?

A.   No.

Q.   Well, you -- you told them, win or lose, you're getting $10,000.  Wasn't that payment?

A.   Yes.  Yes.

Q.   And when you gave the money to pay Santiago's bond, wasn't that also payment for assisting you to -- with home invasions?

A.   I -- I guess.  We were just bonding them out.  It wasn't from any profits or anything.  We were just looking out for them.

Q.   But Santiago never invaded the home in Texas at all; isn't that right?

A.   Yes.

Q.   But you still helped him out?

A.   Yes.

Q.   And isn't it correct that for all three crews that you had, the Benoist Farm Crews, the crew that you say Felix brought in, and the crew in Texas, you provided all the support for them to invade the home to give you access to -- to the computer; isn't that right?

A.   Yes.

Q.   You and your friends in Europe paid for the rental vehicles; correct?

A.   Yes.

Q.   You and your friends in Europe paid up for the homes and hotels they lived in; correct?

A.   Yes.

Q.   You and your friends in Europe paid for the food they had?

A.   I don't recall that.

Q.   Did you get Door Dash when you were in Texas?

A.   I don't recall.

Q.   Was food delivered to the Airbnb in Texas?

A.   I don't remember.

MR. DOORASAMY:  I have no further questions.

THE COURT:  Redirect.

MR. IVERSON:  Briefly.

REDIRECT EXAMINATION

BY MR. IVERSON:

Q.   Mr. Seemungal, how many watches were stolen from Tye?

A.   Two.

Q.   And initially who got those in the split?

A.   Dean and Jesus.

Q.   How did you come in possession of the one?

A.   Jesus was having trouble selling the watch that he has, so he sent it to me.

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

Q. Were you able to sell it?

A. Yes.

Q. For how much?

A. Approximately $15,000.

Q. Did you get a cut of it for ever facilitating the sale?

A. No.

Q. Where'd you send the money?

A. I sent it to Dean through crypto.

Q. What was he supposed to do with it?

A. Send it to Jesus.

Q. Defense counsel asked you whether you and your co-conspirators ever planned to kidnap anyone. You remember that?

A. Yes.

Q. You said no; is that correct?

A. Yes.

Q. What was your understanding of kidnapping?

A. What happened to Justin?

Q. Abducting from a home?

A. Yes.

Q. Once Justin was in the car, I believe your testimony was -- I want to make sure -- you -- you guys rolled with it?

A. Yes.

Q. Okay.

And you and the people in that car decided to try to extort some money from people using -- using Justin?

A.   Yes.

Q.   When you were not in Durham -- or not -- you weren't in Durham.  When the defendant was in Durham with Michael Prim at his computer, were you on the phone with the defendant?

A.   Yes.

Q.   Once you had remote access to the computer and were inside Mr. Prim's Coinbase account, did the defendant leave?

A.   No.

Q.   Did he stay on the phone?

A.   Yes.

MR. IVERSON:  Give me a minute.

No further questions, Your Honor.

THE COURT:  Anything in response to that?

MR. DOORASAMY:  No.

(End of Excerpt.)

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

CERTIFICATE

I, Stacy Harlow, Realtime Verbatim Reporter-Master, Certified Verbatim Reporter-Master, Certificate of Merit, Registered Broadcast Captioner, Registered CART Provider, and Official Reporter of the United States District Court for the Middle District of North Carolina, do hereby certify that the foregoing is a true and correct transcript of the proceedings had in the above-styled action on June 20, 2024, as reported by me by stenomask.

I certify that the transcript fees and format comply with those prescribed by the Court and the Judicial Conference of the United States.

Given under my hand this 11th day of August, 2024.

_____ _Stacy Harlow_
STACY HARLOW
Official Reporter, United States
Middle District of North Carolina