UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA


UNITED STATES DISTRICT COURT     ) 1:23CR260-2

v.     ) Greensboro

REMY RA ST. FELIX     ) June 17, 2024


REDACTED TRANSCRIPT OF THE EXCERPTED TRIAL TESTIMONY OF
MICHAEL PRIM
BEFORE THE HONORABLE WILLIAM OSTEEN
UNITED STATES DISTRICT JUDGE
<u>APPEARANCES:</u>

FOR THE GOVERNMENT:

     ERIC L. IVERSON
     U.S. Attorney's Office
     Middle District of North Carolina
     101 South Edgeworth Street - Fourth Floor
     Greensboro, North Carolina  27401
     (336) 332-6302

     BRIAN MUND
     DOJ-CRM
     10th & Constitution Avenue, NW
     John C. Keeney Building - Suite 600
     Washington, DC  20530
     (202) 598-6205

FOR THE DEFENDANT:

     ALAN DOORASAMY, SR.
     Law Office of Alan Doorasamy, Sr.
     107 Westdale Avenue
     Winston-Salem, North Carolina  27101
     (336) 749-6412

COURT REPORTER:

     STACY HARLOW, RVR-M, CVR-M, CM, RBC, RCP
     Post Office Box 21471
     Winston-Salem, North Carolina  27120

Proceedings recorded by voice stenography realtime translation.
Transcript produced by computer-aided transcription.

INDEX

EXAMINATION INDEX

Page

WITNESSES CALLED ON BEHALF OF THE GOVERNMENT:

MICHAEL PRIM

Direct Examination by Mr. Iverson        5

Cross-Examination by Mr. Doorasamy        40

Redirect Examination by Mr. Iverson      51

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

EXHIBIT INDEX

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---------|-------------|---------|----------|
| EXHIBITS OFFERED ON BEHALF OF GOVERNMENT: | | | |
| 1A | Photograph | 27 | 28 |
| 1B | Photograph | 27 | 28 |
| 1C | Photograph | 27 | 28 |
| 1D | Photograph | 27 | 28 |
| 1E | Photograph | 27 | 28 |
| 1F | Photograph | 27 | 28 |
| 1G | Photograph | 27 | 28 |
| 1H | Photograph | 27 | 28 |
| 1I | Photograph | 27 | 28 |
| 1J | Photograph | 27 | 28 |
| 1K | Photograph | 27 | 28 |
| 1L | Photograph | 27 | 28 |
| 1M | Photograph | 27 | 28 |
| 1N | Photograph | 27 | 28 |
| 1O | Photograph | 27 | 28 |
| 1P | Photograph | 27 | 28 |
| 1Q | Photograph | 27 | 28 |
| 1R | Photograph | 27 | 28 |
| 1S | Photograph | 27 | 28 |
| 1T | Photograph | 27 | 28 |
| 1U | Photograph | 27 | 28 |
| 2 | Photograph | 39 | 39 |

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

| | | | |
|------|----------------------------------------------|----|----|
| 3A | Photograph | 37 | 38 |
| 3B | Photograph | 37 | 38 |
| 26I | Photograph of Michael Prim's Driver's License | 37 | 37 |

Case 1:23-cr-00260-WO    Document 166    Filed 12/03/24    Page 4 of 53

P R O C E E D I N G S

(June 17, 2024.)

(Beginning of excerpt.)

THE COURT: The Government may call its first witness.

MR. IVERSON: United States calls Michael Prim.

THE COURT: Mr. Prim, if you'll step here, please, sir.

(MICHAEL PRIM WAS SWORN.)

MR. IVERSON: May I, Your Honor?

THE COURT: You may proceed.

Whereupon,

MICHAEL PRIM,

having been first duly cautioned and sworn, testified as follows:

DIRECT EXAMINATION

BY MR. IVERSON:

Q. Will you please state your name?

A. Michael Prim.

Q. How old are you, Mr. Prim?

A. Seventy-seven.

Q. Where do you live?

A. Durham, North Carolina.

Q. What's your address?

A.

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

Q.   How long have you lived at that address?

A.   Fifteen years.

Q.   Who do you live with?

A.   My wife, Carrie Benoit Salemi.

Q.   Are you employed?

A.   I'm retired.

Q.   What'd you do for a living?

A.   I taught school; I taught AP physics for 25 years, Millbrook High School, in Raleigh, North Carolina.

Q.   I'm going to direct your attention to April 12th of last year, 2023.  Were you the victim of a crime?

A.   I was.

Q.   What happened?

A.   Well, it was 7:30 in the morning, Wednesday morning. I was still in bed.  I heard a knock at the door.  Sometimes I answer those when they're that early; sometimes I don't.  So I -- some many lovely people in the neighborhood, so I answered the door.

There were two guys, very suspicious looking.  I sort of wondered why I opened the door.  They both had what appeared to be goggles on, like swimming goggles.  And they also had the -- you see construction workers wearing the -- the vest, the orange/yellow-type vest.

So I opened the door and they said that they were utility workers and that the neighbor had a leak and they

wanted to -- they wanted permission to go to the back of the yard to see if we also had a leak, if it had affected our plumbing system. And they wanted my permission. I said, well, that's fine. And he said, if we don't come back, you know, everything's okay. And if we do, we'll -- we'll come back again.

So I -- still asleep, sort of. So I went back to bed, and just within a few minutes, another knock. So I said, well, I think I'm just going to ignore it. But I heard my wife coming from the kitchen area, and she opened it. And I just heard a little -- I didn't really hear the conversation, but then I heard feet moving toward the kitchen, and just within a few -- you know, I don't know, 10, 22 seconds, I heard her screaming, just absolutely going crazy. I mean, she was yelling, "Let me go. Why are you doing this?"

So I immediately jumped out of bed. When I round the corner, I see the -- I'll refer to the smaller and the larger man. The smaller man was picking my wife up and throwing her down, kicking her, and she was screaming and yelling. And I got into the kitchen area and -- and told her to stop yelling. You know, don't resist. He's going to keep doing it, probably. And he continued to throw her down and kick her.

