UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA


UNITED STATES DISTRICT COURT          ) 1:23CR260-2

v.                                    ) Greensboro

REMY RA ST. FELIX                     ) June 21, 2024

REDACTED TRANSCRIPT OF THE EXCERPTED TRIAL TESTIMONY OF
TULLIA SALVATORE HEISSENBERG
BEFORE THE HONORABLE WILLIAM OSTEEN
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE GOVERNMENT:

     ERIC L. IVERSON
     U.S. Attorney's Office
     Middle District of North Carolina
     101 South Edgeworth Street - Fourth Floor
     Greensboro, North Carolina  27401
     (336) 332-6302

     BRIAN MUND
     DOJ-CRM
     10th & Constitution Avenue, NW
     John C. Keeney Building - Suite 600
     Washington, DC  20530
     (202) 598-6205

FOR THE DEFENDANT:

     ALAN DOORASAMY, SR.
     Law Office of Alan Doorasamy, Sr.
     107 Westdale Avenue
     Winston-Salem, North Carolina  27101
     (336) 749-6412

COURT REPORTER:

     STACY HARLOW, RVR-M, CVR-M, CM, RBC, RCP
     Post Office Box 21471
     Winston-Salem, North Carolina  27120
Proceedings recorded by voice stenography realtime translation.
Transcript produced by computer-aided transcription.

INDEX

EXAMINATION INDEX

                                              Page


WITNESSES CALLED ON BEHALF OF THE GOVERNMENT:

TULLIA SALVATORE HEISSENBERG

          Direct Examination by Mr. Iverson        4

          Cross-Examination by Mr. Doorasamy       20

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

EXHIBIT INDEX

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---------|-------------|---------|----------|
| EXHIBITS OFFERED ON BEHALF OF GOVERNMENT: | | | |
| 36A | Photograph | 14 | 14 |
| 36B | Photograph | 16 | 16 |
| 36C | Photograph | 16 | 16 |
| 36D | Photograph | 16 | 16 |
| 36E | Photograph | 16 | 16 |
| 36F | Photograph | 16 | 16 |
| 36G | Photograph | 16 | 16 |

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

Case 1:23-cr-00260-WO    Document 167    Filed 12/03/24    Page 3 of 22

P R O C E E D I N G S

(June 21, 2024.)

(Beginning of excerpt.)

MR. IVERSON:  United States calls Tullia Heissenberg.

(TULLIA SALVATORE HEISSENBERG WAS SWORN.)

Whereupon,

TULLIA SALVATORE HEISSENBERG,

having been first duly cautioned and sworn, testified as follows:

DIRECT EXAMINATION

BY MR. IVERSON:

Q.  Good morning, Ms. Heissenberg.

A.  Morning.

Q.  Will you state your full name for the record, please?

A.  I am Tullia Salvatore Heissenberg.

Q.  Okay.

THE COURT:  Ms. Heissenberg, if you're more comfortable, you can lower that microphone a little bit, and keep your voice up.

THE WITNESS:  Okay.

BY MR. IVERSON:

Q.  All right.

Why don't you say your -- your full name again so -- make sure we can hear you.

A.  Tullia Salvatore Heissenberg.

Case 1:23-cr-00260-WO    Document 167    Filed 12/03/24    Page 4 of 22

Q. Okay. I can hear you, Ms. Heissenberg.

Where do you live?

A. I live in Delray Beach, Florida.

Q. How long have you lived in Delray Beach, Florida?

A. Over 45 years.

Q. What's your address?

A.

Q. How long have you lived in that house?

A. Since 1997.

Q. Who do you live with?

A. My husband.

Q. Does your husband have any significant medical issues?

A. Yes, my husband has advanced Parkinson's disease.

Q. Okay.

Did he suffer from that in 2022?

A. Yes, he's had it for 18 years.

Q. I'm going to direct your attention to September 12th of 2022, the ev- -- the evening or the night. Were you the victim of a crime?

A. Yes, I was.

Q. What type of crime?

A. Armed robbery home invasion. Scary.

Q. Approximately what -- what time did this happen?

A. It was just before midnight.

Q. Would you describe what happened?

A. We were sleeping, soundly sleeping, and we heard a noise on our living room sliding doors. And we both got up and we had heard something another night, so we thought nothing of it.

So we came out; my husband put on the light so whoever it was outside could see us, but we couldn't see. And we kept hearing the noise on the glass (indicating). And all of a sudden, everything came crashing down. The window, the glass, everything. Glass everywhere.

And three masked men, totally masked, barged into the house, and it was just terrifying. We just -- we started screaming, really scared. My husband run towards the front door. I run -- I grab something and run in my bedroom to put something on.

