UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA


UNITED STATES DISTRICT COURT        ) 1:23CR260-2

v.                                  ) Greensboro

REMY RA ST. FELIX                   ) June 17, 2024



REDACTED JURY TRIAL-DAY 1
BEFORE THE HONORABLE WILLIAM OSTEEN
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES:</u>

FOR THE GOVERNMENT:

　　　　ERIC L. IVERSON
　　　　U.S. Attorney's Office
　　　　Middle District of North Carolina
　　　　101 South Edgeworth Street - Fourth Floor
　　　　Greensboro, North Carolina  27401
　　　　(336) 332-6302

　　　　BRIAN MUND
　　　　DOJ-CRM
　　　　10th & Constitution Avenue, NW
　　　　John C. Keeney Building - Suite 600
　　　　Washington, DC  20530
　　　　(202) 598-6205

FOR THE DEFENDANT:

　　　　ALAN DOORASAMY, SR.
　　　　Law Office of Alan Doorasamy, Sr.
　　　　107 Westdale Avenue
　　　　Winston-Salem, North Carolina  27101
　　　　(336) 749-6412

COURT REPORTER:

　　　　STACY HARLOW, RVR-M, CVR-M, CM, RBC, RCP
　　　　Post Office Box 21471
　　　　Winston-Salem, North Carolina  27120
Proceedings recorded by voice stenography realtime translation.
Transcript produced by computer-aided transcription.

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

INDEX

Opening Statement on Behalf of the Government     155


EXAMINATION INDEX

                                                  Page

WITNESSES CALLED ON BEHALF OF THE GOVERNMENT:

MICHAEL PRIM

          Direct Examination by Mr. Iverson      164

          Cross-Examination by Mr. Doorasamy     199

          Redirect Examination by Mr. Iverson    210

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

EXHIBIT INDEX

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED |
|---------|-------------|---------|----------|
| EXHIBITS OFFERED ON BEHALF OF THE GOVERNMENT: | | | |
| 1A | Photograph | 186 | 187 |
| 1B | Photograph | 186 | 187 |
| 1C | Photograph | 186 | 187 |
| 1D | Photograph | 186 | 187 |
| 1E | Photograph | 186 | 187 |
| 1F | Photograph | 186 | 187 |
| 1G | Photograph | 186 | 187 |
| 1H | Photograph | 186 | 187 |
| 1I | Photograph | 186 | 187 |
| 1J | Photograph | 186 | 187 |
| 1K | Photograph | 186 | 187 |
| 1L | Photograph | 186 | 187 |
| 1M | Photograph | 186 | 187 |
| 1N | Photograph | 186 | 187 |
| 1O | Photograph | 186 | 187 |
| 1P | Photograph | 186 | 187 |
| 1Q | Photograph | 186 | 187 |
| 1R | Photograph | 186 | 187 |
| 1S | Photograph | 186 | 187 |
| 1T | Photograph | 186 | 187 |
| 1U | Photograph | 186 | 187 |
| 2 | Photograph | 198 | 198 |

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

| | | | |
|---|---|---|---|
| 3A | Photograph | 196 | 197 |
| 3B | Photograph | 196 | 197 |
| 26I | Photograph of Michael Prim's Driver's License | 196 | 196 |

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

P R O C E E D I N G S

(June 17, 2024, 9:45 A.M.  Defendant present in person in custody.)

THE COURT:  We've got a few things we want to talk about before we get started, but Mr. Iverson please call the case.

MR. IVERSON:  Case is the United States versus Remy Ra St. Felix, 1:23CR260-1.  This matter's on for trial.

THE COURT:  All right.

So we've got three at the Government's table?  Who's --

MR. IVERSON:  Yes, let me -- to my immediate right is Brian Mund from the Department of Justice Computer Crime and Intellectual Property Section.  He's an attorney.  Case Agent Tim Thomas with the FBI, and then Ms. Collins.

THE COURT:  Got it.

MR. IVERSON:  And then we've asked for the table that sits behind the prosecution table here where Ms. Thomas -- or Ms. Collins will sit once it's here.

THE COURT:  Okay.

All right.  Mr. Doorasamy, good morning.

MR. DOORASAMY:  Good morning, Your Honor.

THE COURT:  And it's St. Felix, is that right?

MR. DOORASAMY:  That's correct.  Think we're going to go with St. Felix.

THE COURT: Are you and Mr. St. Felix ready to proceed?

MR. DOORASAMY: Yes, we are, Your Honor.

THE COURT: We will take care of a few housekeeping matters to start and then we'll come in and get started on jury selection.

All right. Let's see. So I have looked over the proposed final instructions, and certainly we don't have to make a final decision today, but let me find -- both sides, as to Count 1 -- yeah, conspiracy to commit wire fraud statute, submitted an instruction that as element one has this:

(Reading): Two or more persons in some way or manner agree to try to accomplish a common and unlawful plan to commit wire fraud, that is to enrich themselves by obtaining unauthorized access to individuals' custodial cryptocurrency exchange accounts and causing the unauthorized transfer of cryptocurrency from those accounts, in violation of 18 U.S.C. Section 1343.

And then we have for Counts 4, 5, and 6, which are the actual wire fraud counts, the first element is as follows:

(Reading): The defendant devised or intended to devise a scheme to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises that were material.

And I -- I raise that point because, number one,

we've got a conspiracy to commit wire fraud and a wire fraud instruction that has a different description of the principal element in it, and I don't like to do that because I think it can be confusing.

The question -- if I were a juror, the question in my mind would be, well, are we talking about the same thing from Count 1 or are we talking about something different here in terms of the instruction? And I think the right -- the correct answer to that is, it's conspiracy to commit wire fraud and then a substance -- substantive offense of wire fraud. And I think those instructions should be consistent with each other.

So for purposes of the preliminary instructions, I have modified for Count 1, the first element, to this:

(Reading): That two or more persons conspired and agreed --

Should be "or."

(Reading): Conspired or agreed to undertake conduct that would constitute a violation of 18 U.S.C. 1343, that is, to knowingly and intentionally devise a scheme or artifice to defraud for obtaining monies by means of false material representations or conceal -- a concealed material fact and for the purpose of executing this scheme to defraud, transmit, or cause to be transmitted, a wire communication -- a wire communication.

That's a little bit -- I think that is a little

bit -- I don't know what the word is -- not burdensome, but it's a little bit awkward, but I think the conspiracy to commit wire fraud needs to be consistent with the wire fraud. Anybody disagree with me on that?

MR. IVERSON: No disagreement from the Government, Your Honor.

THE COURT: Okay.

MR. DOORASAMY: Your Honor, I -- at this point, I've not processed it that way, but I'm going to just say, at this point, I do not disagree, but if I have a different view I'm going to --

THE COURT: Yeah.

MR. MUND: -- let the Court know.

THE COURT: Agreeing here is not waiving any objections --

MR. DOORASAMY: Yes.

THE COURT: -- to the final instructions.

MR. DOORASAMY: Sure.

THE COURT: I just -- as a preliminary matter, I think the two should be consistent.

Similar -- I think similar -- I did a similar thing with respect to the conspiracy. Yeah, with 1951 and the kidnapping, all the conspiracy offenses I modified to just make it so that the first element is the conspiracy to violate the statute which, in turn, says A, B, C, X, Y, Z, and we can sort

that out as we proceed. All right. So that's the first issue.

In terms of kidnapping, there is floating around a different -- a difference of opinion in terms of the final instructions on kidnapping.

I think the statute makes -- answers the question pretty clearly. 18 U.S.C. Section 1201(a) makes it unlawful to kidnap for ransom or reward any person when, the -- a -- number one, the person is unlawfully transported in interstate or foreign commerce or the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce.

And here with respect at least to the Durham kidnapping episode, it seems to me at least on preview of the evidence there are two prongs to that second test.

Well, let me say it this way: I don't think -- I don't understand the preview of the evidence to suggest that any kidnapping victim was transported in interstate commerce, but, instead, I think the Government's theory of the case has two pieces -- two part -- two potential parts to it, one that the kidnapper, the defendants themselves, traveled in interstate commerce from Florida to North Carolina, and/or, B, that they used means or facilities of interstate commerce in -- in committing the commission of the offense with all these bank tran- -- or these Bitcoin electronic transactions that took place during the course of the kidnappings.

Is that a fair statement of the Government's theory?

MR. IVERSON: Yeah, those would be the federal nexuses that the Government will be relying on, and those are the only two that are charged in the indictment.

THE COURT: Okay.

MR. IVERSON: Yeah. And there's a couple different theories on means in furtherance of the conspiracy.

THE COURT: All right.

And, you know, I'm not asking you to waive your objection at this point, but my preliminary instructions will be consistent with the way I read the statute.

MR. DOORASAMY: Yes. And we will argue for what we've put in the jury instructions.

THE COURT: Understood. All right.

So -- and then third issue, we've got a motion in limine from the defendant. We can hear more about that at an appropriate time, but, as I understand it, the defendant argues that other acts in places other than Durham should not be admitted in the case, but I think, at least preliminarily -- not final, but preliminarily -- I certainly need to hear some evidence about the scope of the conspiracy. But in terms of the conspiracies that are charged, the conspiracy to violate 1951 and the conspiracy to commit wire fraud, when you're dealing with the conspiracy and acts within the jurisdiction where the case is brought is necessary to establish venue, but

beyond that, I don't think there's any -- I'm not aware of any requirement that the -- a jurisdiction that has venue is limited to trying the case or if the evidence in the case is limited to only those acts that establish venue in the particular district.

It all, at the end, depends on the scope of the conspiratorial agreement and acts that are committed, arguably, in furtherance of that conspiracy, whether they're in the district that has -- within which venue has been established or whether they occur outside of that district. I'm not aware of any limitations.

So don't need an argument now. We'll deal with it on a -- I hate -- I don't want to say case-by-case basis, but as the evidence is presented, we'll deal with it.

But, at this point in time, absent something further, Mr. Doorasamy, I'm not inclined to limit the Government's opening statement to only those acts that occurred in this district, but you may want to be heard on that.

MR. DOORASAMY: Yeah, I think the Government's theory, Your Honor, is -- as I understand it, there's a master conspiracy.

THE COURT: Uh-huh.

MR. DOORASAMY: That's the theory. There's a master conspiracy. And if there is a master conspiracy, then I understand the overt acts in the other states.

But, as I understand the evidence, there isn't a master conspiracy, and that's the issue here. Because there isn't a master conspiracy, it's -- the Government cannot just bring in anything it wants because they're highly prejudicial and those overt acts, Your Honor, they -- they -- they will move anyone that listens to it. It's very emotive.

And so -- so if the Government says its -- its case is a master conspiracy, well, then, they can't bring it in, that is the submission. But if it's not a -- if it's a master conspiracy.

But the evidence doesn't show that. But my understanding is it's not a master conspiracy, and that's why we raised our objection, Your Honor, on the first part.

There is another issue there about the -- being in -- you know, in detention at some point. But the first part --

THE COURT: Right.

MR. DOORASAMY: -- on the overt acts, that's -- that's what the argument is based on. And I understand the Court's position. If it accepts the Government's position, it's a master conspiracy, then I -- then I have no case on that. Then I understand you can bring all of that.

And the Court wants to hear the second one as well?

THE COURT: Well, I'll talk about that one --

MR. DOORASAMY: Okay.

THE COURT: -- in just a minute.

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

Just cutting right to the chase, Mr. Iverson, I'm not sure that I would say, after reading the indictment and hearing the forecast of evidence, that there is so much a master conspiracy as there is -- there are multiple conspiracies charged in the indictment, conspiracy one being they -- whatever, they steal the SIM cards and then commit wire fraud using that information. Conspiracy two being a conspiracy to commit a robbery and obtain the necessary identification information to allow access to the account, and then all three are related in terms of overlapping participants to some degree. But then the third conspiracy that was part and parcel of the 1951 was the kidnapping conspiracy.

So I think it's a multiple conspiracy case, not so much a master conspiracy.

MR. IVERSON: Yeah, I -- I would agree there's -- there's conspiracies to commit three separate crimes. And the way the Government views the wire fraud conspiracy -- and you'll -- you'll see in the indictment that it's -- it's a larger range charge for the wire fraud conspiracy is that there was a group of individuals who was hacking into custodial cryptocurrency accounts and stealing funds.

At some point, they change their tactics on how they got access and they still got access and defrauded the cryptocurrency exchanges, but the means by which they did that was the robberies, which are part and parcel -- like you said,

are intertwined with the kidnapping. So the Government views it as three separate conspiracies but views each one as an ongoing conspiracy.

THE COURT: Part.

MR. IVERSON: Yeah.

THE COURT: I got it. All right.

Well, I'm -- at this point, I'm satisfied with my preliminary instructions that I will give, and we'll just see where the evidence takes us.

MR. IVERSON: Your Honor, may I preview just one thing on this matter for the Court?

THE COURT: You may.

MR. IVERSON: So just wanted to -- to let the Court know when we expect evidence of the conspiracies to be offered by the Government.

THE COURT: Uh-huh.

MR. IVERSON: I indicated last time we were before Your Honor that we're going to call Christian Isolda early in our witness list due to -- due to some scheduling difficulties.

So the first evidence I expect the Court to see that a conspiracy exists is, the victim will be able to identify that multiple people perpetrated a crime against him.

THE COURT: Uh-huh.

MR. IVERSON: And then we will go to Mr. Isolda fairly quickly, and his phone, and there are text messages --

Telegram text messages on his phone. We'll ask you to authenticate all of those, but we're going to want to introduce some of those. And based on my conversations with Mr. Doorasamy, I expect him to object to the ones that we want to introduce. And it's our position that the four corners of those chats, just reading at them -- reading them establishes a conspiracy. And so I -- I just wanted to flag that for the Court.

And then my anticipation is that Mr. Seemungal will be called, and he will provide an even broader description of what this conspiracy was and entailed.

THE COURT: So the conspiracy part is tricky as -- particularly in dealing with the co-conspirator exception to the hearsay rule.

The parties are obviously familiar with what's required in terms of establishing a conspiracy. And once the conspiracy has been established under evidentiary rules, not guilt or innocence, then statements in furtherance of the conspiracy can be admitted.

So in terms of evidentiary presentation, sitting as a court, it's a lot easier for me to evaluate the objections when the conspiracy gets established first and then you move into the statements.

So these -- Seemungal and then the witness you mentioned, I assume, are alleged -- both are alleged

co-conspirators, both were having these discussions.  And so the witness' statements -- both witness' statements and the responses that are coming through the chats would ordinarily not be admissible unless there's at least some evidence, unless there is a conspiracy, and those statements are in furtherance of the conspiracy.

MR. IVERSON:  And --

THE COURT:  So thinking -- just thinking out loud for a minute, who's the first one that you mentioned?  Not Seemungal, but the other one.

MR. IVERSON:  Mr. Prim.  He's the -- he's the -- he's a victim of the --

THE COURT:  No, the --

MR. IVERSON:  -- first Durham home invasion.

THE COURT:  -- chats that you talk about.

MR. IVERSON:  Oh, Mr. Isolda is a digital forensic examiner with the FBI.

THE COURT:  Oh, okay.

MR. IVERSON:  And he's going to authenticate and enter some chats, and those -- the chats that we want to show the jury at that point are, we allege, between the defendant and a co-conspirator named Neb, who we won't be calling, isn't here.

And the second chat thread is between the defendant; several co-conspirators, including Neb, and Mr. Seemungal is on

that chat, as well as Mr. Nicolopulos, both of who were calling.

And our argument is that just -- the -- the chats are so descriptive. And what they -- what they describe is the Durham home invasion and the next one, New York. So that's what I want to get into at that point because we'll have Durham home invasion testimony by the victim and then the New York arrest.

Simply put, Your Honor, I think the four corners of those chats establish a conspiracy. And I have an extra copy I can hand up at the -- at the appropriate time.

THE COURT: I'll look at it over a break. And it may -- that's -- my initial reaction -- and it may be wrong -- is that's some -- that's using the co-conspirators' statements to establish the existence of the conspiracy. And that seems backwards to me, but I may be wrong about that.

I didn't look at it from that perspective.

MR. IVERSON: Okay.

THE COURT: So I'll take a look at it over the -- over the recess.

Who -- do you have one or more witnesses like Seemungal who will kind of establish the overall scope of the conspiracy?

MR. IVERSON: Oh, yes.

THE COURT: So essentially what you're -- even if I

disagreed with you in terms of using the co-conspirator statements to establish the conspiracy in the first instance, arguably those statements would still be admissible, subject to establishing the conspiracy through evidence that comes in later?

MR. IVERSON: Absolutely.

THE COURT: And if you get into that, then we have the question of how to handle the objections that come down the pike and keep it -- keep the jury from getting confused as they're hearing the evidence.

MR. IVERSON: Absolutely. It's -- it's a -- it's a matter of timing and the Government's preferred presentation of the evidence. And I just emphasize that it's not only the co-conspirator statements that establish the conspiracy, it's the defendant's own statements as well.

THE COURT: Well, that's an admission, arguably. So no problem with those, it's just the responses.

All right. Let me think about it.

MR. IVERSON: Okay. We'll get you a copy of what we intend to show.

THE COURT: All right.

If nothing else, we'll bring the jury down.

For those of you seated over there, just for jury selection, I need you to move to that side because we put the jurors all over there on the side you're sitting on. Once we

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

finish jury selection, you can go back and sit where you want. Anywhere on that side's fine with me.

MR. DOORASAMY: I beg the Court's indulgence. Have we decided the second issue?

THE COURT: Oh, I'll tell you now preliminarily --

MR. DOORASAMY: Okay.

THE COURT: -- I'm not -- after reading -- I -- I get your point about their association in the jail and just limiting it, but I'm not sure what -- so the defendant's argument is to say they met in jail is prejudicial.

I'm not sure how much it adds to their association to make it clear that they were associated in the jail somehow. They saw each other on a daily basis during a particular period of time. If they talked regularly or were together, I think those kinds of details are fair game.

But in terms of at the -- at least as a preliminary matter, I don't see that the fact that they were in jail together, that limited fact, adds anything. And I agree it is prejudicial to some degree.

MR. DOORASAMY: Well, the issue in this case is, I can understand if they did not know each other and they met in jail for the first time and that's where this relationship started. That's not the case here. They were buddies before that.

THE COURT: I understand.

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

MR. DOORASAMY: So I -- I don't see -- and my concern, Your Honor, is that would be the first and only time, as I understand it, that anything related to Mr. St. Felix being in custody or being charged previously -- if he was in jail and he was charged, but not convicted, that that is a trigger that the jurors are going to pick on. That's the concern.

THE COURT: And I understand the concern. And what I am saying is, the fact that the association occurred in the jail, I do not think adds much relevance. The question is, you know, how well did you know each other? Well, we saw each other every day. We met while we -- what -- in high school? Somewhere they met.

MR. DOORASAMY: Correct, yes.

MR. IVERSON: Yeah. I think there's two lines of expected testimony here. Nathan Quintana knew Mr. St. Felix at some point in high school and then was a cellmate with him in the time very much preceding the crimes.

And the other one is Matt Nicolopulos will describe St. Felix joining the conspiracy, and he knows Mr. St. Felix through his cousin, Mr. Quintana, because they were in -- in prison together. So --

THE COURT: I think Mr. Quintana can say, we lived together. We did -- we did this. He can say a lot of things about their relationship without saying it occurred in a

prison, I think.

The -- which I think he is the heart of it. They -- they knew each other well and had a chance to, you know, plan or do whatever it is they talked about back then.

But I don't see that it adds anything to say, well, they were cellmates in the jail together because -- well, I can see where it adds something, but it seems to me that's a little bit unfair -- unfairly prejudicial.

And the relevance of the fact of jail being the place they were associated with seems to me is limited. So preliminarily I think he can talk about, you know, we lived together. We were together. We saw each other every day. He can do a lot of things to describe his relationship, assuming it was close, without saying exactly where it took place. An apartment, a jail, a house. A lot of places they could have spent a lot of time together.

MR. IVERSON: Okay.

May we readdress before those witnesses are called?

THE COURT: Uh-huh.

MR. DOORASAMY: And, Your Honor, while I'm standing up, I don't want to respond directly to everything what -- I'm sorry, Mr. Iverson said about the conspiracy, but I -- I want to tell the Court that, during this trial, it's going to come out whether there was a conspiracy in the first place, and that's going to come up in this case.

I just thought I would add to that because the Government -- I mean, the defense has not admitted that there was a conspiracy. The Government is going to have to prove that, so I'm making the Court aware that that will come as to whether there was a conspiracy at all --

THE COURT: I think that's what --

MR. DOORASAMY: -- in this case.

THE COURT: -- a trial is for.

MR. DOORASAMY: Sure. Yes.

THE COURT: All right.

All right. Everybody had a chance to look at the juror questionnaires? I didn't see anybody that jumped out at me.

Do you have any witnesses?

MR. DOORASAMY: No, Your Honor. Not at this stage.

(Jurors entering the courtroom at 10:21 A.M.)

THE COURT: Okay. Hold one second there on the front row. So I don't let people hide behind the column over there. They too often fall asleep on me, so just come back this way a little bit.

Yep. I knew there was somebody hiding back there. Keep coming. Now sit down. I think I can see everybody. Keep on going; I'll tell you when to stop. Probably right about there. You can actually slide just a little further. That's good right there. If you could keep on going a little further,

a little further.  Right there's probably good.  Yep.

All right.  Ladies and gentlemen.  Good morning.  The first thing I'm going to do while I'm thinking about it is have all of you sworn as members of the venire or the jury panel in this case.

So if you will stand, raise your right hand, and be affirmed, responding accordingly to the oath.

(JURY PANEL SWORN)

THE COURT:  All right, ladies and gentlemen.  Good morning.  My name is Bill Osteen, and I am a United States District Judge for the Middle District of North Carolina.  I'm happy to welcome all of you as prospective jurors in this case.

Seated in front straight from the left is Stacy Harlow; she is our official court reporter and will be responsible, for we'll, say transcribing the proceedings as they take place, and in the event a record is necessary somewhere in the future.

Directly in front of me is Joy Daniel.  She is a court -- I started to say court reporter.  She is a case manager here in the Middle District.  She works for me in the courtroom, and to my right is Elinor Brown, who's a law clerk.  She works directly for me.

Let me back up to Joy for just a minute.  Ms. Daniel will be responsible for maintaining the exhibits, the records of this proceeding, and also taking care of the jurors,

particularly those of you who are selected to serve on the jury during this case.

I know I welcomed you; I'm pretty confident not everyone in this group was happy to call in last night and find out that they had to report today, and I understand that. There are different reasons that people, we'll say, not regret, but people are concerned about jury duty. Number one is, for many of you, this may be your first time being called to serve as a juror, and my guess is, for most of you, it is your first time being summoned to appear in federal court in the Middle District of North Carolina, in any event.

So for those of you who are nervous about the process, please do not be. It will be my responsibility to guide you through this process from start to finish. Hopefully we are able to anticipate most of the things that may come up for our jurors during the course of the trial. But if we haven't anticipated something or an issue arises, please feel free to make a note. Either pass it -- forgot to introduce Mr. Hancock seated in the corner. He's our security officer, court security officer. Either Ms. Daniel or Mr. Hancock will deliver that note to me. And if Mr. Hancock's out of the courtroom, you can always recognize our CSOs by the fancy ties and blue blazers that they wear in the courtroom.

Others of you may have been irritated with this interruption to your schedules, and we recognize, first of all,

that whether you're one of the jurors selected or not, you have other responsibilities, families, friends, jobs, and -- and so forth. And it is a burden to be summoned as a juror. And, unfortunately, there's not much that I can do to assist with that interruption to your daily lives, responsibilities, and schedules. I apologize for that, certainly. But I hope, particularly for those who are selected to serve, that perhaps you will look at jury service a little bit differently in the future, specifically being selected -- summoned and selected as a juror is something that should command great pride in each of you in terms of the service.

And I think about it this way: Our Constitution gives all of us rights that we exercise really on a daily basis without ever thinking about the fact that we're exercising a Constitutional right and without ever being required to do anything to secure that Constitutional right. Every time we worship the way we choose, every time we associate with the people that we choose to associate with, every time we pick up a book or a publication or anything else and read what we want to, we are actually exercising Constitutional rights guaranteed to us by our Constitution, and nothing is demanded in return.

We have the Constitutional right with respect to voting, selecting our -- our chosen leaders, but, again, nothing is required in return. It's up to each individual citizen to decide whether or not they will choose to exercise

that right to vote. The Government does not make that decision for you.

Under our Constitution, individuals and parties have the right to a jury trial, and if they are going to have that right, then we will have to call upon their fellow citizens to sit as jurors during the course of the criminal case. That's the only constitutional right that places a demand on others.

And, at the end of the day, our system of jury trials, at least in my mind, shows the great confidence and the rightful confidence that our forefathers had in making their fellow citizens the jurors or the judges during the course of a trial. No higher duty or honor can be bestowed upon any citizen than that of sitting in judgment of the facts that are presented during the course of a criminal case.

It is the Constitutional right of every citizen to have the facts of his or her case heard and determined fairly and impartially by a jury of his or her peers. That is what the parties here today are entitled to from those jurors selected to serve.

My job throughout the course of the trial is simply that of a referee. It will be my responsibility to make sure that the trial is conducted according to established rules of procedure, to determine what is proper evidence for admission in the case, and then, at the end of the trial, to instruct the jury on the law that they are to apply in reaching their

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

verdict.

Your duties as jurors is to listen carefully to the evidence, determine the facts, and return a just verdict based upon the evidence presented and the law as I instruct you, and you must perform that duty fairly and impartially without fear, favor, prejudice, or sympathy.

The first part of a trial is called the voir dire, and that's a process during which I will ask each of the prospective jurors a number of questions. The purpose of the voir dire examination is to allow me to determine whether or not any jurors should be excused for cause and to allow the parties and their attorneys to exercise their individual judgment with respect to what are called peremptory challenges, that is challenges during which a juror is removed for which no reason at all may be given.

Therefore, please do not be embarrassed in any way if you are not selected to serve during the course of this trial, but I do ask, because of that process, that you not hesitate to answer my questions honestly and candidly. If you have any concern at all about whether or not you should respond to a question, go ahead and answer the question and we will discuss it. In other words, if you make a mistake, make a mistake on the side of responding to a question rather than remaining silent and wondering whether or not you should have responded.

It is not my intention during the jury selection or

the voir dire process to cause any jurors any personal embarrassment or discomfort with the questions that I ask, and I don't anticipate doing that. But if, for any reason, you are not comfortable answering a question in what we'll refer to, for this purpose as, open court, please let me know that and I'll have you step around to the side over there and you can answer it directly to me in the presence of the attorneys for the parties.

With respect to the schedule of this case, and the schedule of court generally, first of all, generally speaking, we start court every day at 9:30.

We'll proceed until about 11:00 or so and take a midmorning break of about 15 minutes. We'll come back, proceed to lunch. I'll usually allow a little bit longer than an hour for lunch because a lot of you -- most of you are not from Greensboro and familiar, and I don't want anybody to feel rushed to get out and get back, so we'll take a little longer than an hour for lunch. We'll usually come back and start about 2:00 in the afternoon, go until about 3:15 or 3:30. Take another break, and then we'll come back and usually recess court sometime between 5:00 and 5:30. Right now, GSA, in its infinite wisdom, is shutting the air conditioning off in the building sometime around 5:30, so we won't -- will not be hanging around here after 5:30 during the day.