And then a larger man came out of my library and immediately just, wham, hit me, and blood just spewed all over the place. I asked him, "Why did you do that?"

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

And he said, "To let you fucker know that I mean business. That I'm here to take your money from your Coinbase account, and if you don't cooperate, I will kill you. Before I kill you, I will cut your toes off, cut your fingers off, cut your dick off, and stick it in your wife's mouth and rape her."

There was some wine bottles nearby, and I, for a brief second, thought about, you know, doing what any person would do when you see your wife being treated like that, but then I realized that was pretty stupid.

So then eventually I guess the smaller man stopped doing that to my wife because she was still crying and screaming. So the guy -- the larger guy put a zip tie around my hands. They were -- they were like this (indicating). So I -- and they were very tight.

So he continued to let me know that they knew everything about our neighborhood. They had been -- I don't know how many days they had been, you know, looking around the neighborhood. They knew everything about the schedules of the people. They knew our schedules. And, again, if I didn't cooperate with him, he would kill me.

So he then took me into a new addition part of the house. And I can recall so well, I did not want to leave my wife because she was still sobbing and crying. And, again, I had -- you know, you obviously want to react and go help your wife. But I -- I didn't. I knew that was not going to help.

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

So he took me into the larger room.  It's a very large room, about a thousand square feet with large ceilings.  He took me up the stairs, put me in the chair in front of my Mac -- Apple Mac.  Told me to turn it on and to log into my Coinbase account.

My hands, again, were tied like this (indicating).  It was hurting very much.  And, you know, you can't -- I couldn't -- I couldn't type with my hands like this (indicating).  You have to have them like this (indicating).  And so I kept telling him, "I -- I -- you know, I just can't do this.  You're going to have to cut these zip ties off."  And he eventually did do that.

But I -- I just remember how completely confused I was.  I had all of my -- I sort of blend high-tech and -- and very old-fashioned filing techniques.  And I had a lot of my passwords and things in -- in manila folders, so I was trying to get those.  And, of course, he kept threatening me.  And -- and most of the time during this hour and half from 7:30 till 9:00, he had a gun either at my temple or at my forehead, or he had it out, waving it around.

He again -- the very beginning, when we were up into the loft area where -- in front of my Mac, he repeated what he said downstairs.  I will cut your dick off.  I will cut your fingers off and your toes and let you slowly bleed to death and then I will throw your body over the loft.

So I somehow -- I -- I really do not know how, I -- I managed to get onto my Coinbase account. And once I got into that, he nudged me to the -- to my right, away from the stairs, and he then started typing. I'm not sure where in all of this he then called someone. He had a cell phone and he called them. And so they -- they seem to be sharing coding or some kind of information. And I remember it -- it didn't seem to be going well. I mean, ten minutes into this, and -- and they were -- you know, you could tell they were really upset because they hadn't started to -- I could see the amount. It was, like, 230 -- $237 or $238,000 was the balance. And after ten minutes it was still that. So I didn't know if that was good or bad.

And then eventually after they kept going back and forth, I started -- I -- I saw that it started draining. And they -- they both -- the -- the larger and the smaller guy called each other the same name, Carlos.

But eventually it started -- it started going down. And I -- after that, I remember we must have been up there I would say 45 to 50 minutes up in the loft area. And so I was in my chair and pushed to the right. And -- and toward the end, I really started feeling like I was either going to pass out or throw up.

And I remember just shaking and I was profusely sweating. And he said to the guy -- I'm not sure if this is

exactly correct -- he said this -- either he said old fucker or this old man is going to have a heart attack or a stroke. We've got to get this -- we've got to finish this. And the other -- the smaller guy kept yelling that. He kept saying, "She's got to be at her school by 9:00 or they're going to know something's up." That was not the case.

Oh, the other thing, he also kept talking about another crypto exchange called Gemini. He was really obsessed with that. And I couldn't get onto that. I just didn't know how to -- I didn't know where my password was. And I -- as you can imagine, I was just really addled. And -- but he -- he sort of dropped that after mentioning it three or four times. The Coinbase account was the -- was the biggie.

So eventually --

Q. Mr. Prim, let me -- let me take you back to around 7:30 when you first --

A. Uh-huh.

Q. -- answered the door. You're the one that answered the door?

A. Yes.

Q. If you'll describe what the two individuals were wearing again?

A. They -- they looked like these swimming goggles, which was really strange. And -- and then they had these orange-yellow, you know, very bright colored vests that you see

construction people wearing -- wearing obviously.  You know, so people won't hit them.

Q.   Could you see their faces?

A.   No, that was the other strange thing.  They had these goggles on, and -- and then I -- I -- I could see they were dark skinned, but I -- I couldn't see any real details, yeah.

And -- and the one guy, the larger guy, the guy who was with me, had a -- a baseball-type cap on, and it had a fish, a big fish, and it said -- I think it said, "Bass," yeah.

Q.   The reflective --

A.   Uh-huh.

Q.   -- vests --

A.   Yes.

Q.   -- do you remember if those had sleeves or not?

A.   I -- I really don't.  I -- I'm not sure.

Q.   When you come to the kitchen after you hear your wife scream --

A.   Uh-huh.

Q.   -- at what point do you realize that the -- the larger man is armed?

A.   Well, comes out.  He may have event- -- he may have initially had his black -- a standard gun.  Then the other guy, which had a -- what looked like a toy gun; it was colored.  So, quickly, I -- he had a gun and he -- he waved it around and threatened me.

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

I don't remember -- he obviously had the gun, so he may have come out -- as I recall it, he came out and immediately he hit me. He just hit me. And my glasses fell off. Fortunately, they didn't break. And strange, it -- it -- it hurt, but it -- just all this blood all over the place. That's what I remember.

Q. Okay.

Do you remember what color gun the larger man had?

A. It was black.

Q. Okay.

Do you remember what color gun the smaller man had?

A. I -- I think it was, gosh, like, purple or char- -- no, not chartreuse. More like purple or pink. Something like that, maybe. I mean, it wasn't totally that, but it was a combination of that. Like, the handle may have been that color, pink or purple.