And one guy followed my husband. I saw they were fighting and they overturned the dining room table, and as I run to the bedroom, two guys followed me.

Q. Let's talk about that, the rest of what happened to you in your bedroom in a minute.

When they -- when they burst through, was it a sliding glass door?

A. Yes, big sliding door.

Q. Could you see whether they were armed with any weapons?

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A.   Oh yeah, we saw the guns.  I saw.  I saw the guns.

Q.   Tell me about those.

A.   I saw two regular guns and one that looked like what I call a machine gun.  I do not know what kind.  But definitely not a regular gun.

Q.   And you said they were masked?

A.   Yes, everything was masked, hoods, masks, gloves.  They even had boots.  Everything was covered.

Q.   Okay.

So glove -- they had gloves?

A.   Yes.

Q.   Could you see any part of their face?

A.   Only around the eyes.

Q.   Okay.

A.   Yeah.

Q.   Could you see any of their skin?

A.   Just around the eyes.

Q.   Okay.

So you were taken into your bedroom?

A.   Yes, they followed me around to the bedroom.  They followed me.  They grabbed me.  They put me down, and I -- I could feel the guns in -- in my head and my neck and they held me down and they threatened me really bad.

Q.   Okay.

And where were -- where were the guns?  Were they

touching you?

A. Yes, I felt the guns on my head and my neck and my head.

Q. Okay.

You said they threatened you. Do you remember in sum and substance what they said?

A. Yeah, they -- we're going to kill you. Going to shoot you if you don't give us -- where is your phone? Where is your computer? Where's your passwords? And they asked definitely where is your password for your Gemini account, and I'm going to shoot you.

Q. And Gemini is a custodial cryptocurrency exchange?

A. Yes.

Q. Okay.

A. Yes.

Q. And -- and did you have a Gemini account?

A. Yes, I did.

Q. At -- at this point when you're in the room experiencing what you just described, where's your husband?

A. I -- I didn't hear after big noises, I didn't hear anything anymore, and I was terrified. I kept asking them Where's my husband? Where's my sick -- he's sick. Where's my husband? Yeah, I didn't know where he was.

Q. Okay.

Did you get the sense of the age of the men that were

with you?

A. They were very young. Very young. From the eyes, very young looking eyes. No -- no yellow -- yeah, very young.

Q. Okay.

And you said you saw some skin. Do you remember what tone that skin was?

A. It was dark.

Q. So when they asked you for your -- your Gemini account and passwords to your -- was it computer and phone?

A. They wanted my computer and the phone.

Q. Okay.

What did you say?

A. I -- I said, I already been SIM -- SIM swapped. They already take most of everything. Everything. So just shoot me. Just shoot. Three times, shoot me. I -- fine. You know, and I called on the name of Jesus, and that was it.

Q. How'd they respond?

A. They held me down still and then one of them started to -- ransacking my bedroom, and then I heard again noises. Something was going on in the living room, so I got enough adrenaline and run, escape -- run, and as I got into the living room door from the bedroom, the bathroom, and I saw my husband hands on the alarm.

And -- and then the only thing I remember was, like, one of the guys said, okay, now. We don't have much time;

let's go. They -- they picked up few more things and they run out, and then I heard a car door slam in the -- in the empty parking lot next to our house.

Q. Okay.

What things did they pick up and take?

A. I -- I didn't know at first because we -- I run over to my neighbor to call the police, and lot of police came, and we weren't allowed into the house.

Q. Ultimately, did you discover what the men took?

A. Yeah. They took the computer. They took the phones. They took my jewelry. They took -- they took my husband, very important, the defibrillator for his brain. He's had two brain surgeries to stop him from shaking, and it was in a beautiful case and they thought it was something important, I suppose, and they took it. That controls, otherwise he goes into seizures.

And what else they take? Yeah --

Q. Okay.

A. -- can't think.

Q. And you mentioned that when they left the house that you ran out?

A. I went next door to call my neighbors to -- I didn't have a phone to call the police.

Q. Why didn't you have a phone?

A. They took it.

Q. Okay.

A. Two phones they took, mine and my husband's.

Q. Did the police respond?

A. Right away. Real quickly, and many, many cars came.

Q. At any point when you were in your bedroom held at gunpoint, did they bring you any of your devices?

A. Yes --

Q. Tell --

A. -- they --

Q. -- the jurors about that.

A. They brought the computer and they wanted the password, and I refused.

Q. What did they want the password for?

A. For Gemini account.

Q. Okay.

A. They knew exactly what I had.

Q. Did they want the password -- did you have a password on your computer as well?

A. Yes.

Q. Okay.

Did they want that too?