So in terms of the length of the trial, I really

don't have a good handle in terms of my guess. I'm pretty convinced, because we have to deal with the Wednesday holiday, that we will carry over into the first part of next week, but whether we get through Monday, Tuesday, or Wednesday, I'm just not sure at this point. I think five to seven days is what I would allow generally for planning purposes. I'm the kind of person who likes to try to make an estimate as to the absolute longest individuals might be here. I'm a little hesitant with that, but if I were planning that way, I probably would anticipate being here Monday, Tuesday, and Wednesday of next week, but I think we can probably get it finished a little quicker than that. I just don't know how much.

This is a criminal case for which you've been summoned. The case is entitled United States of America versus Remy Ra St. Felix. At this point, I'm going to summarize the superseding indictment, that is the charges, for you because I will ask you just a few questions about the type of case this is and that sort of thing, but before I summarize the indictment -- and, by the way, it's offic- -- the document is officially called a superseding indictment, but I may go back and forth between superseding indictment and indictment.

But before I summarize the indictment, let me caution all of you that the indictment itself is only an accusation. It is nothing more. It is not proof of guilt or anything else. Mr. St. Felix is presumed innocent unless and until such time

as proven guilty.  I'll also caution each of you that I will give you instructions as to the law at the end of the trial, and those instructions will be used to guide jury deliberations.  This summary is just provided so you'll know the type of case that it is.

All of these offenses are alleged to have occurred in the county of Durham, Middle District of North Carolina, and possibly other states, including Florida.  Count 1 of the indictment charges a violation of Title 18, United States Code Sections 1343 and 1349.  The indictment alleges that Mr. Felix, from on or around February of 2021, up to on or about July 2023, conspired and agreed with other persons to commit wire fraud, that is to devise a scheme to defraud individuals which would or did use or cause to be used wire transmissions for the purpose of executing the scheme.

Count 2 charges a kidnapping conspiracy in violation of Title 18, United States Code, Section 1201(c).  The indictment alleges that Mr. St. Felix and others conspired to kidnap a person or persons and hold them for ransom or reward. In doing so, the indictment alleges that members of the conspiracy traveled in interstate commerce or used facilities of interstate and foreign commerce in committing the offense.

Count 3 charges a violation of Title 18, United States Code, Section 1951, also known as Hobbs Act robbery conspiracy.  The Government alleges that Mr. St. Felix and

others knowingly and willfully conspired to obstruct and affect commerce by robbery from in or about August of 2022 through July 2023.

Counts 4, 5, and 6 allege the commission of substantive wire fraud offenses in violation of 18 U.S.C. Section 1343. As to each of those offenses, the superseding indictment alleges that Mr. St. Felix and others conducted wire -- certain wire transactions for the purpose of executing a scheme to defraud.

Count 7 charges kidnapping in violation of 18 U.S.C. Section 1201. The indictment alleges that on or about April 12, 2023, Mr. St. Felix and others unlawfully seized and kidnapped two individuals and held those two individuals for ransom, reward, or benefit. The indictment alleges that, in doing so, the defendants traveled in interstate or foreign commerce in some fashion.

Count 8 charges a violation of 18 U.S.C. 1951, which is a substantive offense known as Hobbs Act robbery. The indictment alleges that on April 12, 2023, Mr. St. Felix and others knowingly obstructed and affected commerce by robbery.

Count 9 alleges that on April 12, 2023, Mr. St. Felix and others knowingly carried and used a firearm by brandishing in furtherance of the robbery charged in Count 8 of the indictment, all in violation of Title 18, United States Code, Section 924(c).

Again, ladies and gentlemen, I caution all of you that the superseding indictment is not evidence in the case and Mr. St. Felix is presumed innocent. I will give you instructions as to the law during the trial, and this summary -- I do not expect you to remember everything I provided in this summary. It was simply to explain the type of case this is for purposes of voir dire examination.

At this point, I'm going to ask counsel for the parties to introduce themselves as well as those individuals seated at counsel table with them.

I will start with the United States. Mr. Iverson.

MR. IVERSON: Good morning. I'm Eric Iverson. I'm an Assistant United States Attorney with the U.S. Attorney's Office. Immediately to my right here, this is Timothy Thomas. He's an FBI task force. Next to him is Brian Mund; he's a trial attorney with Department of Justice, and then, finally, at the table is Ms. Jennifer Collins; she's a litigation support specialist at my office.

THE COURT: For Mr. St. Felix, Mr. Doorasamy.

MR. DOORASAMY: Thank you.

Good morning, ladies and gentlemen. My name is Alan Doorasamy. I'm a private lawyer based in Winston-Salem, and sitting next to me is Mr. Remy Ra St. Felix.

THE COURT: All right. Thank you.

Ladies and gentlemen, I'll ask you when you get to

the jury box whether you recognize the names of any of the lawyers or other individuals involved in this case. We will have a number of witnesses who may be called to testify. At this point, I'm going to read their names to all of you, and I will ask you when you get to the jury box if you recognize the names of any of the parties or the witnesses in the case.

Individuals who may be called to testify during the course of this trial include all of the following: Michael Prim, Richard Knott, Daniel Fandrey, Steven Louder, Christian Isolda, Takeria Welch, Kristen Spaeth, Lindsay Chiesa. Is that right?

MR. IVERSON: Chiesa (pronouncing).

THE COURT: Chiesa (pronouncing). Lindsey Chiesa. Jarod Seemungal, Tullia Heissenberg, Nathan Quintana, Jesus Manual Santiago, III, Ruben Matias Nicolopulos, Rui Patricio, Joselyn Baretto, Alain Baretto, Harrison Putnam, Kevin Butler, Keith Goodwin, and Megan Warshawsky. Those individuals may be called to testify during the course of this trial.

All right. So I'm sure I'm forgetting something, but let me tell you a couple more parts of the process. First of all, I'll go through the voir dire questions with the first group of 12 jurors who are brought up and seated in the jury box. You'll be seated in a particular order. I'll explain that.

Those of you who remain in the gallery while that is

going on, please listen to the questions that I'm asking. If we don't get a full complement of jurors with the first sitting, then additional jurors will be called in. I'll ask you when -- I'll go through the questions each time in full, but I'll ask the jurors as they're called in whether there was any question they would have answered yes to, and if there is, you can let me know that at the start. And we'll go through that process because, as you can imagine, I get faster and faster with the questions as the morning goes on.

All right. Ms. Daniel, if you will call 12 jurors to the jury box, please.

THE COURTROOM DEPUTY: Deborah Hunter.

THE COURT: And you'll be seated in a particular order, so this is your Juror Number 1. Mr. Hancock will help you find your seat, but generally speaking, 1 through 6 on the first row; 7 through 12 on the back row, starting at the seats closest to Mr. Hancock.

All right.

THE COURTROOM DEPUTY: Vickie Thomas.

THE COURT: Hold on a second; let me catch up to you.

THE COURTROOM DEPUTY: Okay.

THE COURT: First was Ms. Hunter. And then Vickie Thomas.

All right. Go ahead.

THE COURTROOM DEPUTY: Patricia Stringer. Margaret

Ohare.  Emily Clayton.  Sandra Byrd.  Benjamin Pryor.  Kasey Davis.  Jason Alava.  Kasey Helms.  Vernon Bradshaw.  Kent Lyons.

THE COURT:  All right.  Ladies and gentlemen, most of the questions that I ask can be answered yes or no, and if your answer is yes, just raise your hand.  There are a few exceptions to that.  You'll either recognize them or I'll tell you when we get there.

So the first question we will start out with is:  Did any of you think you recognized the names of any of the lawyers, parties, or witnesses that were introduced or identified earlier?  If you think you did, raise your hand yes.

PROSPECTIVE JURORS:  (No response.)

THE COURT:  All right.  So this is the first question where I'm going to make an exception.  I'm going to ask you to stand and introduce yourself to us one at a time, starting with Ms. Hunter.  It's a big courtroom, so keep your voice up.  That's the reason I get you to stand when we do this.

State your name.  Tell us where you live; city or county is enough.  We don't need a street address.  Your current employment.  Highest grade of school completed.  Tell us whether you're married or live with someone.  And, if so, what they do.  And then if you have any children, let me know how old your children are.  And don't worry; it's not a test.  If you forget any of that, I'll help you along.

Ms. Hunter, you can start out.

PROSPECTIVE JUROR HUNTER: My name is Deborah Hunter. I live in Surry County.

THE COURT: Married?

PROSPECTIVE JUROR HUNTER: Pardon?

THE COURT: Are you married?

PROSPECTIVE JUROR HUNTER: I am married for 45 years. I have three children. Their ages are 40, 37, and 31. I am semi-retired. We own a business, so I help with the bookkeeping.

THE COURT: Husband work?

PROSPECTIVE JUROR HUNTER: My husband is also part of that business. He has another -- he's self-employed with an excavation company.

THE COURT: So when you say, "semi-retired," did you work in that business and that's what you retired from or --

PROSPECTIVE JUROR HUNTER: No, I worked in Surry County Schools.

THE COURT: Surry County Schools?

PROSPECTIVE JUROR HUNTER: Yes. As a teaching assistant.

THE COURT: Highest grade of school completed?

PROSPECTIVE JUROR HUNTER: Associates degree.

THE COURT: All right.

And then -- your children are 47 -- 40, 37, and 31.

Do any of the three of them work outside the home?

PROSPECTIVE JUROR HUNTER: Outside?

THE COURT: Their respective home.

PROSPECTIVE JUROR HUNTER: No.

THE COURT: Okay. So --

PROSPECTIVE JUROR HUNTER: Not -- not -- oh, they do work outside their home.

THE COURT: What do they --

PROSPECTIVE JUROR HUNTER: Yes.

THE COURT: -- generally speaking --

PROSPECTIVE JUROR HUNTER: I'm sorry.

THE COURT: That's all right. I'm not good --

PROSPECTIVE JUROR HUNTER: My older son is a -- he works -- you want me to tell you where he works?

THE COURT: Just what he does.

PROSPECTIVE JUROR HUNTER: What he does. He -- he works at a construction company.

THE COURT: Okay.

PROSPECTIVE JUROR HUNTER: And our daughter's a dental hygienist; my younger son works at a construction company.

THE COURT: Outstanding. Thank you.

All right, Ms. Thomas.

PROSPECTIVE JUROR THOMAS: I'm Vickie Thomas, and I live in Walkertown. I'm married. I have a stepson and a son.

I'm an office manager for Aviation Services. My husband also works outside the home. He is, like, a switcher for a -- a company that does trucking. Switches things around.

THE COURT: Highest grade in school completed.

PROSPECTIVE JUROR THOMAS: Highest grade in school; I have some college.

THE COURT: And how old are your children?

PROSPECTIVE JUROR THOMAS: My children will be 28 and 40 in September.

THE COURT: And then one was a stepchild, and one was your child. What do they do outside -- do they work outside their home?

PROSPECTIVE JUROR THOMAS: They do.

THE COURT: What do they do?

PROSPECTIVE JUROR THOMAS: The stepson works for the State, and my son is a foreman doing -- learning foreman work doing construction-type things now.

THE COURT: All right. Thank you, ma'am.

Ms. Stringer.

PROSPECTIVE JUROR STRINGER: I am Patricia Stringer. I am from Rockingham County, and I work in Guilford County Schools as a school library. I have a master's degree --

THE COURT: I feel like I need to be real quiet right now.

PROSPECTIVE JUROR STRINGER: I have a master's degree

with an add-on certification for library director.

THE COURT: All right. Married?

PROSPECTIVE JUROR STRINGER: Yes, my husband is an ELCA pastor, and he also has a small business.

THE COURT: What -- an ELCA pastor?

PROSPECTIVE JUROR STRINGER: Evangelical Lutheran Church of America.

THE COURT: Okay.

And children. Oh, let's see. You said you got a master's. Children?

PROSPECTIVE JUROR STRINGER: My oldest is 31. She works part-time in a church office as a church office administrator, and my youngest is -- she works for UNC Chapel Hill.

THE COURT: All right. Thank you.

PROSPECTIVE JUROR STRINGER: Uh-huh.

THE COURT: And then Ms. Ohare.

PROSPECTIVE JUROR OHARE: My name is Margaret Ohare. I reside in Greensboro, Guilford County. I work in the profession of marketing, and my domestic partner of five years is a furniture designer. I have a bachelor's degree from college. And what were your other questions?

THE COURT: Any children.

PROSPECTIVE JUROR OHARE: No kids.

THE COURT: All right. Thank you.

And Ms. Clayton.

PROSPECTIVE JUROR CLAYTON: Hello. I'm Emily Clayton. I live in Winston-Salem. I'm married. I have two children, one's four, one's ten.

THE COURT: Have got either one of them working outside the home yet?

PROSPECTIVE JUROR CLAYTON: Neither of them are working.

THE COURT: All right.

PROSPECTIVE JUROR CLAYTON: And I stay at home with them. And, let's see...

THE COURT: Husband's employment.

PROSPECTIVE JUROR CLAYTON: He's a gastroenterologist.

THE COURT: And highest grade of school completed.

PROSPECTIVE JUROR CLAYTON: I've graduated from college.

THE COURT: Thank you.

PROSPECTIVE JUROR CLAYTON: Uh-huh.

Ms. Byrd.

PROSPECTIVE JUROR BYRD: I'm Sandra Byrd. I am a senior HR consultant for Forsyth County. I live in Winston, so I am in Forsyth County also. I am married. My husband is an independent truck driver. I have a bachelor's degree. I have two children, 35-year-old son who works in -- with a

construction business; a 33-year-old daughter who is a hairdresser.

THE COURT: All right. Thank you, ma'am.

Mr. Pryor.

PROSPECTIVE JUROR PRYOR: My name is Benjamin Pryor. I'm an IT infrastructure services manager. Have a Master's of Fine Arts. My son is 29 years old, and he's a hip-hop producer in Brooklyn.

THE COURT: Married?

PROSPECTIVE JUROR PRYOR: No.

THE COURT: All right. Thank you, sir.

And Ms. Davis.

PROSPECTIVE JUROR DAVIS: My name's Kasey Davis. I live in Winston-Salem. I am a high school counselor at Reagan High School. I am married to my husband for six years. He works in -- in an engineering firm out of Raleigh, and I am six and half months pregnant with my first baby.

THE COURT: Congratulations.

PROSPECTIVE JUROR DAVIS: Thank you.

Did you say highest grade in school?

PROSPECTIVE JUROR DAVIS: I'm sorry. I have a master's degree.

THE COURT: Master's degree.

PROSPECTIVE JUROR DAVIS: Yeah. Sorry.

THE COURT: Thank you.

And is it Alava (pronouncing)? Alava (pronouncing)?

PROSPECTIVE JUROR ALAVA: Jason Alava, sir.

THE COURT: Alava (pronouncing). All right. Mr. Alava.

PROSPECTIVE JUROR ALAVA: I'm a financial advisor at a local wealth management firm. I have a bachelor's degree. My wife and I have been married almost ten years. Two small kids, seven-year-old and three-year-old, and we live in Hillsboro, North Carolina.

THE COURT: And highest grade of school completed?

PROSPECTIVE JUROR ALAVA: Bachelor's.

THE COURT: And does your wife work outside the home?

PROSPECTIVE JUROR ALAVA: Yes, sir. Marketing at an elementary school.

THE COURT: Did you say, "marketing," at an elementary school?

PROSPECTIVE JUROR ALAVA: Yes, sir.

THE COURT: Okay. All right. Thank you, sir.

Ms. Helms.

PROSPECTIVE JUROR HELMS: I am Kasey Helms from Summerfield. I am a stay-at-home mom of two children. They are two and nine months old. My husband and I do own a business that we started eight years ago, and that's what he does. I have completed some college.

THE COURT: And what kind of business?

PROSPECTIVE JUROR HELMS: It's a wedding videography and photography business.

THE COURT: Okay. Thank you.

Mr. Bradshaw.

PROSPECTIVE JUROR BRADSHAW: Vernon Bradshaw from Mocksville, North Carolina. My wife of 37 years works at a law firm in Mocksville. I have three children, 18, 24, 29.

THE COURT: Eighteen, 24 and 29?

PROSPECTIVE JUROR BRADSHAW: Yes, sir.

THE COURT: Any of them work outside the home?

PROSPECTIVE JUROR BRADSHAW: I'm self- -- self-employed painting contractor.

THE COURT: All right. And your children, do any of them work outside the home?

PROSPECTIVE JUROR BRADSHAW: My -- my children, one is in Houston, Texas; she's a stay-at-home mom. My other daughter's a bookkeeper in Lexington. And, of course, my son's just graduated high school Saturday.

THE COURT: Congratulations to him.

Highest grade of school completed?

PROSPECTIVE JUROR DAVIS: Tenth grade.

THE COURT: Thank you, sir.

And Mr. Lyons.

PROSPECTIVE JUROR LYONS: My -- my name is Kent Leon. I live in Forsyth County. I've been married 40 years. My wife

is a road technician.  I got a GED.  And what else did you ask?

THE COURT:  I can't remember.  Highest grade of school completed.  Oh, you said GED.

PROSPECTIVE JUROR LYONS:  GED.

THE COURT:  Do you work outside the home?

PROSPECTIVE JUROR LYONS:  Yes, I do.  I work for Procter & Gamble in Greensboro.

THE COURT:  All right.  I think you covered it.

PROSPECTIVE JUROR LYONS:  Okay.

THE COURT:  Any children?

PROSPECTIVE JUROR LYONS:  No, sir.

THE COURT:  Thank you.

Is there any -- do any of you have any special physical disability or problems that would make serving as a juror difficult?

PROSPECTIVE JURORS:  (No response.)

THE COURT:  Is there anything about the schedule or length of this trial that presents a special problem or unusual hardship for anyone?

PROSPECTIVE JUROR DAVIS:  (Raises hand.)

THE COURT:  Yes, ma'am, Ms. Davis.

PROSPECTIVE JUROR DAVIS:  I'm actually supposed to be leaving for vacation this afternoon with my in-laws to Pigeon Forge.

THE COURT:  Let me see you up here.

PROSPECTIVE JUROR DAVIS:  Okay.

THE COURT:  Mr. Doorasamy.

Mr. Iverson.

(Beginning sidebar.)

THE COURT:  Stand in front of that microphone.  Can you hear me okay?

PROSPECTIVE JUROR DAVIS:  Yes.

THE COURT:  Okay.

Mr. Doorasamy, you'll come over here.  Just stand -- you might want the headphones.

You can use them too unless you can hear me okay.

Did you tell them that you had vacation this week?

PROSPECTIVE JUROR DAVIS:  No, because it said vacation is not excused, so I just thought, well, hopefully I won't be called.

THE COURT:  They usually excuse for vacations.

All right.  Go back and have a seat and let me --

PROSPECTIVE JUROR DAVIS:  Okay.

THE COURT:  -- talk to the lawyers.

PROSPECTIVE JUROR DAVIS:  Okay.  Thank you.

(Prospective Juror Davis exits sidebar.)

THE COURT:  Keep that on.

What the heck is going on?  I mean, they usually excuse for vacations.  I don't know what -- I'll have to look into that.

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

What do y'all want me to do with her? I mean, I don't really want her to miss her vacation.

MR. IVERSON: Yeah, no. I'm -- I have no objection to allowing her to be excused.

MR. DOORASAMY: Neither do I.

THE COURT: All right.

I think what I'm going to do is to keep it enough of a mystery, I'm just going to leave her and then she'll be excused with everybody else.

MR. DOORASAMY: No objection to that.

THE COURT: I'm going to just -- anytime you start excusing people, I get worried that others will catch on, so I'm leaving her in.

(End of sidebar.)

THE COURT: All right. A couple of things so that everybody knows.

I -- I will -- in terms of the for-cause excuses and that type of thing, I address those at the conclusion of the round of questioning, along with the peremptory challenges, but -- or generally speaking, I do.

But just so everybody knows -- and this is true for y'all too -- in terms of evaluating hardships or excuses, there's no -- I think during my entire time of service as a district judge, I don't think I've ever really heard anybody make a flimsy excuse about having a conflict or having

difficulties in work and that kind of thing, but I evaluate the nature of the individual hardship, but then I also compare that to what I see other jurors who appear and serve go through in order to make an appearance. And so I try to be fair to those who have hardships but agree to serve in terms of making that final call.

So it's like there's an individual component to the decision and then a collective component to the decision. If you don't like my decision at the end of the day, it's my decision and my decision alone. The lawyers can't overrule me on my decisions. So if I make a decision that makes you mad about -- makes anybody mad about that, direct that towards me and no one knows.

All right. Next question: Is there anything about the nature of the charges that I described that would make it difficult for any of you to serve fairly and impartially in this case? If so, raise your hand.

PROSPECTIVE JURORS: (No response.)

THE COURT: The superseding indictment is only an accusation. Mr. St. Felix is presumed innocent. Do you understand that? Mr. Lyons, I'll start on the back. Do you understand that?

PROSPECTIVE JUROR LYONS: Yes.

THE COURT: Mr. Bradshaw?

PROSPECTIVE JUROR BRADSHAW: Yes, sir.

THE COURT: Ms. Helms?

PROSPECTIVE JUROR HELMS: Yes.

THE COURT: Mr. -- I'm going to get it right eventually. Alava.

PROSPECTIVE JUROR ALAVA: Yes, sir.

THE COURT: Ms. Davis?

PROSPECTIVE JUROR DAVIS: Yes.

THE COURT: Mr. Pryor?

PROSPECTIVE JUROR PRYOR: You asked me a question if I would have a hard time making a decision.

THE COURT: Yeah. Let me see you up here.

PROSPECTIVE JUROR PRYOR: Okay.

(Beginning sidebar.)

THE COURT: Stand right in front of that microphone.

Yes, sir. You can put them on or not.

PROSPECTIVE JUROR PRYOR: Okay.

THE COURT: It's up to you.

PROSPECTIVE JUROR PRYOR: Yes, sir. I don't have the right to judge anybody. The things that I've done in my life. I'm in recovery. I'm seeking my creator every day, and I just don't have the -- I don't have the ability to -- to make a judgment like that.

My cousin is reporting to federal prison August 1st, and it's just a -- it's a moral sort of compass thing with me.

THE COURT: So was he prosecuted here in the Middle

District?

PROSPECTIVE JUROR PRYOR:  South Carolina.

THE COURT:  South Carolina.

PROSPECTIVE JUROR PRYOR:  Columbia.

THE COURT:  What was he charged with?

PROSPECTIVE JUROR PRYOR:  Bank fraud.

THE COURT:  Bank fraud?

PROSPECTIVE JUROR PRYOR:  Yeah.

THE COURT:  So I understand your point about a moral judgment, but in terms of the law and you not being asked -- well, let me say it this way:  I don't necessarily think bank robbery or murder are okay.  I may have my -- have my own personal feelings about those things.  But, on the other hand, here in this courtroom, it's not my personal feelings that control, and I'm required to follow the law as I understand the law to be.

So it's a little bit different from a judgment in the classic sense of, I don't like that conduct or I disagree with that conduct.  That's not -- Congress has already made that decision for you in terms of what's right and what's wrong.  It's a determination whether somebody did something.  Everything else is up to the Court.

Hearing me explain it that way, does that affect your concern?

PROSPECTIVE JUROR PRYOR:  I just -- I -- I can't -- I

can't judge anybody.  God's the judge.  And I -- like I say, the things I've done in my life, I'm just trying to stay sober every day, and I'm taking care of my mom who has dementia.  I'm scheduled to be up there next week in the mountains.  She's in Maggie Valley.  I've got a lot going on right now besides.  I think just in terms of taking care of my sobriety and keeping that sacred, I have to -- I have to be very honest in this situation.

THE COURT:  I want you to be honest.

PROSPECTIVE JUROR PRYOR:  I don't have that -- I don't have that ability to judge anybody right now.

THE COURT:  All right.

Any follow-up questions?

MR. IVERSON:  No, Your Honor.

THE COURT:  You can step back to the jury box.

(Prospective Juror Pryor exits sidebar.)

THE COURT:  You know, I don't think people get it, but if he don't have the ability, why should anybody else have the ability?  I don't know.

Unless you all want to be heard, that's number two for cause.  Anybody want to be heard on --

MR. IVERSON:  Nothing from the Government.

THE COURT:  All right.

(End sidebar.)

THE COURT:  All right.

Ms. Davis -- let's see.  Ms. Davis.  Mr. Pryor.

You had answered yes, you understand that; right?

Ms. Hunter, do you understand that?

PROSPECTIVE JUROR HUNTER:  You.

THE COURT:  Ms. Thomas?

PROSPECTIVE JUROR THOMAS:  Yes, sir.

THE COURT:  Ms. Stringer?

PROSPECTIVE JUROR STRINGER:  Yes.

THE COURT:  And Ms. Ohare?

PROSPECTIVE JUROR OHARE:  yes.

THE COURT:  Ms. Clayton?

PROSPECTIVE JUROR CLAYTON:  Yes.

THE COURT:  Ms. Byrd?

PROSPECTIVE JUROR BYRD:  Yes.

THE COURT:  All right.

Have you heard or read anything about this case?

PROSPECTIVE JURORS:  (No response.)

THE COURT:  Do you or any of your family members own cryptocurrency as far as you know?

PROSPECTIVE JUROR PRYOR:  (Raises hand.)

PROSPECTIVE JUROR CLAYTON:  (Raises hand.)

THE COURT:  I have two.

Mr. Pryor, is it you or a family member?

PROSPECTIVE JUROR PRYOR:  It's actually my -- my ex-wife's cousin.

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

THE COURT: Ex-wife's cousin owns cryptocurrency.

Is there anything about -- well, I haven't talked about cryptocurrency within the parameters of this case, but I'll put it this way: If your understanding of cryptocurrency is different from any instructions that I give you, would you follow my instructions and disregard any personal thoughts you have?

PROSPECTIVE JUROR PRYOR: I would attempt to.

THE COURT: All right.

And we had one other hand go up about cryptocurrency.

PROSPECTIVE JUROR CLAYTON: (Raises hand.)

THE COURT: Ms. Clayton.

PROSPECTIVE JUROR CLAYTON: Yes.

THE COURT: You? Family members?

PROSPECTIVE JUROR CLAYTON: Family member.

THE COURT: Same question. If your understanding of cryptocurrency conflicts with any instructions I give, will you follow my instructions?

PROSPECTIVE JUROR CLAYTON: Yes.

THE COURT: All right.

Have any of you ever served as a juror in any capacity in any court? Anybody have any prior jury service?

PROSPECTIVE JUROR THOMAS: (Raises hand.)

PROSPECTIVE JUROR ALAVA: (Raises hand.)

PROSPECTIVE JUROR BRADSHAW: (Raises hand.)

PROSPECTIVE JUROR LYONS:  (Raises hand.)

THE COURT:  All right.  One, two, three, four.

All right.  Ms. Thomas, where?  What kind of case?  Did you deliberate to verdict?

PROSPECTIVE JUROR THOMAS:  Yes.  Forsyth County, and it was a traffic accident.

THE COURT:  Civil case?

PROSPECTIVE JUROR THOMAS:  Yes.

THE COURT:  Okay.

And did you deliberate to verdict?

PROSPECTIVE JUROR THOMAS:  Yes.

THE COURT:  And anything about that experience give you any concern here?