I mean, at first, I -- I said, it looks like a toy. Which, you know, I assumed that both of them were loaded and real. But it -- it didn't -- I mean, I don't keep up with guns, so I didn't -- I don't know. That's what it looked like.

Q. So you described your office. Are there windows in your loft office?

A. Yes, the house -- the -- the addition, it's just got large, gigantic windows. The -- the room is just flooded with light. And he did allude to that several times about, you

know, too many windows here.  People are going to see us.
Yeah, there are lots of windows.

Q.   So if you'll describe for us what he said to you
immediately after he struck you, the larger man, in the face?

A.   Well, he struck me.  And then I said to him, "Why did
you do that?"

And he said, "To let you know I mean business, you
fucker.  We're here to get your Coinbase account money."

And that's when he then started threatening me with
his -- what I call HBO language.

Q.   Okay.

What's Coinbase?

A.   Coinbase is a cryptocurrency exchange in San
Francisco.  It's the largest in this country, so you can
purchase Bitcoin and -- and many thousands of other
cryptocurrencies, which you can use to buy things or to invest
in.

Q.   How long have you been investing in cryptocurrency?

A.   Seven years.  Well, almost eight now.

Q.   At the time of the incident you're describing, what
are some of the types of cryptocurrency coins you held?

A.   Bitcoin, Ethereum, Cardano.  The list goes on and on.
I have probably 150.

Q.   And the approximate value of your accounts at that
time was what?

A. It was about 238,000.

Q. Through Coinbase, did you use any products that produced interest for you?

A. Yes, there's -- there's a mechanism called staking where you can make interest off of the coins that you earn, but you -- you basically hold them just like a bank. Bank -- you know, you give the money -- the bank your money and they use it until you want it back. And same thing in -- in cryptocurrency, to some extent. Stak- -- staking is like lending it out, and so you do not have access to it for a while, but you're making often large interest on it.

Q. And you described Coinbase as a custodial cryptocurrency account; is that correct?

A. Yeah.

Q. A custodial exchange?

A. Yes, that's correct.

Q. And does that mean that they hold the cryptocurrency?

A. That is correct, yes.

Q. Did you have cryptocurrency in any other accounts at the time of the incident?

A. Yes, I had it in Gemini and crypto.com. Actually, I had it in an Israeli account called Binance, or another one, too, but they -- they went out of business and I actually did get the money back.

Q. Are those custodial cryptocurrency exchanges as well?

A. Yes, they are.

Q. So when you were upstairs as this individual is accessing your computer, what did you observe or hear?

A. Well, I mean, it was obvious -- I drew this conclusion, that he was talking with a -- with a guy who was really savvy about high-tech. And, you know, they were obviously -- had means of getting into my account.

And so that's -- that was the main thing. They kept talking back and forth. And he would -- I have some whiteboards in my loft area; he kept writing a few things up there.

And, again, they just -- it -- it was obvious that they had their own little way of getting into my -- and account, and then draining it. I assume they were sending it to other accounts somewhere, or their own hard wallet, if they had one. I -- I wasn't sure, of course, what they were doing specifically.

But I did see that 238, or something like that, it was -- held steady for about 20 minutes and then it started going down precipitously until it got -- I think it was 100 -- they took $155,000 out.

Q. This is your Coinbase account?

A. Yes.

Q. And as far as what you have to provide access to, did -- did you log into your -- did you have to put a password

into your computer?

A. Oh, yeah, I did.

Q. Okay.

A. Yeah.

Q. And -- and then what?

A. Well, and normally if you have the two-factor authentication code, then you have to do that. But, you know, I guess I'm used to that. I -- I'm so addled. I do remember at first he wanted to do it all on my iPhone, but because my face was swollen, it wouldn't -- the face recognition wasn't working.

Q. Explain -- explain that.

A. Well, when you go into an account, you put in -- initially you basically take photograph, so the high-tech stuff, you know, basically has all the little contours of your face. And if it's you, that is based on your -- all the topography, then it lets you into the -- into your account.

But since I was not -- my face was all swollen, it wouldn't let me. So it denied that access. And that's when we went to the Mac. But I think he wanted me to get into the Mac anyway. I mean...

Q. Who was holding the phone when you were trying to unlock it with face ID?

A. The larger guy.

Q. Okay.

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

So he had your phone and he was holding it up to your face?

A.   Oh, yeah.  Yeah, he kept -- again, he would threaten me and -- yeah, he -- he would -- he would wave it around when he wasn't talking or he would come over and point it to my face or point it to my forehead or to my temple.

Q.   What would he point?

A.   His black gun.

Q.   Okay.

When he -- did he touch your forehead with it?

A.   Well, the gun -- the gun touched my skin at -- at times, yes.

Q.   Okay.

A.   It was in contact.  I thought twice he was going to kill me.  I mean, I felt it in my gut.

Q.   So once you're logged into the -- your Mac computer --

A.   Uh-huh.

Q.   -- you said you put a password in for that.  Do you then log into your Coinbase account?

A.   Yeah, I use a user ID and a -- a password, and I -- I probably did use the two- -- two-factor authentication code, but I'm not sure.  What they'll do is, they'll send you a -- they'll send you a -- a number, a code, a six-digit code to your e-mail account.

Q.   Okay.

A.   And that's probably how I got in, yeah.

Q.   When you were moved -- when he took control of your computer --

A.   Uh-huh.

Q.   -- describe how you were sitting.

A.   Well, I was in this large chair somewhat like this and -- and, you know, from the time that he was talking with this other person, and I was over there, I -- I was just sitting there.  I -- I mean, I would look over and I could see the -- the numbers, you know.

And -- but I remember toward the end, I really -- I was just a mess.  I mean, I was just sweating profusely and shaking.  And -- and then once it was -- I mean, once I could tell that he was about to end it, again, when I thought he was going to kill me, that's when my wife -- the smaller guy brought my wife into the addition.  And I had my hands -- well, he -- he cut them loose initially so I could type.

Q.   What did he cut?

A.   The zip tie.

Q.   Okay.

A.   Yeah, the black zip tie.

And then toward the end -- he gave me some water. Isn't that nice?  He gave me water once as -- as I was shaking and he thought I was going to have a stroke or heart attack.