A. Yes.

Q. So let's talk about -- you mentioned you were SIM swapped?

A. Yes.

Q.   When did that occur?

A.   March '21.  I was away to visit my sister, and while I was away, they took most of our money, over three and a half million dollars, the proceeds from the selling of our three duplexes.  And, yeah, most of our life work we were -- was taken from us.

Q.   What account did they steal that from --

A.   It was in --

Q.   -- if you --

A.   -- BlockFi.  Again, a custodial account for crypto.

Q.   At the time of the home invasion when the people came into your house --

A.   Yes.

Q.   -- approximately how much cryptocurrency did you own in dollars?

A.   We had left about a little over 500,000 in Gemini account.

Q.   Do you know whether you had any Bitcoin or Ether in there?

A.   Yes, mostly Bitcoin and some Ether -- Ethereum.

Q.   Did you hold cryptocurrency in other accounts at the time that you recall?

A.   No.  No, I've had other accounts eventually, but I don't think so at the time.

Q.   Did you or your husband suffer any injuries?

A. Well, my husband was -- his feet were cut up by the glass. He walked on glass to save our lives, and I -- I just -- I didn't get any physical harm, thank God. I was just traumatized, and I was screaming so much I lost my voice for days.

Q. Do you remember approximately how long these people were in your house?

A. It seemed forever. I -- I don't know. I -- from what the police said maybe -- sorry.

Q. Yeah, if you do not know, then --

A. Yeah, I --

Q. -- we'll --

A. -- do not know. Fifteen minutes; I do not know.

Q. Okay.

Say it again.

A. Fifteen minutes, maybe. I don't know.

Q. I have in my hand what's marked 36A.

Do you recognize that?

A. Yes.

Q. What is it?

A. That's a picture of my house and the parking lot next door.

Q. Is it a satellite view?

A. Yes.

Q. Is it a fair and accurate depiction of your home from

above?

     A.   Yes.

          MR. IVERSON:  I'd offer 36A into evidence.

          (Government's Exhibit Number 36A was offered.)

          MR. DOORASAMY:  No objection.

          THE WITNESS:  What did you say?

          THE COURT:  36 -- he's talking to me.

          36A is admitted.

          (Government's Exhibit Number 36A was admitted and made a part of the record of this proceeding.)

          MR. IVERSON:  Will you publish that, Ms. Collins?

BY MR. IVERSON:

     Q.   I'm going to point here to a -- a house towards the right with a circular blue driveway, pretty much right above the yellow evidence sticker there.

          Do you recognize that?

     A.   Yes, my home.

     Q.   That's your home?

     A.   Yes.

     Q.   And mentioned a parking lot?

     A.   Yes.

     Q.   And do you see that parking lot there?

     A.   Yeah, I used to own that lot.  Yes.

     Q.   Okay.

          And it's in the pictures to the left of your house?

A.   Yes.

Q.   And remind the jurors what you heard in that parking lot that night.

A.   I heard a car door slam after they left.  They went through the back gate, and I -- I heard the -- the noise.

Q.   Where is the sliding glass door looking at your house from above?

A.   It's -- how do I find it?  It's to the left of the house here.

Q.   I understand --

A.   The first window.

Q.   Is it on this side (indicating)?

A.   Yes.

Q.   Next to the lot?

A.   Yes.

Q.   Okay.

So facing the lot --

A.   Yes.

Q.   -- on the left side of the house as we're looking at this picture?

A.   Yes.

Q.   Okay.

A.   It's pretty much where the second parking lot is, parking space.

Q.   The second parking space?

A.    Yes.

Q.    Okay.

I'm going to hand you what I've marked 36B through 36G.  Will you take a look through those?  Let me know if you recognize them.

A.    (Complies.)

Q.    Do you recognize 36B through 36G?

A.    Definitely.  This is my home that night of the terrible incident.

Q.    Are those fair and accurate depictions of your -- your home and the area near it during the night of -- of the home invasion?

A.    Yes.

MR. IVERSON:  I would offer 36B and 36G into evidence, Your Honor.

(Government's Exhibit Numbers 36B, C, D, E, F, and 36G were offered.)

THE COURT:  36B through G?

MR. IVERSON:  Yes, Your Honor.

THE COURT:  36B through G are admitted.

(Government's Exhibit Numbers 36B, C, D, E, F, and G were admitted and made a part of the record of this proceeding.)

MR. IVERSON:  If we could publish 36B, Ms. Collins.