PROSPECTIVE JUROR THOMAS:  No.

THE COURT:  And in a civil case, generally speaking, the burden of proof is on the plaintiff by a preponderance of the evidence.  That's a different standard from what applies in a criminal case, which is proof beyond a reasonable doubt.

Can you disregard anything you may have learned about that civil standard and follow my instructions in this case?

PROSPECTIVE JUROR THOMAS:  Yes.

THE COURT:  All right.

I saw three more hands.  All right.  Mr. Alava.

PROSPECTIVE JUROR ALAVA:  Yes, sir.  It was Orange County, California.  Roughly eight years ago.  It was -- they

made -- they had an agreement, and it was dismissed.

THE COURT: So the case kind of settled while you were in the middle of it?

PROSPECTIVE JUROR ALAVA: Yes, sir.

THE COURT: Anything about that experience give you any concern about serving here?

PROSPECTIVE JUROR ALAVA: No, sir.

THE COURT: And let's see. Ms. Helms, did you raise your hand?

PROSPECTIVE JUROR HELMS: No, sir.

THE COURT: No.

All right, Mr. Bradshaw?

PROSPECTIVE JUROR BRADSHAW: Served a year on the grand jury.

THE COURT: So a grand jury is a different mechanism --

PROSPECTIVE JUROR BRADSHAW: Right.

THE COURT: -- as you know. That's a probable cause thing. Can you disregard what you learned -- well, first of all, is there anything about that experience that gives you any concern here?

PROSPECTIVE JUROR BRADSHAW: No, sir.

THE COURT: And can you disregard what you may have learned during that process and follow my instructions?

PROSPECTIVE JUROR BRADSHAW: Yes, sir.

THE COURT: All right.

One more. Let's see, Mr. Lyons?

PROSPECTIVE JUROR LYONS: Yeah.

THE COURT: How long ago?

PROSPECTIVE JUROR LYONS: Been on jury duty probably three times in Forsyth County civil court.

THE COURT: All civil cases?

PROSPECTIVE JUROR LYONS: Yeah.

THE COURT: And did you deliberate to verdict in those cases?

PROSPECTIVE JUROR LYONS: Two of them we did, and one, they dismissed it.

THE COURT: Anything about that experience give you any concern here?

PROSPECTIVE JUROR LYONS: No.

THE COURT: And will you follow my instructions even though it will be -- it will be different from what you were told in those cases?

PROSPECTIVE JUROR LYONS: Yes.

THE COURT: All right.

Have you or any member of your immediate family ever been the victim of or witness to a crime? Victim of or witness to a crime?

PROSPECTIVE JUROR PRYOR: (Raises hand.)

PROSPECTIVE JUROR CLAYTON: (Raises hand.)

THE COURT: All right. I've got two. Mr. Pryor.

PROSPECTIVE JUROR PRYOR: Yes. I lived here in Greensboro back in the 90s and a man tried to come through the window and get after my -- my wife at the time. My son was two weeks. And I had to chase him out. Turns out he was just out of prison. He had been in 16 years for rape.

THE COURT: Okay.

Did they catch the individual?

PROSPECTIVE JUROR PRYOR: They got him, yeah. I had to testify in court.

THE COURT: All right. Thank you, sir.

One other hand went up.

PROSPECTIVE JUROR CLAYTON: (Raises hand.)

PROSPECTIVE JUROR HUNTER: (Raises hand.)

THE COURT: Two other hands went up.

So, let's see. Ms. Clayton, I'll pick on you first.

PROSPECTIVE JUROR CLAYTON: Okay. So my brother witnessed a shooting. It was his coworker, and he was in the vehicle with him and he had to appear in court.

THE COURT: How long ago was that?

PROSPECTIVE JUROR CLAYTON: It's been, like, 19 years ago.

THE COURT: Okay.

And then was there another one?

PROSPECTIVE JUROR CLAYTON: Like -- okay, crime or --

can you repeat the question?

THE COURT: A victim of a crime or a witness to a crime.

PROSPECTIVE JUROR CLAYTON: Oh, that's it.

THE COURT: Okay.

Anything about that experience that would prevent you from serving fairly and impartially in this case?

PROSPECTIVE JUROR CLAYTON: No.

THE COURT: All right.

Ms. Thomas.

PROSPECTIVE JUROR THOMAS: My stepson who works for the State had his State-issued firearms -- broken into his vehicle and they were taken.

THE COURT: Did they catch the individuals?

PROSPECTIVE JUROR THOMAS: No, they recovered the -- the people that they found it on did not have any part of it. I'm not sure where it went from there.

THE COURT: Okay.

Anything about that experience give you any concern about serving here?

PROSPECTIVE JUROR THOMAS: No.

THE COURT: All right.

And Ms. Hunter.

PROSPECTIVE JUROR HUNTER: Does a 50(b) fall in that?

THE COURT: It can. Just -- I appreciate you

bringing it up. Go ahead and tell me about it.

PROSPECTIVE JUROR HUNTER: My son has a 50(b) restraining order against his ex-wife and it's -- it's still pending.

THE COURT: So don't they stay in effect for a year?

PROSPECTIVE JUROR HUNTER: Yes.

THE COURT: Okay.

So within the last year that order's been issued?

PROSPECTIVE JUROR HUNTER: Yes.

THE COURT: And is there anything about that experience that would affect your ability to serve?

PROSPECTIVE JUROR HUNTER: No, sir.

THE COURT: Thank you.

I want to talk about firearms for just a minute. As I mentioned, one of the counts involves firearms. Do any of you have any strong feelings about firearms one way or another that might affect your ability to serve as a fair and impartial juror in the case? Any concern about that?

PROSPECTIVE JURORS: (No response.)

THE COURT: By show of hands only, if there are firearms in your home and the answer's yes, raise your hand.

PROSPECTIVE JURORS: (Various hands raised.)

THE COURT: All right. Thank you.

Are any of you members of any organization whose purpose is related to firearms in any way? If so, raise your

hand.

PROSPECTIVE JURORS:  (No response.)

THE COURT:  All right.

Do each of you understand that this case is to be decided based solely upon the evidence presented here in this courtroom and on my instructions as to the law that I will give you throughout the course of this trial?  Do each of you understand that?  If you understand that, raise your hand if the answer is yes.

PROSPECTIVE JURORS:  (Various hands raised.)

THE COURT:  All right.  Thank you.

And will each of you decide this case solely upon the evidence presented here in the courtroom and my instructions as to the law?

Ms. Byrd, I'll start with you.  Will you do that?

PROSPECTIVE JUROR BYRD:  Yes.

THE COURT:  And Ms. Clayton?

PROSPECTIVE JUROR CLAYTON:  Yes.

THE COURT:  Ms. Ohare?

PROSPECTIVE JUROR OHARE:  Yes.

THE COURT:  Ms. Stringer?

PROSPECTIVE JUROR STRINGER:  Yes.

THE COURT:  Ms. Thomas?

PROSPECTIVE JUROR THOMAS:  Yes.

THE COURT:  Ms. Hunter?

PROSPECTIVE JUROR HUNTER:  Yes.

THE COURT:  Mr. Pryor?

PROSPECTIVE JUROR LYONS:  Yes.

THE COURT:  Mr. -- Ms. Davis, excuse me?

PROSPECTIVE JUROR DAVIS:  Yes.

THE COURT:  And Mr. Alava?

PROSPECTIVE JUROR ALAVA:  Yes, sir.

THE COURT:  Mr. Helms?

PROSPECTIVE JUROR HELMS:  Yes.

THE COURT:  Mr. Bradshaw?

PROSPECTIVE JUROR BRADSHAW:  Yes.

THE COURT:  Mr. Lyons?

PROSPECTIVE JUROR LYONS:  Yes.

THE COURT:  I'm sorry, Ms. Helms; not Mr. Helms.  I -- I am easily confused up here.

By a show of hands if the answer's yes, will each of you follow my instructions on the law even if those instructions may be different from your understanding or belief as to what the law is or should be?  Will you follow my instructions?  If so, raise your hand.

PROSPECTIVE JURORS:  (Various hands raised.)

THE COURT:  Thank you.

Have you or any member of your family been employed by a law enforcement agency?  You or any member of your family employed by law enforcement?

PROSPECTIVE JUROR ALAVA: (Raises hand.)

PROSPECTIVE JUROR THOMAS: (Raises hand.)

PROSPECTIVE JUROR HUNTER: (Raises hand.)

THE COURT: I have three. Mr. Alava, I'll start with you.

PROSPECTIVE JUROR ALAVA: My father is a retired deputy sheriff.

THE COURT: All right.

Your father is?

PROSPECTIVE JUROR ALAVA: Yes, sir.

THE COURT: And is there anything about his position or your relationship to him that would make it difficult for you to serve fairly in this case?

PROSPECTIVE JUROR ALAVA: No, sir.

THE COURT: All right.

And Ms. Thomas and Ms. Hunter, y'all are welcome to keep your hands up, but I promise you, you can jump out -- at me. I just need to see them, and I'll come back and find you even. Even -- yeah, I'm feeling a little tired watching y'all hold your hands up like that.

Ms. Thomas.

PROSPECTIVE JUROR THOMAS: My stepson has worked for Greensboro PD, and he's now currently employed with the State. My son is actually in the interview process for the Greensboro PD.

THE COURT: Okay.

And when you say your stepson is employed by the State, what does he do for the State?

PROSPECTIVE JUROR HUNTER: SBI.

THE COURT: He's an SBI agent with the State now.

Anything about their work, their professions, or your relationship to them that would make it difficult for you to serve fairly and impartially in this case?

PROSPECTIVE JUROR THOMAS: No.

THE COURT: All right.

Ms. Hunter.

PROSPECTIVE JUROR HUNTER: My grandson's father is a detective in Forsyth County.

THE COURT: All right.

Still serving in that capacity?

PROSPECTIVE JUROR HUNTER: Yes.

THE COURT: Anything about your relationship to him or his position that would make it difficult for you to serve fairly and impartially?

PROSPECTIVE JUROR HUNTER: No, sir.

THE COURT: Have any of you ever received any training or education in the law or law enforcement?

PROSPECTIVE JUROR BYRD: (Raises hand.)

THE COURT: Yes, ma'am.

PROSPECTIVE JUROR BYRD: I needed to answer the

previous one.

THE COURT: Got ya. Appreciate you bringing me back. Sorry. Ms. Byrd.

PROSPECTIVE JUROR BYRD: In 2010, I worked for Winston-Salem Police Department, and I was record specialist.

THE COURT: Records -- what'd you -- was that?

PROSPECTIVE JUROR BYRD: Record specialist.

THE COURT: Record specialist.

Anything about that past employment that would make it difficult for you to serve fairly and impartially here?

PROSPECTIVE JUROR BYRD: No.

THE COURT: All right.

Has anybody ever applied to work as a law enforcement agent or received any training or education in the law?

PROSPECTIVE JURORS: (No response.)

THE COURT: All right.

Do any of you think you might give more weight or less weight to the testimony of a law enforcement officer simply because of that person's position? If you think you might do that, raise your hand.

PROSPECTIVE JURORS: (No response.)

THE COURT: All right.

Have either you or your spouse been significantly involved in any type of volunteer work? We all have our little things that we do, but are any of you significantly involved in

anything?

PROSPECTIVE JUROR STRINGER: (Raises hand.)

THE COURT: Yes, ma'am, Ms. Stringer?

PROSPECTIVE JUROR STRINGER: Well, my husband's a pastor, so there's always a lot of volunteer work involved with church. So, you know, it's things like -- and also, even with my schoolwork, I do a lot -- there's a lot of volunteer hours.

THE COURT: I don't doubt that for a minute.

Anything about that work that would affect your ability to serve fairly and impartially?

PROSPECTIVE JUROR STRINGER: No.

THE COURT: Anybody else?

PROSPECTIVE JURORS: (No response.)

THE COURT: All right.

I don't know what the evidence is that will be presented during the course of this trial, but I think it is certainly possible that there may be what I'll refer to as -- as graphic testimony or video evidence presented, and it will be your duty to hear that evidence fairly and impartially. If anybody has any concern about your ability to do that, raise your hand.

PROSPECTIVE JURORS: (No response.)

THE COURT: All right.

One or two of your favorite hobbies or activities in your free time. This is my favorite voir dire question of all.

Ms. Hunter, you look like you're ready to go.  Let me hear.

PROSPECTIVE JUROR HUNTER:  I like to read and like -- love to spend time with my grandchildren.

THE COURT:  All right.

Ms. Thomas.

PROSPECTIVE JUROR THOMAS:  Fishing and spending time with my grandchildren.

THE COURT:  Outstanding.

Ms. Stringer.

PROSPECTIVE JUROR STRINGER:  Reading and gardening.

THE COURT:  All right.

Ms. Ohare.

PROSPECTIVE JUROR OHARE:  Gardening and golfing.

THE COURT:  Ms. Clayton.

PROSPECTIVE JUROR CLAYTON:  Reading, spending time with my family.

PROSPECTIVE JUROR BYRD:  Traveling, spending time with my family.

THE COURT:  All right.

Mr. Lyons.

PROSPECTIVE JUROR LYONS:  Yeah, traveling and sports.

THE COURT:  All right.

Mr. Bradshaw.

PROSPECTIVE JUROR BRADSHAW:  Golfing and fishing.

THE COURT: Okay.

Mr. Helms. Ms. Helms. I don't know why I keep doing that. Sorry. Ms. Helms.

PROSPECTIVE JUROR HELMS: Spending time with my family and cooking.

THE COURT: All right.

Mr. Alava.

PROSPECTIVE JUROR ALAVA: Spending time with family and reading.

THE COURT: All right.

Ms. Davis.

PROSPECTIVE JUROR DAVIS: I'm a runner and I love to read.

THE COURT: All right.

Mr. Pryor.

PROSPECTIVE JUROR PRYOR: Poetry, trail running, basketball.

THE COURT: Do any of you feel you may be partial to or prejudiced against the Government or the defendant for any reason whatsoever, whether I've asked you about it or not? Anybody have any concern about that whatsoever?

PROSPECTIVE JUROR PRYOR: Yes, we already went over that.

THE COURT: All right.

And have you or any member of your family ever been

convicted of a crime, other than a minor traffic offense? Other than what's been described earlier.

PROSPECTIVE JUROR PRYOR:  (Raises hand.)

THE COURT:  Yes, sir, Mr. Pryor.

PROSPECTIVE JUROR PRYOR:  Yes, I was convicted of a DWI in '97, 2004.

THE COURT:  All right.

Anybody else?

PROSPECTIVE JUROR BRADSHAW:  (Raises hand.)

THE COURT:  Yes, sir, Mr. Bradshaw?

PROSPECTIVE JUROR BRADSHAW:  Simple assault.

THE COURT:  Simple assault?

PROSPECTIVE JUROR BRADSHAW:  Yes, sir.

THE COURT:  How long ago?

PROSPECTIVE JUROR BRADSHAW:  1988.

THE COURT:  And anything about that experience give you any concern about serving fairly and impartially?

PROSPECTIVE JUROR BRADSHAW:  No, sir.

THE COURT:  All right.  Thank you.

Anybody have any bumper stickers on the back of their car?

PROSPECTIVE JUROR CLAYTON:  (Raises hand.)

THE COURT:  Yep.

PROSPECTIVE JUROR CLAYTON:  Well, I have, like, magnets for schools.

Case 1:23-cr-00260-WO    Document 187    Filed 02/18/25    Page 67 of 213

THE COURT: They count. All school stuff?

PROSPECTIVE JUROR CLAYTON: Yeah, it's school stuff.

THE COURT: All right.

PROSPECTIVE JUROR STRINGER: (Raises hand.)

THE COURT: Yes, ma'am.

PROSPECTIVE JUROR STRINGER: Same.

THE COURT: School stuff?

Anybody else?

PROSPECTIVE JUROR HELMS: (Raises hand.)

THE COURT: I see that hand back there. I wanted to say Mr. Helms, but I'm going to say Ms. Helms. Ms. Helms.

PROSPECTIVE JUROR HELMS: Same.

THE COURT: Same school stuff.

Anybody else?

PROSPECTIVE JURORS: (No response.)

THE COURT: All right.

Whether I've asked you about it or not, is there anything that you're thinking about that gives you any concern about whether you can sit on this jury and render a fair verdict based on the evidence presented and the law as I instruct you? Anything you want to talk to me about?

PROSPECTIVE JUROR BRADSHAW: (Raises hand.)

THE COURT: Yes, sir, Mr. Bradshaw?

PROSPECTIVE JUROR BRADSHAW: One problem I'm having, I had ear surgery back in March and I'm having trouble with a

lot of ringing and humming and I'm having a lot of trouble understanding everything.  That was my only concern.

THE COURT:  I appreciate you bringing that -- so in terms of listening to me, when I'm on the microphone like this, are you having any trouble?

PROSPECTIVE JUROR BRADSHAW:  I'm having to just really focus.  Just trying to stay focused --

THE COURT:  Yeah.

PROSPECTIVE JUROR BRADSHAW:  -- and concentrate.  It's a little -- it just turned out being a failure and it's actually worse than it was before I went in.

THE COURT:  Understood.

PROSPECTIVE JUROR BRADSHAW:  I just wanted to raise that concern now.

THE COURT:  It is -- I'll -- I'll say this, if you're selected to serve, it's going to be important that if you have a problem and can't hear something, you need to let us know --

PROSPECTIVE JUROR BRADSHAW:  Okay.

THE COURT:  -- immediately.  That's my only requirement.

PROSPECTIVE JUROR BRADSHAW:  Okay.

THE COURT:  Just let us know and we'll either repeat --

PROSPECTIVE JUROR BRADSHAW:  All right.

THE COURT:  -- it or deal with it.

Can each of you serve as a fair and impartial juror in this case?

Ms. Hunter?

PROSPECTIVE JUROR HUNTER:  Yes.

THE COURT:  Ms. Thomas?

PROSPECTIVE JUROR THOMAS:  Yes.

THE COURT:  Ms. Stringer?

PROSPECTIVE JUROR STRINGER:  Yes.

THE COURT:  Ms. Ohare?

PROSPECTIVE JUROR OHARE:  Yes, sir.

THE COURT:  Ms. Clayton?

PROSPECTIVE JUROR CLAYTON:  Yes.

THE COURT:  Ms. Byrd?

PROSPECTIVE JUROR BYRD:  Yes.

THE COURT:  Mr. Pryor?

PROSPECTIVE JUROR PRYOR:  No, we spoke.

THE COURT:  Understood.

Ms. Davis?

PROSPECTIVE JUROR DAVIS:  Yes.

THE COURT:  Mr. Alava?

PROSPECTIVE JUROR ALAVA:  Yes, sir.

THE COURT:  Ms. -- Ms. Helms?

PROSPECTIVE JUROR HELMS:  Yes.

THE COURT:  Mr. Bradshaw?

PROSPECTIVE JUROR BRADSHAW:  Yes.

THE COURT: And Mr. Lyons?

PROSPECTIVE JUROR LYONS: Yes.

THE COURT: All right.

MR. IVERSON: Your Honor, I think I saw Ms. Helms' hand on the prior question.

PROSPECTIVE JUROR HELMS: Yeah, I was just going to mention earlier, previously you had asked about -- two of us actually raised our hands on it -- like, anything that would maybe conflict --

THE COURT: Yes.

PROSPECTIVE JUROR HELMS: -- the commitment. And my biggest concern is just the childcare for my children for that long of a period of time would be really challenging since I am their sole provider for that. So I just wanted to just mention that's a concern for me.

THE COURT: My kids are grown, but I haven't forgotten what it's like when they're young, as you describe. I'll think about that. Appreciate you bringing it to my attention. Like I said, I don't doubt you in terms of the difficulties that it -- that it raises. Not at all.

Anything else from anybody?

PROSPECTIVE JURORS: (No response.)

THE COURT: All right.

We're going to come to the challenges and I'm going to talk to the lawyers briefly for just a second and then

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

they'll have an opportunity to exercise their peremptory challenges.

It won't not take long, and as I -- I'll put it to you this way:  I have no talents whatsoever to entertain you while it's going on, so just sit patiently by and we'll do the best we can to move it along.

Let me see counsel up here at the bench.

(Beginning sidebar.)

THE COURT:  So I'm excusing Mr. Pryor and Ms. Davis for cause.

I really don't have any problem with the burden that Ms. Helms described, but I'm afraid that's pretty much -- everybody confronts that, but I'll hear from you if you want to be heard on her.  She's got the childcare issues.

MR. IVERSON:  Oh, yeah.  I sympathize, but nothing more than that.

MR. DOORASAMY:  I sympathize, but I also think in this particular case there's heavy, heavy evidence.

THE COURT:  Heavy what?

MR. DOORASAMY:  Evidence is, you know, experts. There's very detailed information that's going to come up and if she's going to be worrying about a child the whole time for five, six days, I think that's a problem.

THE COURT:  It's tough.  I agree with you.  I think everybody's got outside responsibilities that are tough to deal

with.

MR. DOORASAMY:  So my suggestion would be for cause.

THE COURT:  All right.

I'll note your motion.  I'm going to overrule that.  Anything else?

MR. DOORASAMY:  And as far as Juror Number --

THE COURT:  You need to stand right in front of the microphone.

MR. DOORASAMY:  Oh, okay.

I think we are looking at Juror Number 11 that has a hearing disability.  I think for cause, Your Honor.  He has to be able to listen to the intensive details of this case.

THE COURT:  I -- I agree with that.  I didn't notice any problem, and I appreciated him bringing it to our attention, but I -- I didn't feel like it was enough.  But if the Government agrees -- so I wasn't inclined to make you strike him.  If the Government agrees, then I'll entertain that.

MR. IVERSON:  No, I think -- I think he committed that he could.  He would let us know if he was having trouble hearing.

THE COURT:  Yeah, I felt comfortable with his commitment and the fact that he seemed to follow along, but it will serve as a reminder to stay in front of your microphones during the trial.  And if he has a problem and he lets us know,

we will deal with it.

All right.

(End sidebar.)

THE COURT:  All right.  The parties may exercise their peremptory challenges.

(Pause while the parties exercise peremptory challenges.)

THE COURTROOM DEPUTY:  Your Honor, we have four jurors selected.

THE COURT:  All right.

Ladies and gentlemen, if your name is called, have a seat back in the gallery of the courtroom.

THE COURTROOM DEPUTY:  Ms. Hunter.  Ms. Thomas.  Ms. Stringer.  Ms. Clayton.  Mr. Pryor.  Ms. Davis.  Mr. Alava, and Mr. Lyons.

THE COURT:  All right.  The four of you all have anything back in the courtroom?  No?

So the jury deliberation room is right through that door.  I'm going to let you all go back there and rest, sit comfortable while we finish up jury selection.

Do not discuss the case amongst yourselves or with anyone else.  We'll continue on with jury selection and bring you back.  I'm going to move you around in the seats.

Ms. Ohare, you'll be Number 1, right there.  Ms. Byrd, Number 2; and Ms. Helms, Number 3; and Mr. Bradshaw, Number 4.

Y'all can be excused back to the jury room.

(Selected jurors exit the courtroom.)

THE COURT: Let me see counsel up here.

(Beginning sidebar.)

THE COURT: Okay. So I don't think this is likely, but we have four jurors seated. I can call 8 more to the box and then we go through that until we get 12 and then pick 2 alternates, or -- I think I did this once before. I can go and call 12 to the box now, and if we should end up with, you know, enough to have the 12 plus 2 alternates, the -- then everybody will be seated in the order they were called to the jury box so we wouldn't have a separate choosing alternates.

As an example, let us say all 12 got selected, 8 of those jurors -- the 8 called and seated will be the remainder of the jury of 12, and then any extras we would put in the alternate seat and skip the separate alternate selection process.

Anybody object to that?

MR. IVERSON: I'm just trying to think how the extra peremptory challenge that you get with the separate alternate process. We would just --

THE COURT: You wouldn't get it.

MR. IVERSON: We wouldn't get it.

THE COURT: Because obviously --

MR. IVERSON: Right.

THE COURT: -- if you -- if -- you can't get rid of somebody for cause. I mean, everybody's used a bunch of challenges, for sure. But you wouldn't get that extra peremptory for the alternates if we did that.

MR. IVERSON: If we did it that way? Okay.

I don't have a problem doing it that way.

MR. DOORASAMY: I don't either. My understanding is we only get six.

THE COURT: What's that?

MR. DOORASAMY: I've got six and not ten.

THE COURT: I didn't understand.

MR. DOORASAMY: The peremptory challenges.

THE COURT: Yeah. So you've got ten; they've got six, and I'm not giving an extra at this point.

MR. DOORASAMY: Yes. Thank you.

THE COURT: Okay.

(End sidebar.)

THE COURT: Ms. Daniel, if you'll just go ahead and call 12 jurors to the jury box, please.

THE COURTROOM DEPUTY: James Pope. Christie Brittain. Joseph Alston. Sandra Blackwell. James King. Matthew Beckett. Katherine Carroll. Michelle Green. Teresa Ramseur. Milton Duncan. Kaye Mabe. Joe Kanoy.

THE COURT: Give me just a minute. Y'all might be surprised to learn that I don't carry the law around -- every

rule around in my head all the time.

All right. Let me see counsel up here real quick.

(Beginning sidebar.)

THE COURT: All right. So I just went back and checked the rule. This is what 24(c)(3) says -- or (c)(4).

(Reading): Each side is entitled to the number of additional peremptory challenges to prospective alternate jurors specified below. These additional challenges may be used only to remove alternate jurors.

One or two alternates, it's -- one additional peremptory challenge that is permitted. So I think this is what I'm going to do: We'll keep picking until we get 12. When we get to 12, if there are additional jurors seated in the jury box, I will give each side one additional challenge to deal with the alternate juror, and then we'll work our way through that way.

Everybody understand that?

MR. DOORASAMY: Yeah.

MR. IVERSON: Yeah, that makes sense.

THE COURT: That sounds good.

(End sidebar.)

THE COURT: All right. Ladies and gentlemen, sorry about that. First of all, is there any questions that you heard me ask that you would have answered yes to or anything you wanted to bring to my attention if you got called to the

box?

And if the answer's no, do not worry. We'll go through the questions again. But we'll go through them rather quickly on the second go round.

Any of you know any of the lawyers, parties, or witnesses whose names were identified earlier? If so, raise your hand.

PROSPECTIVE JURORS: (No response.)

THE COURT: All right.

We'll start with Mr. Pope. If you'll stand and introduce yourself, where you live, city or county; what do you do? Are you married? What does your spouse do? How old are your kids? Highest grade of school completed?

PROSPECTIVE JUROR POPE: I'm James E. Pope. Retired.

THE COURT: Where do you live?

Retired?

PROSPECTIVE JUROR POPE: Yes.

High Point City, Guilford County.

THE COURT: Married?

PROSPECTIVE JUROR POPE: Separated.

THE COURT: And what'd you do? What'd you retire from?

PROSPECTIVE JUROR POPE: Twenty years insurance adjuster. Ended my career with a small maintenance business.

THE COURT: Okay.

And highest grade of school completed?

PROSPECTIVE JUROR POPE:  I'm a 1979 graduate of the University of North Carolina.

THE COURT:  At Chapel Hill?

PROSPECTIVE JUROR POPE:  You hit it on the head.

THE COURT:  Congratulations.  I like you already.

And any children?