Q.   When you were sitting next to him --

A.   Yes.

Q.   -- do you recall if you were zip tied at all at that point?

A.   Oh, yes.  My -- my ankles certainly were.  They were very tight.  Very tight.  And they -- my wrists were very tight the whole time when -- when they were zip tied.

Q.   When would have your ankles been initially zip tied?

A.   I don't think he zip tied those because I had to walk from the kitchen all the way up to the loft area.  I don't think he zip tied those until I sat down in the chair in front of the Mac.

THE COURT:  All right.  Mr. Prim, give me a minute.  I need to take a matter up with counsel.

Ladies and gentlemen of the jury, I'm going to ask you to step back to the jury room for just a minute.  The jury's excused.

(Jurors exiting the courtroom at 3:40 P.M.)

THE COURT:  So Juror Number 5 is struggling to stay awake, which is a little bit surprising with the nature of the testimony that's offered.  I think it might be one of those things where, you know, you eat lunch and you come back and you hit a little down period.  He's coming in and out, but I wanted to get him out for a minute, hopefully to wake up.  But it's something we'll have to keep an eye on.

Anybody -- I mean, I don't know if anybody else noticed this.

MR. IVERSON: Yeah, I think I heard it. It is early.

THE COURT: Yeah. We'll see how we get along.

All right. We'll just be at ease for a few minutes.

(Off the record at 3:41 P.M.)

(On the record at 3:52 P.M.)

THE COURT: Bring the jury back in.

(Jurors entering the courtroom at 3:52 P.M.)

THE COURT: All right.

Mr. Iverson, you may resume.

MR. IVERSON: Thank you.

CONTINUED DIRECT-EXAMINATION

BY MR. IVERSON:

Q. Mr. Prim, do you recall whether either of the individuals that were inside your house were wearing anything on their hands?

A. They had gloves.

Q. I'm sorry. I couldn't hear you.

A. They wore black gloves.

Q. Both of them?

A. I didn't see the smaller man as often, but I'm pretty -- I -- I can't swear that he did, but certainly the larger man that I was with did.

Q. When you were upstairs with the larger man, could you

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

see his face?

A. No, I mean, I could see he was dark skinned, but I couldn't see easy enough to identify him.

Q. Why not?

A. Well, he had a mask. I mean, it was basically covering -- I could see his eyes, and that's enough. I mean, I could tell that he had dark skin, but he had some type of mask on.

Q. When you were upstairs, could you hear your wife at all?

A. Initially I did, yeah. I -- I could still hear her screaming occasionally and pleading with him, but that only -- that -- that -- that ceased pretty quickly.

Q. Did the smaller man ever say anything to you?

A. Yes, a couple times. Twice, in fact. He seemed very rough with me as opposed to what appeared to be a -- despite his initial throwing her down and kicking her -- well, she told me this later. Yes, he --

Q. Well, let's not say that.

MR. DOORASAMY: Objection.

THE COURT: I'll sustain. Next question.

BY MR. IVERSON:

Q. Mr. Prim, I want to know, the smaller man, what, if anything, he said to you.

A. He threatened me also, but they were very -- just

little tiny snippets in the -- in the kitchen. And he came upstairs once to see how the other guy, the larger guy, was doing. And -- and he -- it's, like, he just came over and stuck the gun to my forehead and HBO language again. I will kill you if you don't do what he says.

Q. Did there come a time when you -- when you left the loft?

A. Yes.

Q. Will you describe how that happened?

A. Yes. Right as we were leaving, that is, he indicated that they -- they were finished. He took our two cell phones and it was actually quiet.

Q. Are you upstairs or downstairs?

A. Upstairs in -- in the loft.

Q. Okay.

A. Yes.

And this was for toward the end. They had finished as much as they could get out of the -- out of the Coinbase account. And then he took our two phones, and it was very impressive because he took them and just hit them over his knee and -- and they cracked. And, you know, it's pretty impressive to take these little phones and -- and -- and to do that. So...

Q. Did you observe him break anything else?

A. He broke the Mac. He tried to break it, and he did

break it.  There was some glass on the table.  It's a large table.  So he did that initially.

Q.  Will you describe how he did that?

A.  He just threw it down on the table.  And so he broke -- I -- I saw him break the two iPhones with -- on his knee.  They were shattered and bent.

And then I saw him also take the Mac, throw it on the table.  Later, he would throw it over the loft and demolish it much more.

Q.  Okay.

And how did you get from the loft to downstairs, if you'll describe that.

A.  He put the -- he cut the ankle black -- the -- the...

Q.  Zip tie?

A.  Zip ties, yes.

And so I -- I just walked downstairs.  But, you know, I -- so I walked downstairs and then my wife came from the other room with the -- with the smaller guy with her and they took us into the new addition bathroom.

And then they put the zip ties around us, that is, both our ankles and our wrists; so there were four zip ties then around us.  They were very tight.

The smaller man, I remember, took one of the iPhones and put it in the commode, and the other guy said, you know, some derogatory comment, like, you cannot flush that down the

commode or something.  And took it out and sort of tried to get some water off of it.  Yeah, I -- I...

Q.   And then what happened after they placed you in the bathroom with your wife?

A.   They closed -- they closed the door and I could hear them leaving.  And I said, let's wait five minutes.  And then I slowly opened the door and didn't hear anything, didn't see anything.

And so I said, I'm going to get on my hands and knees and, you know, edge into the kitchen.  So I did.  I just got on my hands and knees and with the Ziploc -- the zip ties around me and managed to get to the -- on the way up to the steps, I had to turn around a little bit and go down.

So I got there.  By the time I got to the kitchen where the -- there was some scissors in -- in one of the drawers, my wife had gotten -- I'm not -- I guess she had gotten her feet -- she had gotten out of her -- the feet zip ties and so she was able to get the scissors and cut them for me.

So then both of us just walked out of the house.  I was amazed that there was no destruction.  Nothing was -- you know, was ransacked.

Q.   Where'd you go?

A.   We went outside and went next door to the neighbor's, knocked on her door, and she came.  And then another neighbor

came out and called 9-1-1. And within five or ten minutes, there must have been six or seven cops there, and the ambulance came too.