BY MR. IVERSON:

Q. Ms. Heissenberg, do you recognize what this shows?

A. Where are you? Oh, sorry.

Q. Oh, you can -- you may have a screen next to you. I don't know. Let me --

A. I do. I do. I do have it. I'm sorry.

This one is the dining room, and this is -- to the right is the big window that got crashed in.

Q. Okay.

And the -- the chairs --

A. From the --

Q. -- that are lying on the ground, do you know how that happened?

A. Yeah, from the dining room table that was overturned and every -- glass everywhere.

Q. And because you're turned to look at that screen, you're getting a little away from the microphone, so just remember to speak up.

A. Okay. Sorry.

Q. No, it's no problem.

MR. IVERSON: 36C, Ms. Collins.

BY MR. IVERSON:

Q. Ms. Heissenberg, what's that?

A. Yeah, that's the window. And, yeah, you can see the chairs down and the -- the glass down.

Q. Okay.

And so this sliding door, can you see through it from the inside of your house?

A. Oh, yeah.

Q. I'm sorry --

A. Oh, I don't know --

Q. -- when -- when it's --

A. -- what you mean.

Q. -- not broken?

A. Yes.  I'm not understanding the question.

Q. Okay.  Let me rephrase it.

When you heard that tapping on the door --

A. Yes.

Q. Before it was broken, you went out there and you looked -- you probably looked at the door?

A. We were -- we didn't go close.  We are right at the entrance of the -- of -- from the bedroom --

Q. Okay.

A. -- bathroom into the living room.

Q. Could you see the door?

A. Yes.

Q. Could you see through the door on the other side?

A. No, because we were in the light.

Q. Uh-huh.

A. My husband turned on the light, and outside was dark. We couldn't see anything.  And, unfortunately, we didn't have

the -- the blinds closed.

Q. Okay.

And what were you wearing at that time?

A. I was naked.

Q. Naked?

A. Yes.

MR. IVERSON: Next picture, Ms. Collins. D -- 30 -- 36D.

BY MR. IVERSON:

Q. Is this a view from outside that broken sliding glass window looking into your home?

A. Yes, I had some pretty glasses on it. Yeah.

MR. IVERSON: 36E, Ms. Collins.

BY MR. IVERSON:

Q. What do you see -- what do you see here, Ms. Heissenberg?

A. The -- the table overturned. The chairs all over, and the glass, and see the front door. And I -- I know where I could see the garage door where my husband was pushed into.

MR. IVERSON: 36F, please.

BY MR. IVERSON:

Q. What's that?

A. That's my bedroom, and yeah. That's -- and the cage of Kiwi there, my -- my pet.

Q. Your pet? Your -- what kind of pet is it?

A.  I have a little parrot.

Q.  Oh, that's -- is that what's sitting on the bed?

A.  The cage, yes.

Q.  Okay.

A.  She sleeps right next to me.

Q.  Under- -- understood.

MR. IVERSON:  36G.

BY MR. IVERSON:

Q.  What is this, Ms. Heissenberg?

A.  This is the parking lot, and there's -- the -- the window -- the light there is that window that was broken, the sliding door that was broken.

Q.  Okay.

A.  So that -- that -- they could see from there everything in the house.

Q.  Okay.

MR. IVERSON:  Give me one moment.

No further questions.

THE COURT:  Cross-examination.

MR. DOORASAMY:  Thank you.

                    CROSS-EXAMINATION

BY MR. DOORASAMY:

Q.  Good morning, Ms. Heissenberg.

A.  Good morning.

Q.  Do you know who stole your 3.6 million from your

account in March 2021?

A. No, I do not.

Q. Do you know who broke into your house in late 2022?

A. I wouldn't recognize them.

MR. DOORASAMY: I have no more questions.

THE COURT: Redirect.

MR. IVERSON: None.

THE COURT: You may step down, ma'am.

(End of excerpt.)

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

CERTIFICATE

I, Stacy Harlow, Realtime Verbatim Reporter-Master, Certified Verbatim Reporter-Master, Certificate of Merit, Registered Broadcast Captioner, Registered CART Provider, and Official Reporter of the United States District Court for the Middle District of North Carolina, do hereby certify that the foregoing is a true and correct transcript originally filed on CM/ECF on August 11, 2024, Docket Entry #111, incorporating redactions requested by the U.S. Attorney's Office and authorized in accordance with §330.10.10(e) and (f). Redactions appear as a black box in the transcript.

Given under my hand this 3rd day of December, 2024.

_____ _Stacy Harlow_
STACY HARLOW
Official Reporter, United States
Middle District of North Carolina