PROSPECTIVE JUROR POPE:  Three girls.

THE COURT:  How old are they?

PROSPECTIVE JUROR POPE:  Fifty, 39 and 37.

THE COURT:  Do they work outside their respective homes?

PROSPECTIVE JUROR POPE:  Yes.

THE COURT:  What do they do?

PROSPECTIVE JUROR POPE:  My oldest daughter works at Walmart.  My two youngest girls have their own business.

THE COURT:  Thank you, sir.

Ms. Brittain?

PROSPECTIVE JUROR BRITTAIN:  Yes.  Good morning.

THE COURT:  Good morning.

PROSPECTIVE JUROR BRITTAIN:  I am Christie Brittain. I am married, 21 years.  My husband works at Power Curbers out of Salisbury.

THE COURT:  Power -- what'd you say?

PROSPECTIVE JUROR BRITTAIN:  Curbers.

THE COURT: Curb -- what's --

PROSPECTIVE JUROR BRITTAIN: Curbers. C-u-r-b-e-r-s.

THE COURT: All right.

And do you work outside the home?

PROSPECTIVE JUROR BRITTAIN: I do.

THE COURT: What do you --

PROSPECTIVE JUROR BRITTAIN: I work for Piedmont Federal Bank.

THE COURT: Okay.

PROSPECTIVE JUROR BRITTAIN: I'm vice president director of loan operations. I graduated from High Point University. We have two children, they are 13 and 12. They do not work outside of the bank -- I'm sorry, outside of the home.

THE COURT: Not yet anyway.

PROSPECTIVE JUROR BRITTAIN: They are in middle school.

THE COURT: I think you covered it. Graduated High Point. I think that got it. Thank you.

Oh, did you say where you -- do you live in High Point?

PROSPECTIVE JUROR BRITTAIN: I live in Davidson County. I'm sorry.

THE COURT: Davidson County.

Mr. Alston.

PROSPECTIVE JUROR ALSTON: I reside in Alamance

County, in the City of Burlington. I work for Medline Industries. I am a systems administrator on site. I'm also an ordained minister of the gospel. I am presently a doctoral student at Anderson University. My highest obtained degree is master's degree at this time. I have two children; one is located in Washington, D.C.; the other one is here. One is 51 and one is 47. I have seven grandchildren and two great-grandchildren.

THE COURT: Wow. So are you married?

PROSPECTIVE JUROR ALSTON: Yes, I am.

THE COURT: Does your wife work outside of the home?

PROSPECTIVE JUROR ALSTON: My wife is retired.

THE COURT: Okay.

And what'd she retire from?

PROSPECTIVE JUROR ALSTON: She retired from the textile industry as a certified color analyst for the University of North Carolina.

THE COURT: Okay.

And the two children, do they work outside their respective homes?

PROSPECTIVE JUROR ALSTON: Yes, they do.

THE COURT: What do they do?

PROSPECTIVE JUROR ALSTON: One is a security agent for -- I think it's the Pentagon, and he works -- he lives in the Washington, D.C. area.

THE COURT: All right.

And the --

PROSPECTIVE JUROR ALSTON: And the other one is a retail manager.

THE COURT: Okay.

And what are you getting your Ph.D. in?

PROSPECTIVE JUROR ALSTON: Christian studies.

THE COURT: Okay.

Now, I don't anticipate this at all, but let's assume, for purposes of this question, that something that I instruct you on under the law conflicts with your -- I'm assuming Christian, since you said Christian studies -- your teachings and Christian's beliefs. For purposes of this trial, will you follow my instructions on the law?

PROSPECTIVE JUROR ALSTON: Yes, I would.

THE COURT: Thank you, sir. You may have a seat.

Ms. Blackwell.

PROSPECTIVE JUROR BLACKWELL: I'm Sandra Blackwell. I live in Guilford County. Married. No children. I have some college. And what else was it?

THE COURT: What do you do?

PROSPECTIVE JUROR BLACKWELL: I'm a HR coordinator.

THE COURT: And your husband, does he work outside the home?

PROSPECTIVE JUROR BLACKWELL: He does. He has --

he's a self-employed carpenter.

THE COURT: Thank you.

Mr. King.

PROSPECTIVE JUROR KING: Hey, how's it going? My name is --

THE COURT: Good morning.

PROSPECTIVE JUROR KING: -- James King, from Winston-Salem, Forsyth County. I'm an audio engineer, producer, music. Have an associate's in arts degree. Married 19 years. Have a stepson who's 21; my son is 10. 21-year-old, he is a food runner at Chili's. And the 10-year-old is obviously at home. What else?

THE COURT: Does your wife work outside the home?

PROSPECTIVE JUROR KING: Yes, she's a housekeeper.

THE COURT: Thank you.

And Mr. Beckett.

PROSPECTIVE JUROR BECKETT: Matthew Beckett. Guilford County. Married 15 years. Spouse is a stay-at-home mom, and I am a marketing manager and youth director here in Greensboro.

THE COURT: Okay.

Any children?

PROSPECTIVE JUROR BECKETT: Three.

THE COURT: How old are they?

PROSPECTIVE JUROR BECKETT: Ten, eight, and just

turned seven.

THE COURT: And highest grade of school completed?

PROSPECTIVE JUROR BYRD: Undergraduate.

THE COURT: Thank you, sir.

Ms. Carroll. You can't hide from me over there in that corner.

PROSPECTIVE JUROR CARROLL: My name is Kate Carroll, and I'm a restaurant owner and work in the restaurant. I'm from Orange County; Hillsboro, North Carolina. My husband also works in the restaurant. He's the executive chef. I work in the front of the house and also in the back of the house.

We have two 14-year-old twins, boys. They work at the restaurant when we drag them there, and we have a small little farm that we work as well.

THE COURT: All right.

Highest grade of school completed?

PROSPECTIVE JUROR CARROLL: I have a Bachelor's of Science from East Carolina.

THE COURT: All right. Thank you.

Ms. Green.

PROSPECTIVE JUROR GREEN: Hello. Michelle Green. I work in the oncology medical affairs group at a large diagnostic company.

I am married. My husband is an engineer for the small town we live in, Hillsboro, in Orange County. We have

two kids, a 9-year-old and a just 13-year-old, as of, like, four days ago.  They do not work outside the house.  And I have a Ph.D.

THE COURT:  Ph.D. in?

PROSPECTIVE JUROR GREEN:  Pharmacology.

THE COURT:  Thank you.

So when you said you work in oncology medical affairs, you got a Ph.D. in -- in pharmacology.

PROSPECTIVE JUROR GREEN:  Uh-huh.

THE COURT:  Do you -- what type of work do you do?

PROSPECTIVE JUROR GREEN:  So I manage an oncology genomics program.

THE COURT:  So, like, studying and developing...

PROSPECTIVE JUROR GREEN:  Yeah, it's more like an educational program where I help physicians understand --

THE COURT:  Oh, okay.

PROSPECTIVE JUROR GREEN:  -- complex diagnostics.

THE COURT:  Got you.

Ms. Ramseur.

PROSPECTIVE JUROR RAMSEUR:  My name is Teresa Ramseur from Rowan County.  I work in manufacturing as a machine operator.  I have two children, ages 45 and 23.  My daughter is a hairstylist.  My son works at the airport, and I'm single.

THE COURT:  And single.

And highest grade of school completed?

PROSPECTIVE JUROR RAMSEUR:  High school diploma.

THE COURT:  Thank you, ma'am.

Mr. Duncan.

PROSPECTIVE JUROR DUNCAN:  I'm Roger Duncan, and I work for Ashley Furniture as a -- as a truck driver.  And I actually retired and then went back to work.  But I'm -- I'm married.  I've got one daughter and three stepsons.  They're all married.  I've got nine grandchildren.

THE COURT:  Wow.  So does your wife work outside of the home?

PROSPECTIVE JUROR DUNCAN:  Yes, she does.

THE COURT:  What does she do?

PROSPECTIVE JUROR DUNCAN:  Sam's Club as a --

THE COURT:  Uh-huh.

PROSPECTIVE JUROR DUNCAN:  -- server.

THE COURT:  And any of your -- let's see.  You have children and stepchildren?

PROSPECTIVE JUROR DUNCAN:  Yes.

THE COURT:  What -- any of them work outside the home?

PROSPECTIVE JUROR DUNCAN:  All -- all of them except one.

THE COURT:  Generally speaking, what do they do?

PROSPECTIVE JUROR DUNCAN:  My stepson works in computer operations.

THE COURT: Uh-huh.

PROSPECTIVE JUROR DUNCAN: My daughter, she runs a personnel department of a cell -- cell phone company.

THE COURT: All right. Highest --

PROSPECTIVE JUROR DUNCAN: And my --

THE COURT: Go ahead.

PROSPECTIVE JUROR DUNCAN: -- son-in-law works for Lowe's Hard- -- Hardware.

THE COURT: Okay.

PROSPECTIVE JUROR DUNCAN: He's -- he's over -- over one of their divisions.

THE COURT: Got you.

Highest grade of school completed?

PROSPECTIVE JUROR DUNCAN: I have two -- two years of -- of college.

THE COURT: Thank you, sir.

Did you tell me where you live?

PROSPECTIVE JUROR DUNCAN: Winston-Salem.

THE COURT: Winston. Thank you.

Ms. Mabe.

PROSPECTIVE JUROR MABE: I am Kaye Mabe. I'm retired from medical laboratories. I'm a clinical laboratory scientist. My husband is retired also. He retired from maintenance work at Surry Community College. I'm from Surry County. I have a daughter who's 48, and she works at the

community college systems office in Raleigh.

THE COURT:  And where do you live?

PROSPECTIVE JUROR MABE:  I live in Surry County.

THE COURT:  Surry County.

And highest grade of school completed?

PROSPECTIVE JUROR MABE:  Bachelor's degree.

THE COURT:  Thank you.  I think you covered it all.

Mr. Candy (verbatim).

PROSPECTIVE JUROR KANOY:  Joe Kanoy.  I live in Davidson County.  I retired from the City of High Point.  HVAC inspector --

THE COURT:  Kanoy.

PROSPECTIVE JUROR KANOY:  -- and then I do HVAC work for myself.  I have one son that's 33, calibrates instruments in factories.  My wife works for a care center in High Point.

THE COURT:  Let's see.

Did you tell me highest grade of school completed?

PROSPECTIVE JUROR KANOY:  High school diploma.

THE COURT:  High school diploma.  Thank you, sir. I'm sorry about that.  I can't read my own handwriting.  I'll get the Kaony right next time.

Anything about the schedule that -- or length of this trial that presents a special physical problem or unusual hardship for anybody?

PROSPECTIVE JUROR KING:  (Raises hand.)

THE COURT: Yes, sir, Mr. King?

PROSPECTIVE JUROR KING: Yeah, just financial hardship. My father passed away late last year, so helped with the end-of-life stuff for a month, and then I had a -- about a month with dealing with the estate and all that stuff. And I usually schedule three to six months in advance, so it pushed my schedule down. And there's actually still clients from towards the end of last year that I'm working on now.

And then I'm afraid that they're going to have to cancel because they have record label deadlines, some labels overseas, and other states. And they get deadlines and so they'll have to take their business elsewhere.

And, you know, it will just be a financial struggle, at least at the moment. Plus I had put -- recently had to put in a new HVAC system, $3,000 in car repairs. Just a bunch of -- $12,000 in taxes. A bunch of stuff I wasn't expecting, just kind of snowballed into a bad situation financially for me.

THE COURT: Yeah, I understand. I'll think about it, and I don't know what the answer will be, but if the answer is, you stay, that's -- that's my decision and mine alone.

PROSPECTIVE JUROR KING: Okay.

THE COURT: Anybody else?

PROSPECTIVE JURORS: (No response.)

THE COURT: All right.

Any special physical disability or problem that would

make serving as a juror difficult?

PROSPECTIVE JURORS:  (No response.)

THE COURT:  Anything about the nature of the charges that would make it difficult for any of you to serve fairly and impartially?

PROSPECTIVE JUROR BECKETT:  Your Honor, I'm sorry.  Back up.  Type 1 insulin-dependent diabetic.  So require food, drink for low blood sugars and then insulin to lower blood sugars.

THE COURT:  So we usually -- we really do take a break about every hour and a half.  Is that often enough to accommodate that or do we need to do it a little more often?

PROSPECTIVE JUROR BECKETT:  It would just depend.  So blood sugar goes up and down.  It -- it depends on stress; it depends on food and the amount of insulin I've taken during the day.

THE COURT:  So here's the -- here's the thing:  We've had to accommodate similar things before.  If something comes up and we're not close to a break and you need a break, just raise your hand, let me know, and we'll take a break and accommodate that.

Let's see.

Mr. St. Felix is presumed innocent.  The superseding indictment is only an accusation.  Do each of you understand that Mr. St. Felix is presumed innocent?

Mr. Kanoy, do you understand that?

PROSPECTIVE JUROR KANOY:  Yes.

THE COURT:  Ms. Mabe?

PROSPECTIVE JUROR MABE:  Yes.

THE COURT:  Mr. Duncan?

PROSPECTIVE JUROR DUNCAN:  Yes.

THE COURT:  Ms. Ramseur?

PROSPECTIVE JUROR RAMSEUR:  Yes.

THE COURT:  Ms. Green?

PROSPECTIVE JUROR GREEN:  Yes.

THE COURT:  Ms. Carroll?

PROSPECTIVE JUROR CARROLL:  Yes.

THE COURT:  Mr. Pope?

PROSPECTIVE JUROR POPE:  Yes, Your Honor.

THE COURT:  Ms. Brittain?

PROSPECTIVE JUROR BRITTAIN:  Yes, Your Honor

THE COURT:  Mr. Alston?

PROSPECTIVE JUROR ALSTON:  Yes, sir.

THE COURT:  Ms. Blackwell?

PROSPECTIVE JUROR BLACKWELL:  Yes.

THE COURT:  Mr. King?

PROSPECTIVE JUROR KING:  Yes, sir.

THE COURT:  And Mr. Beckett?

PROSPECTIVE JUROR BECKETT:  Yes.

THE COURT:  Have any of you heard or read anything

about this case?

PROSPECTIVE JURORS:  (No response.)

THE COURT:  Do you or any of your family members own cryptocurrency?  If so, raise your hand.

PROSPECTIVE JUROR BLACKWELL:  (Raises hand.)

THE COURT:  I have one.  Ms. Blackwell.

PROSPECTIVE JUROR BLACKWELL:  I think it's my cousin. I see him post stuff about Bitcoin.

THE COURT:  Uh-huh.

And whatever you've learned about it through him, will you follow my instructions on the --

PROSPECTIVE JUROR BLACKWELL:  I don't know a thing about it.  Yes, sir.

THE COURT:  All right.  You and I are in the same boat, then.

Have any of you ever served as a juror before? Civil?  Criminal?  Grand jury?  All right.  We've got four.

PROSPECTIVE JUROR GREEN:  (Raises hand.)

PROSPECTIVE JUROR ALSTON:  (Raises hand.)

PROSPECTIVE JUROR KANOY:  (Raises hand.)

PROSPECTIVE JUROR MABE:  (Raises hand.)

THE COURT:  Ms. Green, I'll start with you.  How long ago?  What kind of case?

PROSPECTIVE JUROR GREEN:  It was probably 10, 15 years ago.  I lived in Durham at the time.  I sat on a jury for

a criminal case.  It's a domestic violence.  We deliberated.

THE COURT:  Anything about that experience give you any concern here?

PROSPECTIVE JUROR GREEN:  No.

THE COURT:  All right.

Who else had a hand up over there?

PROSPECTIVE JUROR ALSTON:  (Raises hand.)

THE COURT:  All right.  Let's see.  Mr. Alston.

PROSPECTIVE JUROR ALSTON:  I sat on a conspiracy case about five years ago.

THE COURT:  State court?

PROSPECTIVE JUROR ALSTON:  State -- state -- yeah.  And it was just fraud and conspiracy going on.  And I was selected foreman.

THE COURT:  Deliberated to verdict in that case?

PROSPECTIVE JUROR ALSTON:  Yes.

THE COURT:  Anything about that experience cause you any concern here?

PROSPECTIVE JUROR ALSTON:  No, sir.

THE COURT:  All right.

I think I had two more hands up.  Mr. Kanoy.

PROSPECTIVE JUROR KANOY:  About probably 20 years ago, Davidson County, criminal case.  And then about 15 years ago in this building, criminal case.

THE COURT:  Back over here for federal court?

Anything about those experiences that give you any concern about serving here?

PROSPECTIVE JUROR KANOY: No.

THE COURT: Wasn't there one more hand?

PROSPECTIVE JUROR MABE: (Raises hand.)

THE COURT: Ms. Mabe.

PROSPECTIVE JUROR MABE: Case about 30 or 40 years ago. It was probably a civil case.

THE COURT: Anything -- did you deliberate to verdict? Do you remember?

PROSPECTIVE JUROR KANOY: We deliberated to a verdict, yes.

THE COURT: Anything about that experience give you any concern?

PROSPECTIVE JUROR MABE: No.

THE COURT: All right. Thank you.

Have you or any member of your immediate family ever been the victim or a witness to a crime? You or any member of your immediate family victim or witness to a crime.

PROSPECTIVE JUROR CARROLL: (Raises hand.)

PROSPECTIVE JUROR BRITTAIN: (Raises hand.)

THE COURT: All right. Ms. Carroll?

PROSPECTIVE JUROR CARROLL: My house was broken into.

THE COURT: How long ago?

PROSPECTIVE JUROR CARROLL: Thirty-some odd years

ago.

THE COURT: Anyone arrested or prosecuted?

PROSPECTIVE JUROR CARROLL: No.

THE COURT: Anything about that experience that would affect your ability here?

PROSPECTIVE JUROR CARROLL: No.

THE COURT: And, let's see. Ms. Brittain.

PROSPECTIVE JUROR BRITTAIN: I was a victim when I was 12.

THE COURT: You put something about that on your form.

PROSPECTIVE JUROR BRITTAIN: I did.

THE COURT: Anything about the experience that would affect your ability to serve here.

PROSPECTIVE JUROR BRITTAIN: Not at all.

THE COURT: All right.

Anybody else?

PROSPECTIVE JUROR ALSTON: (Raises hand.)

THE COURT: Yes, sir, Mr. Alston.

PROSPECTIVE JUROR ALSTON: Stepson was murdered 18 years ago.

THE COURT: And was anybody arrested or prosecuted?

PROSPECTIVE JUROR ALSTON: No.

THE COURT: Anything about that experience that would affect your ability to serve here?

PROSPECTIVE JUROR ALSTON:  No.

THE COURT:  All right.

Do each of you under- -- oh, well, let's see.  Do any of you have such strong feelings about firearms that you have any concern about your ability to serve fairly and impartially? If you do, raise your hand.

PROSPECTIVE JURORS:  (No response.)

THE COURT:  All right.

If there are firearms in your home, raise your hand.

PROSPECTIVE JURORS:  (Various hands raised.)

THE COURT:  Thank you.

Are any of you members of any organization whose purpose is related in any way to firearms?

PROSPECTIVE JUROR KANOY:  (Raises hand.)

THE COURT:  Yes, sir, Mr. Kanoy?

PROSPECTIVE JUROR KANOY:  NRA.

THE COURT:  NRA.  And I don't anticipate it, Mr. Kanoy, but if anything that I should instruct you on as to the law, if that should conflict with something the NRA promotes or believes, will you follow my instructions on the law?

PROSPECTIVE JUROR KANOY:  Yes.

THE COURT:  Thank you, sir.

Do each of you understand that this case is to be decided based solely upon the evidence presented here in this courtroom and on my instructions as to the law that I will give

you throughout the course of this trial?  If you understand that, raise your hand if the answer's yes.

PROSPECTIVE JURORS:  (Various hands raised.)

THE COURT:  All right.

And will each of you decide this case based on the evidence presented and my instructions?  If you will do that, raise your hand please.

PROSPECTIVE JURORS:  (Various hands raised.)

THE COURT:  All right.

Will each of you follow my instructions on the law even if those instructions may be different from your understanding or belief as to what the law is or should be?  If you'll follow my instructions even if you disagree with them, raise your hand.

PROSPECTIVE JURORS:  (Various hands raised.)

THE COURT:  Thank you.

Have you or any member of your family been employed by a law enforcement agency?  You or any member of your family ever been employed by a law-enforcement agency?

PROSPECTIVE JUROR POPE:  (Raises hand.)

PROSPECTIVE JUROR DUNCAN:  (Raises hand.)

THE COURT:  Yes, Mr. Pope?

PROSPECTIVE JUROR POPE:  My grandfather was a city police officer.

THE COURT:  And anything about your relationship to

him or his position that would affect your ability --

PROSPECTIVE JUROR POPE:  Greatest man I know.

THE COURT:  I'm sorry?

PROSPECTIVE JUROR POPE:  Greatest man I know.

THE COURT:  I understand that.

But it wouldn't have any -- you --

PROSPECTIVE JUROR POPE:  Not at all.

THE COURT:  Have any of you applied to work as a law enforcement agent or received any training or education in the law?

PROSPECTIVE JURORS:  (No response.)

THE COURT:  Would any of you give --

MR. IVERSON:  Your Honor, excuse me.  I think I saw a second hand to Mr. Pope's on the question he answered in the affirmative to.

Family member law enforcement?

PROSPECTIVE JUROR DUNCAN:  (Raises hand.)

THE COURT:  Oh, there it is.  Mr. Duncan.

PROSPECTIVE JUROR DUNCAN:  I've got a -- a brother-in-law.  He's a federal attorney.

THE COURT:  Here?  In the Middle District or somewhere else?

PROSPECTIVE JUROR DUNCAN:  Somewhere else.

THE COURT:  Okay.

Anything about your relationship to him or his

position that would affect your ability to serve here?

PROSPECTIVE JUROR DUNCAN: No.

THE COURT: Thank you, sir.

Do any of you think you would give more weight or less weight to the testimony of a law enforcement officer simply because of that person's position? You think you might do that, raise your hand.

PROSPECTIVE JURORS: (No response.)

THE COURT: Have either you or your spouse been significantly involved in any type of volunteer work? Anything?

PROSPECTIVE JUROR GREEN: (Raises hand.)

PROSPECTIVE JUROR ALSTON: (Raises hand.)

THE COURT: I have two. Ms. Green.

PROSPECTIVE JUROR GREEN: So I'm on the council at my church.

THE COURT: All right.

Anything about that that would affect you here?

PROSPECTIVE JUROR GREEN: No.

THE COURT: And Mr. Alston.

PROSPECTIVE JUROR ALSTON: I do a lot of volunteer work with the Southern Baptist conference and also the United Church of Christ. I do a lot of computer stuff within the community of Burlington teaching hands-on stuff, supporting -- helping support people who can't afford different things in

their life.

THE COURT: All right.

Anything about that that might affect your ability to serve here?

PROSPECTIVE JUROR ALSTON: No.

THE COURT: Thank you, sir.

As I mentioned, it is possible -- I don't know what the evidence will show -- but it's possible there may be graphic testimony or video evidence presented. If so, it will be your duty to hear and see that evidence fairly and impartially. Anybody have any concern about that?

PROSPECTIVE JURORS: (No response.)

THE COURT: One or two of your favorite hobbies or activities in your free time. Mr. Beckett, I will start with you since I haven't started with you yet.

PROSPECTIVE JUROR BECKETT: Sports with our kids and theological studies.

THE COURT: All right.

Mr. King?

PROSPECTIVE JUROR KING: Time with the family and travel.

THE COURT: Ms. Blackwell?

PROSPECTIVE JUROR BLACKWELL: I like to read and try to play golf.

THE COURT: Mr. Alston?

PROSPECTIVE JUROR ALSTON: Theological studies and baseball.

THE COURT: All right.

Ms. Brittain?

PROSPECTIVE JUROR BRITTAIN: Soccer with my son and ride horses with my daughter.

THE COURT: Okay.

Mr. Pope?

PROSPECTIVE JUROR POPE: I like to restore furniture and small engines.

THE COURT: All right.

PROSPECTIVE JUROR POPE: And I have two brand-new grandsons born six weeks apart.

THE COURT: Oh, fantastic. Yep, you got your hands full.

Ms. Carroll?

PROSPECTIVE JUROR CARROLL: Spend time with my family, for the most part, and some small home renovation projects.

THE COURT: All right.

Ms. Green?

PROSPECTIVE JUROR GREEN: Time with the kids; I read, and I practice yoga.

THE COURT: Okay.

Ms. Ramseur.

PROSPECTIVE JUROR RAMSEUR: Shopping and spending time with children.

THE COURT: All right.

Mr. Duncan.

PROSPECTIVE JUROR DUNCAN: Camping and just spending time with family.

THE COURT: All right.

Ms. Mabe?

PROSPECTIVE JUROR MABE: Gardening, playing with my dog.

THE COURT: Okay.

Mr. Kanoy?

PROSPECTIVE JUROR KANOY: Camping and boating.

THE COURT: Okay.

Do any of you feel you may be partial to or prejudiced against the Government or the defendant for any reason whatsoever? Whether I've asked you about it or not.

PROSPECTIVE JURORS: (No response.)

THE COURT: All right.

Have you or any member of your family been convicted of a crime, other than a minor traffic offense?

PROSPECTIVE JUROR ALSTON: (Raises hand.)

PROSPECTIVE JUROR KANOY: (Raises hand.)

THE COURT: I have two. I'll start with Mr. Alston.

PROSPECTIVE JUROR ALSTON: Yes, sir, I was convicted

of possession and distribution of marijuana about -- when I was 21.

THE COURT: You were?

PROSPECTIVE JUROR ALSTON: Yes, I was.

THE COURT: And civil rights restored?

PROSPECTIVE JUROR ALSTON: Yes.

THE COURT: All right.

Anything about that experience would affect your ability to serve here?

PROSPECTIVE JUROR ALSTON: No.

THE COURT: All right.

And, Mr. Kanoy, did you raise your hand?

PROSPECTIVE JUROR KANOY: Yeah. I had a nephew convicted of theft.

THE COURT: Nephew? Anything about that that might affect your ability to serve here?

PROSPECTIVE JUROR KANOY: No.

THE COURT: All right.

Any bumper stickers on the cars?

PROSPECTIVE JUROR CARROLL: (Raises hand.)

PROSPECTIVE JUROR GREEN: (Raises hand.)

PROSPECTIVE JUROR KANOY: (Raises hand.)

PROSPECTIVE JUROR KING: (Raises hand.)

THE COURT: I have one, two, three, four.

All right. Ms. Carroll, what are they?

PROSPECTIVE JUROR CARROLL:  It just says, John Prine is pretty good.

THE COURT:  That's pretty -- that's pretty good.

Ms. Green.

PROSPECTIVE JUROR GREEN:  I have one of my kid's school and then the public library.

THE COURT:  All right.

Let's see.  Mr. Kanoy, your hand went up?

PROSPECTIVE JUROR KANOY:  Trump 2020.

THE COURT:  And one more.

PROSPECTIVE JUROR KING:  The American flag magnet.

THE COURT:  All right.

Is there any reason at all, whether I've asked you about it or not, that you have concerns about sitting on this jury and rendering a fair verdict?  Anything running through your mind?

PROSPECTIVE JURORS:  (No response.)

THE COURT:  All right.

Can each of you serve as a fair and impartial juror in this case?

Mr. Pope, I will start with you.  Can you?