Q. Did you incur any injuries from this home invasion?

A. I had nine stitches put in my mouth, yes.

Q. Where in your mouth?

A. In the upper part of my mouth, yeah. I think there were eight inside and one outside.

Q. Did you observe any injuries to your wife?

A. Yes, she had a hematoma. She had a big -- big knot bleeding on -- on her head. And then they would find out she had three broken ribs and her tailbone was -- was fractured.

Q. Did you receive any medical care?

A. Oh, yeah, we immediately from -- we -- we walked out of the house at 9:00, and by 9:30 or quarter till 10:00, we were in an ambulance going to Duke emergency room. We went in as aliases. We didn't have a -- we didn't use our name.

Q. I'll stop you there.

A. Yeah.

Q. How long were you at Duke?

A. Until 4:00.

Q. Okay.

I've got in my hand what are marked as Exhibits 1A through 1U --

A. Uh-huh.

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

Q.   -- for identification.

MR. IVERSON:  Can I hand these to the witness, Your Honor?

THE COURT:  You may.

BY MR. IVERSON:

Q.   Will you take a look at these, please?

A.   Sure.

Q.   Do you recognize those?

A.   I do.

Q.   What are those?

A.   Our house.

Q.   Are those fair and accurate images of your house?

A.   They are.

Q.   Are they taken immediately after the home invasion you just described?

A.   Yes.

MR. IVERSON:  I would offer the exhibits into evidence at this point, 1A through 1U.

(Government's Exhibit Numbers 1A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, R, S, T, and U were offered.)

MR. DOORASAMY:  No objection, Your Honor.

THE COURT:  Government's Exhibits 1A through 1U are admitted.

(Government's Exhibit Numbers 1A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, R, S, T, and U were admitted and

made a part of the record of this proceeding.)

MR. IVERSON: Ms. Collins, if you'll display 1A.

BY MR. IVERSON:

Q. Mr. Prim, can you see Exhibit 1A on the screen?

A. Yes, it's the front of our house.

Q. Say what it is again one more time.

A. It is the front of our house on Wells Street.

THE COURT: Ms. Collins, 1B, please.

BY MR. IVERSON:

Q. What does this depict, Mr. Prim?

A. That is the first room you enter of the house from the front. It's where we eat. I don't know what you might want to call it, but that's -- that's the first room you enter from the front.

Q. And your -- your front door, where you first encountered the individual you described --

A. Yes.

Q. -- where is it in relation to this picture?

A. It's to the left. As you're looking at it, to the left.

MR. IVERSON: Ms. Collins, 1C, please.

THE WITNESS: Yeah, that's the table we -- where we eat, and those are the zip ties.

MR. IVERSON: 1D, please, Ms. Collins.

THE WITNESS: Yeah, zip ties.

MR. IVERSON: 1E, please.

BY MR. IVERSON:

Q. What are we looking at here, Mr. Prim?

A. This is from -- you can see the bedroom on the right, so I was in bed when I heard the knocks. And then when I went back to go to sleep.

So I hear all the screaming, and so I come from that bedroom on the right through that door into this entering room and then go into the kitchen.

So my wife was on the left of that centerpiece in the -- in the kitchen, and that's where he was throwing her down and kicking her.

Q. Okay.

A. And I was sort of standing to the right side of that centerpiece.

MR. IVERSON: 1F, please.

THE WITNESS: Yeah, that's just another view of the kitchen and the centerpiece. You can see, I can see, stains on the --

BY MR. IVERSON:

Q. There's some more pictures.

A. Okay.

MR. IVERSON: If you'll show 1G, please.

THE WITNESS: Yeah, that, I assume, is the blood from my wife.

BY MR. IVERSON:

Q. Why -- why do you think that?

A. That's where she was. The guy was on the left side of the center isle, and that's where she was screaming and that's where he was throwing her down and kicking her. And you can see blood.

MR. IVERSON: Let's go to the next one. Next exhibit, please.

BY MR. IVERSON:

Q. This is 1H.

A. Uh-huh.

Q. What do you see here, Mr. Prim?

A. I see blood on the right. That's the blood, I assume, that came from my face.

Q. Where were you standing when you were punched in the face?

A. I was standing about between the isle -- the -- the center isle in the kitchen and that black chair where the wine is, that area there. And he comes out of that room. You can see that library area where that snail, which is a door.

Q. Is that the door on the right side of the picture?

A. Yes, that's where the -- that's where he comes out of there and just whams me. Yeah.

MR. IVERSON: Next picture, Ms. Collins, please.

BY MR. IVERSON:

Q.   This is 1I.  Mr. Prim, what do you see at 1I?

A.   There was a glass -- a small glass, I believe, on the counter there on that isle, center isle, and in -- in all the ruckus, I think it fell over.  And there's some water there too.  There must have been some water in there.

MR. IVERSON:  1J, Ms. Collins, please.

THE WITNESS:  And that's looking into the new addition from the kitchen area.

BY MR. IVERSON:

Q.   Is this going away from the kitchen?

A.   This is going away from the kitchen into the new addition, which is where the loft is.  Yeah.

MR. IVERSON:  Next exhibit, Ms. Collins.

THE WITNESS:  That's into the loft --

BY MR. IVERSON:

Q.   IJ?

A.   -- you can also see the -- I can see the Mac on the floor there.  And the loft is, obviously, to the right.  And the bathroom, which we would -- eventually we went to is down there.

Q.   The bathroom you eventually went to --

A.   Yes, to the right of that red circular piece.

Q.   You mentioned windows earlier.  Are these some of the windows you were describing?

A.   Yes, those two large windows there.  They're -- I

think they are 6 or 7 feet long and 4 feet wide.

Q. Okay.

Are there any blinds or shades on --

A. No --

Q. -- those windows?

A. -- there's nothing. Nothing on them. So it's totally exposed. And then there are two large windows, three large windows up in the loft area.

MR. IVERSON: Next exhibit, please.

BY MR. IVERSON:

Q. This is 1L. What does this -- this depict, Mr. Prim?

A. That's the Mac that was used to get into the account. And it was not broken sufficiently, I assume, on the table, so it was thrown over.