PROSPECTIVE JUROR POPE:  Yes, Your Honor.

THE COURT:  Ms. Brittain?

PROSPECTIVE JUROR BRITTAIN:  Yes.

THE COURT:  Mr. Alston?

PROSPECTIVE JUROR ALSTON:  Yes, sir.

THE COURT:  Ms. Blackwell?

PROSPECTIVE JUROR BLACKWELL:  Yes.

THE COURT:  Mr. King?

PROSPECTIVE JUROR KING:  Yes, sir.

THE COURT:  Mr. Beckett?

PROSPECTIVE JUROR BECKETT:  Yes, Your Honor.

THE COURT:  Ms. Carroll?

PROSPECTIVE JUROR CARROLL:  Yes, sir.

THE COURT:  Ms. Green?

PROSPECTIVE JUROR GREEN:  Yes.

THE COURT:  Ms. Ramseur?

PROSPECTIVE JUROR RAMSEUR:  Yes.

THE COURT:  Mr. Duncan?

PROSPECTIVE JUROR DUNCAN:  Yes.

THE COURT:  Ms. Mabe?

PROSPECTIVE JUROR MABE:  Yes.

THE COURT:  And Mr. Kanoy?

PROSPECTIVE JUROR KANOY:  Yes.

THE COURT:  Counsel need to approach the bench for anything?

MR. IVERSON:  No.

THE COURT:  Well, we will talk about one thing.  Come on up.  I forgot.

(Beginning sidebar.)

THE COURT:  Mr. King and his financial issues and job issues.  I mean, it sounds like he's in a tough spot, but everybody that owns their own businesses is in a tough spot.  But I'll hear from you if either one of you want to be heard.

MR. IVERSON:  I don't.

MR. DOORASAMY:  For cause, yes.

THE COURT:  All right.

Do you want to respond to that?

MR. IVERSON:  I don't, Your Honor.  I think it -- I think it's close.  It sounds like he's had a lot going on in his life, but I think a lot of people do, so I think it's close.

THE COURT:  He's right on the line.  If I accept him as -- if I accept him at his word, I think the imposition on his business is one thing, but as he continued to speak, it sounds like there were some bad financial debt issues.  So in the absence of any objection, I would probably be inclined to let him go for cause.

MR. IVERSON:  That's okay.

THE COURT:  Just to avoid running into something midway through the trial when some customer of his -- something happens.

All right.  He's gone for cause.

(End sidebar.)

THE COURT:  The parties to exercise their peremptory

challenges.

(Pause while the parties exercise peremptory challenges.)

THE COURTROOM DEPUTY: Your Honor, we have eight jurors.

THE COURT: All right.

Ladies and gentlemen, if Ms. Daniel calls your name, have a seat in the back of the courtroom or in the gallery of the courtroom.

THE COURTROOM DEPUTY: Christie Brittain. Joseph Alston. James King. Katherine Carroll. Michelle Green. Milton Duncan. Kaye Mabe. Joe Kanoy.

THE COURT: All right.

So Mr. Pope, you will be Juror Number 5.

Ms. Blackwell will be Juror Number 6. Mr. Beckett will be Juror Number -- you don't not need to move right now. And we'll get you lined up when you come back.

I'm saying this more so I will remember rather than worry about y'all.

Mr. Beckett, you'll be Juror Number 7.

Ms. Ramseur, you'll be one seat over as Juror Number 8.

I'm going to excuse you back to the jury room. And I actually think I'm going to take a short break, so step in there. I'll bring y'all back out in just a second.

All right, ladies and gentlemen. We've been here --

or at least the lawyers and I have been here for about almost -- close to two and half hours, I'm going to take a short break.

It's -- there's -- it's just very cumbersome to take a break during jury selection. There's no easy way to do it. But what I'm going to ask all of you to do is, we'll take a 15-minute recess. At the end, you'll have to --

Were they assembled up on four?

THE COURTROOM DEPUTY: Yes, Your Honor.

THE COURT: You'll have to reassemble up on four and Ms. Daniel will come -- come and get you. So when you finish the break, head upstairs and we'll come get you and bring you back down.

Y'all are excused for a recess.

(Prospective jury panel exiting the courtroom at 12:16 P.M.)

THE COURT: If you'll bring those jurors back in.

They don't need to be lined up in any particular way; they can just come in the courtroom.

(Jurors entering the courtroom at 12:17 P.M.)

THE COURT: Just come on in and stand in front of the jury box. I'm just sending everybody off for a break. You don't even need to worry about taking a seat. You're only going to be here for just a minute. We need four more and then we'll get you out of here.

All right. I got all eight of you. Stand -- right

there is fine.

We're going to take a 15-minute break. Y'all are a little different. The jurors remaining will have to reassemble upstairs in the jury room, but y'all can come back and just assemble in the jury deliberation room. And it'll be easiest -- if you go through and come out, you'll see on the other side, the door that will drop you in the front lobby. Y'all can use that one to come in and out from this point forward, but we're on recess for 15 minutes, so relax and we'll be back with you in a little bit.

(Jurors exiting the courtroom at 12:18 P.M.)

THE COURT: All right. We'll be in recess for 15 minutes.

(Off the record for 12:18 P.M.)

(On the record at 12:35 P.M.)

THE COURT: So what I'm going to do is different, but what I described up at the bench is, I'm going to just go ahead and put 12 more jurors in the jury box. We'll go through the voir dire. The parties will exercise their peremptory challenges, whatever they have left.

And then assuming that we get the 4 to fill out the jury of 12, we'll get -- those 4 will be the first called and not struck in the order in which they were called. Once we have those four, I'm going to stop. I'll probably send them back to the jury deliberations room. Y'all will have one

additional peremptory challenge and then you can exercise it on whoever remains.

If we do not get enough to do that -- I want two alternates for this trial -- if we don't get enough to do that with this batch, then we'll start putting more and depending on what we need.

You all just remain at ease for a minute.

(Jurors entering the courtroom at 12:41 P.M.)

THE COURT: All right. Ms. Daniel, if you'll call 12 jurors to the jury box, please.

THE COURTROOM DEPUTY: Callie Bresch. Melinda Fyfe. Todd Weavil. David Kiger. Jacqueline Gordon. Billy Ledwell. Jennifer Khan. Lori Dixon. Ana Chavez. Brian Watson. Marcelo Monge. Ryan Youngblood.

THE COURT: All right. Ladies and gentlemen, I apologize. I'm sure y'all are as tired of listening to me as I am listening to me, but we will press forward. Anything anybody would have answered yes to or wanted to bring to my attention if called to the jury box?

PROSPECTIVE JURORS: (No response.)

THE COURT: All right. We'll run through the questions. Y'all recognize the names of any lawyers, parties, or witnesses that were read earlier?

PROSPECTIVE JURORS: (No response.)

THE COURT: No?

Then I'll start with you. Is it Bresch (pronouncing)?

Ms. Bresch, if you'll stand and introduce yourself. Where you live. What you do. You married. What's your spouse do. Children. Highest grade of school completed.

PROSPECTIVE JUROR BRESCH: My name is Callie Bresch. I am 22. I am from Hillsborough. Orange County. Not married. Don't have kids. Have an associate's degree.

THE COURT: Are you working?

PROSPECTIVE JUROR BRESCH: I work at a Bath and Body Works.

THE COURT: Thank you.

And is Fyfe (pronouncing)?

PROSPECTIVE JUROR FYFE: Fyfe. Uh-huh.

THE COURT: Ms. Fyfe.

PROSPECTIVE JUROR FYFE: Melinda Fyfe. Married, 38 years. My husband's retired technical advisor for an automotive company. I am a lead business consultant at Wells Fargo. I have one child, 31. He's a geographical information systems analyst. Live in Winston-Salem, Forsyth County. Have a master's degree.

THE COURT: All right. Thank you.

Mr. Weavil.

PROSPECTIVE JUROR WEAVIL: Name is Todd Weavil. I work as a facilities maintenance manager at -- for Novant

Health.  My wife works remote for -- she's an auditor for a company out of Texas.  I have two kids, one will be 16 in just a couple weeks, and one just turned 13.  Let's see.  The highest education is a bachelor's degree from here at UNCG.

THE COURT:  You live in Winston?

PROSPECTIVE JUROR WEAVIL:  Oh, I live in Belews Creek in Forsyth County.  Anything else?

THE COURT:  Did you say highest grade of school?

PROSPECTIVE JUROR WEAVIL:  A bachelor's degree.

THE COURT:  Bachelor's degree.

So I don't know how it'll be for you, but when my kids turned 16, I thought that was the most terrifying time of my life riding around in the car.  Good luck.  Thank you, sir.

THE COURT:  Mr. Kiger.

PROSPECTIVE JUROR KIGER:  My name's David Kiger.  I'm from Lexington in Davidson County.  Married for 28 years.  Have two kids, 34 and 31.  I work outside the home.  My son works for Duke Power.  My daughter works for a daycare in Matthews.  My wife is disabled, and I currently work in manufacturing.  And the diploma is high school.

THE COURT:  Thank you, sir.

Ms. Gordon.

PROSPECTIVE JUROR GORDON:  Yeah, Jacqueline Gordon from Davie County.  Divorce, separated.  Anyway, I take care of my disabled mom.  I have five kids -- what?  Twenty-nine, 27.

What?  Twenty-one, 14, and 12.

THE COURT:  Okay.

PROSPECTIVE JUROR GORDON:  And my oldest daughter stays with my mom.  My son lives in Arizona and does roofing. The 21-year-old works at Popeyes, and the other ones are in school.

THE COURT:  All right.

PROSPECTIVE JUROR GORDON:  Oh, and, I mean, I went to business college for certification, but...

THE COURT:  So some college?

PROSPECTIVE JUROR GORDON:  Yeah.

THE COURT:  Thank you, ma'am.

But you -- you take care of your mom?  You don't work outside the home right now?

PROSPECTIVE JUROR GORDON:  Well, I get paid to take care of her.

THE COURT:  Okay.  Thank you.

Mr. Ledwell.

PROSPECTIVE JUROR LEDWELL:  Name is Billy Ledwell. Live in Randolph, Asheboro area.  And my wife, she is a customer service manager for Harris Teeter, and I work at the -- got two kids, 34 and 31.  My daughter, she is a manager at Lowes Foods.  My son, he works for automotive.  Highest grade is a high school education.

THE COURT:  Thank you, sir.

Ms. Khan.

PROSPECTIVE JUROR KHAN:  I'm Jennifer Khan.  I work very, very part-time in the NICU.  Mostly I'm the taxi driver, cook, and caregiver to my four kids.  They are 14, 11, 10, and then 6.  The 14-year-old does work three times as many hours as I do volunteering at a museum.

THE COURT:  Well, good for him.

PROSPECTIVE JUROR KHAN:  My husband is in IT and risk management something or other.  I don't know.  He makes pretty spreadsheets and tells people what to do.  And I have an associate's degree.  Did I miss anything?

THE COURT:  I don't think so.  Is your degree in nursing?

PROSPECTIVE JUROR KHAN:  No.

THE COURT:  Thank you.

Ms. Dixon.

Oh, wait a minute.  You live here in town?

PROSPECTIVE JUROR KHAN:  Oh, yes.  Guilford County.

THE COURT:  Guilford County.  Thank you.

Ms. Dixon.

PROSPECTIVE JUROR DIXON:  My name is Lori Dixon.  I am from Asheboro, Randolph County.  I'm a registered nurse. Work for Alliance Health Plans.  I am single.  I have a 22-year-old son who is a lineman, and highest degree is a bachelor's.

THE COURT: All right. Thank you.

PROSPECTIVE JUROR CHAVEZ: My name is Anna Chavez. I'm from Hillsborough. My fiancé, he's a detention officer in the U.S. Army Reserves as a military police. I'm a billing technician for a local health department, and no kids.

THE COURT: And highest grade of school completed.

PROSPECTIVE JUROR CHAVEZ: Some college.

THE COURT: Thank you.

Mr. Watson.

PROSPECTIVE JUROR WATSON: My name's Brian Watson. I am married. My wife and I are both registered nurses. I have an associate's degree. Got three kids, they were 21, 11, and 9. The 21-year-old is a full-time student and also works full-time for the City of Wilmington.

THE COURT: And where do you live?

PROSPECTIVE JUROR WATSON: Kernersville.

THE COURT: Thank you, sir.

And is it Monge (pronouncing)? Monge (pronouncing)?

PROSPECTIVE JUROR MONGE: Monge (pronouncing).

THE COURT: Monge (pronouncing).

PROSPECTIVE JUROR MONGE: My name is Marcello Monge. I live in Davidson County. My wife and I and my two kids are there. Work for Novant Health as a quality assurance auditor.

THE COURT: Highest grade of school.

PROSPECTIVE JUROR MONGE: Some college.

THE COURT: Some college.

How old are your kids?

PROSPECTIVE JUROR MONGE: Sixteen going on 30 and three-years-old.

THE COURT: I know that feeling.

Does your wife work outside the home?

PROSPECTIVE JUROR MONGE: We technically both work from home. Technically she is a team lead for Novant Health as well.

THE COURT: Okay.

Thank you, sir.

PROSPECTIVE JUROR MONGE: Thank you.

THE COURT: Mr. Youngblood.

PROSPECTIVE JUROR YOUNGBLOOD: Ryan Youngblood. I live in Winston-Salem. Married with two kids, ages four and one. I'm an insurance broker and I have a bachelor's degree.

THE COURT: Okay.

Wife work outside of the home?

PROSPECTIVE JUROR YOUNGBLOOD: No.

THE COURT: Thank you.

Anything about the schedule or length of trial present a problem?

PROSPECTIVE JURORS: (No response.)

THE COURT: Anybody have any special physical issues, disabilities or issues?

PROSPECTIVE JUROR KHAN:  (Raises hand.)

PROSPECTIVE JUROR MONGE:  (Raises hand.)

THE COURT:  Yes, I'll start with you, Ms. Khan.

PROSPECTIVE JUROR KHAN:  I'm pretty sure I broke my foot early this morning.  I'm in some pain.  And my mother is having surgery on Wednesday, and I will not have reliable childcare.

THE COURT:  All right.

And Mr. Monge.

PROSPECTIVE JUROR MONGE:  I have medical procedures coming up on Wednesday and consecutively once a week for the next three weeks.

THE COURT:  All right.

Let me see counsel up here.

(Beginning sidebar.)

THE COURT:  I mean, people just think they're not going to get picked and they don't communicate?  I don't know.

Medical procedures I generally would excuse ahead of time.  We're down to our last three jurors.  I can go ahead and take them out and seat two of those three jurors and we can do our best or leave them in.  What do y'all want to do?

I guess to put it clearly:  I would ordinarily, if asked about it ahead of time, excused for cause when there's medical issues involved like Mr. Monge.  And his -- his -- his scheduled procedure is Wednesday.  We're off Wednesday, and

then so maybe he's okay.

But the woman who loses her childcare because her mom's having surgery. What do you all want to do with her?

MR. IVERSON: Is that Ms. Khan?

THE COURT: Yes.

MR. IVERSON: I noticed something else regarding her that I think we should address. She -- she has noted that she has severe anxiety and a current mental health crisis right now, and I would want to make --

THE COURT: You agree with that?

MR. DOORASAMY: I'll agree with that.

MR. IVERSON: Yeah.

THE COURT: I'm going to see if we can make Mr. Monge work and I'm going to take Ms. Khan out --

MR. IVERSON: Okay.

THE COURT: -- and excuse for her cause.

MR. IVERSON: If Mr. Monge, as you explore, has some sort of conflict, we wouldn't oppose cause.

THE COURT: Let me see -- just stay right here.

MR. IVERSON: Yeah.

(End sidebar.)

THE COURT: Mr. Monge, let me ask you: I think you mentioned medical procedure on Wednesday and then once a week --

PROSPECTIVE JUROR MONGE: Right.

THE COURT: -- after that.

PROSPECTIVE JUROR MONGE: Exactly.

THE COURT: So we're off on Wednesday.

PROSPECTIVE JUROR MONGE: Okay.

THE COURT: So this Wednesday's not a problem.

PROSPECTIVE JUROR MONGE: Okay.

THE COURT: Do you know what the schedule will be --

PROSPECTIVE JUROR MONGE: Yes, it's -- it's -- it's every single Wednesday for the next three weeks that I have --

THE COURT: Okay.

PROSPECTIVE JUROR MONGE: -- I have to take, like, knee shots, shots to my knees consecutively.

THE COURT: So I think that -- if -- I think we'll -- you will be okay --

PROSPECTIVE JUROR MONGE: Okay.

THE COURT: -- in terms of that schedule.

(Beginning sidebar.)

THE COURT: I really don't think from what I've heard we can't -- finished by Wednesday. And if we can't, we can work around his knee shots if we need to, if that's what it is.

So I'll leave him in. I'm going to go ahead and take Ms. Khan out.

(End sidebar.)

THE COURT: Ms. Kahn, I'm going to have -- for a couple reasons, I'm going to excuse you now and ask you to have

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

a seat back in the courtroom.

And I'm going to ask everybody on the back row to slide down one seat.

And we will seat -- if you'll call one more juror for me, please. That'll be Ms. Andrews.

THE COURTROOM DEPUTY: Angela Andrews.

THE COURT: All right.

Ms. Andrews, I'm going to catch up real quick. Do you recognize the names of any parties, lawyers, or witnesses in this case?

PROSPECTIVE JUROR ANDREWS: No.

THE COURT: Anything you would have answered yes to?

PROSPECTIVE JUROR ANDREWS: No.

THE COURT: Stand and introduce yourself. Where you live. What do you do?

PROSPECTIVE JUROR ANDREWS: My name's Angela Andrews. I live in Alamance County. I'm married. Been married for 42 years. I have two children, 38, 36. My husband and myself own a realty management group, real estate company.

Our oldest son has rental property and just started a waste services company. Our youngest son also does the realty management stuff, and he owns his own consulting firm with -- for real estate.

I have a high school education. Trying to think if there's anything else.

THE COURT: I think you covered it. Thank you.

PROSPECTIVE JUROR ANDREWS: Okay. Thank you.

THE COURT: All right.

Any -- just asked about any special physical dis- -- or issue in terms of the schedule and length of trial. Any other issues in terms on -- in terms of that or any type of physical issue?

PROSPECTIVE JUROR ANDREWS: No.

THE COURT: All right.

Anything about the nature of the charges that would make it difficult for you to serve fairly and impartially?

PROSPECTIVE JURORS: (No response.)

THE COURT: The superseding indictment is only an accusation. Mr. St. Felix is presumed innocent. Do each of you understand?

Ms. Bresch, do you understand that?

PROSPECTIVE JUROR BRESCH: (No verbal response.)

THE COURT: You'll have to say yes or no for the court reporter.

PROSPECTIVE JUROR BRESCH: Yes.

THE COURT: Thank you.

Ms. Fyfe?

PROSPECTIVE JUROR FYFE: Yes.

THE COURT: Mr. Weavil?

PROSPECTIVE JUROR WEAVIL: Yes.

THE COURT:  Mr. Kiger?

PROSPECTIVE JUROR KIGER:  Yes.

THE COURT:  Ms. Gordon?

PROSPECTIVE JUROR GORDON:  Yes.

THE COURT:  Mr. Ledwell?

PROSPECTIVE JUROR LEDWELL:  Yes.

THE COURT:  Ms. Andrews?

PROSPECTIVE JUROR ANDREWS:  Yes.

THE COURT:  Mr. Youngblood?

PROSPECTIVE JUROR YOUNGBLOOD:  Yes.

THE COURT:  Mr. Monge?

PROSPECTIVE JUROR MONGE:  Yes.

THE COURT:  Mr. Watson?

PROSPECTIVE JUROR WATSON:  Yes.

THE COURT:  Ms. Chavez?

PROSPECTIVE JUROR CHAVEZ:  Yes.

THE COURT:  And Ms. Dixon?

PROSPECTIVE JUROR DIXON:  Yes.

THE COURT:  All right.

Have any of you heard or read anything about this case?

PROSPECTIVE JURORS:  (No response.)

THE COURT:  Any of you -- do you or any of your family members own cryptocurrency?

PROSPECTIVE JUROR YOUNGBLOOD:  (Raises hand.)

THE COURT: I have one; that's Mr. Youngblood. Is that you or a family member?

PROSPECTIVE JUROR YOUNGBLOOD: It is me, yes.

THE COURT: So in terms of your ownership of cryptocurrency, you may be familiar with the markets and technical stuff. I say, "stuff," that shows you the extent of my technical knowledge. But during the course of this trial, you'll have to base your decision on the evidence that's presented at trial, even if it is contrary to your experience. Do you understand that?

PROSPECTIVE JUROR YOUNGBLOOD: Yes, sir.

THE COURT: All right.

Have any of you ever served as juror in any capacity?

I have one, two -- I think a half a hand up. One, two, three, four.

PROSPECTIVE JUROR BRESCH: (Raises hand.)

PROSPECTIVE JUROR FYFE: (Raises hand.)

PROSPECTIVE JUROR ANDREWS: (Raises hand.)

PROSPECTIVE JUROR DIXON: (Raises hand.)

Well, I'm curious about -- yes?

MR. IVERSON: I thought I saw Mr. Watson's hand on the cryptocurrency question.

PROSPECTIVE JUROR WATSON: Yes, sir. I own a small amount myself. And, honestly, I haven't even looked at the thing --

THE COURT:  Same question.  You'll follow my --

PROSPECTIVE JUROR WATSON:  Yes, sir.

THE COURT:  -- the evidence and my instructions?

PROSPECTIVE JUROR WATSON:  Yes, sir.

THE COURT:  All right.

I'm really curious about this little half a hand, Ms. Bresch.

PROSPECTIVE JUROR BRESCH:  I have been the defendant in a civil case before.

THE COURT:  Did you deliberate to verdict in that case?

PROSPECTIVE JUROR BRESCH:  Uh-huh.

THE COURT:  And does anything about that experience give you any concern about serving here?

PROSPECTIVE JUROR BRESCH:  No.

THE COURT:  All right.

And you probably heard me say earlier, the burden of proof in a civil case is very different and you have to follow my instructions here.  Can you do that?

PROSPECTIVE JUROR BRESCH:  Yes, sir.

THE COURT:  All right.

Ms. Dixon, did you raise your hand?

PROSPECTIVE JUROR DIXON:  Yes, a criminal case.

THE COURT:  How long ago?

PROSPECTIVE JUROR DIXON:  Thirty years.

THE COURT: Deliberate to verdict?

PROSPECTIVE JUROR DIXON: Deliberated.

THE COURT: Anything about that experience give you concern?

PROSPECTIVE JUROR DIXON: No.

THE COURT: And, let's see. Ms. Fyfe, did you raise your hand?

PROSPECTIVE JUROR FYFE: Yes. Traffic accident -- incident and I was on the jury, and we deliberated.

THE COURT: Anything about that experience give you any concern?

PROSPECTIVE JUROR FYFE: No.

THE COURT: Who else raised their hand for jury?

PROSPECTIVE JUROR GORDON: (Raises hand.)

PROSPECTIVE JUROR ANDREWS: (Raises hand.)

THE COURT: Two more. Let's see. Ms. Andrews, how -- how long ago? What kind of case?

PROSPECTIVE JUROR ANDREWS: It was probably 30 years ago, a DWI, and we had to deliberate.

THE COURT: Anything about that experience give you any concern?

PROSPECTIVE JUROR ANDREWS: No.

THE COURT: And Ms. Gordon.

PROSPECTIVE JUROR GORDON: It was about 20 years again and was a DUI case, and we threw it out.

THE COURT: It got dismissed?

PROSPECTIVE JUROR GORDON: Yes.

THE COURT: Anything about that experience give you any concern?

PROSPECTIVE JUROR GORDON: No.

THE COURT: Okay.

Have you or any member of your immediate family ever been the victim of or a witness to a crime? Victim of or witness to a crime.

All right. We have several.

PROSPECTIVE JUROR BRESCH: (Raises hand.)

PROSPECTIVE JUROR FYFE: (Raises hand.)

PROSPECTIVE JUROR WATSON: (Raises hand.)

PROSPECTIVE JUROR WEAVIL: (Raises hand.)

PROSPECTIVE JUROR KIGER: (Raises hand.)

Ms. Bresch.

PROSPECTIVE JUROR BRESCH: My mom and dad watched a guy get shot in Durham.

THE COURT: And anything about that give you any concern about serving here?

PROSPECTIVE JUROR BRESCH: No.

THE COURT: Ms. Fyfe?

PROSPECTIVE JUROR FYFE: We had our house broken into about 25 years.

THE COURT: Anybody arrested or prosecuted?

PROSPECTIVE JUROR FYFE: Nobody was arrested and prosecuted.

THE COURT: Anything about that experience give you any concern?

PROSPECTIVE JUROR FYFE: No.

THE COURT: All right.

Show me the hands again.

PROSPECTIVE JUROR WEAVIL: (Raises hand.)

PROSPECTIVE JUROR KIGER: (Raises hand.)

PROSPECTIVE JUROR WATSON: (Raises hand.)

PROSPECTIVE JUROR MONGE: (Raises hand.)

PROSPECTIVE JUROR YOUNGBLOOD: (Raises hand.)

THE COURT: Let's see, Mr. Weavil.

PROSPECTIVE JUROR WEAVIL: Yeah, I had some personal property stolen from my home, ATVs and lawn equipment.

THE COURT: How long ago?

PROSPECTIVE JUROR WEAVIL: Fifteen years.

THE COURT: Anybody prosecuted?

PROSPECTIVE JUROR WEAVIL: No.

THE COURT: Anything about that experience give you any concern?

PROSPECTIVE JUROR WEAVIL: No.

THE COURT: Mr. Kiger.

PROSPECTIVE JUROR KIGER: My mother-in-law breaking and entering to her home.

THE COURT: And anybody prosecuted?

PROSPECTIVE JUROR KIGER: No.

THE COURT: Anything give you any concern about serving here?

PROSPECTIVE JUROR KIGER: No, sir.

THE COURT: Let's see. Mr. Watson, you raise your hand?

PROSPECTIVE JUROR WATSON: Yes, sir. I had a vehicle broken into about 15 years ago.

THE COURT: Anything about that experience give you any concern?

PROSPECTIVE JUROR WATSON: No, sir.

THE COURT: Mr. Monge?

PROSPECTIVE JUROR MONGE: My parents owned a grocery store, a Latin grocery store, about 20 years ago and got held up at gunpoint. Unfortunately, they never caught anybody for it. It was just...

THE COURT: Anything about that experience give you any concern about serving here?

PROSPECTIVE JUROR MONGE: No.

THE COURT: And Mr. Youngblood.

PROSPECTIVE JUROR YOUNGBLOOD: Growing up, my house was broken into about 25 years ago.

THE COURT: Okay.

Anything about that experience give you any concern?

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

PROSPECTIVE JUROR YOUNGBLOOD:  No.

THE COURT:  Okay.  Anybody else?  Did I miss anybody?

PROSPECTIVE JUROR GORDON:  (Raises hand.).

My daughter and my niece both are going through domestic violence cases.

THE COURT:  Anything about what they're going through give you any concern --

PROSPECTIVE JUROR GORDON:  No.

THE COURT:  -- about serving here?

Let's see, do any of you have strong feelings about firearms such that you do not believe you could serve as a fair and impartial juror in this case?