Q. Did you see that happen?

A. No, I did not see it. I heard it. Did not see it.

Q. Where were you when you heard it?

A. In the bathroom.

Q. What did you hear?

A. I heard a big thud. You know?

MR. IVERSON: 1M, Ms. Collins.

THE WITNESS: Yeah, that's the loft area.

MR. IVERSON: 1N, Ms. Collins.

THE WITNESS: Same thing. Loft area.

So you can see that blue chair. So I was sitting

there. And that's about the position it was in where I was sitting most of the time. And he was -- he was in the foreground.

BY MR. IVERSON:

Q. Would that be between where you were sitting in the chair and the stairs?

A. Yes, that's correct.

Q. Okay.

And you had just mentioned some other windows in the loft office. Are those displayed here?

A. That's correct, yeah. There's actually -- yeah, you can't -- there are two there. Yeah, that's it. But there's also a door out -- going out onto a deck that's also totally a window.

Q. Okay.

And do any of those windows have blinds --

A. No.

Q. -- or shading?

A. No, they do not.

MR. IVERSON: Next exhibit, Ms. Collins.

THE WITNESS: Yeah, that's the -- the north side of the desk, you might say, and the filing cabinets. Although that's not the filing cabinets I was alluding to earlier. But that's just where he was going back and forth from that area to --

BY MR. IVERSON:

Q. Do you see anything sitting on the white filing cabinet?

A. Yes, the red book. Yeah, he -- I do not know if it was the larger -- I think it was the smaller man who, toward the very end, said, let's take this. It's probably worth a hundred bucks or something. And then he started asking me about where I had a safety deposit box and other valuables. And I just said, we don't have any. We do not have any of that.

Q. Okay.

Do you see anything sitting on the red book?

A. Yeah, I do, a zip -- a zip tie.

Q. Thank you.

MR. IVERSON: Next photo, Ms. Collins.

That's 1P.

Next photo, Ms. Collins.

BY MR. IVERSON:

Q. 1Q. What does 1Q show, Mr. Prim?

A. It shows some of the glass that came from the screen of the Mac. Yeah. And then you can see the mouse in the...

MR. IVERSON: Ms. Collins, will you zoom in on the mouse?

THE WITNESS: That's the bathroom we were taken into. You can see where the iPhone's on the floor.

MR. IVERSON: I'm going to have Ms. Collins zoom in on the mouse, here.

THE WITNESS: Blood. I see blood.

BY MR. IVERSON:

Q. Okay.

Whose blood is that?

A. It's my blood.

Q. What usually sits on this desk, if anything? Where's the glass from on the desk?

A. Well, the glass is from the -- from the screen of the -- of the Mac.

Q. Okay.

So this is where the Mac would normally sit?

A. Yes, exactly.

MR. IVERSON: Next exhibit, Ms. Collins.

BY MR. IVERSON:

Q. This is 1R. What is 1R, Mr. Prim?

A. This is the bathroom where they took us at the very end.

MR. IVERSON: Next exhibit, Ms. Collins.

BY MR. IVERSON:

Q. What is this, Mr. Prim?

A. That's the bathroom. You can see the two iPhones. You can see that they're -- the one in the foreground is curved a little bit. It's shat- --

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

MR. IVERSON:  Next --

A.    -- very shattered.

MR. IVERSON:  Next exhibit, Ms. Collins.

THE WITNESS:  Yeah.

MR. IVERSON:  Next exhibit, Ms. Collins.

BY MR. IVERSON:

Q.    What's this room?

A.    That's the -- my wife's bathroom.  It's the bathroom right off from the bath -- from the bedroom.

Q.    Okay.

So it's a different bathroom?

A.    Yes, there are three -- three bathrooms.

Q.    Is that chair usually there?

A.    No.

Q.    Okay.

Do you see any red on the floor?

A.    I do.

Q.    Is that usually there?

A.    No.

MR. IVERSON:  Your Honor, I'm going to hand Mr. Prim what I've marked 26I for identification.

BY MR. IVERSON:

Q.    Do you recognize this?

A.    I do.  It's my driver's license.

Q.    Fair and accurate image of your driver's license?

A. Yes.

Q. Okay.

MR. IVERSON: Offer 26I into evidence.

(Government's Exhibit Number 26I was offered.)

MR. DOORASAMY: No objection.

THE COURT: Okay. No objection?

Government's 26I is admitted.

(Government's Exhibit Number 26I was admitted and made a part of the record of this proceeding.)

MR. IVERSON: Can we publish that to the jury, Ms. Collins?

BY MR. IVERSON:

Q. I'm going to hand you what I've marked 3A and 3B for identification, as well as Exhibit 2, but we'll start with 3A and 3B.

If you'll look at 3A and 3B; do recognize those?

A. I do. That's me.

Q. What do they depict?

A. A mouth that has been bruised badly.

Q. Is it the injury you just described from the home invasion that you've been discussing today?

A. Yes, that's the manifestation of it.

MR. IVERSON: I would offer 3A and 3B into evidence.

(Government's Exhibit Numbers 3A and B were offered.)

THE COURT: Any objection?

MR. IVERSON:  If you'll hand me those.

THE WITNESS:  Sure.  All of them?

MR. IVERSON:  Just the top, please.

THE WITNESS:  Just the top.  Okay.

MR. DOORASAMY:  No objection to those pictures.

THE COURT:  3A and 3B are admitted.

(Government's Exhibit Numbers 3A and B were admitted and made a part of the record of this proceeding.)

MR. IVERSON:  Ms. Collins, if you'll display 3A.

BY MR. IVERSON:

Q.   If you'll direct us to where the injury is, Mr. Prim?

A.   Well, you can see my lip is swollen, and then there is a -- I don't know if they're stitches, but they look like they're stitches, yeah, right above the lip.

MR. IVERSON:  And if we could publish 3C, Ms. Collins.

THE COURT:  3C?

MR. IVERSON:  3B.

THE WITNESS:  Yeah, same thing.