PROSPECTIVE JURORS:  (No response.)

THE COURT:  By a show of hands if there are firearms in your home, raise your hands.

PROSPECTIVE JURORS:  (Various hands raised.)

THE COURT:  All right.

Are any of you members of any organization whose purpose is related in any way to firearms?

PROSPECTIVE JUROR FYFE:  (Raises hand.)

THE COURT:  Yes, ma'am, Ms. Fyfe?

PROSPECTIVE JUROR YOUNGBLOOD:  NRA and USCC.

THE COURT:  What's the USCC?

PROSPECTIVE JUROR FYFE:  United States Concealed Carry.

THE COURT: Oh, okay. I don't anticipate it, but if my instructions should conflict with anything those organizations believe or stand for, will you follow my instructions on the law?

PROSPECTIVE JUROR FYFE: Yes, I will.

THE COURT: All right.

Anybody else?

PROSPECTIVE JURORS: (No response.)

THE COURT: Do each -- by show of hands, do each of you understand that this case is to be decided based solely upon the evidence presented in this courtroom and my instructions as to the law that I will give you? If you understand that, raise your hand.

PROSPECTIVE JURORS: (Various hands raised.)

THE COURT: Will each of you decide this case based solely upon the evidence presented here in the courtroom and my instructions? If you will do that, raise your hand.

PROSPECTIVE JURORS: (Various hands raised.)

THE COURT: Okay.

And will each of you follow my instructions on the law, even if those instructions may be different from your understanding or belief as to what the law is or should be? If you will follow my instructions regardless, raise your hand.

PROSPECTIVE JURORS: (Various hands raised.)

THE COURT: Thank you.

Have you or any member of your family been employed by a law enforcement agency?

We got one, two, three, four, five.

PROSPECTIVE JUROR CHAVEZ:  (Raises hand.)

PROSPECTIVE JUROR WATSON:  (Raises hand.)

PROSPECTIVE JUROR WEAVIL:  (Raises hand.)

PROSPECTIVE JUROR KIGER:  (Raises hand.)

PROSPECTIVE JUROR ANDREWS:  (Raises hand.)

THE COURT:  Ms. Chavez, I'll start with you.

PROSPECTIVE JUROR CHAVEZ:  My fiancé, he is a detention officer.

THE COURT:  A detention officer, and I think you mentioned Reserve duty --

PROSPECTIVE JUROR CHAVEZ:  And military police and the Reserves.

THE COURT:  Anything about his position that might affect your ability to serve fairly and impartially here?

PROSPECTIVE JUROR CHAVEZ:  No.

THE COURT:  And Mr. Watson.

PROSPECTIVE JUROR WATSON:  My stepfather is retired from the sheriff's department.

THE COURT:  And -- and I've forgotten where you're -- oh, Kernersville.  Forsyth County Sheriff?

PROSPECTIVE JUROR WATSON:  He was with Caswell County.

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

THE COURT: Caswell County.

Anything about his position or your relationship to him that might affect your ability to serve?

PROSPECTIVE JUROR WATSON: No, sir.

THE COURT: I had two more. Show me your hands.

PROSPECTIVE JUROR KIGER: (Raises hand.)

PROSPECTIVE JUROR WEAVIL: (Raises hand.)

PROSPECTIVE JUROR ANDREWS: (Raises hand.)

THE COURT: Three more.

Mr. Weavil.

PROSPECTIVE JUROR WEAVIL: My brother's currently a sheriff with the Guilford County Sheriff's Department.

THE COURT: Anything about your relationship to him or his position that would affect your ability to serve?

PROSPECTIVE JUROR WEAVIL: No.

THE COURT: And Mr. Kiger, did you raise your hand?

PROSPECTIVE JUROR KIGER: My uncle's retired Forsyth County sheriff deputy.

THE COURT: All right. Anything about that that would affect your ability to serve?

PROSPECTIVE JUROR KIGER: No, sir.

THE COURT: And then I think Ms. Andrews, maybe you were the last one.

PROSPECTIVE JUROR ANDREWS: My husband's nephew used to be a Alamance County sheriff's deputy. That's probably

maybe 25 years ago.

THE COURT: Anything about that that would affect your ability to serve here?

PROSPECTIVE JUROR ANDREWS: No.

THE COURT: Any -- have any of you ever applied to work as a law enforcement officer or received any training or education in the law?

PROSPECTIVE JURORS: (No response.)

THE COURT: Have -- do any of you think you might give more weight or less weight to the testimony of a law enforcement officer simply because of that person's position?

PROSPECTIVE JURORS: (No response.)

THE COURT: Have either you or your spouse been significantly involved in any type of volunteer work? We all have our little things.

PROSPECTIVE JUROR YOUNGBLOOD: (Raises hand.)

THE COURT: Mr. Youngblood?

PROSPECTIVE JUROR YOUNGBLOOD: Serve on a board for a nonprofit in Forsyth County.

THE COURT: And what kind of work does the nonprofit do?

PROSPECTIVE JUROR YOUNGBLOOD: It helps housing individuals with different furnishings.

THE COURT: Okay. Anything about that that might affect your ability to serve here?

PROSPECTIVE JUROR YOUNGBLOOD:  No.

THE COURT:  Anybody else?

PROSPECTIVE JURORS:  (No response.)

All right.  As I've mentioned and you've heard me say a couple of different times, it is possible that there may be some graphic testimony and evidence presented, and it will be your duty to hear and see that evidence fairly and impartially if it is.  Anybody have any concern about that?

PROSPECTIVE JURORS:  (No response.)

THE COURT:  One or two of your favorite hobbies or activities in your free time.

Ms. Andrews, I'll start with you.

PROSPECTIVE JUROR ANDREWS:  My family and traveling.

THE COURT:  Okay.

Mr. Youngblood.

PROSPECTIVE JUROR YOUNGBLOOD:  Playing with my kids and traveling.

THE COURT:  Mr. Monge.

PROSPECTIVE JUROR MONGE:  Playing music with my children and target shooting.

THE COURT:  All right.

Mr. Watson?

PROSPECTIVE JUROR WATSON:  Traveling and reading.

THE COURT:  Okay.

Ms. Chavez?

PROSPECTIVE JUROR CHAVEZ:  Reading and baking.

THE COURT:  All right.

Ms. Dixon?

PROSPECTIVE JUROR DIXON:  Traveling and hiking.

THE COURT:  All right.

Ms. Bresch?

PROSPECTIVE JUROR BRESCH:  Baking and fishing.

THE COURT:  What was that first thing?

PROSPECTIVE JUROR BRESCH:  Baking.

THE COURT:  Baking.

Ms. Fyfe?

PROSPECTIVE JUROR FYFE:  Machine embroidery quilting and watching professional sports.

THE COURT:  Mr. Weavil?

PROSPECTIVE JUROR WEAVIL:  Taking my kids all over the place for their sports; and anything outdoors, hunting and fishing.

THE COURT:  Okay.

Mr. Kiger?

PROSPECTIVE JUROR KIGER:  Reading, spending time with grandkids.

THE COURT:  All right.

Ms. Gordon?

PROSPECTIVE JUROR GORDON:  I don't have much free time, but when I do, I spend it with my kids.

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

THE COURT: All right.

And Mr. Ledwell?

PROSPECTIVE JUROR LEDWELL: Fishing and hunting.

THE COURT: Okay.

Do any of you feel you may be partial to or prejudiced against the Government or the defendant for any reason whatsoever, whether I've asked you about it or not?

PROSPECTIVE JURORS: (No response.)

THE COURT: Have you or any member of your family been convicted of a crime other than a minor traffic offense? Anybody?

PROSPECTIVE JUROR GORDON: (Raises hand.)

THE COURT: Yes, ma'am, Ms. Gordon.

PROSPECTIVE JUROR GORDON: Oh, a lot. But the most recent, my sister has had some drug charges and gun charges, and my brother has had some theft charges and drug charges.

THE COURT: What was that? Your brother's had what charges?

PROSPECTIVE JUROR GORDON: Theft.

THE COURT: Theft charges.

PROSPECTIVE JUROR GORDON: Yeah.

THE COURT: Anything about their experiences that might affect your ability to serve fairly?

PROSPECTIVE JUROR GORDON: No.

THE COURT: Bumper stickers on the back of the car.

Anybody got any bumper stickers?

PROSPECTIVE JUROR BRESCH:  (Raises hand.)

PROSPECTIVE JUROR WEAVIL:  (Raises hand.)

PROSPECTIVE JUROR CHAVEZ:  (Raises hand.)

PROSPECTIVE JUROR WATSON:  (Raises hand.)

THE COURT:  I got one, two, three, four.

All right.  Ms. Bresch, what do you...

PROSPECTIVE JUROR BRESCH:  My school parking pass and a Jesus.

THE COURT:  All right.

And let's see, Mr. Weavil, did you raise...

PROSPECTIVE JUROR WEAVIL:  Stickers from our favorite beaches.

THE COURT:  Understood.

And, let's see -- who else was on the back?

PROSPECTIVE JUROR CHAVEZ:  (Raises hand.)

THE COURT:  All right.  Ms. Chavez?

PROSPECTIVE JUROR CHAVEZ:  A Bernie Sanders sticker.

THE COURT:  Okay.

And Mr. Watson.

PROSPECTIVE JUROR WATSON:  A couple Dukes of Hazard decals.

THE COURT:  All right.

And was there more up there?

PROSPECTIVE JUROR KIGER:  (Raises hand.)

THE COURT: All right. Mr. Kiger?

PROSPECTIVE JUROR KIGER: Got a Marine Corps sticker and church emblem.

THE COURT: All right.

Is there any reason at all, having listened to these questions, that you have any concern about your ability to sit on this jury and render a fair verdict? Anybody have any concerns?

PROSPECTIVE JURORS: (No response.)

THE COURT: Can each of you serve as a fair and impartial juror in this case?

Mr. Ledwell, can you?

PROSPECTIVE JUROR LEDWELL: Yes, sir.

THE COURT: Ms. Gordon?

PROSPECTIVE JUROR GORDON: Yes.

THE COURT: Mr. Kiger?

PROSPECTIVE JUROR KIGER: Yes, sir.

THE COURT: Mr. Weavil?

PROSPECTIVE JUROR WEAVIL: Yes.

THE COURT: Ms. Fyfe?

PROSPECTIVE JUROR FYFE: Yes.

THE COURT: Ms. Bresch?

PROSPECTIVE JUROR BRESCH: Yes, sir.

THE COURT: Ms. Dixon?

PROSPECTIVE JUROR DIXON: Yes, sir.

THE COURT: Ms. Chavez?

PROSPECTIVE JUROR CHAVEZ: Yes.

THE COURT: Mr. Watson?

PROSPECTIVE JUROR WATSON: Yes, sir.

THE COURT: Mr. Monge?

PROSPECTIVE JUROR MONGE: Yes.

THE COURT: Mr. Youngblood?

PROSPECTIVE JUROR YOUNGBLOOD: Yes.

THE COURT: Ms. Andrews?

PROSPECTIVE JUROR ANDREWS: Yes.

THE COURT: Okay.

Parties need to approach the bench for any reason?

(No response.)

THE COURT: You may exercise your peremptory challenges.

(Pause while the parties exercise peremptory challenges.)

THE COURT: If Ms. Daniel calls your name, have a seat in the back of the courtroom.

THE COURTROOM DEPUTY: Callie Bresch. Todd Weavil. Jacqueline Gordon. Jennifer Khan. That's it.

THE COURT: All right.

So Ms. Fyfe, you will be Juror Number 9.

Mr. Kiger, Juror Number 10.

Let me get this squared away. Kiger.

And, Mr. Ledwell, you will be Juror Number 11.

And Ms. Dixon will be Juror Number 12.

All right. The four of you, Ms. Fyfe, Mr. Kiger, Mr. Ledwell, and Ms. Dixon, y'all can go ahead and step back into the jury room.

(Jurors exiting the courtroom at 1:16 P.M.)

THE COURT: All right. Those of you remaining, let me see counsel up here at the bench.

(Beginning sidebar.)

THE COURT: All right. Each side has one additional peremptory challenge. The first two called and not struck will be our two alternate jurors.

MR. IVERSON: Okay.

THE COURT: I'm going to give you a chance to exercise that additional.

MR. IVERSON: Okay.

(End sidebar.)

THE COURT: Ladies and gentlemen, we have to do the alternate selection a little differently. Bear with us just a minute or two more.

(Pause while the parties exercise peremptory challenges.)

THE COURT: All right. If Ms. Daniel calls your name, have a seat back in the gallery.

THE COURTROOM DEPUTY: All right. Mrs. Chavez. Mr. Monge. Ms. Andrews.

THE COURT: All right.

Mr. Watson, you will be Alternate Juror Number 1. And, Mr. Youngblood, you will be Alternate Juror Number 2.

So Alternate Juror Number 1 has a seat -- it's really the next to last chair down on the first row, and Alternate Juror Number 2 will be in the next to last chair on the second row.

Y'all can step back to the jury room. I'll bring you in in just a minute and excuse you for lunch.

(Jurors exiting the courtroom at 1:20 P.M.)

THE COURT: All right. Ladies and gentlemen, those of you who were not selected to serve during this trial are to call for reporting information on Sunday, June 23rd. So call back in for additional reporting information this Sunday. Thank you for your patience here today, and we'll see what happens on June 23rd. All of you are excused.

(Jury panel exiting the courtroom at 1:21 P.M.)

THE COURT: If you will tell them to come in and stand in front of the jury box; I'm going to excuse them for lunch. They don't need to line up here. They can just come in.

(Jurors entering the courtroom at 1:22 P.M.)

THE COURT: All right. Just come on in and just stand in front of the jury box. You don't need to take a seat just yet. I will give you a couple of quick instructions and excuse you for lunch. Yeah, anywhere you can find a spot that

you can hear me is fine.

All right. Ladies and gentlemen, I'm going to excuse you for your lunch recess. I'm going to ask you to be back -- it's 1:20. I'm going to call it 2:30. Be back at 2:30 in that jury deliberation room. We'll bring you in and get started with the trial. Don't discuss the case with anyone or permit anyone to discuss it with you, and we will see you at 2:30. Jury's excused. Y'all can go right back through that door.

(Jurors exiting the courtroom at 1:23 P.M.)

THE COURT: All right. Just as a reminder, we'll come back -- we'll be on break -- recess until 2:30. When we get back's when we'll switch over to standing for the jury and not for me. We'll be in recess until 2:30.

(Off the record at 1:24 P.M.)

(On the record at 2:35 P.M.)

THE COURT: Anything we need to take up? Everybody's ready to go?

(No response.)

THE COURT: All right. Bring the jury in.

(Jurors entering the courtroom at 2:35 P.M.)

THE COURT: I am going to ask all of you to stand and be sworn as jurors in the case of United States of America versus Remy Ra St. Felix.

So stand, raise your right hand, and listen to the oath.

(JURORS SWORN.)

THE COURT: Ladies and gentlemen, so first of all, there's a little change in procedure now that the jury has been selected, and that's is: From this point forward during the course of the trial, we'll stand when the jurors enter and leave the courtroom, not when I enter and leave the courtroom, which is what you kind of see on TV is, everybody stands up for the judge. We don't -- we do that differently in a jury trial in -- in this district.

And we stand for the jurors for two reasons. We stand, number one, as a mark of our gratitude for the service and -- and duty that each of you have undertaken during the course of this trial; and, second, we stand in recognition of the jurors as the judges of the facts in this case. So when you stand -- enter the courtroom, come on in; we'll be standing. Take your seat and we'll stand as you leave the courtroom each day.

Now that you have been sworn, I would like to give you some preliminary instructions to help you in your participation during this trial. It will be your duty to find from the evidence what the facts are. You and you alone are the judges of the facts. You will then have to apply to those facts the law as I will instruct you. You must follow that law whether you agree with it or not.

Nothing that I may say or do during the course of the

trial is intended to indicate, nor should it be taken by you, as indicating what your verdict should be. The evidence from which you will find the facts will consist of the testimony of witnesses, documents, other things received into the record as exhibits and any facts the lawyers may agree or stipulate to or that I may instruct you to find.

Certain things are not evidence and must not be considered by you as evidence, such as: One, statements, arguments, and questions by lawyers are not evidence.

Two, objections to questions are not evidence. Lawyers have an obligation to their client to make an objection when they believe the evidence being offered is improper under the Rules of Evidence. You should not be influenced by the objection nor by my ruling -- excuse me, by the objection, or by my ruling upon it. If the objection is sustained, then you will ignore the question or the answer. If the objection is overruled, then you will treat the answer like any other answer. If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

Three, testimony that I exclude or tell you to disregard is not evidence and must not be considered.

Four, anything you may have seen or heard outside the courtroom is not evidence and must be disregarded. You are to decide the case solely on the evidence presented here in the

courtroom.

Five, from time to time, it will be necessary for me to confer with lawyers at the bench. The bench conference is simply a means to cause you as little inconvenience as possible. You should neither attempt to listen to those conferences nor draw any inferences from them. Those conferences are for the purpose of assisting me in determining proper trial procedure.

There are two kinds of evidence, direct and circumstantial. Direct evidence is direct proof of the fact, such as the testimony of an eyewitness. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist. I will give you further instructions on these as well as other matters at the end of the case, but keep in mind that you may consider both direct and circumstantial evidence.

Now, as you know, this is a criminal case. There are three basic rules about a criminal case that you must keep in mind. First, the defendant is presumed innocent unless and until proven guilty. The indictment against the defendant brought by the Government is only an accusation, nothing more. It is not proof of guilt or anything else. The defendant, therefore, starts out with a clean slate.

Second, the burden of proof is on the Government until the very end of the case. The defendant has no burden to

prove his innocence or to present any evidence or to testify. Since the defendant has the right to remain silent, the law prohibits you in arriving at your verdict from considering that the defendant may not have testified. And, third, the Government must prove the defendant's guilt beyond a reasonable doubt. I will give you further instructions on this point later, but keep in mind that, in this respect, a criminal case is different from a civil case.

Now in this case, the superseding indictment alleges nine separate offenses or charges as to the defendant, Remy Ra St. Felix. I will give you detailed instructions on the law at the end of the case, and those instructions will be used in your deliberations and to reach a decision. But in order to help you follow the evidence, I will now give you a brief summary of the essential elements of the offense -- offenses charged in the indictment.

Count 1 of the indictment alleges a violation of Title 18, United States Code, Sections 1343 and 1349. In order to prove the defendant guilty of the offense charged in Count 1 of the indictment, the Government must approve beyond a reasonable doubt each of the following facts: One, that two or more persons conspired or agreed to undertake conduct that would constitute a violation of 18 U.S.C. 1343, that is to knowingly and intentionally devise a scheme or artifice to defraud for obtaining monies by means of false material

misrepresentations or concealed a material fact of and for the purpose of executing the scheme to defraud, transmitted or cause to be transmitted a wire communication; and, two, that the defendant knew of the conspiracy; and, three, that the defendant knowingly and voluntarily became a member of the conspiracy.

Count 2 of the superseding indictment alleges a violation of Title 18, United States Code, Section 1201(c). In order to prove the defendant guilty of the offense charged in Count 2 of the superseding indictment, the Government must prove beyond a reasonable doubt each of the following facts: One, two or more persons conspired or agreed to undertake conduct that would constitute a violation of 18 U.S.C. Section 1201(a), that is to knowingly and unlawfully seize, kidnap, or carry away another person and hold that person for ransom, reward, or other reason and, in so doing, to travel in interstate commerce or to use any means or facility of interstate or foreign commerce in furtherance of the commission of the offense; and, two, that the defendant knew of the conspiracy; and, three, that the defendant knowingly and voluntarily became a part of the conspiracy; and, four, at some time during the existence or life of the conspiracy, agreement, or understanding, one of its alleged members knowingly performed at least one overt act in the Middle District of North Carolina and did so in order to further or advance the

purpose of the agreement.

Count 3 of the superseding indictment alleges a violation of Title 18, United States Code, Section 1951. In order to prove the defendant guilty of the offense charged in Count 3 of the superseding indictment, the Government must prove beyond a reasonable doubt each of the following facts: One, that two or more persons conspired or agreed to undertake conduct that would constitute a violation of 18 U.S.C. 1951(a), that is to knowingly and unlawfully obstruct, delay, and affect interstate -- and affect commerce and the movement of articles and commodities in such commerce by a robbery; two, that the defendant knew of the agreement or conspiracy; and, three, the defendant knowingly and intentionally joined the agreement or the conspiracy.

Counts 4, 5, and 6 of the superseding indictment each allege on or about the date specified in the indictment, separate violations of Title 18 United States Code, Section 1343 and 18 U.S.C. Section 2, aiding and abetting, which I will explain in just a moment. In order to prove the defendant guilty of the offenses charged in each of Counts 4, 5, and 6, the Government must prove beyond a reasonable doubt each of the following facts as to each account: One, the defendant knowingly devised a scheme or artifice to defraud, as described in the count you are then considering, either Count -- either Counts 4, 5, or 6; and, two, that the scheme or artifice to

defraud employed a false material representation or concealed a material fact; and, three, the defendant acted with the specific intent to defraud; and, four, for the purpose of executing the scheme to defraud, the defendant caused interstate wire communications to take place in the manner charged to the particular count you are then considering.

Count 7 of the superseding indictment alleges a violation of Title 18, United States Code, Section 1201(a). In order to prove the defendant guilty of the offense charged in Count 7 of the superseding indictment, the Government must prove beyond a reasonable doubt each of the following facts: One, the defendant unlawfully, knowingly, and willfully seized, confined, kidnapped, or carried away another person or persons, that is, in this case, individuals identified as Victims-8 and Victim-9; and, two, the defendant held Victim-8 and Victim-9 for ransom or reward or other reason; and, three, that the defendant traveled in interstate commerce or used the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense.

Count 8 of the superseding indictment alleges violation of Title 18, United States Code, Sections 1951(a) and 18 U.S.C. Section 2. In order to prove the defendant guilty of the offense charged in Count 8 of the superseding indictment, the Government must prove beyond a reasonable doubt each of the

following facts: One, the defendant knowingly and willfully obtained or took the personal property of another or in the presence of another; and, two, the defendant took the property against the victim's will by actual or threatened force or violence or fear of injury, whether immediately or in the future, to his or her person or property, or the person or property of a relative or member of the victim's family; and, three, as a result of the defendant's actions, interstate commerce, or an item moving in interstate commerce, was obstructed, delayed, or affected in any way or degree.

Count 9 of the superseding indictment alleges a violation of Title 18, United States Code, Section 924(c) and, two, 18 U.S.C. Section 2. In order to prove the defendant guilty of the offense charged in Count 9 of the superseding indictment, the Government must prove beyond a reasonable doubt each of the following facts: One, that the defendant knowingly used and carried a fire- -- or carried a firearm; and, two, that the firearm was brandished; and, three, that the defendant did so during and in relation to a crime of violence which may be prosecuted in a court of the United States, that is interference with commerce by robbery as charged in Count 8 of the indictment.

As I mentioned, each of Counts 4, 5, 6, 7, 8, and 9 also charge the defendant with a violation of Title 18, United States Code, Section 2. Title 18, United States Code, Section

2 provides that whoever aids, abets, counsels, commands induces or procures the commission of a crime is punishable as a principal, relatedly, whoever willfully causes an act to be done, which if directly performed by him or another, and would be an offense against the United States, is punishable as a principal.

As I mentioned earlier, I will give you detailed instructions on the law at the end of the case, and those instructions will be used in your deliberation and to reach a decision. These instructions are given to you now solely to help you follow the evidence in the case.

Now a few words about your conduct as jurors. First, I instruct you that, during the trial, you are not to discuss the case with anyone or permit anyone to discuss it with you until you retire to the jury room at the end of the case to deliberate on your verdict. You simply are not to talk about this case with anyone, including your family and friends. When you go home in the evening, simply tell them that I have told you not to talk about the case until it is over.

Second, do not read or listen to anything touching on this case in any way. If anyone should try to talk to you about it, please bring that to my attention promptly.

And I will say this, ladies and gentlemen: This is a small courthouse, and it is entirely possible that in wandering around the courthouse, you will bump into lawyers or parties or

other individuals and, instinctively, you may say hello or do something because they look familiar. If they don't respond, it's because I've directed them not to have any discussion or speak to the jurors during the course of the trial. You can rest assured that everybody's friendly and courteous and would otherwise speak to you, but not during the course of this trial.

Third, do not try to make any -- do any research or make any investigation of this case on your own. I instruct each of you that you are not to use the Internet to investigate or communicate or receive any information that relates to this case in any way. Do not post, send, or receive any information by Twitter, Facebook, cellular telephone, or any other electronic means.

And, finally, do not form any opinion until all of the evidence is in. Keep an open mind until you start your deliberations at the end of the case.

Now, if you wish, you may take notes, but if you do, leave those notes in the jury -- in the jury box; in your chair in the jury box at night. Ms. Daniel will see to it that no one looks at your notes in your absence. And remember that these notes are for your own personal use, and they are not to be given or read to anyone else.

Ms. Daniel, you can pass out some notepads and pencils.

All right. Ladies and gentlemen, generally trial questioning should remain with the lawyers representing the parties to this action. It is possible, however, that occasionally questions may arise in a juror's mind which should be given consideration. And while I'm not encouraging you to ask questions, it is proper for me to give consideration to your question -- questions if they arise.

Therefore, if you have questions during the presentation of evidence, you may write your questions down and hand it to the Marshal. He will deliver it to me, and I will review it. If it is proper under the rules, then you may get an answer, but if it is not proper under the rules, you must not be offended when I do not allow your question to be answered, nor should you speculate on what the answer would have been. Your duty is to determine what the facts are from the evidence presented, and usually that should be presented by the lawyers who are trained to ask material and relevant questions.

Now, if you happen to send a question up, rest assured that I will get the question, but I don't stop to either say, no answer, or, yes, here's the answer to the question. Instead, just continue to listen to the evidence, knowing that I have received your question. And most often, at least in my experience, questions tend to anticipate evidence that may come in later or has to come in through a different

witness, so most of the time the questions are not addressed, but know that I got the question.

The trial will now begin. First the Government will make an opening statement, which is simply an outline to help you understand the evidence as it comes in. Next, the defendant's attorney may, but it is not required to, make an opening statement. Opening statements are neither evidence nor arguments.

The Government will then present its witnesses and counsel for the defendant may cross-examine those witnesses. Following the Government's case, the defendant may, if he wishes, present witnesses whom the Government may cross-examine.

After all the evidence is in, the attorneys will present their closing arguments to summarize and interpret the evidence for you, and then I will instruct you on the law. After that, you will retire to deliberate on your verdict.

Now, ladies and gentlemen, the lawyers will first have an opportunity to make opening statements to outline what they expect the evidence to show. These statements are not to be considered by you as evidence in the case, which will come only from witnesses, exhibits, and stipulations. Nevertheless, these statements are intended to help them understand the evidence as it comes in, so I ask that you give the lawyers your close attention as I recognize them for the purpose of

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

making opening statements.

Is the United States ready to proceed?

MR. MUND:  Yes, Your Honor.

THE COURT:  You may do so.

MR. MUND:  It is the morning of April 12, 2023. Michael Prim, a retired 76-year-old teacher, hears his wife scream in their home.  Michael runs to the kitchen where he sees his wife with two masked intruders.  One of them is slamming his wife on the ground and kicking her.  She is screaming.  The other man, the defendant, Remy St. Felix, runs to Michael.  He punches Michael in the face hard, splitting Michael's lip open, and spraying blood.  Michael asks, why'd you hit me?  And the defendant responded, so now you know I'm serious.