BY MR. IVERSON:

Q.   And if you'll look at Exhibit 2A for identification. It's one of the --

A.   Oh.

Q.   -- pieces of paper I handed you.

A.   2A.

THE COURT: 2A or 2?

MR. IVERSON: It's just 2.

THE WITNESS: Oh, 2. Yes, this is the one of -- yeah, that's...

BY MR. IVERSON:

Q. What is it?

A. That is a picture of my wife and myself and our neighbor right after we walked out of the house at 9:00. So probably about 9:10 or something.

Q. Is that a fair and accurate depiction of you at that time?

A. Correct, it is.

MR. IVERSON: I offer 2 into evidence.

(Government's Exhibit Number 2 was offered.)

THE COURT: Any objection?

MR. DOORASAMY: No objection.

THE COURT: Two's admitted.

(Government's Exhibit Number 2 was admitted and made a part of the record of this proceeding.)

MR. IVERSON: Will you publish 2, Ms. Collins?

BY MR. IVERSON:

Q. Would you identify the people in this photo, Mr. Prim?

A. That is Michael Prim on the right; that's my wife, Carrie Benoit Salemi; and that is our neighbor, Christa

Alexander, on the far left.

Q.   Okay.

Neighbor on the far left, and your wife's in the middle?

A.   Yes.

MR. IVERSON:  If you will give me one moment.

No further questions, Your Honor

THE COURT:  Cross-examination.

MR. DOORASAMY:  Thank you.

CROSS-EXAMINATION

BY MR. DOORASAMY:

Q.   Good afternoon, Mr. Prim.

A.   Good afternoon, sir.

Q.   I am sorry that you had such great ordeal on the night of this -- on the day of this fateful event as you describe.

Now, you testified that you are -- you were a physics schoolteacher?

A.   Yes, sir.

Q.   How many years did you teach physics?

A.   I taught physics 25 years.

Q.   Okay.

A.   I taught 31 years total.

Q.   One of the photographs that the Government had shown was of a book, calculus book, still on your desk; is that

correct?

A. Correct.

Q. Okay.

I raise that because the calculus book raises a lot of fears in the minds of a lot of students.

So my understanding is, you were a very experienced schoolteacher in physics; is that right?

A. That is correct.

Q. And on the day of this ordeal, you had a chance to be next to the small and the big guy that was in your house, as you described them; correct?

A. A chance?

Q. Well, were you close to them?

A. I was.

Q. Now, how much of the time did you spend with the big guy or the larger guy, as you described him? From the moment they entered the house until they left.

A. I spent probably an hour and a half, approximately.

Q. Okay.

And for that entire time, you were with the larger guy; is that correct?

A. That is correct.

Q. And you testified that he had zip tied you while you were with him at your computer; is that correct?

A. Yes, sir.

Q.   Now, were you present when your wife was interviewed by a police officer?

A.   I may have been there.  I'm not sure I heard it.

Q.   Do you know if your wife ever told the police officer --

MR. IVERSON:  Objection.

THE COURT:  Sustained.

MR. DOORASAMY:  Okay.

BY MR. DOORASAMY:

Q.   Now, did you make a statement to the police officer on the day of the incident?

A.   If they asked me questions, I answered them, yes.

Q.   Did you tell them that 250,000 U.S. dollars was stolen from you?

A.   No, I may have said that was insurance that covered up to 250,000.

Q.   Now, you mentioned insurance.  You paid about 29.99 a month for insurance on Coinbase; is that correct?

A.   Yes, sir.

Q.   So did you recover all of that --

MR. IVERSON:  Objection.  Relevance.

THE COURT:  I'm going to sustain.

MR. DOORASAMY:  I would like to be heard, Your Honor.

THE COURT:  Let me see counsel up here.

(Beginning sidebar.)

THE COURT: Okay. What's the relevance of the insurance recovery?

MR. DOORASAMY: He got his money back.

THE COURT: I'm sorry?

MR. DOORASAMY: He got his money back. Not that that makes a difference to the case, but I think the jurors need to know.

THE COURT: I -- I don't see how that's relevant. That doesn't undo the fact of the crime.

MR. DOORASAMY: No, it does not. I agree.

THE COURT: I'll -- I'll sustain.

MR. DOORASAMY: Okay.

(End of sidebar.)

THE COURT: That objection is sustained. The jury will disregard it.

BY MR. DOORASAMY:

Q. How many times did the police talk to you about this case?

A. I can't give you a specific number. Constantly, though.

Q. Four? Five? Ten times?

A. At least.

Q. Did they, at any time, show you photographs of any persons that may have inv- -- broken into your house?

A. No.

Q. Okay.

Now, earlier on, I was asking you about the larger guy that you spent over an hour and a half with --

A. Not over, an hour and a half.

Q. An hour and a half?

A. Yes, sir.

Q. And when the larger and the smaller guy left your house, is it correct that, at that time, you were placed in the bathroom?

A. No.

Q. Where were you before they left?

A. We were in the bathroom.

Q. Okay.

But did they bring you to the bathroom?

A. Sir?

Q. Did they bring you to the bathroom --

A. They certainly did.

Q. Okay.

But that's the first time you and your wife were together when they were not with you; is that correct?

A. That is the first time I was with my wife after the larger guy exited me from the kitchen and he was -- she was still screaming when I left her.

Q. Okay.

You had never -- you was never taken out of your

house -- correct? -- for the entire ordeal?

A. That is correct.

Q. Okay.

And do you remember telling the police that the bigger guy was, like, 6-1 and a big guy. Those were your words that you used.

A. I may have said he was in that range. I said that I tried to gauge his height. I really couldn't, but I suspected he was somewhere between 5-10 and 6 feet.

Q. Okay.

But you told the officers 6.1 --

MR. IVERSON: Objection.

THE COURT: I'll sustain.

MR. DOORASAMY: Okay.

BY MR. DOORASAMY:

Q. You also testified that there was a third person involved by telephone; is that right?

A. That is correct.

Q. Okay.

Now, you described that individual that you didn't see as a tech savvy person; is that right?

A. Based on speed with which he was speaking, I could only hear it vaguely. I could not identify a -- any kind of accent. He seemed that way.

Q. And it was --

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A.    That was my initial impression.