He takes out a black handgun and pushes it against Michael's head.  He tells Michael, you better listen to me or, he says, I am going to fucking kill you.

The defendant then takes zip ties and ties Michael's wrists together, crossing his hands over.  He separates Michael from his wife, who is still screaming, and he forces Michael upstairs to his office loft at gunpoint.  The loft office is surrounded by large glass windows, and the defendant shoves Michael into the chair at the desk in the loft.  He tells Michael, I'm here for your cryptocurrency.

He then takes Michael's phone and tries to unlock it

by holding it in front of Michael's face. The face ID doesn't work. Michael's face is already bloody and swollen. The defendant then tells Michael to unlock his computer and forces him at gunpoint to type in the passcode. He threatens Michael again. Again, he holds his handgun against Michael's head. Again, he tells Michael he's going to kill him.

You'll hear testimony that the defendant made other threats as well. You'll hear testimony that the defendant said, I am going to cut off your dick and shove it in your wife's mouth. You'll hear testimony that he threatened to rape Michael's wife, who was being held captive downstairs. Occasionally, Michael could hear her voice. And then the defendant told Michael, you need to log into your Coinbase account.

Now, you'll hear about Coinbase. Coinbase is a company that stores cryptocurrency for its clients, similar to how a bank stores money for its customers.

And then Michael sees the defendant get on the phone. He makes a phone call because, you see, these home invaders in the house, these two masked men, you'll hear that they weren't working alone. You'll hear that there was two groups; to use the defendant's words through text message, there's the tech team and the goons. There was the brain and brawn.

The defendant, he led the brawn, the home invasion crew. He was responsible for scoping out targets' homes for

breaking in, for beating and tying up the people inside and forcing access to their cryptocurrency by whatever means necessary.

The tech team, on the other hand, they had a more technical role. They found the targets who had cryptocurrency to rob. They also -- once the defendant had access to Michael's crypto accounts, they were responsible for stealing the money.

One of the members of the tech team named Jarod Seemungal helped the defendant use Michael's computer to download a software application called AnyDesk. And what this application did is, it allowed Seemungal, who was out in Florida, to remotely control Michael's computer from where he was, and Seemungal used that remote control to access Michael's Coinbase account.

Between 8:15 and 9:00 A.M. that morning, Seemungal used that access like an ATM, making multiple withdrawals from Michael's account to an address that he controlled. Altogether that morning, the defendant and Seemungal stole more than $156,000 from Michael's account. The whole time, Michael and his wife were held captive in their own home.

At a certain point as this robbery's going on, Michael's hands began to shake. He starts sweating profusely, and the defendant, he notices. And he says, that old man, he looks like he's going to have a stroke or heart attack.

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

And then, at 9:00 A.M., the home invaders decide it's time to go. They break Michael's computer, and they smash his phones and they force Michael into his bathroom. They zip tie his wrist and they zip tie his ankles. Next to him is his wife; she's zip tied, wrists and ankles, and she's got tape covering her mouth, and the home invaders leave.

Eventually, they free themselves, and bloodied and beaten, they make their way to the neighbors, who then call the police.

Now, that same day, the defendant and the other man, the other home invader in the house with him named Elmer Castro, they opened Coinbase accounts of their own, and they both received the exact same amount of cryptocurrency. They each got $22,267.65 exactly, which was, for each of them, their 15 percent of the robbery proceeds that they stole from Michael's Coinbase account.

You'll hear testimony from -- that Jarod Seemungal, the one who took the money out of the Coinbase account, a member of the tech team, he first tried to launder the money, and only after that did he send the money to the Coinbase accounts that the defendant and Castro opened.

I'd like to fast-forward to July 27th of 2023. The FBI -- the FBI, they caught up to the defendant. He was arrested in Long Island, New York. He was alone in a car. At his feet was a gun. In the back, there was a duffel bag; it

Case 1:23-cr-00260-WO    Document 187    Filed 02/18/25    Page 158 of 213

had an assault rifle, and it had zip ties, and there was evidence of his home invasion against Michael and his wife in his hand. Ladies and gentlemen, I'm talking about the defendant's cell phone.

You'll hear that cell phone had photos and it had chat messages between the defendant and his co-conspirators. You'll also hear evidence that this home invasion against Michael, it wasn't the defendant's first.

Now, over a year before, Seemungal, that member of the tech team, he approached the defendant, and he pitched the defendant on this idea of committing home invasions to rob people of their cryptocurrency. And you'll hear evidence that the defendant was immediately on board. You'll hear evidence that he later told Jarod Seemungal that he was all in.

The plan was -- you'll hear evidence that the plan was this: There was the tech team that would find the targets to rob of cryptocurrency. Then the defendant and the home invasion crew would break into their home, kidnap the people inside, and hold them captive and force them to provide access to the cryptocurrency accounts that they were targeting.

The plan was an agreement to commit a series of home invasions, and that's why the United States has charged the defendant with crimes of conspiracy. Conspiracy to commit wire fraud. An agreement to obtain cryptocurrency by trickery. Conspiracy to commit kidnapping. An agreement to seize people

against their will and hold them for some period of time. A conspiracy to commit robbery. An agreement to rob people by threats and with force, with violence.

The defendant was also charged by the United States with substantive counts of wire fraud for defrauding Coinbase of its cryptocurrency. The defendant was charged substantively with kidnapping for the home invasion of Michael and his wife and holding them captive and then leaving them tied up afterwards. The defendant is also charged with robbery for robbing Michael's Coinbase account. And then finally, the defendant is charged with brandishing a firearm in furtherance of its robbery against Michael.

Now, you'll hear evidence that the defendant, he took charge of the home -- the home invasion crew. He -- he conducted the surveillance. He kicked out co-conspirators he didn't like, and he replaced them with the ones that he did.

You'll see messages where the defendant describes his approach to home invasions. You'll see him write, we -- we hit any target with reliable info anywhere in the states, anytime. Anywhere. Anytime.

Now, you'll hear that over the course of the conspiracy, the first few home invasions, they weren't successful in getting cryptocurrency, but the conspirators kept trying and they got better.

You'll hear that the defendant and others planned and

attempted home invasions in Delray Beach, Florida; in Homestead, Florida; in Little Elm, Texas; in Fort Lauderdale, Florida; and then at Michael Prim's house in Durham, North Carolina.

Now, during the course of the trial, you'll see different types of evidence. You'll see messages from the defendant's cell phone, messages with co-conspirators. You'll see phone locating records placing the defendant's location at certain periods of time. When you hear that testimony, pay special note to where the defendant's phone was before, at, and after the robbery crimes.

There's also going to be photo evidence from the defendant's cell phone. You'll hear from victims who tell you about the home invasion crimes. You'll see financial records. You'll see information from the defendant's Google account, including a photo of a North Carolina driver's license, Michael Prim's driver's license.

You'll see this different type of evidence, but then you'll also -- you'll hear from people. You'll hear from co-conspirators who will tell you how they committed these crimes along with the defendant. And you'll hear from both the brains and brawn, the people on the tech side as well as some of the home invasion crew themselves. You'll hear testimony from Jarod Seemungal, that member of the tech team who withdrew the money from Michael's Coinbase account. And Jarod will tell

you that it was his idea to rob people of cryptocurrency, and he'll tell you how he worked with the defendant throughout the course of the conspiracy.

Jarod will tell you about the schemes that he plotted and the crimes that he committed, and he'll tell you that he committed these along with the defendant. He'll give you a perspective from the inside out.

You'll also hear from, as I said, some of the brawn, the home invaders. And they'll tell you about how they planned the home invasions, how they broke into people's homes, how they threatened people at gunpoint, and even hurt people. And they'll tell you that they committed those crimes alongside the defendant.

When you listen to this testimony from these co-conspirators, I urge you, listen carefully and compare what they're telling you to all the other evidence that you'll hear in the case and compare and see how it lines up.

Now, I want to take you back to July, to the day of the defendant's arrest in New York. The evidence in this case will tell you why. Why was the defendant in New York? The defendant will -- the -- the evidence will tell you why the defendant was in a car with guns and with zip ties, and evidence will tell you that the defendant was in New York for the same reason he was Delray Beach, Florida. The same reason he was in Homestead, Florida. The same reason he was in Little

Elm, Texas, and Fort Lauderdale, Florida. The same reason he went to Michael Prim's house in Durham, North Carolina.

The defendant was in New York because a man named Kevin Butler had cryptocurrency, and the defendant wanted to rob him. You'll see evidence that the defendant had Kevin Butler's home address, had photos of his house, had photos of Kevin and Kevin's driver's license. You'll see evidence that the defendant was surveilling Kevin's house. You'll see evidence that the defendant knew that Kevin lived at home with a kid -- with a child who played Youth 13 hockey. And you'll see the defendant's reaction when he learned that information. There's a child in the home of his home invasion target. How did the defendant respond? Leverage. The defendant responded leverage. Anywhere. Anytime.

Now, I've just given you an overview of some of the evidence that you'll hear in this case. After you've heard all of the evidence, the Government will have the opportunity to speak to you again in closing statement, and at that time, we will ask that you return a verdict, the only possible verdict on the evidence in this case, and that is that the defendant, Remy St. Felix, is guilty on every single count. Thank you.

THE COURT: Mr. Doorasamy, will there be an opening statement on behalf of Mr. St. Felix?

MR. DOORASAMY: There will be no opening for the defense.

THE COURT: All right.

(Beginning of the excerpted testimony previously filed at ECF #113 on August 12, 2024.)

THE COURT: The Government may call its first witness.

MR. IVERSON: United States calls Michael Prim.

THE COURT: Mr. Prim, if you'll step here, please, sir.

(MICHAEL PRIM WAS SWORN.)

MR. IVERSON: May I, Your Honor?

THE COURT: You may proceed.

Whereupon,

MICHAEL PRIM,

having been first duly cautioned and sworn, testified as follows:

DIRECT EXAMINATION

BY MR. IVERSON:

Q. Will you please state your name?

A. Michael Prim.

Q. How old are you, Mr. Prim?

A. Seventy-seven.

Q. Where do you live?

A. Durham, North Carolina.

Q. What's your address?

A.             .

Q. How long have you lived at that address?

A. Fifteen years.

Q. Who do you live with?

A. My wife, Carrie Benoit Salemi.

Q. Are you employed?

A. I'm retired.

Q. What'd you do for a living?

A. I taught school; I taught AP physics for 25 years, Millbrook High School, in Raleigh, North Carolina.

Q. I'm going to direct your attention to April 12th of last year, 2023. Were you the victim of a crime?

A. I was.

Q. What happened?

A. Well, it was 7:30 in the morning, Wednesday morning. I was still in bed. I heard a knock at the door. Sometimes I answer those when they're that early; sometimes I don't. So I -- some many lovely people in the neighborhood, so I answered the door.

There were two guys, very suspicious looking. I sort of wondered why I opened the door. They both had what appeared to be goggles on, like swimming goggles. And they also had the -- you see construction workers wearing the -- the vest, the orange/yellow-type vest.

So I opened the door and they said that they were utility workers and that the neighbor had a leak and they

wanted to -- they wanted permission to go to the back of the yard to see if we also had a leak, if it had affected our plumbing system. And they wanted my permission. I said, well, that's fine. And he said, if we don't come back, you know, everything's okay. And if we do, we'll -- we'll come back again.

So I -- still asleep, sort of. So I went back to bed, and just within a few minutes, another knock. So I said, well, I think I'm just going to ignore it. But I heard my wife coming from the kitchen area, and she opened it. And I just heard a little -- I didn't really hear the conversation, but then I heard feet moving toward the kitchen, and just within a few -- you know, I don't know, 10, 22 seconds, I heard her screaming, just absolutely going crazy. I mean, she was yelling, "Let me go. Why are you doing this?"

So I immediately jumped out of bed. When I round the corner, I see the -- I'll refer to the smaller and the larger man. The smaller man was picking my wife up and throwing her down, kicking her, and she was screaming and yelling. And I got into the kitchen area and -- and told her to stop yelling. You know, don't resist. He's going to keep doing it, probably. And he continued to throw her down and kick her.

And then a larger man came out of my library and immediately just, wham, hit me, and blood just spewed all over the place. I asked him, "Why did you do that?"

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

And he said, "To let you fucker know that I mean business. That I'm here to take your money from your Coinbase account, and if you don't cooperate, I will kill you. Before I kill you, I will cut your toes off, cut your fingers off, cut your dick off, and stick it in your wife's mouth and rape her."

There was some wine bottles nearby, and I, for a brief second, thought about, you know, doing what any person would do when you see your wife being treated like that, but then I realized that was pretty stupid.

So then eventually I guess the smaller man stopped doing that to my wife because she was still crying and screaming. So the guy -- the larger guy put a zip tie around my hands. They were -- they were like this (indicating). So I -- and they were very tight.

So he continued to let me know that they knew everything about our neighborhood. They had been -- I don't know how many days they had been, you know, looking around the neighborhood. They knew everything about the schedules of the people. They knew our schedules. And, again, if I didn't cooperate with him, he would kill me.

So he then took me into a new addition part of the house. And I can recall so well, I did not want to leave my wife because she was still sobbing and crying. And, again, I had -- you know, you obviously want to react and go help your wife. But I -- I didn't. I knew that was not going to help.

So he took me into the larger room. It's a very large room, about a thousand square feet with large ceilings. He took me up the stairs, put me in the chair in front of my Mac -- Apple Mac. Told me to turn it on and to log into my Coinbase account.

My hands, again, were tied like this (indicating). It was hurting very much. And, you know, you can't -- I couldn't -- I couldn't type with my hands like this (indicating). You have to have them like this (indicating). And so I kept telling him, "I -- I -- you know, I just can't do this. You're going to have to cut these zip ties off." And he eventually did do that.

But I -- I just remember how completely confused I was. I had all of my -- I sort of blend high-tech and -- and very old-fashioned filing techniques. And I had a lot of my passwords and things in -- in manila folders, so I was trying to get those. And, of course, he kept threatening me. And -- and most of the time during this hour and half from 7:30 till 9:00, he had a gun either at my temple or at my forehead, or he had it out, waving it around.

He again -- the very beginning, when we were up into the loft area where -- in front of my Mac, he repeated what he said downstairs. I will cut your dick off. I will cut your fingers off and your toes and let you slowly bleed to death and then I will throw your body over the loft.

So I somehow -- I -- I really do not know how, I -- I managed to get onto my Coinbase account. And once I got into that, he nudged me to the -- to my right, away from the stairs, and he then started typing. I'm not sure where in all of this he then called someone. He had a cell phone and he called them. And so they -- they seem to be sharing coding or some kind of information. And I remember it -- it didn't seem to be going well. I mean, ten minutes into this, and -- and they were -- you know, you could tell they were really upset because they hadn't started to -- I could see the amount. It was, like, 230 -- $237 or $238,000 was the balance. And after ten minutes it was still that. So I didn't know if that was good or bad.

And then eventually after they kept going back and forth, I started -- I -- I saw that it started draining. And they -- they both -- the -- the larger and the smaller guy called each other the same name, Carlos.

But eventually it started -- it started going down. And I -- after that, I remember we must have been up there I would say 45 to 50 minutes up in the loft area. And so I was in my chair and pushed to the right. And -- and toward the end, I really started feeling like I was either going to pass out or throw up.

And I remember just shaking and I was profusely sweating. And he said to the guy -- I'm not sure if this is

exactly correct -- he said this -- either he said old fucker or this old man is going to have a heart attack or a stroke. We've got to get this -- we've got to finish this. And the other -- the smaller guy kept yelling that. He kept saying, "She's got to be at her school by 9:00 or they're going to know something's up." That was not the case.

Oh, the other thing, he also kept talking about another crypto exchange called Gemini. He was really obsessed with that. And I couldn't get onto that. I just didn't know how to -- I didn't know where my password was. And I -- as you can imagine, I was just really addled. And -- but he -- he sort of dropped that after mentioning it three or four times. The Coinbase account was the -- was the biggie.

So eventually --

Q. Mr. Prim, let me -- let me take you back to around 7:30 when you first --

A. Uh-huh.

Q. -- answered the door. You're the one that answered the door?

A. Yes.

Q. If you'll describe what the two individuals were wearing again?

A. They -- they looked like these swimming goggles, which was really strange. And -- and then they had these orange-yellow, you know, very bright colored vests that you see

construction people wearing -- wearing obviously. You know, so people won't hit them.

Q. Could you see their faces?

A. No, that was the other strange thing. They had these goggles on, and -- and then I -- I -- I could see they were dark skinned, but I -- I couldn't see any real details, yeah.

And -- and the one guy, the larger guy, the guy who was with me, had a -- a baseball-type cap on, and it had a fish, a big fish, and it said -- I think it said, "Bass," yeah.

Q. The reflective --

A. Uh-huh.

Q. -- vests --

A. Yes.

Q. -- do you remember if those had sleeves or not?

A. I -- I really don't. I -- I'm not sure.

Q. When you come to the kitchen after you hear your wife scream --

A. Uh-huh.

Q. -- at what point do you realize that the -- the larger man is armed?

A. Well, comes out. He may have event- -- he may have initially had his black -- a standard gun. Then the other guy, which had a -- what looked like a toy gun; it was colored. So, quickly, I -- he had a gun and he -- he waved it around and threatened me.

I don't remember -- he obviously had the gun, so he may have come out -- as I recall it, he came out and immediately he hit me.  He just hit me.  And my glasses fell off.  Fortunately, they didn't break.  And strange, it -- it -- it hurt, but it -- just all this blood all over the place.  That's what I remember.

Q.  Okay.

Do you remember what color gun the larger man had?

A.  It was black.

Q.  Okay.

Do you remember what color gun the smaller man had?

A.  I -- I think it was, gosh, like, purple or char- -- no, not chartreuse.  More like purple or pink.  Something like that, maybe.  I mean, it wasn't totally that, but it was a combination of that.  Like, the handle may have been that color, pink or purple.

I mean, at first, I -- I said, it looks like a toy.  Which, you know, I assumed that both of them were loaded and real.  But it -- it didn't -- I mean, I don't keep up with guns, so I didn't -- I don't know.  That's what it looked like.

Q.  So you described your office.  Are there windows in your loft office?

A.  Yes, the house -- the -- the addition, it's just got large, gigantic windows.  The -- the room is just flooded with light.  And he did allude to that several times about, you

know, too many windows here. People are going to see us. Yeah, there are lots of windows.

Q. So if you'll describe for us what he said to you immediately after he struck you, the larger man, in the face?

A. Well, he struck me. And then I said to him, "Why did you do that?"

And he said, "To let you know I mean business, you fucker. We're here to get your Coinbase account money."

And that's when he then started threatening me with his -- what I call HBO language.

Q. Okay.

What's Coinbase?

A. Coinbase is a cryptocurrency exchange in San Francisco. It's the largest in this country, so you can purchase Bitcoin and -- and many thousands of other cryptocurrencies, which you can use to buy things or to invest in.

Q. How long have you been investing in cryptocurrency?

A. Seven years. Well, almost eight now.

Q. At the time of the incident you're describing, what are some of the types of cryptocurrency coins you held?

A. Bitcoin, Ethereum, Cardano. The list goes on and on. I have probably 150.

Q. And the approximate value of your accounts at that time was what?

A. It was about 238,000.

Q. Through Coinbase, did you use any products that produced interest for you?

A. Yes, there's -- there's a mechanism called staking where you can make interest off of the coins that you earn, but you -- you basically hold them just like a bank. Bank -- you know, you give the money -- the bank your money and they use it until you want it back. And same thing in -- in cryptocurrency, to some extent. Stak- -- staking is like lending it out, and so you do not have access to it for a while, but you're making often large interest on it.

Q. And you described Coinbase as a custodial cryptocurrency account; is that correct?

A. Yeah.

Q. A custodial exchange?

A. Yes, that's correct.

Q. And does that mean that they hold the cryptocurrency?

A. That is correct, yes.

Q. Did you have cryptocurrency in any other accounts at the time of the incident?

A. Yes, I had it in Gemini and crypto.com. Actually, I had it in an Israeli account called Binance, or another one, too, but they -- they went out of business and I actually did get the money back.

Q. Are those custodial cryptocurrency exchanges as well?

A. Yes, they are.

Q. So when you were upstairs as this individual is accessing your computer, what did you observe or hear?

A. Well, I mean, it was obvious -- I drew this conclusion, that he was talking with a -- with a guy who was really savvy about high-tech. And, you know, they were obviously -- had means of getting into my account.

And so that's -- that was the main thing. They kept talking back and forth. And he would -- I have some whiteboards in my loft area; he kept writing a few things up there.

And, again, they just -- it -- it was obvious that they had their own little way of getting into my -- and account, and then draining it. I assume they were sending it to other accounts somewhere, or their own hard wallet, if they had one. I -- I wasn't sure, of course, what they were doing specifically.

But I did see that 238, or something like that, it was -- held steady for about 20 minutes and then it started going down precipitously until it got -- I think it was 100 -- they took $155,000 out.

Q. This is your Coinbase account?

A. Yes.

Q. And as far as what you have to provide access to, did -- did you log into your -- did you have to put a password

into your computer?

A. Oh, yeah, I did.

Q. Okay.

A. Yeah.

Q. And -- and then what?

A. Well, and normally if you have the two-factor authentication code, then you have to do that. But, you know, I guess I'm used to that. I -- I'm so addled. I do remember at first he wanted to do it all on my iPhone, but because my face was swollen, it wouldn't -- the face recognition wasn't working.

Q. Explain -- explain that.

A. Well, when you go into an account, you put in -- initially you basically take photograph, so the high-tech stuff, you know, basically has all the little contours of your face. And if it's you, that is based on your -- all the topography, then it lets you into the -- into your account.

But since I was not -- my face was all swollen, it wouldn't let me. So it denied that access. And that's when we went to the Mac. But I think he wanted me to get into the Mac anyway. I mean...

Q. Who was holding the phone when you were trying to unlock it with face ID?

A. The larger guy.

Q. Okay.

So he had your phone and he was holding it up to your face?

A. Oh, yeah. Yeah, he kept -- again, he would threaten me and -- yeah, he -- he would -- he would wave it around when he wasn't talking or he would come over and point it to my face or point it to my forehead or to my temple.

Q. What would he point?

A. His black gun.

Q. Okay.

When he -- did he touch your forehead with it?

A. Well, the gun -- the gun touched my skin at -- at times, yes.

Q. Okay.

A. It was in contact. I thought twice he was going to kill me. I mean, I felt it in my gut.

Q. So once you're logged into the -- your Mac computer --

A. Uh-huh.

Q. -- you said you put a password in for that. Do you then log into your Coinbase account?

A. Yeah, I use a user ID and a -- a password, and I -- I probably did use the two- -- two-factor authentication code, but I'm not sure. What they'll do is, they'll send you a -- they'll send you a -- a number, a code, a six-digit code to your e-mail account.

Q. Okay.

A. And that's probably how I got in, yeah.

Q. When you were moved -- when he took control of your computer --

A. Uh-huh.

Q. -- describe how you were sitting.

A. Well, I was in this large chair somewhat like this and -- and, you know, from the time that he was talking with this other person, and I was over there, I -- I was just sitting there. I -- I mean, I would look over and I could see the -- the numbers, you know.

And -- but I remember toward the end, I really -- I was just a mess. I mean, I was just sweating profusely and shaking. And -- and then once it was -- I mean, once I could tell that he was about to end it, again, when I thought he was going to kill me, that's when my wife -- the smaller guy brought my wife into the addition. And I had my hands -- well, he -- he cut them loose initially so I could type.

Q. What did he cut?

A. The zip tie.

Q. Okay.

A. Yeah, the black zip tie.

And then toward the end -- he gave me some water. Isn't that nice? He gave me water once as -- as I was shaking and he thought I was going to have a stroke or heart attack.

Q. When you were sitting next to him --

A. Yes.

Q. -- do you recall if you were zip tied at all at that point?

A. Oh, yes. My -- my ankles certainly were. They were very tight. Very tight. And they -- my wrists were very tight the whole time when -- when they were zip tied.

Q. When would have your ankles been initially zip tied?

A. I don't think he zip tied those because I had to walk from the kitchen all the way up to the loft area. I don't think he zip tied those until I sat down in the chair in front of the Mac.

THE COURT: All right. Mr. Prim, give me a minute. I need to take a matter up with counsel.

Ladies and gentlemen of the jury, I'm going to ask you to step back to the jury room for just a minute. The jury's excused.

(Jurors exiting the courtroom at 3:40 P.M.)

THE COURT: So Juror Number 5 is struggling to stay awake, which is a little bit surprising with the nature of the testimony that's offered. I think it might be one of those things where, you know, you eat lunch and you come back and you hit a little down period. He's coming in and out, but I wanted to get him out for a minute, hopefully to wake up. But it's something we'll have to keep an eye on.

Anybody -- I mean, I don't know if anybody else noticed this.

MR. IVERSON: Yeah, I think I heard it. It is early.

THE COURT: Yeah. We'll see how we get along.

All right. We'll just be at ease for a few minutes.

(Off the record at 3:41 P.M.)

(On the record at 3:52 P.M.)

THE COURT: Bring the jury back in.

(Jurors entering the courtroom at 3:52 P.M.)

THE COURT: All right.

Mr. Iverson, you may resume.

MR. IVERSON: Thank you.

CONTINUED DIRECT-EXAMINATION

BY MR. IVERSON:

Q. Mr. Prim, do you recall whether either of the individuals that were inside your house were wearing anything on their hands?

A. They had gloves.

Q. I'm sorry. I couldn't hear you.

A. They wore black gloves.

Q. Both of them?

A. I didn't see the smaller man as often, but I'm pretty -- I -- I can't swear that he did, but certainly the larger man that I was with did.

Q. When you were upstairs with the larger man, could you

see his face?

A. No, I mean, I could see he was dark skinned, but I couldn't see easy enough to identify him.

Q. Why not?

A. Well, he had a mask. I mean, it was basically covering -- I could see his eyes, and that's enough. I mean, I could tell that he had dark skin, but he had some type of mask on.

Q. When you were upstairs, could you hear your wife at all?

A. Initially I did, yeah. I -- I could still hear her screaming occasionally and pleading with him, but that only -- that -- that -- that ceased pretty quickly.

Q. Did the smaller man ever say anything to you?

A. Yes, a couple times. Twice, in fact. He seemed very rough with me as opposed to what appeared to be a -- despite his initial throwing her down and kicking her -- well, she told me this later. Yes, he --

Q. Well, let's not say that.

MR. DOORASAMY: Objection.

THE COURT: I'll sustain. Next question.

BY MR. IVERSON:

Q. Mr. Prim, I want to know, the smaller man, what, if anything, he said to you.

A. He threatened me also, but they were very -- just

little tiny snippets in the -- in the kitchen.  And he came upstairs once to see how the other guy, the larger guy, was doing.  And -- and he -- it's, like, he just came over and stuck the gun to my forehead and HBO language again.  I will kill you if you don't do what he says.

Q.   Did there come a time when you -- when you left the loft?

A.   Yes.

Q.   Will you describe how that happened?

A.   Yes.  Right as we were leaving, that is, he indicated that they -- they were finished.  He took our two cell phones and it was actually quiet.