Q.    Sorry.

And it was his actions on your computer that eventually led to crypto being taken out --

A.    I can't -- I can't speak for that.  I don't know all the mechanisms involved.

I do know that it appeared that this third person was the individual involved in actually transferring the money or the -- the main person involved in understanding the high-tech and to enable the larger guy to hit the keys the way he did to get the money out.

Q.    Okay.

But you don't know who transferred the money, whether --

A.    No, of course not.

Q.    -- the guy on the phone or --

A.    I do not.

Q.    Do you know that?

A.    I know he was talking to a third guy.  That's all I can tell you.

Q.    Okay.

You testified that they were struggling because, at some point, you noticed the money was still in your account and there was some conversation going on and then eventually the money started -- the crypto started going out; is that correct?

That's what you testified.

A. I testified that it took a long time for there to appear to be any initial money coming out of the account. Once it started going, it went pretty quickly. That's what I said.

Q. Do you recall telling the police that you were asked by the third person on the phone to download AnyDesk on your computer?

A. I think that is the case.

Q. So did you download AnyDesk on the instructions of the third person on the phone?

A. I -- I never heard the third person. He never talked to me directly on the phone. No, I did not have any -- any communication with a third person.

Q. So after you downloaded AnyDesk, did the third person take over your --

A. It appeared --

Q. -- computer?

A. Yes, it appeared that way.

Q. Okay.

Now, do you recall telling the police that three to four years ago you had AnyDesk on your phone three to four years before this incident. Do you recall that?

A. I may have said that.

Q. And do you recall you told the police that a friend of yours came and removed it from your computer?

A.   He was not a friend.  I paid him to do it.

Q.   Okay.

A.   He was an expert, a Ph.D.

Q.   All right.

Do you also recall that prior to this incident on April 12th, you were having some problems with text messages telling you, you need to change your password and your e-mail?

A.   That is true.  I probably should have taken action.

Q.   Do you know who sent those text messages to you?

A.   No idea.

Q.   Did you change your passwords?

A.   I did constantly.

Q.   Okay.

Did you have problems with your e-mail?

A.   Not problems with my e-mail, no.

Q.   Did you have problems with your virus software?

A.   Not that I was aware of.

Q.   Do you remember telling the police that you had just downloaded the virus software and you was asked to change the password on it?

A.   Repeat your question, please.

Q.   Okay.

Do you recall telling the police that strange things were happening before the incident at your house?

A.   Yes, I did say that.

Case 1:23-cr-00260-WO   Document 166   Filed 12/03/24   Page 48 of 53

Q. One of the issues was you were receiving text messages to change your password --

A. That is true. That is true, yeah.

Q. Is that true?

A. Yeah. Yeah.

Q. And you also told them that you had just downloaded new virus software and you got an e-mail saying you needed to change your password on that.

A. I got a text from that. I was naïve --

Q. Okay.

A. -- and took it -- took -- I should not have answered those texts.

Q. And all of this happened how long before the incident at your house?

A. I don't know.

Q. Weeks? Months?

A. I don't know.

Q. Did --

A. I had problems with the EarthLink account for -- for months. I should have taken action on that, but I didn't.

Q. Okay.

Do you know a person by the name of Rick that comes to your house?

THE WITNESS: Do I have to answer that?

THE COURT: There's no objection, so yeah. If you

know a person named --

THE WITNESS:  I do, sure.

BY MR. DOORASAMY:

Q.  Okay.

And does Rick drive a black Chevy SUV?

A.  Not the Rick I know.  He doesn't drive.

Q.  Okay.

Do you know if any person told police that there was a black Chevy SUV --

MR. IVERSON:  Objection.

THE COURT:  Yeah, that seems like hearsay.  Sustained.

MR. DOORASAMY:  Okay.

Just give me a second, Your Honor.

BY MR. DOORASAMY:

Q.  Now, you testified you had a Coinbase account; correct?

A.  Yes, sir.

Q.  Now, where is Coinbase based?

A.  San Francisco.

Q.  Okay.

And you also had crypto in Binance; is that correct?

A.  I did.  They closed down.  They went bankrupt.

Q.  Okay.

When was that?

A. I don't remember. Years ago.

Q. Okay.

After this traumatic incident, you went to your neighbors'. You didn't call 9-1-1. Why?

A. You're a human being? I was just assaulted, sir. I had a gun to my head for an hour and a half. I responded very appropriately, I think.

I didn't have a phone to use, first of all.

Q. Okay.

A. It had been destroyed. So I went outside and I went to a neighbor's house.

Q. Okay.

MR. DOORASAMY: I have no further questions for this witness.

THE COURT: Redirect?

REDIRECT EXAMINATION

BY MR. IVERSON:

Q. Mr. Prim, once the individuals who were in your house were able to access your Coinbase account, what was asked of you? Where were you?

A. Well, I had been pushed to the side of -- of where the Mac was, so I --

Q. Did --

A. -- was in the blue chair, sitting in there. And that's when I really started feeling sick.

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

Q. Okay.

Approximately how long were you in that chair?

A. Fifty minutes.

Q. How many?

A. Fifty minutes.

Q. 5-0?

A. 5-0.

MR. IVERSON: No further questions.

THE COURT: Anything further?

MR. DOORASAMY: No.

THE COURT: You may step down, sir.

(End of excerpt.)

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

CERTIFICATE

I, Stacy Harlow, Realtime Verbatim Reporter-Master, Certified Verbatim Reporter-Master, Certificate of Merit, Registered Broadcast Captioner, Registered CART Provider, and Official Reporter of the United States District Court for the Middle District of North Carolina, do hereby certify that the foregoing is a true and correct transcript originally filed on CM/ECF on August 11, 2024, Docket Entry #113, incorporating redactions requested by the U.S. Attorney's Office and authorized in accordance with §330.10.10(e) and (f). Redactions appear as a black box in the transcript.

Given under my hand this 3rd day of December, 2024.

_____*Stacy Harlow*___
STACY HARLOW
Official Reporter, United States
Middle District of North Carolina

Case 1:23-cr-00260-WO     Document 166     Filed 12/03/24     Page 53 of 53