Q.   Are you upstairs or downstairs?

A.   Upstairs in -- in the loft.

Q.   Okay.

A.   Yes.

And this was for toward the end.  They had finished as much as they could get out of the -- out of the Coinbase account.  And then he took our two phones, and it was very impressive because he took them and just hit them over his knee and -- and they cracked.  And, you know, it's pretty impressive to take these little phones and -- and -- and to do that.  So...

Q.   Did you observe him break anything else?

A.   He broke the Mac.  He tried to break it, and he did

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

break it.  There was some glass on the table.  It's a large table.  So he did that initially.

Q.  Will you describe how he did that?

A.  He just threw it down on the table.  And so he broke -- I -- I saw him break the two iPhones with -- on his knee.  They were shattered and bent.

And then I saw him also take the Mac, throw it on the table.  Later, he would throw it over the loft and demolish it much more.

Q.  Okay.

And how did you get from the loft to downstairs, if you'll describe that.

A.  He put the -- he cut the ankle black -- the -- the...

Q.  Zip tie?

A.  Zip ties, yes.

And so I -- I just walked downstairs.  But, you know, I -- so I walked downstairs and then my wife came from the other room with the -- with the smaller guy with her and they took us into the new addition bathroom.

And then they put the zip ties around us, that is, both our ankles and our wrists; so there were four zip ties then around us.  They were very tight.

The smaller man, I remember, took one of the iPhones and put it in the commode, and the other guy said, you know, some derogatory comment, like, you cannot flush that down the

commode or something. And took it out and sort of tried to get some water off of it. Yeah, I -- I...

Q. And then what happened after they placed you in the bathroom with your wife?

A. They closed -- they closed the door and I could hear them leaving. And I said, let's wait five minutes. And then I slowly opened the door and didn't hear anything, didn't see anything.

And so I said, I'm going to get on my hands and knees and, you know, edge into the kitchen. So I did. I just got on my hands and knees and with the Ziploc -- the zip ties around me and managed to get to the -- on the way up to the steps, I had to turn around a little bit and go down.

So I got there. By the time I got to the kitchen where the -- there was some scissors in -- in one of the drawers, my wife had gotten -- I'm not -- I guess she had gotten her feet -- she had gotten out of her -- the feet zip ties and so she was able to get the scissors and cut them for me.

So then both of us just walked out of the house. I was amazed that there was no destruction. Nothing was -- you know, was ransacked.

Q. Where'd you go?

A. We went outside and went next door to the neighbor's, knocked on her door, and she came. And then another neighbor

came out and called 9-1-1. And within five or ten minutes, there must have been six or seven cops there, and the ambulance came too.

Q. Did you incur any injuries from this home invasion?

A. I had nine stitches put in my mouth, yes.

Q. Where in your mouth?

A. In the upper part of my mouth, yeah. I think there were eight inside and one outside.

Q. Did you observe any injuries to your wife?

A. Yes, she had a hematoma. She had a big -- big knot bleeding on -- on her head. And then they would find out she had three broken ribs and her tailbone was -- was fractured.

Q. Did you receive any medical care?

A. Oh, yeah, we immediately from -- we -- we walked out of the house at 9:00, and by 9:30 or quarter till 10:00, we were in an ambulance going to Duke emergency room. We went in as aliases. We didn't have a -- we didn't use our name.

Q. I'll stop you there.

A. Yeah.

Q. How long were you at Duke?

A. Until 4:00.

Q. Okay.

I've got in my hand what are marked as Exhibits 1A through 1U --

A. Uh-huh.

Q.    -- for identification.

MR. IVERSON:  Can I hand these to the witness, Your Honor?

THE COURT:  You may.

BY MR. IVERSON:

Q.    Will you take a look at these, please?

A.    Sure.

Q.    Do you recognize those?

A.    I do.

Q.    What are those?

A.    Our house.

Q.    Are those fair and accurate images of your house?

A.    They are.

Q.    Are they taken immediately after the home invasion you just described?

A.    Yes.

MR. IVERSON:  I would offer the exhibits into evidence at this point, 1A through 1U.

(Government's Exhibit Numbers 1A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, R, S, T, and U were offered.)

MR. DOORASAMY:  No objection, Your Honor.

THE COURT:  Government's Exhibits 1A through 1U are admitted.

(Government's Exhibit Numbers 1A, B, C, D, E, F, G, H, I, J, K, L, M, N, O, P, Q, R, S, T, and U were admitted and

made a part of the record of this proceeding.)

MR. IVERSON: Ms. Collins, if you'll display 1A.

BY MR. IVERSON:

Q. Mr. Prim, can you see Exhibit 1A on the screen?

A. Yes, it's the front of our house.

Q. Say what it is again one more time.

A. It is the front of our house on ███████████.

THE COURT: Ms. Collins, 1B, please.

BY MR. IVERSON:

Q. What does this depict, Mr. Prim?

A. That is the first room you enter of the house from the front. It's where we eat. I don't know what you might want to call it, but that's -- that's the first room you enter from the front.

Q. And your -- your front door, where you first encountered the individual you described --

A. Yes.

Q. -- where is it in relation to this picture?

A. It's to the left. As you're looking at it, to the left.

MR. IVERSON: Ms. Collins, 1C, please.

THE WITNESS: Yeah, that's the table we -- where we eat, and those are the zip ties.

MR. IVERSON: 1D, please, Ms. Collins.

THE WITNESS: Yeah, zip ties.

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

MR. IVERSON: 1E, please.

BY MR. IVERSON:

Q. What are we looking at here, Mr. Prim?

A. This is from -- you can see the bedroom on the right, so I was in bed when I heard the knocks. And then when I went back to go to sleep.

So I hear all the screaming, and so I come from that bedroom on the right through that door into this entering room and then go into the kitchen.

So my wife was on the left of that centerpiece in the -- in the kitchen, and that's where he was throwing her down and kicking her.

Q. Okay.

A. And I was sort of standing to the right side of that centerpiece.

MR. IVERSON: 1F, please.

THE WITNESS: Yeah, that's just another view of the kitchen and the centerpiece. You can see, I can see, stains on the --

BY MR. IVERSON:

Q. There's some more pictures.

A. Okay.

MR. IVERSON: If you'll show 1G, please.

THE WITNESS: Yeah, that, I assume, is the blood from my wife.

BY MR. IVERSON:

Q. Why -- why do you think that?

A. That's where she was. The guy was on the left side of the center isle, and that's where she was screaming and that's where he was throwing her down and kicking her. And you can see blood.

MR. IVERSON: Let's go to the next one. Next exhibit, please.

BY MR. IVERSON:

Q. This is 1H.

A. Uh-huh.

Q. What do you see here, Mr. Prim?

A. I see blood on the right. That's the blood, I assume, that came from my face.

Q. Where were you standing when you were punched in the face?

A. I was standing about between the isle -- the -- the center isle in the kitchen and that black chair where the wine is, that area there. And he comes out of that room. You can see that library area where that snail, which is a door.

Q. Is that the door on the right side of the picture?

A. Yes, that's where the -- that's where he comes out of there and just whams me. Yeah.

MR. IVERSON: Next picture, Ms. Collins, please.

BY MR. IVERSON:

Q.   This is 1I.  Mr. Prim, what do you see at 1I?

A.   There was a glass -- a small glass, I believe, on the counter there on that isle, center isle, and in -- in all the ruckus, I think it fell over.  And there's some water there too.  There must have been some water in there.

MR. IVERSON:  1J, Ms. Collins, please.

THE WITNESS:  And that's looking into the new addition from the kitchen area.

BY MR. IVERSON:

Q.   Is this going away from the kitchen?

A.   This is going away from the kitchen into the new addition, which is where the loft is.  Yeah.

MR. IVERSON:  Next exhibit, Ms. Collins.

THE WITNESS:  That's into the loft --

BY MR. IVERSON:

Q.   IJ?

A.   -- you can also see the -- I can see the Mac on the floor there.  And the loft is, obviously, to the right.  And the bathroom, which we would -- eventually we went to is down there.

Q.   The bathroom you eventually went to --

A.   Yes, to the right of that red circular piece.

Q.   You mentioned windows earlier.  Are these some of the windows you were describing?

A.   Yes, those two large windows there.  They're -- I

think they are 6 or 7 feet long and 4 feet wide.

Q. Okay.

Are there any blinds or shades on --

A. No --

Q. -- those windows?

A. -- there's nothing. Nothing on them. So it's totally exposed. And then there are two large windows, three large windows up in the loft area.

MR. IVERSON: Next exhibit, please.

BY MR. IVERSON:

Q. This is 1L. What does this -- this depict, Mr. Prim?

A. That's the Mac that was used to get into the account. And it was not broken sufficiently, I assume, on the table, so it was thrown over.

Q. Did you see that happen?

A. No, I did not see it. I heard it. Did not see it.

Q. Where were you when you heard it?

A. In the bathroom.

Q. What did you hear?

A. I heard a big thud. You know?

MR. IVERSON: 1M, Ms. Collins.

THE WITNESS: Yeah, that's the loft area.

MR. IVERSON: 1N, Ms. Collins.

THE WITNESS: Same thing. Loft area.

So you can see that blue chair. So I was sitting

there. And that's about the position it was in where I was sitting most of the time. And he was -- he was in the foreground.

BY MR. IVERSON:

Q. Would that be between where you were sitting in the chair and the stairs?

A. Yes, that's correct.

Q. Okay.

And you had just mentioned some other windows in the loft office. Are those displayed here?

A. That's correct, yeah. There's actually -- yeah, you can't -- there are two there. Yeah, that's it. But there's also a door out -- going out onto a deck that's also totally a window.

Q. Okay.

And do any of those windows have blinds --

A. No.

Q. -- or shading?

A. No, they do not.

MR. IVERSON: Next exhibit, Ms. Collins.

THE WITNESS: Yeah, that's the -- the north side of the desk, you might say, and the filing cabinets. Although that's not the filing cabinets I was alluding to earlier. But that's just where he was going back and forth from that area to --

BY MR. IVERSON:

Q. Do you see anything sitting on the white filing cabinet?

A. Yes, the red book. Yeah, he -- I do not know if it was the larger -- I think it was the smaller man who, toward the very end, said, let's take this. It's probably worth a hundred bucks or something. And then he started asking me about where I had a safety deposit box and other valuables. And I just said, we don't have any. We do not have any of that.

Q. Okay.

Do you see anything sitting on the red book?

A. Yeah, I do, a zip -- a zip tie.

Q. Thank you.

MR. IVERSON: Next photo, Ms. Collins.

That's 1P.

Next photo, Ms. Collins.

BY MR. IVERSON:

Q. 1Q. What does 1Q show, Mr. Prim?

A. It shows some of the glass that came from the screen of the Mac. Yeah. And then you can see the mouse in the...

MR. IVERSON: Ms. Collins, will you zoom in on the mouse?

THE WITNESS: That's the bathroom we were taken into. You can see where the iPhone's on the floor.

MR. IVERSON: I'm going to have Ms. Collins zoom in on the mouse, here.

THE WITNESS: Blood. I see blood.

BY MR. IVERSON:

Q. Okay.

Whose blood is that?

A. It's my blood.

Q. What usually sits on this desk, if anything? Where's the glass from on the desk?

A. Well, the glass is from the -- from the screen of the -- of the Mac.

Q. Okay.

So this is where the Mac would normally sit?

A. Yes, exactly.

MR. IVERSON: Next exhibit, Ms. Collins.

BY MR. IVERSON:

Q. This is 1R. What is 1R, Mr. Prim?

A. This is the bathroom where they took us at the very end.

MR. IVERSON: Next exhibit, Ms. Collins.

BY MR. IVERSON:

Q. What is this, Mr. Prim?

A. That's the bathroom. You can see the two iPhones. You can see that they're -- the one in the foreground is curved a little bit. It's shat- --

MR. IVERSON: Next --

A. -- very shattered.

MR. IVERSON: Next exhibit, Ms. Collins.

THE WITNESS: Yeah.

MR. IVERSON: Next exhibit, Ms. Collins.

BY MR. IVERSON:

Q. What's this room?

A. That's the -- my wife's bathroom. It's the bathroom right off from the bath -- from the bedroom.

Q. Okay.

So it's a different bathroom?

A. Yes, there are three -- three bathrooms.

Q. Is that chair usually there?

A. No.

Q. Okay.

Do you see any red on the floor?

A. I do.

Q. Is that usually there?

A. No.

MR. IVERSON: Your Honor, I'm going to hand Mr. Prim what I've marked 26I for identification.

BY MR. IVERSON:

Q. Do you recognize this?

A. I do. It's my driver's license.

Q. Fair and accurate image of your driver's license?

A.  Yes.

Q.  Okay.

MR. IVERSON:  Offer 26I into evidence.

(Government's Exhibit Number 26I was offered.)

MR. DOORASAMY:  No objection.

THE COURT:  Okay.  No objection?

Government's 26I is admitted.

(Government's Exhibit Number 26I was admitted and made a part of the record of this proceeding.)

MR. IVERSON:  Can we publish that to the jury, Ms. Collins?

BY MR. IVERSON:

Q.  I'm going to hand you what I've marked 3A and 3B for identification, as well as Exhibit 2, but we'll start with 3A and 3B.

If you'll look at 3A and 3B; do recognize those?

A.  I do.  That's me.

Q.  What do they depict?

A.  A mouth that has been bruised badly.

Q.  Is it the injury you just described from the home invasion that you've been discussing today?

A.  Yes, that's the manifestation of it.

MR. IVERSON:  I would offer 3A and 3B into evidence.

(Government's Exhibit Numbers 3A and B were offered.)

THE COURT:  Any objection?

MR. IVERSON: If you'll hand me those.

THE WITNESS: Sure. All of them?

MR. IVERSON: Just the top, please.

THE WITNESS: Just the top. Okay.

MR. DOORASAMY: No objection to those pictures.

THE COURT: 3A and 3B are admitted.

(Government's Exhibit Numbers 3A and B were admitted and made a part of the record of this proceeding.)

MR. IVERSON: Ms. Collins, if you'll display 3A.

BY MR. IVERSON:

Q. If you'll direct us to where the injury is, Mr. Prim?

A. Well, you can see my lip is swollen, and then there is a -- I don't know if they're stitches, but they look like they're stitches, yeah, right above the lip.

MR. IVERSON: And if we could publish 3C, Ms. Collins.

THE COURT: 3C?

MR. IVERSON: 3B.

THE WITNESS: Yeah, same thing.

BY MR. IVERSON:

Q. And if you'll look at Exhibit 2A for identification. It's one of the --

A. Oh.

Q. -- pieces of paper I handed you.

A. 2A.

THE COURT: 2A or 2?

MR. IVERSON: It's just 2.

THE WITNESS: Oh, 2. Yes, this is the one of -- yeah, that's...

BY MR. IVERSON:

Q. What is it?

A. That is a picture of my wife and myself and our neighbor right after we walked out of the house at 9:00. So probably about 9:10 or something.

Q. Is that a fair and accurate depiction of you at that time?

A. Correct, it is.

MR. IVERSON: I offer 2 into evidence.

(Government's Exhibit Number 2 was offered.)

THE COURT: Any objection?

MR. DOORASAMY: No objection.

THE COURT: Two's admitted.

(Government's Exhibit Number 2 was admitted and made a part of the record of this proceeding.)

MR. IVERSON: Will you publish 2, Ms. Collins?

BY MR. IVERSON:

Q. Would you identify the people in this photo, Mr. Prim?

A. That is Michael Prim on the right; that's my wife, Carrie Benoit Salemi; and that is our neighbor, Christa

Alexander, on the far left.

Q. Okay.

Neighbor on the far left, and your wife's in the middle?

A. Yes.

MR. IVERSON: If you will give me one moment.

No further questions, Your Honor

THE COURT: Cross-examination.

MR. DOORASAMY: Thank you.

CROSS-EXAMINATION

BY MR. DOORASAMY:

Q. Good afternoon, Mr. Prim.

A. Good afternoon, sir.

Q. I am sorry that you had such great ordeal on the night of this -- on the day of this fateful event as you describe.

Now, you testified that you are -- you were a physics schoolteacher?

A. Yes, sir.

Q. How many years did you teach physics?

A. I taught physics 25 years.

Q. Okay.

A. I taught 31 years total.

Q. One of the photographs that the Government had shown was of a book, calculus book, still on your desk; is that

Stacy Harlow, RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

correct?

A. Correct.

Q. Okay.

I raise that because the calculus book raises a lot of fears in the minds of a lot of students.

So my understanding is, you were a very experienced schoolteacher in physics; is that right?

A. That is correct.

Q. And on the day of this ordeal, you had a chance to be next to the small and the big guy that was in your house, as you described them; correct?

A. A chance?

Q. Well, were you close to them?

A. I was.

Q. Now, how much of the time did you spend with the big guy or the larger guy, as you described him? From the moment they entered the house until they left.

A. I spent probably an hour and a half, approximately.

Q. Okay.

And for that entire time, you were with the larger guy; is that correct?

A. That is correct.

Q. And you testified that he had zip tied you while you were with him at your computer; is that correct?

A. Yes, sir.

Q. Now, were you present when your wife was interviewed by a police officer?

A. I may have been there. I'm not sure I heard it.

Q. Do you know if your wife ever told the police officer --

MR. IVERSON: Objection.

THE COURT: Sustained.

MR. DOORASAMY: Okay.

BY MR. DOORASAMY:

Q. Now, did you make a statement to the police officer on the day of the incident?

A. If they asked me questions, I answered them, yes.

Q. Did you tell them that 250,000 U.S. dollars was stolen from you?

A. No, I may have said that was insurance that covered up to 250,000.

Q. Now, you mentioned insurance. You paid about 29.99 a month for insurance on Coinbase; is that correct?

A. Yes, sir.

Q. So did you recover all of that --

MR. IVERSON: Objection. Relevance.

THE COURT: I'm going to sustain.

MR. DOORASAMY: I would like to be heard, Your Honor.

THE COURT: Let me see counsel up here.

(Beginning sidebar.)

THE COURT: Okay. What's the relevance of the insurance recovery?

MR. DOORASAMY: He got his money back.

THE COURT: I'm sorry?

MR. DOORASAMY: He got his money back. Not that that makes a difference to the case, but I think the jurors need to know.

THE COURT: I -- I don't see how that's relevant. That doesn't undo the fact of the crime.

MR. DOORASAMY: No, it does not. I agree.

THE COURT: I'll -- I'll sustain.

MR. DOORASAMY: Okay.

(End of sidebar.)

THE COURT: That objection is sustained. The jury will disregard it.

BY MR. DOORASAMY:

Q. How many times did the police talk to you about this case?

A. I can't give you a specific number. Constantly, though.

Q. Four? Five? Ten times?

A. At least.

Q. Did they, at any time, show you photographs of any persons that may have inv- -- broken into your house?

A. No.

Q. Okay.

Now, earlier on, I was asking you about the larger guy that you spent over an hour and a half with --

A. Not over, an hour and a half.

Q. An hour and a half?

A. Yes, sir.

Q. And when the larger and the smaller guy left your house, is it correct that, at that time, you were placed in the bathroom?

A. No.

Q. Where were you before they left?

A. We were in the bathroom.

Q. Okay.

But did they bring you to the bathroom?

A. Sir?

Q. Did they bring you to the bathroom --

A. They certainly did.

Q. Okay.

But that's the first time you and your wife were together when they were not with you; is that correct?

A. That is the first time I was with my wife after the larger guy exited me from the kitchen and he was -- she was still screaming when I left her.

Q. Okay.

You had never -- you was never taken out of your

house -- correct? -- for the entire ordeal?

A.   That is correct.

Q.   Okay.

And do you remember telling the police that the bigger guy was, like, 6-1 and a big guy.  Those were your words that you used.

A.   I may have said he was in that range.  I said that I tried to gauge his height.  I really couldn't, but I suspected he was somewhere between 5-10 and 6 feet.

Q.   Okay.

But you told the officers 6.1 --

MR. IVERSON:  Objection.

THE COURT:  I'll sustain.

MR. DOORASAMY:  Okay.

BY MR. DOORASAMY:

Q.   You also testified that there was a third person involved by telephone; is that right?

A.   That is correct.

Q.   Okay.

Now, you described that individual that you didn't see as a tech savvy person; is that right?

A.   Based on speed with which he was speaking, I could only hear it vaguely.  I could not identify a -- any kind of accent.  He seemed that way.

Q.   And it was --

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

A. That was my initial impression.

Q. Sorry.

And it was his actions on your computer that eventually led to crypto being taken out --

A. I can't -- I can't speak for that. I don't know all the mechanisms involved.

I do know that it appeared that this third person was the individual involved in actually transferring the money or the -- the main person involved in understanding the high-tech and to enable the larger guy to hit the keys the way he did to get the money out.

Q. Okay.

But you don't know who transferred the money, whether --

A. No, of course not.

Q. -- the guy on the phone or --

A. I do not.

Q. Do you know that?

A. I know he was talking to a third guy. That's all I can tell you.

Q. Okay.

You testified that they were struggling because, at some point, you noticed the money was still in your account and there was some conversation going on and then eventually the money started -- the crypto started going out; is that correct?

That's what you testified.

A. I testified that it took a long time for there to appear to be any initial money coming out of the account. Once it started going, it went pretty quickly. That's what I said.

Q. Do you recall telling the police that you were asked by the third person on the phone to download AnyDesk on your computer?

A. I think that is the case.

Q. So did you download AnyDesk on the instructions of the third person on the phone?

A. I -- I never heard the third person. He never talked to me directly on the phone. No, I did not have any -- any communication with a third person.

Q. So after you downloaded AnyDesk, did the third person take over your --

A. It appeared --

Q. -- computer?

A. Yes, it appeared that way.

Q. Okay.

Now, do you recall telling the police that three to four years ago you had AnyDesk on your phone three to four years before this incident. Do you recall that?

A. I may have said that.

Q. And do you recall you told the police that a friend of yours came and removed it from your computer?

A.    He was not a friend.  I paid him to do it.

Q.    Okay.

A.    He was an expert, a Ph.D.

Q.    All right.

Do you also recall that prior to this incident on April 12th, you were having some problems with text messages telling you, you need to change your password and your e-mail?

A.    That is true.  I probably should have taken action.

Q.    Do you know who sent those text messages to you?

A.    No idea.

Q.    Did you change your passwords?

A.    I did constantly.

Q.    Okay.

Did you have problems with your e-mail?

A.    Not problems with my e-mail, no.

Q.    Did you have problems with your virus software?

A.    Not that I was aware of.

Q.    Do you remember telling the police that you had just downloaded the virus software and you was asked to change the password on it?

A.    Repeat your question, please.

Q.    Okay.

Do you recall telling the police that strange things were happening before the incident at your house?

A.    Yes, I did say that.

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

Q.   One of the issues was you were receiving text messages to change your password --

A.   That is true.  That is true, yeah.

Q.   Is that true?

A.   Yeah.  Yeah.

Q.   And you also told them that you had just downloaded new virus software and you got an e-mail saying you needed to change your password on that.

A.   I got a text from that.  I was naïve --

Q.   Okay.

A.   -- and took it -- took -- I should not have answered those texts.

Q.   And all of this happened how long before the incident at your house?

A.   I don't know.

Q.   Weeks?  Months?

A.   I don't know.

Q.   Did --

A.   I had problems with the EarthLink account for -- for months.  I should have taken action on that, but I didn't.

Q.   Okay.

Do you know a person by the name of Rick that comes to your house?

THE WITNESS:  Do I have to answer that?

THE COURT:  There's no objection, so yeah.  If you

know a person named --

THE WITNESS:  I do, sure.

BY MR. DOORASAMY:

Q.  Okay.

And does Rick drive a black Chevy SUV?

A.  Not the Rick I know.  He doesn't drive.

Q.  Okay.

Do you know if any person told police that there was a black Chevy SUV --

MR. IVERSON:  Objection.

THE COURT:  Yeah, that seems like hearsay. Sustained.

MR. DOORASAMY:  Okay.

Just give me a second, Your Honor.

BY MR. DOORASAMY:

Q.  Now, you testified you had a Coinbase account; correct?

A.  Yes, sir.

Q.  Now, where is Coinbase based?

A.  San Francisco.

Q.  Okay.

And you also had crypto in Binance; is that correct?

A.  I did.  They closed down.  They went bankrupt.

Q.  Okay.

When was that?

A.   I don't remember.  Years ago.

Q.   Okay.

After this traumatic incident, you went to your neighbors'.  You didn't call 9-1-1.  Why?

A.   You're a human being?  I was just assaulted, sir.  I had a gun to my head for an hour and a half.  I responded very appropriately, I think.

I didn't have a phone to use, first of all.

Q.   Okay.

A.   It had been destroyed.  So I went outside and I went to a neighbor's house.

Q.   Okay.

MR. DOORASAMY:  I have no further questions for this witness.

THE COURT:  Redirect?

REDIRECT EXAMINATION

BY MR. IVERSON:

Q.   Mr. Prim, once the individuals who were in your house were able to access your Coinbase account, what was asked of you?  Where were you?

A.   Well, I had been pushed to the side of -- of where the Mac was, so I --

Q.   Did --

A.   -- was in the blue chair, sitting in there.  And that's when I really started feeling sick.

Q.   Okay.

Approximately how long were you in that chair?

A.   Fifty minutes.

Q.   How many?

A.   Fifty minutes.

Q.   5-0?

A.   5-0.

MR. IVERSON:  No further questions.

THE COURT:  Anything further?

MR. DOORASAMY:  No.

THE COURT:  You may step down, sir.

(End of previously filed excerpted testimony.)

THE WITNESS:  Thank you.

THE COURT:  Let's get started with the next witness.

MR. IVERSON:  May Mr. Prim be released?

MR. DOORASAMY:  No objections.

THE COURT:  He may.

MR. IVERSON:  May we approach, Your Honor?

THE COURT:  Uh-huh.

(Beginning sidebar.)

MR. IVERSON:  I'm out of witnesses for today.

THE COURT:  Well, we'll go home.

(End sidebar.)

THE COURT:  All right.  Ladies and gentlemen, I'm going to go ahead and excuse you for the afternoon.  Don't

discuss the case with anyone or permit anyone to discuss it with you, and we will start court tomorrow morning at 9:30.

Jury's excused until 9:30.

(Jurors exiting the courtroom at 4:30 P.M.)

THE COURT: All right. Give the jurors a minute to clear out. We'll be in recess until tomorrow morning at 9:30.

(Proceedings adjourned at 4:30 P.M.)

Stacy Harlow,  RVR-M, CVR-M, CM, RCP, RBC
United States Court Reporter
Middle District of North Carolina

CERTIFICATE

I, Stacy Harlow, Realtime Verbatim Reporter-Master, Certified Verbatim Reporter-Master, Certificate of Merit, Registered Broadcast Captioner, Registered CART Provider, and Official Reporter of the United States District Court for the Middle District of North Carolina, do hereby certify that the foregoing is a true and correct transcript originally filed on CM/ECF on January 5, 2025, Docket Entry #174, incorporating redactions requested by the U.S. Attorney's Office and authorized in accordance with §330.10.10(e) and (f). Redactions appear as a black box in the transcript.

Given under my hand this 18th day of February, 2025.


_____*Stacy Harlow*___
STACY HARLOW
Official Reporter, United States
Middle District of North Carolina